```
 1          IN THE CIRCUIT COURT OF THE STATE OF OREGON

 2               FOR THE COUNTY OF WASHINGTON

 3

 4   STATE OF OREGON,               )
                                    )
 5          Plaintiff,              )   Washington County
                                    )   Circuit Court
 6          v.                      )   No. 16CR46339
                                    )
 7   BENJAMIN JAY BARBER,           )   CA A163786
                                    )
 8          Defendant.              )   Volume 2 of 5

 9

10          TRANSCRIPT OF PROCEEDINGS ON APPEAL

11               BE IT REMEMBERED that the above-entitled

12   Court and cause came on regularly for hearing before

13   the Honorable Eric Butterfield, on Wednesday, the

14   28th day of September, 2016, at the Washington County

15   Courthouse, Courtroom No. 108C, Hillsboro, Oregon.

16                    APPEARANCES

17          Marie Atwood, Deputy District Attorney,
            Appearing on behalf of the State;
18
            Cameron Taylor, Attorney at Law,
19          Appearing on behalf of Defendant Barber.

20                    ALSO PRESENT

21          Melanie Kebler, Attorney at Law.

22
               KATIE BRADFORD, CSR 90-0148
23                  Court Reporter
                    (503) 267-5112
24
     Proceedings recorded by digital audio recording;
25   transcript provided by Certified Shorthand Reporter.
```

1                          GENERAL INDEX

2                            VOLUME 2

3                                                    Page No.

4    September 28, 2016 Proceedings              23

5    Case Called; Parties Introduced            23

6    Colloquy, re:  Demurrer                     23

7    Colloquy, re:  Amicus-type Brief            24

8    Attorney Kebler's Argument                  26

9    Defendant's Argument, re:  Demurrer         27

10   State's Argument, re:  Demurrer             56

11   Defendant's Response                        86

12   Colloquy Between the Court and Counsel      93

13   Colloquy, re:  Scheduling                   96

14   Trial Date Set                             100

15   Colloquy, re:  Defendant's Release         100

16   Court's Ruling                             106

17   Matter Taken Under Advisement              110

18   Reporter's Certificate                     112

19                          *  *  *

20

21

22

23

24

25

1    (Volume 2, Wednesday, September 28, 2016, 9:02 a.m.)

2               P R O C E E D I N G S

3               (Whereupon, the following proceedings

4    were held in open court:)

5               THE COURT:  We are on the record in the

6    State of Oregon versus Benjamin Barber, Case

7    No. 16CR46339.

8               Mr. Barber is present.  He is in custody

9    with counsel, Cameron Taylor.  Marie Atwood is here

10   for the State of Oregon.

11              And so we're ready to proceed on the

12   demurrer?

13              MR. TAYLOR:  Judge, that's correct.  Our

14   understanding after leaving FRC is that today, we are

15   going to discuss and argue the demurrer motion and

16   then we're going to select a new trial date based on

17   the State's reset that was granted at the FRC and

18   with the obvious implication that my client will be

19   released from custody today.  That's his 60 days.  I

20   would --

21              THE COURT:  Oh, is that right?  I wasn't

22   aware of any of this.  So we're not trying this case

23   today?

24              MS. ATWOOD:  No, Judge.

25              THE COURT:  If we get to that point?

1           MS. ATWOOD:  Right.

2           THE COURT:  Okay.  All right.  Very

3    good.

4           MS. ATWOOD:  The only other issue I'd

5    like to bring up -- sorry for jumping in -- is that,

6    as you may have seen in court, the victim's

7    attorney -- counsel for the victim, filed, basically,

8    like, an Amicus response to the defense demurrer.

9           It -- from what we've discussed briefly

10   so far, it seems like the defendant would object to

11   victim's counsel being able to discuss or argue their

12   point of view as to the motion.

13          But the -- the more that I've thought

14   about this, from the State's perspective, considering

15   that the outcome of this motion could affect whether

16   or not the case proceeds, I -- I -- I think,

17   obviously, it qualifies as a critical stage hearing.

18          And I think that the victim's attorney

19   should be able to speak on behalf of the victim as it

20   relates to the demurrer motion.

21          THE COURT:  Okay.  Very good.

22          And I take it that's the individual

23   standing behind you?

24          MS. KEBLER:  Yes, Judge.

25          THE COURT:  Good morning.

1           MS. KEBLER:  Melanie Kebler, here for

2     the victim in this case.

3           THE COURT:  Good morning, Ms. --

4           MS. KEBLER:  Good morning.

5           THE COURT:  -- Kebler.

6           MR. TAYLOR:  Judge, may I be heard on

7     this matter?

8           THE COURT:  Sure.

9           MR. TAYLOR:  So, Judge, I became aware

10    of this, I guess, two days ago when Ms. Kebler filed

11    her memorandum.  And I've reviewed all of the case

12    law and the constitutional provisions on victims'

13    rights and things like that.

14           I don't think there's any problem

15    with Ms. Kebler filing the motion for the Court's

16    consideration in a form of, you know, some sort of

17    Amicus-type brief.  However, I don't believe

18    Ms. Kebler has any standing to argue in this matter

19    before the Court.

20           This is a legal argument in the case of

21    the State of Oregon versus Benjamin Barber and my

22    client has due process rights to be prosecuted by

23    only the State of Oregon, which is effectively what

24    is happening here.

25           As far as the constitutional provisions

1   for victims' rights go, they say that the victim has

2   the right to be heard at pretrial release and at

3   sentencing.  I don't believe that covers any of these

4   sorts of situations arguing at demurrer.

5               And as far as the fact that Ms. Kebler

6   is an attorney, obviously, she represents the victim.

7   However, there would be no situation I can imagine in

8   which the Court would have a victim arguing a motion,

9   so I don't see any reason why the victim's

10  representative should be granted any different or

11  additional opportunities to do so.

12              THE COURT:  Great.  Thank you.

13              Did you want to be heard on that,

14  Ms. Kebler?

15              MS. KEBLER:  Yes, Judge.

16              THE COURT:  I'll allow you to make

17  argument on the --

18              MS. KEBLER:  Your Honor, we --

19              THE COURT:  -- on that.

20              MS. KEBLER:  -- disagree with the State

21  [sic].  This is critical stage.  We believe that the

22  victim does have a right to participate at this point

23  in the -- in the case.  But, you know, I'll leave it

24  up to you, Judge.

25              You have my -- my memorandum and, quite

1    honestly, I think a lot of the arguments overlap with

2    the State is going to argue anyway, so whatever you'd

3    like to do, Judge.  I'm here to be heard if you want

4    me to elaborate on my memo.  If not, that's okay with

5    me, too.

6              THE COURT:  All right.  Thank you very

7    much, Ms. Kebler.

8              (Pause in proceedings, 9:05 a.m. -

9    9:06 a.m.)

10             THE COURT:  All right.  So go ahead,

11   Mr. Taylor.  Let's hear your argument on the

12   demurrer.

13             MR. TAYLOR:  Thank you, Judge.

14             And I guess I'll -- Judge, I'll start

15   with a question.  Has the Court had a chance to

16   review the demurrers or are we kind of starting from

17   scratch?

18             THE COURT:  I was assigned this case

19   after I left work yesterday.  I got here this morning

20   around 8:30 and read very quickly through everything

21   you all have filed.

22             MR. TAYLOR:  All right.  I'll just --

23             THE COURT:  I'll leave you to interpret

24   that however you will.

25             MR. TAYLOR:  All right.  So I guess I'm

1   going to start with a couple of sort of premises and

2   then I'll get into where I think the action in this

3   argument is.

4            Obviously, this is the so-called revenge

5   porn statute that was adopted earlier this year.  The

6   idea is that it criminalizes the dissemination of an

7   intimate image through an internet website.

8            And it has several additional elements

9   involving consent of the person in the intimate

10  image, the intent of the person who distributes it,

11  as well as whether a sort of harm, humiliation or

12  injury occurs.

13           So it's a statute that, yes, spent a lot

14  of time being sort of debated and worked on.  It's a

15  statute that as been mirrored in many other states.

16  I think 37, at this point, states in the last year or

17  two have adopted these sort of things.  So it is one

18  of these types of crimes that has all of a sudden

19  become a big thing in the world.

20           You know, it's part of the growing

21  sphere of internet, social media, privacy and how

22  people interact with each other and as all of those

23  things that sort of exploded into the world, it

24  creates problems, many of which are not socially

25  desirable.

1              And, clearly, revenge porn is one of
2     those.  You know, the fundamental premises is that
3     somebody is in a relationship with somebody.

4              They receive these intimate photographs
5     as part of that relationship and then after something
6     goes south or the relationship ends, the party
7     holding the photographs as a manner of taking
8     revenge, posts them to some form of internet website.

9              The big premise I want to start out
10    with, Judge, is that, obviously, this is not laudable
11    conduct.  It is not praiseworthy or something we
12    should encourage, but that isn't the question.

13             The question, when it comes to free
14    speech in particular, is, is this speech?  And if so,
15    can the government prohibit it?  And if they can, did
16    they do it the right way?

17             And the history of the First Amendment
18    and Oregon's free speech provisions are rife with
19    examples of speech that the majority -- the vast
20    majority of people would find reprehensible.  But a
21    lot of that is constitutionally protected.

22             You know, we're talking about things
23    like hate speech, obscenity, blasphemy, you know,
24    speech critical of government.  The United States has
25    gone through many permutations of -- of what the new

1    threat to society is, you know, every -- whether it's

2    communists or blasphemy or obscenity.

3              We've been through all of these and we

4    realize that the fundamental idea behind a lot of the

5    free speech provisions in this country and in this

6    State are that Americans and Oregonians are robustful

7    [sic].  We don't criminalize speech because we are

8    afraid of what it has to say.

9              We don't criminalize speech because

10   people don't want to hear it.  We criminalize speech

11   when there is a separate and distinct harm that it

12   causes.  And those are the only instances in which we

13   criminalize speech.

14             So I guess with that being said, I'm

15   going to move into sort of the State analyzes and

16   then the federal analysis.  Free speech in Oregon,

17   Oregon is widely known has having some of the

18   broadest free speech protections.

19             The case that defines it is State

20   v. Robertson.  It's an old case, about 30 years old.

21   There's been about 30 to 40 cases decided under that

22   framework, but the basic framework is this:  When a

23   challenge of free speech is -- arises, the first step

24   is you decide which category it falls into.

25             There's basically three categories and

1     I'm going to refer to my notes throughout this to

2     make sure I'm getting the language right because this

3     is a pretty language-dependent issue.

4               The first category are those statutes

5     which, on their face, are written in terms directed

6     at the substance of any opinion or any subject of

7     communication.

8               Now, this is not -- the Supreme Court

9     has never acknowledged that this is a content-based

10    category in the sense that, you know, the way

11    content-based and content-neutral are used in First

12    Amendment federal litigation, but the basic idea is

13    very similar.

14              These are statutes which are facially

15    written to be directed at some content of speech.

16    The second category, Judge, are statutes that

17    prohibit expression used to accomplish forbidden

18    results.

19              And so these are statutes that are

20    written that may or do implicate speech as far as

21    what they criminalize or prohibit, but are, in the

22    end, based at some prohibited results.

23              The third category is those statutes

24    which incidentally burden speech, but aren't facially

25    directed at speech.  I believe the parties are in

1      complete agreement that, obviously, the third

2      category is not implicated here.

3              This statute, on its face, says, "We are

4      regulating the dissemination of intimate images."  So

5      it's clearly facially directed at speech.  I think

6      that the action in this case, the big argument as far

7      as the Oregon Constitution goes, is whether this

8      falls into the first category or the second.

9              The reason that matters, if the speech

10     falls -- or if the statute falls under the first

11     category, then the statute is presumptively

12     unconstitutional unless it falls within some

13     recognized historical exception that was around at

14     the time the Oregon free speech provisions were

15     adopted.

16             And the Oregon Supreme Court has gone

17     through a handful of those over the years as things

18     like defamation and libel, forgery, verbal

19     solicitation of crime, a lot of the sort of classic

20     exempted categories that are also recognize by the

21     federal First Amendment.

22             I don't think either party believes that

23     there is any historical exemption that would cover

24     revenge porn.  And I can elaborate on that if

25     necessary, but I think it's somewhat clear.

1          Obviously, this idea of disseminating

2     photographs of another person that were consensually

3     exchanged, I mean, nothing like that was even

4     contemplated in the 1850s when the Oregon -- Oregon

5     adopted its free speech provisions.

6          I've spent a lot of time researching it.

7     I can find nothing that even approximately gets

8     towards it, so I don't there' anything in there.  So

9     I think if we are in the first category, then the

10    defense is correct and we basically win.

11         Conversely, if it's in the second

12    category, the test is whether the statute is

13    substantially overbroad.  And I'm not going to

14    directly concede, for the matter of making a record,

15    that this statute is -- isn't overbroad.

16         But I put a lot of time and research and

17    effort in thinking about it.  And I basically don't

18    have any argument that this statute is substantially

19    overbroad because I think the legislative history

20    is pretty clear that as far as overbreadth, the

21    Legislature tried to make a pretty good stab at

22    narrowing things down.

23         There are a number of savings clauses in

24    the statute where they exempt, you know, matters

25    that are of public concern, the Anthony Weiner type

1    things, that kind of stuff.

2              So I think if the Court decides that

3    this falls into the second Robertson category, I

4    think the State will win on the Oregon Constitutional

5    argument.  So that's kind of where all of the

6    action is.

7              Now, what the actual dividing line

8    between the first and second category is, is

9    relatively difficult to tell.  And the reason for

10   that is because of the 30 or 40 cases that examine

11   statutes and then toss them into either the first or

12   second Robertson category, the Court uses a lot of

13   kind of loose language.

14             And part of that comes because you got

15   opinions coming from, you know, a three panel -- or a

16   three-person panel in the Court of Appeals all the

17   way up to an (indiscernible) Supreme Court opinion.

18   And, obviously, they're going to use different

19   language as they go around.

20             Having read all of those cases and then

21   read them again looking for some sort of divining

22   principle of what divides the first category from the

23   second, I think something becomes clear.

24             Now, the State's argument as far as what

25   the divide is, is that in first category, there's no

1    harm and in the second category there is this harm,

2    this forbidden effect.

3                    But that can't be true because,

4    obviously, every statute that is also in the first

5    category has a harm, a forbidden effect, associated

6    with it.  Some of the common examples of things that

7    are in the first category are defamation, libel.

8                    Obviously, that's a speech-driven

9    statute of prohibition on libel because you can't

10   make up lies about other people.  You are prohibiting

11   the content of the speech, but there's a harm there.

12                   And the harm is, obviously, that

13   whenever the person you would be lying about is

14   injured or, you know, embarrassed or becomes

15   emotional about what you said.

16                   So there's obviously always a harm.  So

17   the question can't be, you know, is there harm or

18   not?  That's just a false dichotomy.  And if that

19   were true, then we might as well say, you know, the

20   emperor has no clothes.

21                   And what we're really doing is just

22   decided which speech we really don't like versus

23   which speech we just kind of don't like.  So what's

24   the actual division?  And, Judge, our position is

25   that division is this:  The first category are those

1    statutes where the harm is dependent on the content

2    of the speech.

3              And, conversely, the second category is

4    those where the harm is either not directly dependent

5    on the content on the speech or is what we might be

6    referred to as sort of secondary effect.

7              And I guess to sort of start

8    illustrating the distinction between those two is

9    using some examples.  Category 1 examples, there's a

10   couple I want to mention and then a couple

11   Category 2.  So one of the big cases is

12   State v. Chantinelli (phonetic), which both parties

13   cite in their briefs.

14             That statute prohibited promoting

15   unlawful sexual conduct.  And it prohibited and

16   criminalized acts only when they occur in an

17   expressive context.

18             And the Court of Appeals -- or the

19   Supreme Court said, "That statute primarily, if not

20   solely, is directed towards the expressive conduct --

21   the expressive aspect conduct that it describes."

22             So what they were trying to stamp out

23   were these live sex shows.  And, obviously, that has

24   a strong expressive component.  When somebody is

25   putting on a live sex show, they are expressing

1    themselves and that is a form of speech.

2              And the Court looked at it and said,

3    "The only way to violate this statute is if you are

4    performing this live sex show.  The content of your

5    speech is your live sex show and that's what we are

6    stamping out."

7              So it's -- the content of the speech is

8    dependent on whether this harm occurs.  And the harm

9    is, obviously -- well, I mean, not obviously, but we

10   can presume the harm is some sort of decaying the

11   moral fabric of society through a live sex show,

12   something like that, because no other harm that was

13   really made.

14             On the far side of things in Category 2,

15   you know, we're looking at what kind of statutes fall

16   there.  Some of the big examples are Menacing.  The

17   State of State v. -- the case of State v. Garcias

18   (phonetic), the Court of Appeals looked at that and

19   said, "Okay.  What is the harm and what is the speech

20   component?  Are they dependent on each other or are

21   they separate?" because, obviously, you can menace

22   somebody in many different ways.

23             You can menace them through your words.

24   You can make a verbal threat that causes someone that

25   immediate fear and harm or you can do it physically

1   with actions, something like that -- which would be a

2   more expressive, non-speech way to go about things.

3            But no matter how you -- or what conduct

4   of speech you engage in, that's not the harm they're

5   getting at.  The harm they're getting at is the

6   threat that the victim feels and it is therefore

7   separate and distinct from the content of the speech.

8            Another good example, State v. Betnar

9   (phonetic), which is Oregon's child pornography case.

10  The case was challenging the encouraging child sex

11  abuse statute.  And they said, "No.  It's free speech

12  to distribute these photographs."

13           And the Court says, "No.  This statute

14  clearly gets at stamping out separate and distinct

15  harm."  We don't care what your or whether your

16  disseminating or anything like that.  We're not

17  trying to stamp out your speech.

18           The forbidden effect we're trying to

19  stamp out is the fact that to make child pornography,

20  a child must actually be abused.  And that is a

21  separate harm that occurs before any speech occurs.

22  So the forbidden effect is not dependent on the

23  content of the speech.

24           And so then kind of turn to this case --

25  or this -- this statute.  The question is:  Is the

1       harm whatever Legislature is trying to stamp out

2       dependent on the content of speech?  And, Judge, it

3       clearly is.

4                   The statute specifically only says that

5       the dissemination of an intimate image is prohibited

6       through an internet website.  And the harm that the

7       State is apparently trying to stamp out is the

8       embarrassment, the harassment, the emotional impact

9       that speech has on the person in the photo.

10                  And, thus, the only way to achieve the

11      forbidden effect that the Legislature is trying to

12      stamp out is to prohibit this specific content of

13      speech because you can put up a picture of your ex

14      doing something embarrassing or looking ridiculous

15      or, you know, you can put up a picture of your ex,

16      you know, saying hateful, racist things.

17                  Any of those would cause embarrassment,

18      injury, harassment, the same thing this statute is

19      trying to stamp out and it wouldn't be a crime.  The

20      only thing that's going to end with you in custody is

21      if it's an intimate image.  And thus, the statute is

22      clearly focusing on content of speech.

23                  And that's pretty much the end of the

24      analysis, Judge.  It is clear that the statute falls

25      within the first Robertson category.  And that's the

1    only way it can survive constitutional scrutiny, is

2    if it falls with some historical exception, which, as

3    I had mentioned earlier, does not appear to exist.

4                I don't believe any of the parties here

5    have any argument to that effect.  I'm happy to

6    respond to it if they do, but I am unaware of such.

7    Turning to the federal analysis -- and there's a

8    point I want to be very clear on here sort of in

9    between those two.

10                The State floats this idea in their

11   brief about how, you know, the Oregon Constitution is

12   often said to be more robust, more expansive than the

13   federal Constitution.  And thus, they say, "If it

14   passes constitutional scrutiny under the Oregon

15   Constitution, it must be lawful under the First

16   Amendment."

17                That is not any basis to cut off a

18   federal analysis.  That is not at all how

19   constitutions work.  These are two wholly distinct

20   sovereigns, two wholly distinct documents and sets of

21   rights that my client has.

22                So an analysis under the First Amendment

23   is absolutely appropriate and required.  So turning

24   to the First Amendment side of things, the State --

25   and I -- I'm starting in a responsive fashion because

1    it's required for the analysis.

2              The State, in their brief, kind of blows

3    right past the first step of a constitutional First

4    Amendment analysis.  Every single First Amendment

5    case makes clear that the very first thing you do

6    when speech is raised, is determine whether it is

7    content based or content neutral.

8              And I guess to back up a minute as a

9    quick caveat, obviously the same idea that this

10   focuses on dissemination of photographs is the same

11   reason that the First Amendment applies, as does

12   Article I, Section 8.

13             And so the whole content based versus

14   content neutral, the question is -- and, again, I'm

15   going to quote here, "Content-neutral statutes are

16   those that are justified without reference to the

17   content of the speech."

18             And that's from Buss v. Barry (phonetic)

19   which I am going to discuss more in a minute and I

20   cite in my brief.  "Conversely, content-based

21   statutes are those that regulate speech due to it's

22   potential primary impact, those that focus on what is

23   being said."

24             And, again, this statute is clearly

25   content based.  And I want to talk some about a

1    couple cases which made that very clear.  One of the

2    big cases that I think is very important in this

3    case -- and I actually came across it in researching

4    a response to some of the things that Ms. Kebler

5    wrote.

6                    It's the Simon & Schuster v. The New

7    York State Crime Victims' Board.  That was the Son of

8    Sam case.  Very quickly, the Son -- if the Court's

9    not familiar, the Son of Sam laws were adopted after

10   the Son of Sam serial killer in New York sold the

11   rights to his memoir, his account of -- of his

12   crimes.

13                   And he made a bunch of money off of it.

14   And similar to the revenge porn case, that happened

15   and then all of a sudden, states across the country

16   adopted these Son of Sam laws where they said, "No,

17   no, no.  If you have been accused or convicted of a

18   crime and you are trying to sell or profit off of an

19   account of that crime, then you don't get to keep

20   that money.  We get to take it."

21                   And the took it for various reasons and

22   different schemes.  In the New York one, they said,

23   "What where going to do is take all the money for

24   five years, place it in escrow and then we're going

25   to use that to pay off the victims of your crimes,

1     their restitution," things like that.

2               So the Supreme Court looked at this

3     statute and they said, "Is it content based or

4     content neutral?"

5               And it was clearly content based

6     because, although there was this forbidden effect,

7     you might call it, or a secondary effect that the

8     State argued it was trying to get at, which was

9     recompensating victims for crimes, the statute

10    clearly, by its terms, said, "What can't you sell?

11    You can't sell an account of the crimes

12    you committed."

13              You can sell a -- a cookbook, a -- a

14    fancy novel, anything like that.  You can't sell an

15    account of the crimes you committed.  And here, the

16    statute is, for all intents and purposes, identical.

17    What can't you disseminate under our statute?

18    Intimate images.

19              What can you disseminate?  Anything else

20    you want.  So this is clearly a content-based

21    statute.  Another couple very brief similar statutes,

22    the United States v. Stevens that was the animal

23    crush video case from 2010.

24              And that was a state -- case where the

25    federal government passed a statute saying, "It is

1    unlawful to create, possess or disseminate depictions

2    of animal cruelty."

3             And what they were trying to get at was

4    this fetish called animal crush videos where a woman

5    puts on high heels and stomps a small animal to death

6    that, for some reason, people find that to be erotic

7    and desirable.

8             Similar to this case, very few people

9    would think that is desirable or a good thing.

10   Similar to this case, there are perhaps distinct

11   harms that aren't actually contemplated by the

12   statute.  In that case you've got, sure, animals are

13   abused.

14            This statute directed at speech doesn't

15   stop animals from being abused.  Similarly here --

16   and Ms. Kebler and, I believe, the State float a

17   great deal of argument about abusive relationships

18   and things like that.  But there is no requirement

19   under the statute that any relationship exists to

20   begin with and, number two, that it be abusive.

21            So are there possible harms that could

22   be effected by both of these statues?  Yes.  But

23   getting back to my point, the Supreme Court looked at

24   the animal crush video statute and said it's clearly

25   content based.  What can you not create, possess or

1   distribute?  Depictions of animal cruelty.

2              Here, again, we're talking about images.

3   This is a content-based statute, Judge.  The State,

4   when they fly past that argument, goes straight into

5   an expressive conduct analysis, the O'Brien

6   (phonetic) test.

7              The O'Brien case and cases that cite it

8   are about this federal idea of expressive conduct.

9   And what you're looking at there -- and I guess it's

10  most clearly illuminated when you just discuss what

11  O'Brien was all about.

12             O'Brien was the draft card burning case.

13  There was a statute that said, "It is unlawful" --

14  and this was during the Vietnam War.  It is unlawful

15  to destroy, mutilate or otherwise dispose of your

16  Selective Services card."

17             The reason for that statute's clear.

18  The government's running a draft.  People have to

19  have their draft cards and know what's going on.

20  Nowhere in that statute does it discuss speech.

21             We're talking solely about conduct,

22  conduct specifically of mutilating or destroying your

23  draft card.  Now, that type of conduct can have a

24  speech component.

25             Mr. O'Brien himself, took his draft

1    card, went outside a draft office and burned it in

2    front of a bunch of people.  He clearly is making a

3    political statement there through his conduct and

4    thus, he's engaged in expressive conduct.

5              But, Judge, that whole line of cases,

6    that whole line inquiry requires that a statute be

7    content neutral before you go down an expressive

8    conduct analysis.  And the statute there clearly was

9    content neutral because you're not talking about any

10   form of speech.

11             You're regulating conduct, which is, you

12   cannot destroy your draft card.  Again, here, there

13   is no such content neutrality.  The statute strikes

14   at one thing:  Dissemination of intimate images.  So

15   we are in a content-based analysis very clearly.

16             The analysis for a content-based statute

17   is this:  You first look at, does this conduct fall

18   into any of the recognized unprotected categories of

19   speech?  And, again, that's obscenity, fighting

20   words, incitements, true threats, child pornography.

21   It's a list.

22             It is a short list and I don't believe

23   either party is going to content that -- assuming

24   this is a content-based regulation on speech, that it

25   falls into any of the unprotected categories 'cause

1    it simply doesn't.

2              What we are talking about is

3    consensually exchanged, non-obscene photographs.

4    There is no threat aspect to it, which would, you

5    know, qualify as a true threat.

6              There's obviously a pretty high standard

7    of showing under a true threat analysis.  I don't

8    believe that is remotely contemplated.  So if we're

9    not in a category of unprotected speech, but we have

10   a content-based regulation, the test is

11   (indiscernible) originally drawn from the equal

12   protection.  Jurisprudence has a long history of

13   First Amendment applications.

14             The test is this:  It is -- it is

15   described in some cases as two-part test and

16   sometimes a third component is added.  But the basic

17   test is, question one:  Is the statute necessary to

18   serve a compelling government interest?

19             Number two:  Is the statute narrowly

20   tailored to achieve that interest?  Do the means

21   appropriately hit at the end?  And then third, the

22   sort of one that is or isn't used, is it the least

23   restrictive means?  Because often, narrow tailoring

24   and less restrictive means are two of the same.

25             However, narrow tailoring requires

1    analysis of both over-inclusiveness and

2    under-inclusiveness.  So least-restrictive means is a

3    sort of secondary factor to consider.  So then you're

4    at the question of, okay.  What is the compelling

5    government interest?

6              Is the statute narrowly tailored and is

7    it necessary to serve that compelling government

8    interest?  And, Judge, the State gets at this when

9    we're talking about compelling interest and what is

10   the government interest.  You an refer to it as a

11   government interest or a harm or  a forbidden effect.

12             They refer to secondary effects of

13   speech.  And I think that is a very important thing

14   for us to address in this case 'cause it is addressed

15   in the State's case Renton (phonetic) that they

16   describe.

17             It is also addressed in the Simon and

18   Schuster, the Son of Sam case I discussed, as well as

19   the Buss v. Barry case and RAV v. City of Saint Paul.

20   And I think some discussion of those cases will

21   illuminate what I'm getting at very well.

22             So I talked about the Son of Sam case.

23   That is where the language sort of begins where the

24   government's talking about compelling interest.

25             In that case, the Crime Victims' Board,

1   who had imposed this statute about taking people's

2   restitution, they had to come up with compelling

3   interest to justify this statute.

4                    And the Supreme Court makes a very clear

5   line.  And they say, the Board doesn't even try to

6   float the idea that protecting the victims of the

7   crimes, of which the story is written about, that

8   protecting them from being revictimized by having

9   these accounts of the crime spread around, is a

10  compelling interest.

11                   The Board doesn't even try and make that

12  their compelling interest.  And the reason for that

13  is that since Buss v. Barry, which I'm going to talk

14  about in a second, the Supreme Court has recognized

15  that the emotional impact of speech on the people it

16  affects is not a compelling government interest.

17                   It just simply does not qualify.  And

18  that goes back to the robust nature of the 1st

19  Amendment and the fact that we do not criminalize

20  speech just because people don't want to hear it or

21  are embarrassed by it.

22                   Now, Judge, Buss v. Barry is the second

23  case that I think is very important to this -- this

24  case.  That's an older case.  The issue there was

25  Washington, D.C. had adopted this statute that said,

1    "It shall be unlawful for any person to go within 500

2    feet of a foreign embassy or ambassador and display a

3    sign or -- or any sort of form of protest that brings

4    that foreign government or the ambassador into public

5    odium or disrepute."

6              So that, again, they looked at it and

7    they said, "What is the compelling interest?"  And

8    the Court had this to say, "We have indicated that in

9    a public debate, our own citizens must tolerate

10   insulting and even outrageous speech in order to

11   provide adequate breathing space to the freedoms

12   protected by the First Amendment.

13             "A dignity standard, like

14   outrageousness, is so inherently subjective that it

15   would be inconsistent with our long-standing refusal

16   to punish speech because the speech in question may

17   have an adverse emotional impact on the audience."

18             So, again, Judge, they're getting at the

19   idea that speech's emotional impact on the person it

20   is directed towards or who's affected by it is not a

21   compelling government interest.

22             And this idea is really wrapped up very

23   succinctly in the third case I want to talk about,

24   which is RAV v. City of Saint Paul.  And, Judge, that

25   was hate speech case, where the City of Saint Paul,

 1    had a adopted this statute.

 2              The statue says, "Whoever places on

 3    public or private property a symbol, an object, et

 4    cetera, including, but not limited to a burning

 5    cross, or Nazi swastika, which one knows or has

 6    reasonable grounds to know arouses anger, alarm or

 7    resentment in others on the basis of race, color,

 8    creed, religion or gender, commits Disorderly

 9    Conduct."

10              And that statute -- I'm going to talk

11    about the secondary effects in a minute.  But that

12    statute, we -- our position is, is highly analogous

13    to the case here.  You, again, have speech, which we

14    all agree, doesn't further a political debate.  It

15    doesn't have very much merit in public discourse.

16              Burning a cross or displaying a swastika

17    is obviously morally reprehensible.  That isn't the

18    analysis.  And it doesn't save such a statute to talk

19    about the effect that it has on the people who

20    view it.

21              And we certainly recognize the effects

22    that a lot of speech have on people can be difficult,

23    can be extremely embarrassing, emotional, all those

24    types of things.  But that isn't the legal test.

25              And the very important part -- and this

1    gets to the compelling government interest and what

2    we're talking about.  The Court talks about the

3    supposed secondary effects of speech.

4              They say this: "The City of Saint Paul

5    argues that the ordinance comes within another of the

6    specific exemptions we mentioned.  The one that

7    allows content discrimination aimed only at the

8    secondary effects of speech," which is the argument

9    that the prosecution is floating in this case, that

10   the secondary effects, the embarrassment, are

11   compelling government interest.

12             According to Saint Paul, "The ordinance

13   is intended not to impact on the right of free --

14   expression of the accused, but rather to protect

15   against the victimization of a person or persons who

16   are particularly vulnerable because of their

17   membership in a group that historically has been

18   discriminated against."

19             Even assuming that an ordinance, which

20   completely prescribes rather than merely regulates a

21   specified category of speech, can't ever be

22   considered to be directed only at the secondary

23   effect of such speech, it is clear that the St. Paul

24   ordinance is not directed to secondary effects within

25   the meaning of Renton, the case on which the State

1    relies.

2              And this is the most important part.  As

3    we have said in Buss v. Barry, "Listeners' reaction

4    to speech are not the type of secondary effects we

5    referred to in Renton.  Even motive, impact of speech

6    on its audience is not a secondary effect."

7              So, Judge, that is the problem with

8    compelling government interest here.  There are also

9    a great number of problems with narrow tailoring.

10   And I discuss these at some -- some length in my

11   brief, so I'm not going to go deeply into them.

12             But I talked some earlier in this

13   argument about the internet and the world in which we

14   are presently living.  The internet does a lot of

15   great things.  It also does a lot of bad things.  And

16   the manner in which people relate to the internet is

17   constantly evolving.

18             You know, we look at things like

19   government surveillance.  We look at discussions

20   about privacy on social media.  People who choose to

21   engage with the internet, to a certain degree, assume

22   a level of risk.

23             When we put things out into the world

24   via phones with internet capability or we put them on

25   our Facebook or websites or whatever we do, we

1    understand that it is difficult to take that back.

2              And that particularly applies,

3    unfortunately, to pornography, given that it's very

4    clearly demonstrated that society as whole has a

5    great interest in pornography.  People love it.  It

6    is the subject of, you know, the old saying, half the

7    internet is pornography.

8              People don't like to talk about it.

9    People don't like to admit it.  But it's very clearly

10   true given how much of it is out there.

11             And, in particular, when we talk about

12   things like sex tapes and pornographic pictures, you

13   know, going back to the earliest days of the

14   internet, people realized that when you're floating

15   pornography out there in the world, it gets out and

16   people look at it.

17             You go back and look, you know, at the

18   beginning with the Tommy Lee and Pamela Anderson,

19   Anthony Weiner, every year, there is people's

20   pornography that gets out there because people

21   realize when you start distributing your pornography,

22   it gets out.

23             And that is unfortunate.  And, again, I

24   have no doubt that people are the feature of that

25   feel embarrassed and humiliated, no doubt.  But it is

1   a risk people have to understand at this point.

2            And, Judge, the other big problem with

3   narrow tailoring in this case is that the statute is

4   not narrowly tailored to serve this purported

5   interest.

6            The alleged interest is clearly, you

7   know, preventing this humiliation, embarrassment,

8   that kind of thing.  But the statute only applies to

9   internet websites.

10           So somebody who is in possession of

11   these intimate images can send them in the mail.

12   They can text them, they can, you know, put up a

13   billboard on I-5.  They can put them out anyway they

14   want.  The only they can't do it is on a internet

15   website.

16           And, thus, if what we're trying to get

17   at is preventing this embarrassment and things like

18   that, the statute is not narrowly tailored to do that

19   because there are so many alternative avenues that,

20   again, do not land somebody in custody and are not a

21   crime.  It's only a crime when you use the internet.

22           So, Judge, our position is that this

23   statute, while admirable in what it is trying to

24   achieve, does not satisfy constitutional tests.

25   We're asking you to strike this statute down.

1                    I'll reserve any other remarks for my

2          rebuttal.

3                    THE COURT:  Thank you.

4                    Ms. Atwood.

5                    MS. ATWOOD:  Thank you, Judge.  So I

6          will take kind of a similar approach to the State's

7          arguments in this case, first going through the

8          step-by-step analysis of most of what we laid out in

9          our briefing.  And then I want to respond

10         specifically to some of the -- the points that

11         defense counsel has brought up today.

12                   We are in agreement that this, at least,

13         insofar as we're talking about the Oregon

14         Constitution, requires Your Honor, to perform a

15         Robertson analysis.

16                   Obviously, as you can tell from the

17         State's response and from defense counsel's

18         arguments, we highly disagree on which category

19         this -- this kind of statute would fall under --

20         under State v. Robinson -- or Robertson, sorry.

21                   And I want to start, I guess, by

22         explaining the reasons why this is clearly, without a

23         doubt, on its face, a Category 2 statute and then

24         follow that up with some distinct situations where

25         the Court has discussed Category 1 statutes.

1          So as we have identified in our brief,

2     there are some lines that the Oregon Court of Appeals

3     and the Oregon Supreme Court have drawn when

4     determining where a statute falls in the Robertson

5     framework.

6          And just at the outset, the State

7     disagrees wholeheartedly with the defense that there

8     is some sort of confusing or baffling magic that goes

9     on in the Court's mind when deciding what category to

10    place a statute in.

11         This -- the case law in question clearly

12    shows exactly where that line is drawn and it's at

13    whether or not the government is aiming the statute,

14    either on its face or implicitly, but obviously,

15    toward a distinct secondary harm.

16         There are a number of cases that stand

17    for this proposition and I want to go through a

18    couple of them for you.  I guess just to list the

19    names that the State has mentioned in it's briefing,

20    Babson (phonetic), Rangle (phonetic), Plowman

21    (phonetic), Rae (phonetic), Moyle (phonetic),

22    Garcias, Stoneman (phonetic), Betnar.

23         All of these cases stand for the

24    proposition that when a statute facially -- even if

25    it discriminates against a certain type of expression

1    based on content, if the statute, on its face,

2    prescribes a harm as the -- the true effect that

3    the -- that the government's trying to achieve or if,

4    in the case similar to the child pornography

5    statutes, if the harm is implicit in the act itself,

6    those are Category 2 cases.

7                    And to just point out just a couple of

8    analogous situations to what we're dealing with here,

9    State v. Rangle in particular, I think, is

10   instructive to the Court today.  That involves the

11   stalking statute.

12                   The Court identified the fact that

13   stalking requires, if you're going to talk about

14   communicative conduct or contacts, that a person has

15   to communicate some sort of threat to another person.

16   That, even in defense counsel's own terms, would

17   constitute a content-based restriction under the

18   stalking statute.

19                   However, what the court concluded in

20   that case was that the fact that the statute

21   prescribes, along with a person's intent to cause

22   fear in this person, a reasonableness of the fear in

23   the victim, that it was nevertheless constitutional.

24                   So in Rangle, even though a distinct

25   type of communication was being proscribed, that was

1    still a Category 2 case.  I would also point out just

2    as kind of first step in this line of reasoning that

3    Robertson itself was a Category 2 analysis of -- of

4    the Coercion statute that existed at that time.

5            And if I could point out a specific

6    quote that the Court in that case states, they made

7    it very clear that it's virtually impossible to

8    commit the crime of Coercion without using

9    expression.  "Expression based at a demand" is -- is

10   the term that they were specifically fixating on.

11           The Court even notes that, "Speech would

12   be the offender's only act in committing this crime

13   in most situations."  So the idea that the line that

14   has to be drawn is whether or not a crime can be

15   committed without the use of speech is wholly against

16   what the Court in Robertson stated regarding the

17   Coercion statute.

18           So at the outset, we disagree with how

19   defense counsel has explained the process through

20   which this sort of classification takes place.

21           In addition to Rangle and Robertson, the

22   Court in Plowman was discussing the intimidation

23   statute, which, of course, requires conduct that is

24   specifically directed at somebody's race or sexual

25   orientation or something like that.

1                   That's being content based.

2    Additionally in State v. Moyle, that statute involved

3    threats made to a person, but it delineated that the

4    forbidden effect that was stated in the statute was

5    actual and reasonable harm.

6                   So, again, it -- it's really -- there's

7    no question where the Courts are coming down on how

8    to categorize something under the Robertson analysis.

9                   The question is whether, on its face,

10   the statute proscribes a harm that's supposed to be

11   real end, the speech being the means, or whether, as

12   in the line of child pornography-related cases, the

13   harm is so implicit in the nature of the act itself.

14                  And that brings me to those -- that line

15   of cases dealing with child pornography, which, as

16   I've stated in our briefing, actually broadened the

17   scope of Category 2 under the Robertson test.

18                  So the cases I'm talking about

19   specifically are Stoneman, Betnar and later -- let's

20   see.  I think it appears in defense counsel's

21   briefing.  Demmock (phonetic).  These are all

22   Encouraging Child Sex Abuse cases or cases otherwise

23   involving the possession or distribution of child

24   pornography.

25                  When you think about the nature of those

1    statutes themselves, they are content based and

2    cannot be committed.  Those violations cannot be

3    committed without the use of expression.

4    Disseminating child pornography requires the

5    expression of something that is content based.

6            You could disseminate anything else, in

7    defense counsel's own words, and it wouldn't fall

8    under that statute.  So for all of those reasons,

9    before I even get into why this statute surpasses

10   constitutional muster in the State of Oregon, I would

11   just state that I think that the Court needs to

12   approach this case the same way that the Courts have

13   approached all of the cases leading up to this point.

14           As you can see, if you actually want to

15   look at the Unlawful Dissemination statute, it's

16   lengthy, to say the least.  It covers about two

17   columns of the statute book here.

18           And it clearly requires not only that,

19   you know, dissemination of a -- a particular type of

20   image occurs, but it requires that the person do so

21   with specific intent to harm another person, that the

22   other person actually be harmed and the harm actually

23   be reasonable.

24           So on its face, the statute is a

25   Category 2 statute.  And there's no question that

1      Category 1 does not apply in this situation.  On that

2      note, I kind of want to transition into just barely

3      discussing some of the Category 1 cases that defense

4      counsel mentions in it's briefing and it's argument,

5      particularly Chantinelli (phonetic) and Tidyman

6      (phonetic).

7                      And we've also -- also mentioned another

8      case in our briefing, Hillsboro v. Purcell.  Those

9      cases are, very clearly on their face, distinct from

10     the type of statute that we're dealing with here.

11                     In the City of Portland versus Tidyman,

12     the ordinance at issue was a city ordinance

13     prohibiting adult business from located within

14     500 feet of other adult businesses or residential or

15     school zones.

16                     There was no, on its face, secondary

17     harm mentioned in the city ordinance.  And,

18     therefore, it had to be categorized under Category 1.

19     Similarly, in State v. Chantinelli, the statute in

20     the case involved the operation of a live sex show,

21     as defense counsel pointed out.

22                     But the Court noted specifically that it

23     was facially unconstitutional because it was not

24     aimed at a particular harm and therefore had to

25     analyzed under Category 1.

1                     Similarly in Hillsboro v. Purcell, the

2          Court struck down a city ordinance that criminalized

3          door-to-door solicitations.

4                     And the court in that case specifically

5          noted that the face of that ordinance didn't prohibit

6          them based on certain time, place or manner

7          restrictions, whether it involved consent or any

8          particular intent in making these solicitations.

9                     All it did was prohibit a certain type

10         of expression and communication without delineating a

11         secondary harm.  Those cases, for obvious reasons are

12         different from the stype of statute we're dealing

13         with here.

14                    So once we've established that this

15         revenge porn statute, ORS 163.472, falls under

16         Category 2, the next step in that analysis is

17         overbreadth.  The overbreadth test is discussed

18         pretty thoroughly in a lot of the cases that we've

19         cited.

20                    But, essentially, what it requires you

21         to decide is whether or not this statute can be

22         violated without -- how -- how should I frame this --

23         how -- violated in such a way that

24         otherwise-protected expression would be implicated

25         without creating this necessary harm.

1              So there's a lot of case law dealing

2       with overbreadth, just as there is dealing with how

3       to classify statutes.

4              And a couple of the things that I want

5       to bring up to you first are the ones that Oregon

6       courts have deemed to be unconstitutional.  I want to

7       start with the -- the line of cases like State v.

8       Maynard (phonetic).

9              In that case, it was a statute

10      prohibiting furnishing of obscene materials to

11      minors, which, in some respects, I guess you could

12      find analogous to the type of thing that we're

13      dealing with in child pornography statutes.

14             However, the Court in that case,

15      determined that the -- the actual text of the statute

16      didn't sufficiently delineate what it meant to

17      furnish something to minors and -- and for what

18      particular reason the furnishment [sic] should be

19      illegal.

20             The -- the cases in line with State v.

21      Maynard include State v. Johnson and City of Salem v.

22      Laurow (phonetic).  Those cases also dealt with

23      overbreadth analysis under Category 2.

24             In Johnson, the Court was trying to

25      decide whether or not portions of the Harassment

1    statute were lawful because they prohibited a person

2    from insulting another by abusive words or gestures

3    in a manner intended or likely to provoke a violent

4    response.

5              Similarly, in City of Salem v. Laurow, a

6    municipal ordinance was at issue that prohibited a

7    person for, essentially, receiving a fee for watching

8    somebody else perform a sexual act with another

9    person.

10             And in that case, the Court, again,

11   explained that although this is a Category 2

12   analysis, what they're trying to prevent is people

13   making money from this sort of obscene behavior.  The

14   statute itself was unconstitutionally overbroad

15   because it regulated expression and couldn't be

16   narrowly construed.

17             What we're getting at here is the fact

18   that this statute, the Unlawful Dissemination of an

19   Intimate Image, as defense counsel correctly pointed

20   out, does a pretty good job of narrowing itself.

21             It not only requires intent,

22   reasonableness, actual harm, non-consent, a certain

23   type of image disseminated in a certain type of way,

24   it also gives a laundry list of exceptions for

25   situations that don't constitute Unlawful

1    Dissemination of an Intimate Image.

2              And it adequately defines each and every

3    term that it uses when -- when delineating what type

4    of behavior would constitute a violation of the

5    statute.

6              So, unlike the types of statutes that

7    we're dealing with in Maynard and Johnson, where

8    things like "insults" or "furnishing" weren't

9    adequately defined, this statute does adequately

10   define the type of behavior that it intends to be

11   prohibited.

12             And it's worth noting that in State v.

13   Maynard, that initial statute, the Furnishing Obscene

14   Materials to Minors, after that case came out, the

15   Oregon Legislature went back, got rid of that statute

16   altogether and then created two new statutes that

17   were, let's see, 167.075 and 167.080, Displaying

18   Obscene Materials to Minors and Exhibiting Obscene

19   Materials to Minors.

20             These statutes were created for the

21   purpose of adequately defining what type of behavior

22   the Legislature intended to prohibit.  It's our

23   position today that the statute, as it is, already

24   sufficiently defines the kind of behavior that it

25   intends to prohibit.

1          So the next line of cases that I'd like

2     to point out as -- as they relate to overbreadth, in

3     addition to Rangle, is Garcias.  I think that the

4     Court will find that case to be particularly

5     illuminating on this point.

6          The Menacing statute was at issue in

7     that case.  And even though that statute was attacked

8     for potential overbreadth, the Court found that

9     because it required actual harm, imminence,

10    seriousness of the actual harm and the implicit

11    hostility between the two people involved, that the

12    Menacing statute wasn't overbroad.

13         And at this point, I think it's worth

14    noting how similar that is to the line of cases

15    involving child pornography.  What the Court decided

16    in cases like Stoneman was that we're not looking,

17    necessarily, at a statute in a vacuum when we're

18    determining if it's overbroad.

19         What you have to do is look at the

20    context of the statute and the legislative history

21    that -- for all the considerations that were made

22    when the statute itself was enacted.

23         And, in this case, I think I would point

24    out that counsel for the victim has supplied a whole

25    lot of very valuable information, along with their

 1    response to defendant's demurrer.

 2              The State would adopt -- not only adopt

 3    their arguments, but also urge the Court to look at

 4    some of the material they've provided.

 5              The Oregon Legislature was exhaustive in

 6    enacting this statute, meeting with multiple groups,

 7    including the ACLU, for months on end to try to

 8    determine the best way to tailor this statute to

 9    avoid these exact kinds of challenges.

10              And by making the statute not only

11    account for certain exceptions like -- and -- and

12    I'll get to these in a minute -- but the, like,

13    Anthony Weiner-type of situations or

14    celebrity-sex-tape type of situations, those, in our

15    opinion, might fall outside the statute.

16              And the Oregon Legislature clearly took

17    these things into consideration and not only by

18    delineating exceptions and definitions within the

19    statute, itself, but by framing the statute as

20    analogous to things like the stalking statute in

21    State v. Rangle.  It insured that it was going to

22    pass constitutional muster.

23              So the next thing that I would like to

24    address is defense counsel's assertion that the State

25    is kind of resting on its laurels as far as the

1    Oregon constitutional analysis is concerned.

2              We did include a footnote in our

3    response to defendant's motion that -- I mean, time

4    and time again, Courts have said that the Oregon

5    First Amendment protections usually exceed federal

6    First Amendment protections.

7              And if Your Honor were so inclined to

8    agree with that statement, then we don't think,

9    necessarily, that there would be any grounds to find

10   that this was unconstitutional under the First

11   Amendment of the United States Constitution.

12             However, and as you can see in our

13   response, we did go through a lengthy response to

14   that portion of the arguments as well, which I will

15   move on to at this point.  So this is where things

16   get a little bit sticky because, again, we disagree

17   with the way that defense counsel is urging the Court

18   to approach the analysis from the get go.

19             The First Amendment obviously does

20   require the Court to determine whether or not a

21   certain type of expressions is content based or

22   content neutral.

23             However, the cases that the State has

24   cited clearly show that even where specific forms of

25   content are regulated, that that statute can be

1    based -- can be determined to be content neutral

2    based on the fact that it is neutrally aimed at a

3    secondary harm.

4              And the exact case that I would like to

5    point Your Honor to -- let's see here -- to

6    illustrate this proposition is -- let's see.   Okay.

7    Ward v. Rock Against Racism, 491 U.S. 781.

8              The Court emphasized in that case that

9    the consideration that should be -- like, the

10   foremost consideration with determining whether or

11   not these kinds of statutes are neutral is the

12   government's purpose in enacting them.

13             And this is a direct quote:   "A

14   regulation that serves purposes unrelated to the

15   content is deemed neutral even if it affects speakers

16   of some messages, but not others."

17             That is exactly what we're dealing with

18   here.   As with the child pornography line of cases,

19   as with anything dealing with expression based on

20   race or sexual orientation that causes secondary

21   harm, this is a scenario where a certain type of

22   content is being affected.

23             But because the harm is the focus of the

24   statute, this should be analyzed under the O'Brien

25   framework.   The O'Brien test itself is kind of a

1    less-stringent version of the strict-scrutiny

2    analysis.  So I guess I would begin with the

3    strict-scrutiny test, just to get that out of

4    the way.

5               But it is our position here today that

6    this is not a strict-scrutiny situation.  The test

7    for strict scrutiny, obviously, is whether or not

8    there's a compelling government interest and whether

9    or not the statute is narrowly tailored to achieve

10   that interest.

11              And there's a couple of points that I'd

12   like to make to that end.  First, in response to the

13   cases brought up by defense counsel, RAV and Buss v.

14   Barry, not only to -- that they brought up to support

15   the idea that this should be a strict-scrutiny

16   analysis, but to almost, like, immediately strike

17   down this statute, I would like to point out that

18   those cases are basically inapplicable for this

19   particular issue.

20              So those statutes involved effect on the

21   listener.  This statute involves effect on a targeted

22   victim.  There's nothing in the Unlawful

23   Dissemination statute that would prohibit someone

24   from furnishing or disseminating any type of

25   information or speech based on its effect on the

1    listener.

2              Those -- those statutes in those cases

3    forbid the things that they forbid because of some

4    hypothetical public nuisance or discomfort that the

5    speech would cause.  That's what was at issue in

6    those cases and that's not the type of statute that

7    we're dealing with here today.

8              What we're dealing with here today is a

9    crime that involves the targeting of a specific

10   victim, the nonconsensual dissemination of sexual

11   images of that person with the intent to harm them,

12   that it actually does harm them and that that harm is

13   reasonable.

14             It's not analogous to the -- the line of

15   cases involving a vague threat of discomfort posed to

16   the public who hears a certain message.  So just at

17   the outset, I think that those cases are inapplicable

18   in this situation.

19             However, ever so far as narrow tailoring

20   is concerned for a strict-scrutiny analysis, as I've

21   already pointed out, the statute almost exhaustively

22   defines and delineates the type of conduct that we're

23   talking about here.

24             And I think it's helpful to go through

25   some of the hypothetical situations that defense

1    counsel brings up in argument and in their briefing

2    to show that this is a narrowly-tailored situation.

3              The celebrity sex tape or Anthony Weiner

4    argument, that if you put it out there, it's your own

5    fault if it gets disseminated further.  Okay.  So to

6    begin, the celebrity sex tape and the Anthony Weiner

7    analysis kind of fails at the outset because we're

8    talking about celebrities and public figures.

9              So the portion of the Unlawful

10   Dissemination statute requiring that it's reasonable

11   that a person be truly harmed by this conduct could

12   fail in those situations.

13             Is it reasonable that a person who is

14   always in the public eye and constantly being

15   scrutinized and is used to every stone being

16   overturned about their private life, is it reasonable

17   for that person to feel harm from this type of

18   conduct?

19             Additionally, defense counsel makes some

20   interesting arguments that, more or less from the

21   State's perspective, amount to little more than

22   victim blaming for this type of situation.

23             If -- to say that if a person gives an

24   image to somebody, that they give up any right to be

25   offended for disseminating that image further is

1    completely, I guess, backward from a lot of other

2    crimes that we deal with here in -- in -- in our

3    community.

4                    For example, if you lend your car to a

5    friend for a day and they never bring it back, it's

6    not your fault for giving them permission initially.

7    They're still guilty of Unlawful Use of a Vehicle.

8                    If you tell someone to hold your purse

9    for you while you go use the restroom and that person

10   takes off with your wallet, it's not your fault for

11   letting them handle your purse.  They're still a

12   thief.

13                   If -- if a -- if a girl allows her

14   boyfriend to kiss her and he rapes her against her

15   will, it's not her fault for allowing physical

16   contact.  Again, this amounts to little more than

17   victim blaming and it completely disregards one of

18   the main and -- and vital portions of this statute,

19   which is nonconsent.

20                   So scenarios where, you know, Joe Blow

21   gets on Tinder and sends nude selfies to every other

22   girl that he finds there, complete strangers, it's

23   not reasonable for those girls not to think he didn't

24   consent to that image being put in public.

25                   We'd never be able to prove that case.

1    This statute targets a very narrow set of conduct

2    that causes a very narrow type of harm in very narrow

3    circumstances.  And I think defense counsel's

4    argument that this statute refers only to

5    disseminating images over the internet is a testament

6    to that.

7                 That's not a -- a -- an -- an argument

8    that you can make for overbreadth.  That is a

9    provision included in this statute that narrows it to

10   particular situations.

11                And it's a testament to the fact that

12   things that are disseminated -- disseminated over the

13   internet are almost impossible to take down and can

14   reach hundreds of thousands of people in the course

15   of a couple of hours.

16                So the statute adequately defines the

17   type of harm that it's trying to prevent here.  We're

18   not dealing with someone handing out, you know, 20

19   flyers of -- of an image that someone might be

20   embarrassed by.

21                The internet is a particularly difficult

22   and potentially extremely harmful weapon that another

23   person can use against a victim.  And this statute

24   adequately helps protect Oregon citizens from the

25   type of conduct that they shouldn't have to be

1    subjected to.

2              People should not have to be subjected

3    to -- to embarrassment, humiliation, job loss,

4    personal harm, emotional distress, regardless of

5    whether or not they may have, at some point,

6    consensually made an image with another person.

7              And I think that the quote listed in the

8    State's brief from State v. Moyle absolutely gets at

9    this point.  The Oregon Legislature and the Oregon

10   Court of Appeals and Supreme Court have stated that

11   this is a -- a compelling State's interest, as far as

12   the harassment statute was concerned in that case.

13             The object of the criminal law was to

14   punish abuses that cause a private harm, alarm of

15   another person, in lieu of or in addition to civil

16   remedies for the injured person.

17             Protection of individual as well as

18   societal interest and a sense of personal security

19   among the citizenry is a classic objective of law.

20   And Oregon law has been no exception.

21             Since its earliest enactments, the

22   Oregon Legislature has sought to preserve a sense of

23   personal security among the citizenry.  So, again,

24   there's no question whether or not this would be a

25   compelling State interest to preserve its citizens'

1   well being.

2              And the line of cases that defense

3   counsel points out, RAV and Buss v. Barry, are

4   completely -- I guess, miss the point.  They're off

5   base for a couple of reasons.

6              So the last thing that I would like to

7   bring up, once we're past the strict scrutiny

8   argument, which, again, the State does not think

9   applies in this case, is the State's position, which

10  is that this is an O'Brien analysis.

11             O'Brien involves a line of cases where a

12  statute or an ordinance or a civil provision

13  prohibits a certain type of expression, mostly based

14  on the particular type of -- sorry -- content in the

15  expression.

16             But, in those cases, the statutes were

17  aimed ar proscribing some secondary harm.  The cases

18  that the State mentions in our briefing and a couple

19  of others include Renton, Erie v. Pap's, Ward, Clark

20  v. Community for Creative Nonviolence.

21             These all involve that exact type of

22  secondary harm that we're trying to prevent with the

23  Unlawful Dissemination statute.  So to get into the

24  O'Brien analysis, I want to start by talking about

25  O'Brien itself.

1          Defense counsel does point out that this

2    was a draft card burning ordinance or a crime that

3    the defendant was convicted of in that case.  And

4    it's worth noting that that is content based.  He

5    didn't get in trouble for something else, he got in

6    trouble for burning his draft card.

7          It's a specific type of content involved

8    in his expression that he was convicted of.  And,

9    nevertheless, in that case, the Court found that

10   the statute was constitutional and his conviction

11   was upheld because there was a secondary aim for

12   the statute itself.

13         And the aim, even though the Court noted

14   that maybe it was kind of a proxy, the government

15   argued in the case that it was the ability -- the

16   government's ability -- to regulate the Selective

17   Service.  And that was enough of a compelling

18   interest for the statute to stand.

19         This -- the framework that they came up

20   with in State v. O'Brien is, first, whether or not

21   the regulation itself could be within the

22   government's power and it -- does it -- does it

23   further that government's interest?

24         Second, does the -- the government's

25   interest have a specific relation to the expression,

1    itself?  And, finally, does the regulation restrict

2    speech greater than is necessary to achieve that

3    goal, which is, essentially as we've stated, another

4    overbreadth analysis.

5              For the arguments I've already made,

6    I -- I would just rest on those to reiterate the fact

7    that the government clearly has an interest in

8    maintaining the well being of its citizens and that

9    that's within the government's power to do so.

10             Otherwise, we wouldn't even have

11   statutes like Harassment or Menacing or Coercion or

12   Stalking.  And defense counsel's assertion that it's

13   not important to protect your citizens' emotional

14   well being is just misplaced.

15             As far as the next step in the O'Brien

16   analysis is concerned, the question is whether or not

17   the interest is related to the expression itself.

18             And what the State was trying to point

19   out in our brief is that there's nothing -- there's

20   no -- there's a disconnect, I guess, in most of the

21   cases that follow O'Brien between the type of

22   expression that we're talking about and the type of

23   harm we're talking about.

24             The defense correctly points out the

25   fact that the -- the dissemination of intimate images

1    can occur in a number different avenues and wouldn't

2    fall under the statute, which I think kind of

3    concedes the point that we're not talking about the

4    content of the -- the dissemination itself as the

5    focus of the statute.

6              The focus of the statute is the type of

7    harm that results from conduct, from doing what

8    you're doing on the internet.  Finally, the last part

9    of the analysis, again, is the overbreadth portion of

10   the framework.

11             The -- let's see here.  As far as

12   O'Brien is concerned, there are a couple of cases I'd

13   like to point out as far as the overbreadth arguments

14   go, the first one being the Texas v. Johnson case,

15   491 U.S. 397.  This was a flag burning situation.

16             Someone was convicted for burning a

17   United States flag and he invoked his First Amendment

18   rights on appeal.  The State, in that case, agreed.

19   This is expressive conduct and it totally depends on

20   the particular content.  You're not in trouble for

21   burning something else.

22             However, the reason the court noted that

23   the statute in that case was unconstitutional was

24   because they didn't make any record -- there was no

25   assertion in the statute or in the legislative

1    history -- of some sort of harm that would've been

2    prevented by enacting the statute, itself.

3              So, again, this is analogous to the

4    Oregon framework laid out in Robertson that when

5    you're dealing with a statute that creates a

6    content-based restriction for the purpose of

7    preventing a secondary harm, you have to make the

8    harm clear.

9              And in this case, we do.  So the line of

10    cases I've already mentioned that fall under the

11    O'Brien analysis, Renton v. Playtime Theaters, City

12    of Erie v. Pap's and Ward v. Rock Against Racism, are

13    all fairly analogous to the case at hand.

14              And most of them even deal with things

15    involving public indecency or sexual or nude conduct

16    or content of speech.  In Renton, the -- the

17    ordinance in question there was, one, again,

18    prohibiting adult theaters from locating within a

19    certain distance of residential or school zones.

20              And the ordinance itself specified that

21    it has to be an adult movie theater.  Again, we're

22    talking about content, not other types of movie

23    theaters or stores at issue there.  However, the

24    Court found that the secondary effects were the main

25    issue.

1                     When the Legislature enacted the statute

2     itself it was clear they were trying to prevent the

3     harm, not necessarily the content, of the speech.

4     And it was upheld.

5                     Again, in City of Erie v. Pap's, the --

6     the statute involved there was Public Indecency,

7     which we also have here in Oregon, which was, the

8     Court conceded, aimed specifically at nude -- or nude

9     expression, but it was enacted for the purpose of

10    combatting the harmful effects that that kind of

11    nonconsensual expression can result in.

12                    Finally, in Ward v. Rock Against Racism,

13    that was a -- a regulation involving sound levels

14    during various, like, public activities, protests,

15    expressive conduct.

16                    The Court in that case has a lot of

17    pretty good analysis, particularly reaffirming that a

18    regulation of time, place and manner of protected

19    speech must narrowly tailored to serve the

20    government's interest.

21                    But it need not be the least-restrictive

22    or least-intrusive means of doing so.  Ward against

23    Rock v. Racism [sic], in fact, that seems to broaden

24    the scope of -- of the O'Brien analysis to the point

25    where you don't even have to have the least-intrusive

1      or least-restrictive means in the regulation itself.

2                     So, finally, the last case that I want

3      to discuss is Clark v. Community for Noncreative --

4      for Creative Nonviolence.  In that case, the

5      ordinance or the rule at -- at issue was one that

6      prohibited people from sleeping overnight in certain

7      public zones.

8                     A group, this, you know, Community for

9      Creative Nonviolence was basically trying to stage,

10     not a protest, but an event to highlight the plight

11     of the homeless by doing sleep-in type of things and

12     erecting tent cities and stuff like that.

13                    The Court in that case determined that,

14     yes, clearly, we're talking about a particular type

15     of conduct in a particular type of place.  However,

16     the government's interest in maintaining its cities,

17     the cleanliness of its parks and public zones is the

18     focus when we enacted this ordinance.

19                    And that's the reason why it was allowed

20     to stand.  If Your Honor were to determine that this

21     was a strict-scrutiny analysis, there's one case that

22     defense counsel cites that I'd also like to discuss.

23     It's United States v. Stevens (phonetic).

24                    And that one, the Court did find that

25     the so-called crush video statute was

 1     unconstitutional as being overbroad.  And I think

 2     that even if -- again, if -- if you're going to go

 3     down the road of a strict-scrutiny analysis, the

 4     difference between what this statute and what our

 5     statute entails completely highlights that we pass

 6     either test in this case.

 7               The government determined -- or the --

 8     the government enacted that statute, obviously, for

 9     the purpose of not further disseminating these truly

10     horrific videos and even potentially, and arguably,

11     to discourage their further creation, sort of the

12     similar analysis as we're dealing with in child

13     pornography cases.

14               However, the focus is on the statute

15     itself.  The Court in that case determined that the

16     statute was overbroad based on its language.

17               In that case, there were several terms

18     used to describe the content of the video that they

19     wanted to prevent from being disseminated or created,

20     particularly things like "cruelty" or "wounding,"

21     that the Supreme Court determined, in that case, that

22     weren't adequately defined and could cover a,

23     theoretically, endless amount of types of conduct.

24               So the statute being overbroad and not

25     providing enough exceptions for when certain things

1    were permissible, such as hunting videos, you know,

2    humane farm practices, things like that, it was too

3    broad to stand.

4              So if you're going to go down the

5    strict-scrutiny analysis, I think that contrasting

6    this case with the statute at hand is going to be

7    pretty helpful to you because, again, the -- the

8    Oregon Legislature has gone to extremely lengthy odds

9    to make sure that everything that needs to be defined

10   is defined in the statute and that the particular

11   conduct we're talking about is narrowed on so many

12   different levels, you know, from -- from --

13   everything from the -- what -- what type of content

14   we're talking about to where it's disseminated, to

15   how it's disseminated, to the lack of consent, to the

16   specific intent, to the reasonable harm.

17             This is a narrow statute that prohibits

18   a very narrow type of conduct.  And even under a

19   strict-scrutiny analysis, it would survive.  Unless

20   Your Honor has any other questions for me, I think

21   the rest of our argument is adequately laid out in

22   our response.

23             And, again, we would adopt the arguments

24   made by the victim's attorney as well as the exhibits

25   provided in their briefing.  And with that, I think

1    that's all I have.

2                    THE COURT:  All right.  Thank you.

3                    Go ahead, Mr. Taylor.

4                    MR. TAYLOR:  Judge, just a handful of

5    things I want to address, a few -- a few State points

6    and then a handful of federal points.

7                    So as I mentioned in my initial

8    argument, you know, we can go through every single

9    Robertson case and argue 'til we're blue in the face

10   about what's analogous and what's not.

11                   There's two cases I simply want to put

12   on the record to sort of cite a rebuttal to what

13   Ms. Atwood brought up.  So the first one is State ex

14   rel Sports Management v. Nachtigal, 324 Or 80.  That

15   was a statute that prohibited the nondisclosure of

16   trade secrets, right?

17                   So you can't give away trade secrets.

18   Obviously, the harm there is that businesses are

19   harmed when their secrets are given away, right?  The

20   Court found that that was clearly a Category 1

21   Robertson law because the law is, by its terms,

22   directed at a specific subject of communication,

23   excluding some speech, based on the content of the

24   message.

25                   And, therefore, it limits the substance

1    of a subject of communication.  Here, again,

2    extremely analysis [sic].  What can't you distribute?

3    Intimate images.

4              I also wanted -- the State hang -- hangs

5    their hat on a lot of the Category 2 cases, Garcias,

6    Robertson itself and then Johnson, which are all

7    Coercion, Menacing, intimidation.

8              And the important thing to point out

9    there -- and I think it's illuminated best in

10   Johnson, which is the one -- it's the prohibiting the

11   abusive speech provision of the Harassment.

12             What the Court is stamping out there and

13   approving, it's saying that the separate and distinct

14   harm is, is a threat.  It doesn't matter what you say

15   or how you say it.  It's that the person feels

16   threatened.  So there is, again, this separate and

17   distinct harm that is not dependent on the content of

18   the speech itself.

19             The other kind of second thing I want to

20   point, the State and victim's attorney put a lot of

21   weight into -- well, the Legislature spent a lot of

22   time on this.  The Legislature talked to the ACLU

23   about this.  That is all true.  That doesn't make the

24   statute constitutional.

25             It is the role of the courts, and solely

1    the courts, to examine that.  The Legislature has had

2    plenty of bad ideas over the years that they thought

3    were great ideas at the time.

4              And the Courts have routinely struck

5    them down.  So the fact that the Legislature spent a

6    bunch of time on this is not a determining factor.

7              I want to point out just a few of the

8    federal things.  First off, returning to the issue of

9    whether we are in strict scrutiny or what is called

10   intermediate scrutiny, which is the O'Brien test

11   Ms. Atwood is asking for.

12             Ms. Atwood cites several cases, Ward v.

13   Rock Against Racism, United States v. O'Brien, the

14   Clark case and the Renton case.  And the unifying

15   theme, particularly of Renton, Clark and Ward itself

16   are that those are time, place and manner

17   restrictions.

18             And I think Ward is the easiest example

19   because Ms. Atwood cited some language from Ward that

20   would seem to support her position, where the Court

21   is talking about, oh, if you incidentally burn some

22   type -- some content, but not other content, you

23   know, it's okay.

24             The question is, why is it okay?  And

25   unpacking Ward is crucial to that.  The statute at

1       issue in Ward was a noise statute, a volume statute,

2       because Rock Against Racism was this giant outdoor

3       concert and there was a problem with permitting.

4                   And so the argument was that, "We want

5       to have loud rock-and-roll bands.  We're going to

6       have all these really loud bands."  And the argument

7       was that when they were trying to make it a content

8       argument, they were saying, "Well, this impacts our

9       loud band because we are a loud rock-and-roll band.

10                  "And if we were a, you know, string

11      quartet, we wouldn't be having this permitting

12      problem."  And the Court -- the Supreme Court --

13      looked at it and said, "No.  The statute here just

14      says you can't have noise over a certain number of

15      decibels.

16                  "It doesn't matter whether you're a rock

17      band or a jazz band or whatever.  What matters is the

18      noise."  And it has always been understood that time,

19      place and manner restrictions, where the statute

20      makes no reference to the content it is suppressing,

21      are subject to the O'Brien test, which is, basically,

22      intermediate scrutiny.

23                  And the basic idea is a laundry list of

24      things.  It has to be content neutral.  It has to

25      leave open ample alternative channels of

1    communication, things like that, which is why,

2    obviously, you can have laws that say, you know, "No

3    protesting outside the courthouse between 8:00 a.m.

4    and 5:00 p.m.," right?

5              The government has interest in

6    maintaining a reasonable theory of order.  And it's

7    similar to some of the -- the abortion buffer zone

8    cases in the same sense.  Those are time, place and

9    manner when you say, "You cannot picket within 500

10   feet of an abortion clinic."

11             What is that obviously targeting?

12   Anti-abortion people.  But what is the statute

13   saying?  Nobody can picket.  You can't have a labor

14   picket outside of an abortion clinic.

15             You can't have a, you know, free the

16   whales protest outside the abortion clinic because,

17   although it may incidentally keep out the only people

18   who are trying to protest outside of an abortion

19   clinic, the statute is, itself, neutral to content.

20             And the statute here, the revenge porn

21   statute, is clearly not.  It only speaks to intimate

22   images.  So the one other big point I want to make

23   regarding specific cases, the State brought up Buss

24   v. Barry and RAV v. City of Saint Paul and floated

25   this argument that those were about, you know,

1   general public disorder.

2                And they didn't have this particular

3   victim and that this statute, comparatively, has this

4   particular victim we're trying to protect.  And,

5   Judge, that just is not what those cases say.

6                Buss v. Barry which, again, was the

7   protesting outside of embassies and things like that,

8   the whole discussion about what is the compelling

9   interest is protecting the ambassadors and the

10  officials of those countries from public odium or

11  disrepute.

12               It wasn't about the world in general

13  finding out that, you know, Nicaragua is having a

14  genocide, which is what one of the issues in that

15  case was.  It was about the Nicaraguan ambassador

16  being embarrassed and, you know, torn apart and very

17  sad that people were protesting him.

18               RAV is very similar.  The actual facts

19  of that case were that some kids had taken a cross to

20  their neighbor's yard, who were African American, and

21  they set the cross on fire.  The statute said you

22  can't do that.  There, clearly -- and -- and the

23  statute specifically references "causing alarm to the

24  person that it is directed towards."

25               So, again, there was, in that case, an

1    alleged, you know, discrete victim.  They weren't

2    talking about how just it's bad for society.  They

3    were talking, just like this is, about specific

4    people who are, for whatever reason, whether it's a

5    threat, which you can lawfully prohibit, versus

6    general embarrassment, which you can't.

7                    I will say, at this point, I am still

8    unclear as to precisely what the State has identified

9    as their compelling interest, which I think is

10   important for the Court to do this analysis because

11   at various times -- and perhaps I'm just

12   misunderstanding -- but Ms. Atwood talks about the

13   general well being of Oregonians and their privacy

14   and things like that.

15                   If that is the compelling interest they

16   claim, then the statute's clearly not narrowly

17   tailored and it is wildly underinclusive.  There are

18   all kinds of forms of privacy and well being that are

19   not encompassed by this statute.

20                   If the compelling interest is

21   prohibiting specific alleged victims of revenge porn,

22   then I think that is a more discrete compelling -- or

23   compelling government interest, but I don't think

24   that it still survives strict scrutiny based on, you

25   know, everything I already said, so I'm not going to

1    repeat it.

2              And then the last case that I want to

3    respond to is Stevens.  And Ms. Atwood said, "Well

4    the Supreme Court just looked at overbreadth."

5              The reason they just looked at

6    overbreadth is because the parties conceded that the

7    statute was content based and they conceded that they

8    weren't really arguing compelling interest.

9              So the Supreme Court went immediately

10   into the strict-scrutiny analysis and looked at

11   narrow tailoring and said, "This doesn't survive

12   narrow tailoring because it is so wildly overbroad

13   that we don't even need to have any more discussion

14   of anything else."

15             So, Judge, in the Stevens case, the

16   crush video case, which, again, I think is very

17   analogous, it was a strict-scrutiny analysis.  It was

18   a content-based regulation.  I think that's all I

19   have for you, Judge, at this time.

20             THE COURT:  All right.  Thank you both.

21             I trust that neither of you are aware --

22   are aware of any litigation regarding this Unlawful

23   Dissemination of an Intimate Image charge here in

24   Oregon that we've not --

25             MS. ATWOOD:  I -- so I've --

1              THE COURT:  -- that we haven't dealt

2       with yet.

3              MS. ATWOOD:  -- contacted Department of

4       Justice ot see if anything's been on their radar, if

5       anyone is having any similar motions or if there's

6       anything on appeal and they told me no.

7              THE COURT:  Okay.

8              MS. ATWOOD:  This is it.

9              THE COURT:  All right.  I assume you've

10      found the same thing --

11             MR. TAYLOR:  I did.

12             THE COURT:  -- to be true?  All right.

13      All right.  Thank you both.  I am not going to give

14      you an answer right away.  I'm going to do some

15      additional homework.  But we need to deal with the

16      trial setting, apparently?

17             MS. ATWOOD:  Yes.

18             THE COURT:  Does it make sense to set a

19      trial or whatever our next dates are appropriate and

20      then let me get you a decision, which will decide

21      whether or not those dates will still hold?

22             MR. TAYLOR:  Makes sense to us.

23             THE COURT:  Do we just need a trial date

24      or do we need any other dates?

25             MS. ATWOOD:  I think just --

1                    MR. TAYLOR:  Judge, this --

2                    MS. ATWOOD:  -- just the trial date.

3                    MR. TAYLOR:  -- this is a misdemeanor.

4       We've already had FRC.

5                    THE COURT:  Okay.  Very good.  And

6       what's -- I've tried to find on the computer an order

7       regarding that decision and the reason for it, but

8       I -- I could find your motion, but I couldn't find an

9       affidavit and I --

10                    MS. ATWOOD:  Right.

11                    THE COURT:  -- couldn't find a signed

12      order.  But -- but Bailey granted a motion to --

13                    MS. ATWOOD:  So it was kind of a

14      retroactive motion.  We note -- well, like, so after

15      defense counsel filed this demurrer, we also got a

16      substantial amount of discovery.  Most of that

17      information's laid out in the motion itself.

18                    But we went to FRC.  And at that point,

19      I had not filed the reset yet because I wanted to

20      float the idea to Judge Roberts of severing the

21      demurrer from the trial, since I thought, you know,

22      that whoever got the demurrer would want a

23      substantial amount of time to, you know, do some

24      research and consider it.

25                    And that was what she granted there at

1    FRC.  And -- and her order -- just her, you know, GPO

2    from that setting, she crossed off the trial and just

3    put motion today at 8:45 and told me, "Now, go file a

4    reset to sort of formalize it."

5                    THE COURT:  Okay.

6                    MS. ATWOOD:  So I think that that was

7    the granting, but I don't think it really went before

8    presiding.

9                    THE COURT:  Okay.

10                   MR. TAYLOR:  That -- if I may just add

11   to that?  That was the day that Judge Erwin was

12   presiding --

13                   MS. ATWOOD:  Yes.

14                   MR. TAYLOR:  -- because Judge

15   (indiscernible) was on vacation.  I know

16   Judge Roberts called Judge Erwin and he sort of

17   stamped --

18                   MS. ATWOOD:  He kind of gave --

19                   MR. TAYLOR:  -- off --

20                   MS. ATWOOD:  -- the marching orders.

21                   MR. TAYLOR:  -- on this plan.

22                   THE COURT:  All right.  Very good.

23                   So we will set a trial date.  When do

24   you want to do this --

25                   MS. ATWOOD:  Well --

1                    THE COURT:  -- roughly speaking?

2                    MS. ATWOOD:  -- that's a good question.

3      I need to confer, not only with victim's counsel, but

4      with my witnesses to make sure that we don't have any

5      bad dates coming up.  I know I, personally, have some

6      bad dates coming up, so if I could have a couple of

7      minutes to do that?

8                    It may be easier just to set the date

9      once the demurrer is decided 'cause that, obviously,

10     would effect whether we have a trial or not.

11                   MR. TAYLOR:  Well, we certainly need

12     to --

13                   THE COURT:  Well --

14                   MR. TAYLOR:  -- pick some kind of a next

15     date.

16                   THE COURT:  Yeah.  We need to -- we

17     need --

18                   MS. ATWOOD:  Okay.

19                   THE COURT:  -- something out there.  Why

20     don't we do this?  Why don't we --

21                   MS. ATWOOD:  I can -- I mean, I can find

22     this information out, like, right now if you want

23     me to.

24                   THE COURT:  Yeah.  Let's -- let's give

25     everybody a break and then come back at -- have an

1     appearance at 11 o'clock with the defendant and

2     everybody here and we'll put a new trial date on the

3     record.  Hopefully, you -- you all will have done

4     what you need to do to pick on and agree on a date by

5     11:00.

6                    MS. ATWOOD:  Yeah.

7                    MR. TAYLOR:  And, Judge, there was the

8     obvious also contemplation that Mr. Barber would be

9     released today.  Today is the 62nd day.  He's not

10    willing to waive.  Can we take that up when we come

11    back at 11:00?

12                   THE COURT:  I assume you're --

13                   MS. ATWOOD:  Yes.

14                   THE COURT:  -- in agreement that --

15                   MS. ATWOOD:  The only real issue --

16                   THE COURT:  -- he ought to be released?

17                   MS. ATWOOD:  Right.  The only real issue

18    there would be determining the conditions of release.

19    We have already had one release hearing in this case,

20    where Judge Upton, in her order on that hearing,

21    stated that if -- even if he were to post the bail

22    that she had raised, that a certain number of

23    conditions would apply.  So I think -- I'm assuming

24    everybody would want to be heard on those.

25                   THE COURT:  Okay.  Very good.

```
 1                         Well, let's do that at 11:00.  He will
 2      be released at some point today.  And we'll discuss a
 3      trial date and release conditions at 11 o'clock.
 4                         MR. TAYLOR:  Thank you, Judge.
 5                         THE COURT:  Thank you.
 6                         (Recess taken, 10:32 a.m. - 11:03 a.m.)
 7                         (Whispered discussion, off the record,
 8      11:03 a.m. - 11:06 a.m.)
 9                         THE COURT:  So do we have dates picked?
10                         MS. ATWOOD:  Yes, Judge.
11                         THE COURT:  Excellent.  What is our new
12      trial date going to be?
13                         MS. ATWOOD:  Well, the first thing we
14      were going to float by you is whether or not you'd
15      like to retain the case.  And if so, if this date
16      works for you --
17                         THE COURT:  Okay.
18                         MS. ATWOOD:  -- we have chosen --
19                         THE COURT:  I'm going to --
20                         MS. ATWOOD:  Yeah.
21                         THE COURT:  I'm going to -- I'll ask my
22      presiding judge whether he will -- wants me to keep
23      it or not, given the ruling that I have to make if we
24      get to a trial.  But I'm going to let him decide
25      that.
```

1           But what's the date?

2           MS. ATWOOD:  November 9th.

3           THE COURT:  November 9th.  I'll -- I'll

4    be here.

5           MS. ATWOOD:  Okay.

6           THE COURT:  So if it's assigned to me,

7    great.  If it's assigned to someone else, that is

8    fine, too.  And I will try to get you a ruling as

9    soon as possible -- it's going to be a couple days, I

10   imagine, on --

11          MS. ATWOOD:  Sure.

12          THE COURT:  -- the demurrer.  So

13   November 9th, 8:45 a.m. for Mr. Barber's trial.  And

14   Mr. Barber is going to be released today.  He'll need

15   to sign a release agreement.  And I'm wondering if

16   the release conditions are somewhere here

17   electronically to look at.  I think they are.

18          Looks like Judge Upton intended for him

19   to reside with a responsible person, obey house

20   rules, et cetera, not to leave residence, not to

21   possess or consume alcohol or illegal drugs, no

22   contact with the victim, may not own or operate

23   computer, handheld device with internet access, no

24   social media.

25          And I assume the -- is the State

1      requesting that those conditions continue?

2                     MS. ATWOOD:  Yes, Judge.

3                     THE COURT:  Okay.  Thank you.

4                     Mr. Taylor.

5                     MR. TAYLOR:  Judge, a couple things.

6      First off, there is not -- there is no responsible

7      third party.  The only person my client has in the

8      State of Oregon is his mother, who lives in a

9      different county and is going into very substantial

10     surgery in two days.

11                    So the idea of him being placed with a

12     third party is, for all intents and purposes,

13     impractical and impossible.  And I -- I think

14     requiring a third party would effectually keep him in

15     custody, which I don't think is -- is proper at this

16     point, given that his 60 days have run.

17                    What I can tell the Court is that I have

18     been to Mr. Barber's house.  He resides -- he rents a

19     room about two blocks from here, right over on the

20     other side of Lincoln.  That's where he lives, Judge.

21     You know, he -- he lives in Hillsboro.  He works in

22     Hillsboro at Intel.

23                    So I don't think a third party is

24     necessary in this case.  You'll note that my client

25     has practically zero criminal history.  He currently

1    has a Criminal Trespass II community court case in

2    Multnomah County.  That is it.

3              You know, the only other thing that pops

4    up is a arrest for Harassment in 2013, which did

5    involve this case.  Both the -- Mr. Barber and the

6    alleged victim, in -- during the course of their

7    marriage, had arrests in summer of 2013 for

8    Harassment.  Neither of them were convicted and no

9    charges were filed.

10              So I don't think this is a case where a

11    third party is appropriate under the law.  And I

12    don't particularly think it's necessary.  The other

13    thing you'll note, Judge, is there was an FTA in this

14    case and if I can sort of explain what happened

15    there.

16              When my client was initially arrested,

17    he was taken into custody --

18              THE COURT:  I'm not interested in an

19    FTA.  Thank you.

20              MR. TAYLOR:  All right.  So I guess,

21    Judge, the other thing I'd like to be heard on is the

22    conditions and, particularly, the ones regarding

23    internet and things like that.  Now, obviously, my

24    client has no opposition to a no contact with the

25    alleged victim in this case.

1                        It's my understanding that they have not

2      even seen each other in person in over a year.  And a

3      year ago, they were on relatively amicable terms.

4      The only contact they have had since then has

5      apparently been texts and e-mails and things like

6      that.

7                        My client, obviously, understands that

8      he would not be allowed to do anything like that or

9      even related to that on release.  But with the issue

10     of -- of internet and computers, Judge, my client is

11     a systems administrator.  He is a software person.

12     That is the only line of work he has had.

13                        That's what he does professionally.  So

14     I had explained to him that I was going to ask the

15     Court -- we understand where the Court would be

16     coming from with those concerns.  But I think what we

17     would ask is use of internet and things like that

18     only at work for work purposes.

19                        What I can tell the Court is, like I

20     said, his most recent employment was at Intel.  Those

21     are the types of places he works.  So you're

22     obviously not going to be allowed, at those places,

23     to, you know, get into pornography or social media or

24     things like that.

25                        He understands exactly what the lay of

1    the land is as far as what is categorically

2    inappropriate.  I am not concerned about him

3    violating his release.

4              What I think he's going to want to do is

5    go to work given he's been in custody for 62 days,

6    and he's going to want to talk to me about his case.

7    So those are the conditions we would propose.

8              THE COURT:  All right.  Thank you.

9              Ms. Atwood, did you want to be heard

10   further?

11             MS. ATWOOD:  Other than reiterating that

12   we would request all the previously ordered

13   conditions, there was one other no contact we were

14   going to ask for.  The victim in the case now has

15   another -- she's in another relationship with an

16   individual named Micah Goldstein (phonetic).

17             It's my understanding that he's also,

18   through the course of this series of events, had some

19   negative interactions with the defendant.  And she

20   frequently is with him or resides with him or they

21   are together.  We would also ask that he be subject

22   to a no-contact order as well.

23             MR. TAYLOR:  He would, obviously, have

24   no problem with that.

25             THE COURT:  Okay.  Thank you.

1                    All right.  So, Mr. Barber --

2                    Well, did you want to be heard?

3                    MS. KEBLER:  Just -- just briefly,

4     Judge.  I think -- I -- I just wanted to speak to the

5     third party.  I think one of the biggest concerns

6     with Mr. Barber being out of custody is his -- is

7     continued use of the internet, continued potential

8     postings about my client, about this case.

9                    And so that's, I think, part of the

10    reason Judge Upton was looking for a third party to

11    be monitoring him when he's not at work.  And I

12    understand that that was kind of a -- at issue

13    before, but I think that's the main motivation for

14    that type of supervision.

15                   And I just don't know any other way to

16    guarantee that -- even -- even then, it's not a

17    guarantee that he's not, you know, using the internet

18    at home for reasons he shouldn't be.  But that's the

19    main concern.

20                   She doesn't want any continued kind of

21    contact or any continued updating or posting of

22    anything while he's out of custody.

23                   THE COURT:  All right.  Thank you.

24                   And, of course, he could -- even if he

25    was with a responsible person, unless they were awake

1    24/7 and looking over his shoulder, he could do

2    things with computers or portable devices.

3              I'm -- I'm not going to require the

4    third party, but I'll try to fashion conditions to

5    assure that the victim isn't subject to any type of

6    contact or harassment from Mr. Barber.

7              So the release agreement will need to

8    include the following conditions:  I'm going to keep

9    in place the do not possess or consume alcohol or --

10   or illegal drugs condition that Judge Upton

11   originally imposed.  He's to have no contact with the

12   victim, the family of the victim or any witnesses.

13             He's also to have no contact with Micah

14   Goldstein.  He is prohibited form possessing or

15   operating any type of computer.  And that includes

16   any handheld electronic devices, telephones, anything

17   that has internet access unless it is for purposes

18   solely related to employment.

19             He is to not visit any social media

20   websites.  He is prohibited from disseminating, in

21   any manner, internet or otherwise, any photographs or

22   images of the victim in this case.

23             And I'm sorry, victim's attorney,

24   Kebler --

25             MS. KEBLER:  Yes.

1           THE COURT:  -- is that the name?

2    Ms. Kebler, does that address your concerns?

3           MS. KEBLER:  I think that that goes

4    mostly to it.  And I know that what -- I was at the

5    hearing where Judge Upton made those findings and all

6    of what she said sounded appropriate to me, so --

7           THE COURT:  Okay.

8           MS. KEBLER:  And maybe -- maybe just

9    move that he's -- he needs to reside at -- at

10   whatever the address that he's at and not move

11   without Court permission so that we -- everyone knows

12   where he's at.

13          THE COURT:  Okay.  That seems reasonable

14   as well.  Does he still have that residence available

15   to him --

16          MR. TAYLOR:  So, Judge, I -- when I was

17   over there --

18          THE COURT:  -- Mr. Taylor?

19          MR. TAYLOR:  -- about a month ago, the

20   landlord told me he was paid 'til the 30th of

21   September, which is two days from now.

22          I -- quite frankly, Mr. Barber does not

23   have any money in his accounts.  He expects to be

24   able to pick up his last couple paychecks from work,

25   pay his rent and stay there.

1           THE COURT:  Okay.

2           MR. TAYLOR:  But I don't think we can

3    guarantee that at this point.

4           THE COURT:  Okay.  What is that address?

5           DEFENDANT BARBER:  176, what is it,

6    Lincoln Street -- Lincoln Avenue?

7           MR. TAYLOR:  No, it's -- it's on --

8           MS. ATWOOD:  Jackson, isn't it?  We had

9    a conversation about this before.

10           MR. TAYLOR:  Right.  And, Judge, the

11    reason for the confusion's that Mr. Barber just moved

12    in there about a month before, so it's not like he's

13    been there forever and remembers his address.

14           THE COURT:  Okay.

15           MR. TAYLOR:  I have it written down

16    somewhere in my notes.  I will look for it.  One

17    second.

18           MS. KEBLER:  Is it 176 Southwest Jackson

19    Street?

20           MR. TAYLOR:  I believe that is accurate?

21           MS. KEBLER:  Does that sound right?

22           MR. TAYLOR:  Yes.

23           MS. KEBLER:  It's on his release.

24           MS. ATWOOD:  Yeah.

25           MR. TAYLOR:  If -- if it's any

1    different, it's because it's Southeast instead of

2    Southwest.

3              MS. KEBLER:  Oh, right.

4              MS. ATWOOD:  Right.

5              MR. TAYLOR:  That was the confusion.

6    And, Judge, I had one more question.

7              THE COURT:  Okay.  Thank you.

8              MR. TAYLOR:  Can Mr. Barber use

9    technology to communicate with me, as in, you know,

10   calling my office to schedule an appointment or

11   sending me an e-mail?

12             THE COURT:  He can use a telephone.

13   That's technology.

14             MR. TAYLOR:  Uh-huh.

15             THE COURT:  But he's not -- he's not

16   allowed to possess any type of computer or handheld

17   device that includes internet access.  So I suppose

18   if he had a flip phone, you know, that would work as

19   well.  He's close enough he can walk, so --

20             MR. TAYLOR:  Thank you, Judge.

21             THE COURT:  All right.  I'm ordering

22   that he must reside at 176 Southwest Jackson, comma,

23   Hillsboro.  And, of course, if he's unable to reside

24   at that address, he'll be required to notify the

25   Release Office of change of address.

1               That's standard on a release agreement,

2       is it not, that he's got to keep the Release Office

3       apprised of any change in address?

4               All right.  I'll try to get you a

5       written decision as soon as possible.  I suspect it

6       will be -- what day is this, Wednesday?  It will be

7       next week sometime.

8               MR. TAYLOR:  Thank you.

9               MS. ATWOOD:  Thank you.

10              MS. KEBLER:  Thank you, Judge.

11              MR. TAYLOR:  And, Judge, as I asked and

12      said we'd put on the record, if the Court would give

13      us permission to e-mail citations to any cases we

14      argued but were, perhaps, not in our briefs?

15              THE COURT:  Yeah.

16              MS. ATWOOD:  Oh, okay.

17              THE COURT:  So if there -- if there are

18      any cites that you referred to in oral argument today

19      that were not in your written filings, you can e-mail

20      those to me.  Make sure you CC the other party,

21      please, but also if you'd limit it to cases that you

22      specifically referenced during --

23              MS. ATWOOD:  Sure.

24              THE COURT:  -- your argument this

25      morning.

1              MR. TAYLOR:  Thank you, Judge.

2              THE COURT:  Thank you.

3                      * * *

4     (Court adjourned, Volume 2, 9-28-16 at 11:18 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               REPORTER'S CERTIFICATE

2                    I, Katie Bradford, Court Reporter of the

3       Circuit Court of the State of Oregon, Twentieth

4       Judicial District, certify that I transcribed in

5       stenotype from a digital audio recording the oral

6       proceedings had upon the hearing of the

7       above-entitled cause before the HONORABLE

8       ERIC BUTTERFIELD, on *September 28, 2016*;

9                    That I have subsequently caused my

10      stenotype notes, so taken, to be reduced to

11      computer-aided transcription under my direction; and

12      that the foregoing transcript, *Volume 2 of 5,*

13      *Pages 21 through 111*, both inclusive, constitutes a

14      full, true and accurate record of said proceedings

15      taken from a digital audio recording and so reported

16      by me in stenotype as aforesaid.

17                    Witness my hand and CSR Seal at

18      Portland, Oregon, this 11th day of January, 2017.

19

20

21                    _____
                       Katie Bradford, CSR 90-0148
22                     Court Reporter
                       CSR Expires:  9-30-17
23                     (503) 267-5112

24

25