1          IN THE CIRCUIT COURT OF THE STATE OF OREGON

2                 FOR THE COUNTY OF WASHINGTON

3

4    STATE OF OREGON,                    )
                                         )
5              Plaintiff,                )   Washington County
                                         )   Circuit Court
6              v.                        )   No. 16CR46339
                                         )
7    BENJAMIN JAY BARBER,                )   CA A163786
                                         )
8              Defendant.                )   *Volume 3 of 5*

9

10           _TRANSCRIPT OF PROCEEDINGS ON APPEAL_

11              BE IT REMEMBERED that the above-entitled

12   Court and cause came on regularly for hearing before

13   the Honorable Beth L. Roberts, on Wednesday, the 9th

14   day of November, 2016, at the Washington County

15   Courthouse, Courtroom No. 304C, Hillsboro, Oregon.

16                      APPEARANCES

17           Marie Atwood, Deputy District Attorney,
             Appearing on behalf of the State;
18
             Cameron Taylor, Attorney at Law,
19           Christine Helregel, Certified Law Student,
             Appearing on behalf of Defendant Barber.
20

21
                  KATIE BRADFORD, CSR 90-0148
22                     Court Reporter
                       (503) 267-5112
23
     Proceedings recorded by digital audio recording;
24   transcript provided by Certified Shorthand Reporter.

25

1                    GENERAL INDEX

2                      VOLUME 3

3                                               Page No.

4    November 9, 2016 Proceedings              116

5    Case Called; Parties Introduced           116

6    Colloquy, re:  Federal Lawsuit            117

7    Defendant Excepts to Judge Butterfield's

8        Ruling on the Demurrer                119

9    Collquy, re:  Motions in Limine           119

10   Defendant's Argument                      120

11   State's Argument                          123

12   Court's Ruling                            124

13   Colloquy, re:  Evidence                   125

14   Court's Ruling                            143

15   Court's Ruling                            151

16   Court's Ruling                            157

17   Colloquy, re:  Jury Instructions          160

18   Colloquy, re:  State's Exhibits           162

19   Court Reads Charges to Prospective Jurors 180

20   Prospective Jurors Sworn                  184

21   Voir Dire Recorded; Not Transcribed       184

22   Jury Duly Sworn and Empaneled             185

23   *AFTERNOON SESSION*                       186

24   Court's Precautionary Instructions        187

25   State's Opening Statement                 193

1                          <u>GENERAL INDEX</u>

2                            <u>VOLUME 3</u>

3                                                        <u>Page No.</u>

4    Defendant's Opening Statement                        205

5    Reporter's Certificate                               358

6                            * * *

7                        <u>WITNESS INDEX</u>

8    <u>FOR THE STATE:</u>      <u>Direct</u>   <u>Cross</u>   <u>Redirect</u>   <u>Recross</u>

9    Meagan Vance            220     258       301

10   Micah Goldstein        315     316

11   Thomas Duenas          319     332       351

12                           * * *

13

14                       <u>EXHIBIT INDEX</u>

15   <u>FOR THE STATE:</u>                      <u>*Offered*</u>   <u>*Received*</u>

16   No. 2       (text messages)            236        236

17   No. 3       (text messages)            237        237

18   No. 4       (text messages)            238        238

19   Nos. 5-6    (Facebook messages)        239        239

20   Nos. 7-8    (e-mails)                  242        242

21   No. 9       (screenshots)              251        251

22   No. 10      (list of links)           250        250

23   Nos. 11-12  (e-mails)                  254        254

24   Nos. 14-15  (CDs)                      324        324

25                           * * *

1    (Volume 3, Wednesday, November 9, 2016, 9:00 a.m.)

2                     P R O C E E D I N G S

3                     (Whereupon, the following proceedings

4    were held in open court:)

5                     THE COURT:  Thank you.  Please be

6    seated.

7                     Good morning.  We're here today for the

8    case of State of Oregon versus Benjamin J. Barber.

9    This is 16CR46339.  Mr. Barber is present.  He is out

10   of custody with his attorney, Mr. Taylor.  Ms. Atwood

11   is here on behalf of the State.

12                    And, Mr. Taylor.

13                    MR. TAYLOR:  Judge, I was just going

14   to -- as you list the attorneys, Ms. Helregel, our

15   certified law student will also be joining us as

16   co-counsel.  She's wrapping up some business in front

17   of Judge Simms.

18                    THE COURT:  Okay.  And, I'm sorry, her

19   name is?

20                    MR. TAYLOR:  Christina Helregel.  I can

21   try to spell her last name for you, H-e-l-r-e-g-e-l.

22                    THE COURT:  Helregel?

23                    MR. TAYLOR:  Helregel, yes, Judge.

24                    THE COURT:  Christina?

25                    MR. TAYLOR:  Yes, Judge.

1               THE COURT:  Okay.  Thank you.

2               All right.  And so I understand that

3       there's some preliminary motions; is that correct?

4               MS. ATWOOD:  Yes, Judge.

5               THE COURT:  All right.  And, Ms. --

6       whose are they?

7               MS. ATWOOD:  Well, I -- I kind of want

8       to bring something up before we get started with the

9       motions in limine.

10              I was notified yesterday that this

11      defendant has elected to file a lawsuit against me in

12      federal court.  He came by the office yesterday and

13      also handed me a motion that was apparently filed

14      here in circuit court requesting a number of things.

15              Let's see here.  It's a motion to

16      acquit, notice of removal to federal court to track

17      with the pending lawsuit.  It's my understanding he's

18      seeking a temporary restraining order against me and

19      has also sued the victim and her attorney.

20              And in just glancing through the

21      paperwork that I've received so far, some of what he

22      discusses in his filings -- which appear to be pro se

23      at this point -- but I know that he has filed for an

24      attorney to represent him on those matters as well.

25              Some of what he indicates has to do with

1   our case and proceeding with our case.  He states in

2   his motions that he does not feel that his attorney

3   is representing him the way that he wants to be

4   represented and that this proceeding cannot move

5   forward in any way until the resolution of his

6   pending federal action.

7                 So I just wanted to notify the Court of

8   all of those sort of related but extraneous matters.

9   I was, basically, advised just to ask you how you

10   would prefer to proceed.  The victim is here today,

11   but she has not yet been served anything in terms of

12   her role in the federal case as a defendant.

13                 She is still currently down in the

14   basement of the other building 'cause she was afraid

15   to come up here for fear that he would personally try

16   to serve her and potentially cause a violation of his

17   release conditions.  So there's kind of a lot going

18   on there.

19                 But I just wanted to bring that to our

20   attention before we proceed with any substantive

21   issues.

22                 THE COURT:  Okay.  And I don't find that

23   to be compelling in any way towards proceeding today.

24                 MS. ATWOOD:  Okay.

25                 THE COURT:  Mr. Taylor.

1              MR. TAYLOR:  We're prepared to proceed

2        today, Judge.  If Your Honor's not interested in that

3        matter, we won't discuss it any further.

4              THE COURT:  Okay.

5              MR. TAYLOR:  The one thing I did want to

6        put on the record before I forget is that in this

7        case, a demurrer that I filed, a First Amendment

8        demurrer, was heard by Judge Butterfield previously.

9        The last time we were all in court together, he took

10       the issue under advisement.

11             He subsequently issued a just order

12       denying that demurrer.  But as a matter of preserving

13       my record, I'd like to put on the record now that we

14       do take exception to Judge Butterfield's ruling on

15       that matter.  And I just want to make sure that issue

16       is properly preserved for the Appellate Courts.

17             THE COURT:  And at any point in time,

18       did you contact Judge Butterfield's office in order

19       to get the matter in front of him so that you put it

20       on the appropriate record?  'Cause you're not giving

21       Judge Butterfield an opportunity to respond.

22             MR. TAYLOR:  And, Judge, I -- I will

23       concede, I did not.  I -- I believe that

24       Judge Butterfield sort of issued his final ruling and

25       that as this case progressed, simply the way to

1    preserve it was to put on the record next time we

2    were in court on the matter.

3                    THE COURT:  Okay.  All right.  What

4    else?

5                    MS. ATWOOD:  Do you want to start or

6    should I start?

7                    MR. TAYLOR:  I don't have a whole lot of

8    issues to bring up in limine, I guess.  A couple

9    things I would want to note, I do intend to

10   cross-examine the State's complaining witness about

11   some statements she made with regard to a release

12   hearing we had in this case.

13                   So as far as putting things on the

14   record for that, we would, obviously, waive any sort

15   of mistrial arguments or things like that related to,

16   obviously, the facts coming out that my client was

17   incarcerated for a time during this.

18                   THE COURT:  Thank you.

19                   MR. TAYLOR:  So aside from that, I don't

20   have a lot.  The only other thing I want to talk

21   about is I would move to exclude -- and I guess,

22   Judge, to frame the issue, a brief sort of

23   encapsulation of what this case is all about.

24                   So the victim in this case and my client

25   were previously married.  They were married for -- in

1    2012, married for about a year, divorced.  Long,

2    nasty divorce and then that ended up in about 2015

3    and then there was communications back and forth

4    between them throughout 2015 and 2016.

5              There was some discussion -- amongst all

6    this marriage and divorce, there is this sort of

7    loose allegation of a marital rape situation.  And as

8    I understand the facts, are that while they were

9    married, the victim was consuming a number of

10   prescribed medications and mixing them with alcohol

11   to the point where she, at some points, became quite

12   intoxicated and had sex with my client, her husband

13   at the time.

14             Subsequent to them splitting up, she got

15   involved with some counseling and things like that.

16   And there was discussion there about how, obviously,

17   sex, when people are incapable of having -- of

18   consenting, can constitute rape.  And so there were

19   some allegations back and forth of this rape issue.

20             They came up in this case when Deputy

21   Duenas, who's the main arresting officer in this

22   case, was arresting my client and sort of going

23   through, you know, what are all the reasons why you

24   were bent out of shape with your ex-wife?

25             And this issue of this possible marital

1    rape came up.  I also have some documentation that's

2    in the evidence we have where they have -- my client

3    and the victim had a brief discussion where, you

4    know, the victim says, "To be clear, I don't think

5    you ever raped me or anything like that."

6                 All that goes to say, I don't believe

7    that issue is critical at all to the State's case.  I

8    don't think it is necessary for them to put on that

9    evidence.  I think that an allegation like that is

10   obviously about as inflammatory as things can get.

11                As such, I'd be moving to exclude it

12   under 403 because I think that the State will have

13   plenty of things they can say about why my client

14   would be upset with Ms. Vance and angry at her

15   without getting into this issue of rape.

16                And I think -- given Ms. Vance's

17   statements on that matter, I don't think it is a

18   factual contention that she would even make herself.

19   So I don't believe that it is an appropriate thing to

20   have.  I believe it's unduly prejudicial to my

21   client.

22                I think the probative value of it is so

23   extremely low that it is outweighed by the

24   prejudicial effect on my client.

25                THE COURT:  Okay.

1          Ms. Atwood, how is it relevant?

2          MS. ATWOOD:  So I guess I just want to

3   be clear as far as the evidence is concerned, I don't

4   intend to ask the victims any -- the victim any

5   questions about what happened during the course of

6   their marriage that may have constituted marital

7   rape.

8          However, the evidence, as it actually

9   pertains to this case is that when the defendant was

10  contacted by the officer, he was the one who said, "I

11  did this because she accused me of rape."  So I think

12  that it is highly probative of his motive.

13          It's his basic admission to the police,

14  so I don't see any way that the -- the prejudice of

15  the statement when I'm not -- no one's proving or

16  disproving a rape allegation.

17          And, frankly, that's not what really

18  matters.  What matters is that, from his perspective,

19  he had been accused and this was his retaliation.

20          THE COURT:  Okay.  And I -- it does seem

21  it's your client's statement and it goes to the

22  motive of him doing this action.  I will allow it for

23  that purpose and simply find that it is relevant and

24  that it is more probative than prejudicial.

25          I don't -- I'm hearing from the State

1    that they don't intend to bring out the facts of

2    that; and is that correct?

3              MS. ATWOOD:  That's correct.

4              THE COURT:  And so I don't think, unless

5    you bring it out, that it would be relevant.  And so

6    I won't allow that portion of it.

7              MR. TAYLOR:  So, Judge, I -- I

8    understand that.  However, I believe that if this

9    allegation does come out, I would want to

10   cross-examine upon the fact that this was just an

11   accusation and pursue that line of questioning.

12             MS. ATWOOD:  But I don't see how he can

13   cross-examine the victim about it when she's not

14   going to be the one offering that testimony.  It'll

15   be coming through Officer -- or Deputy Duenas just as

16   the statement.

17             THE COURT:  And it's the defendant's

18   statement, so you can certainly inquire of your

19   client --

20             MS. ATWOOD:  Yes.

21             THE COURT:  -- but not of the -- of the

22   complaining witness.

23             MR. TAYLOR:  I understand your ruling.

24   That's all I have for right now.

25             THE COURT:  Okay.

1                      And then, Ms. Atwood.

2                      MS. ATWOOD:   I have a number of things.

3         So I haven't -- the last time I got a chance to view

4         the defense evidence was quite some time ago.   And we

5         had kind of intended to at least have, hopefully, a

6         few minutes to go through it again 'cause it stayed

7         at his office.

8                      I wasn't provided a physical copy.   But

9         I took some notes at that time about what the

10        evidence was and I have a number of objections.   Most

11        of what the defense intends to offer, from what I can

12        tell, in their case today is hearsay, lacks

13        relevance.

14                     And I can't find any other way that it

15        would be admissible.   And -- and most of the evidence

16        that I think they might argue is relevant to bias, I

17        don't think falls under any exception that would

18        allow it.

19                     So to summarize, there is a number of

20        mostly e-mails, Facebook chats, Google chats, things

21        like that that span the length of time from November

22        2010 to the summer of 2015.   A lot of these records

23        don't have -- my -- the victim in the case is not a

24        participant in the conversation at all.

25                     So they're records of conversations

 1    between the defendant and other individuals.  So in

 2    that respect, I think for the defense to offer them,

 3    they would be hearsay 'cause it's my understanding

 4    that the defense does not intend to offer the other

 5    individuals as witnesses or have them testify to

 6    their conversations with the defendant.

 7                     And, namely, the conversations that have

 8    occurred years and years ago -- 2010, 2011 is when

 9    most of this information is from -- are far too

10    remote in time to be relevant in any way.

11                     Just to give you an idea of what we're

12    talking about, in -- in November of 2010, there was

13    an e-mail from the defendant to an individual who is

14    only identified as Vin, responding to an

15    advertisement that this Vin individual had made.  The

16    defendant responding tells Vin that he and his wife

17    want to make pornography.

18                     The victim was never a party to that

19    conversation.  And I don't believe that this could

20    even legally be offered as an adoptive statement by

21    the victim to cross-examine her on because, from my

22    understanding, the adopted statement, I guess, rule

23    applies only to statements of party opponents.

24                     She's not a party opponent to the

25    defense in this case.  But the -- most of the

1    conversations that I'm talking about are similar.

2    Conversations between the defendant and other

3    individuals, where he is soliciting -- soliciting sex

4    encounters and oftentimes including the victim in his

5    offers or requests to other individuals.

6              But she's not actually a part to these

7    conversations.  This also includes some conversations

8    between the defendant and the victim during the midst

9    of their divorce, which was in 2013, for the most

10   part.  There were, understandably so, a -- a lot of

11   fights, a lot of arguments, bickering about

12   paperwork, legal issues.

13             But none of those conversations, from

14   what I can tell, have anything to do with the

15   dissemination of intimate images by the defendant of

16   the victim.  So I don't believe that they're relevant

17   in any way to the case at hand.

18             I -- even if the defense intended to

19   offer them as proof of bias, I think that, at most,

20   what they could do is ask the victim, you know, "Did

21   you have a -- kind of a hostile, rocky divorce with

22   the defendant?  Did you guys argue about things such

23   as X, Y and Z?"

24             And unless she denies somehow having

25   similar arguments with the defendant, they -- they

1    can't use these as exhibits or offer them against

2    her.  To, I guess, wrap up arguments on those

3    issues -- let's see.

4              Oh, the other route I could foresee

5    the defense attempting to take when offering these

6    statements or exhibits as actual exhibits is the

7    prior consistent statement exception in the event

8    that the defendant testifies.

9              However, the State does not plan to

10   cross-examine the defendant or argue that he never

11   made these statements.  And my understanding of the

12   prior consistent statement exception is that the

13   state -- a statement itself has to be challenged

14   initially to offer the prior consistent statement

15   in -- in support of it.

16             And what I wrote down, specifically,

17   from Kirkpatrick is that an implied charge of

18   fabrication is not created merely where the testimony

19   of a witness is impeached by contradictory evidence.

20             So even where the defendant's testimony

21   might be contradictory to what the State has put on,

22   that does not, in and of itself, create an implied

23   charge of fabrication such that they can offer all of

24   this, you know, four, five, six-year-old

25   documentation of irrelevant conversations to support

1    his testimony.

2                    THE COURT:  Okay.  So there's two

3    separate e-mails theory -- themes.  One --

4                    MS. ATWOOD:  Yes.  The --

5                    THE COURT:  -- is the theme of --

6                    MS. ATWOOD:  -- well, that's mostly the

7    categories of the e-mails.  There are e-mails from

8    him to others involving sexual encounters, requests,

9    solicitations and e-mails between him and the victim

10   involving matters of their divorce is kind of the

11   general categories I could see in the defense.

12                   THE COURT:  Okay.

13                   Mr. Taylor?

14                   MS. ATWOOD:  (Indiscernible).

15                   MR. TAYLOR:  Judge, thank you.  And

16   before I -- obviously, relevance is a big issue of

17   what Ms. Atwood is saying, so if I can sketch out a

18   few more parts of the factual scenario for

19   Your Honor.

20                   So these guys met in, like, 2009,

21   they -- online.  They quickly get into a romantic

22   relationship.  And a substantial part of their

23   romantic relationship is that they are into their

24   very sexually adventurous lifestyle.

25                   So they are having sex in public places,

1    going to sex clubs.  They are soliciting other people

2    to have threesomes and foursomes with.  They are

3    making this -- these videos that are the subject of

4    this case.  They're making voluminous amounts of

5    photographs and things like that.

6                      They are exchanging these videos and

7    photographs with these other couples they're talking

8    to that they've met in the Internet.  And in the

9    final note, they are -- my client, on behalf of them

10   as a couple, contacts some pornographers who are

11   making porn and expresses their mutual interest in

12   creating pornography.

13                     And all of this is extremely relevant to

14   this case because, when you look at this crime,

15   there's elements to the crime that talk about -- and

16   just to make sure I get it perfectly right -- the

17   defendant knows or reasonably should have known that

18   the person does not consent to the disclosure.

19                     Again, intends to harass, humiliate or

20   injure is a big part of it and then questions about

21   whether the alleged victim is, in fact, harassed,

22   humiliated or injured by the disclosure and whether a

23   reasonable person would be so harassed, humiliated or

24   injured.

25                     So a lot of this stuff, the -- the stuff

1    from back in 2010, 2011 -- which is when these videos

2    at issue in this case are made -- goes to the fact

3    that -- because Mr. Barber's understanding of the

4    situation is critical to the elements of this crime.

5              And if they are involved -- he and

6    Ms. Vance -- involved in this very expansive, sort of

7    sexually-progressive thing where they are doing all

8    these things in view of other people, they are

9    sharing all of this stuff with other people, it is

10   certainly a question for the jury as to whether she

11   can then later claim that, one, she did have

12   expectations of privacy.

13             And, two, Ms. Atwood would have to argue

14   that despite all this stuff that had previously

15   happened with her willingness to share all these

16   things and stuff like that, that now, he must know

17   that she expects privacy in these matters.

18             So that encapsulates a lot of that.  And

19   as far as the hearsay argument, the things that I'm

20   talking about, a great deal of this, my client is

21   going to testify to.

22             And if Ms. Atwood doesn't challenge

23   that, then, yes.  I don't intend to offer these

24   things as exhibits because, for example, what I'd be

25   asking is, you know, "Mr. Barber, did you, as part of

1    the four-way relationship you all were establishing

2    with these other two folks, distribute these videos

3    in question to them over the internet?"

4                And if he says, "Yes," and Ms. Atwood

5    doesn't challenge that, then I don't need to offer

6    these e-mails as proof of that.  But were Ms. Atwood

7    to argue them and say, "That's not true," or

8    something like that, then I think I obviously have

9    the ability to enter them as evidence as proof, given

10   that she's, you know, challenging it.

11               If she isn't challenging it, then a lot

12   of it will end up just being testimony and I won't

13   end up offering actual exhibits.

14               MS. ATWOOD:  May I respond?

15               THE COURT:  Mm-hmm.

16               MR. TAYLOR:  Oh.

17               MS. ATWOOD:  I think that the issues are

18   getting a bit confused here.  First, my first point

19   is that the arguments just made by defense counsel

20   are confusing and -- and will be confusing to the

21   jury if allowed to proceed in that manner.

22               The issue in this case is not whether

23   images or videos or conversations were consensually

24   made or had.  This is nonconsensual dissemination of

25   those.  And defense counsel repeatedly uses the

1    "they" and "y'all" in terms of referring to the

2    defendant and the victim as though they are one unit.

3                   To be clear, the exhibits of the

4    conversations that he apparently intends to ask about

5    have no reference to the victim at all.  She does not

6    participate in those.

7                   So to allow a line of questioning as

8    though the defendant -- as though his statements can

9    proceed under the guise that they are adopted by her,

10   that he speaks for them as a unit, would be totally

11   improper and contradictory to the evidence that's

12   been shown to me.

13                  THE COURT:  So these e-mails from 2010

14   to 2011, the parties were together?

15                  MS. ATWOOD:  Yes.

16                  THE COURT:  They were involved in

17   consensual sexual activity and that's all well and

18   good.  That's not what we're here about.  We're here

19   about the fact that they are no longer together and

20   these images that were taken during a time in which

21   they were consent -- consenting to have these images

22   taken were then disseminated without -- allegedly,

23   without the consent of the victim.

24                  And that -- and that's what we're

25   dealing with.  So how is it relevant that she agreed

1    to do these back in 2010, 2011?

2                MR. TAYLOR:  Because back in 2000 --

3    there will be evidence and testimony, Judge, that

4    back in 2010, 2011, she did consent to their

5    disclosure.  Now, Ms. Atwood, I think her witnesses

6    will say that's not true and that becomes a question

7    of fact.

8                But that is a contention for the jury.

9    And so if the question in the element of the crime

10   is:  Did Ben Barber know or should have known that

11   she didn't consent, then the fact that she has

12   previously consented to their disclosure, we believe,

13   is clearly relevant to that issue, particularly given

14   that there appears to have been no explicit

15   discussion at any point afterwards, either during

16   their breakup or during the divorce, that there was

17   any discussion of these videos at all.

18                So there was no point where consent was

19   revoked.  Ms. Atwood is certainly free to imply, and

20   I believe she will argue to the jury, that the

21   breakup or the divorce gave this obvious -- you know,

22   he should have known consent was withdrawn.

23                But that's a question of fact for the

24   jury to decide, Judge.  And we believe that prior

25   fact -- prior evidence -- evidence that she

1    previously consented to disclosure is clearly

2    relevant to the question of what he knew about her

3    consent.

4              THE COURT:  Okay.  And these e-mails

5    are -- intend that you're going to be using them in

6    your case in chief; is that correct?

7              MR. TAYLOR:  Primarily, I -- I certainly

8    will have cross-examination of her on them.

9              MS. ATWOOD:  See, that's where I -- I

10   have a problem.  She -- unless I've missed something

11   in those exhibits, nowhere in there does she ever

12   offer any verbal consent to his dissemination of the

13   videos in question.

14              And, for the most part, she's not even a

15   party to the conversations.  She has no personal

16   knowledge and it's just not reflective in the

17   evidence what they're trying to get her to say.

18              MR. TAYLOR:  I --

19              THE COURT:  And so if that's the case

20   and -- then they wouldn't be -- they are hearsay on

21   his part and you're not going to be able to use them

22   against -- with the complaining witness.  If she

23   says, "No, I didn't do that," then you just have to

24   wait until your case and -- and use your defendant.

25              MR. TAYLOR:  For sure.  But I believe

1      I'd be able to ask her the questions as -- as allowed

2      in cross-examination, as -- "Were you aware these

3      e-mails were being sent?  Were you aware the videos

4      were being shared?"  Things like that.

5                      MS. ATWOOD:  I --

6                      THE COURT:  And --

7                      MR. TAYLOR:  -- disagree.

8                      THE COURT:  -- they are your client's

9      statements and you're offering them for the truth of

10     the assertion.  And he's not testifying, so they

11     would not come in through her.

12                     MR. TAYLOR:  Okay.

13                     THE COURT:  Anything else, Ms. Atwood?

14     And my understanding is, as far as the e-mails

15     regarding the dissolution, those also do not come in

16     unless she denies.

17                     MR. TAYLOR:  So, Judge, if I can be

18     specific about some of those e-mails, primarily, the

19     e-mails I'm asking her about are statements that she

20     has made previously.  There are a handful of ones,

21     just off the top of my head, I can explain to the

22     Court.

23                     For example, statements she made to

24     persons that she is the -- and the reason I get at

25     this is that Ms. Atwood, for a long time, has pitched

1    this as this -- as a domestic violence-style case.

2    And I'm not sure if that's what she's going to give

3    to the jury.

4              But if she is, her client's made -- or

5    the victim has made statements that she is the actual

6    abuser in the relationship.  She is emotionally

7    abusive.  She likes to play the victim.

8              Those statements would clearly be ripe

9    for cross-examination if Ms. Atwood is proceeding on

10   any form of this domestic violence theory or that my

11   client is controlling, things like that, which is all

12   the rhetoric that she has put forward in this case

13   so far.

14             The other things that I would be looking

15   to cross-examine her on are when they're getting

16   divorced, they go back and forth over e-mail a great

17   deal.  And there are talks, admittedly from both

18   parties, where they both say, you know, "I'm going to

19   get a lawyer and get you arrested for this.  I'm

20   going to get a lawyer and get you arrested for that."

21             And I think those statements are

22   certainly ripe for cross-examination when Ms. Vance

23   is -- has made a number of previous threats to have

24   my client arrested and incarcerated and things like

25   that.

1              THE COURT:  Ms. Atwood, I -- I guess I

2    don't know what these e-mails say.

3              MS. ATWOOD:  Sure.  I think that might

4    be helpful.  So -- well, it may be a good idea just

5    for you to go through the evidence.  I know that

6    would add a little time to our timeline here today,

7    but I think that it could be valuable for you to just

8    have a look for yourself at what we're talking about.

9              The e-mails in question, again, are from

10   a number of years ago.  The ones where the victim --

11   where I wrote down that she makes commentary about

12   being a -- a physical abuser are from 2013.  And as

13   you're aware, there's no self-defense argument to be

14   made in a case like this.

15             That's not an issue that's at hand.

16   It's not pertinent to the elements that are charged.

17   The victim and the defendant do make a number of

18   statements to each other, kind of back and forth,

19   saying, "I'll have you arrested.  Well, I'll have you

20   arrested.  This is extortion.  This is fraud."

21             Again, I -- I'm not planning on asking

22   the victim about any of that.  To give you an -- an

23   idea of the scope of my questioning of her regarding

24   the divorce, the plan is, "How long were you dating

25   before you got married?  How long were you married

1    before you filed for divorce?  Who filed for divorce?

2    How long until the divorce was finalized?"

3               And, "Could you give a general

4    description of the tone of the divorce?"  I think

5    that it is relevant to the jury that this was a

6    messy, drawn-out divorce for all parties involved,

7    but I don't think that anyone should be getting into

8    the weeds of the specifics of their arguments about

9    legal issues during their dissolution because it

10   confuses what issues we're here to decide today.

11              So that -- I mean, that's the scope of

12   what I intend to ask the victim regarding the

13   divorce, so I don't -- I think it would be kind of

14   outside the scope, pretty drastically, to be talking

15   about specific conversations that they had.

16              MR. TAYLOR:  Judge, the evidentiary

17   rules give us incredibly wide latitude to

18   cross-examine for bias.  And just as some examples to

19   give the Court some context, you know, e-mails from

20   Ms. Vance saying -- you know, talking about she's

21   going to get a lawyer.

22              "You have this choice or the other.

23   You're going to be sent to jail and then you will

24   have more lawsuits."  Statements like this that she

25   has made against my client are -- are clearly

1    relevant to her bias as far as not only her making

2    these complaints at first, but also the testimony

3    she's going to give today because credibility is a

4    huge issue in this case.

5                    And some of the main things that are

6    going to be for the jury to decide are the issues of

7    consent -- whether there was any discussion of it.

8    And I fully expect Ms. Vance is going to take the

9    stand and say that she didn't consent and that there

10   was some express agreement, of which there is no

11   proof.

12                   And so the fact that she has repeatedly

13   over the years threatened my client with lawyers and

14   lawsuits and jail is clearly relevant to the jury as

15   a matter of bias for examining whether she's a

16   credible witness or not.

17                   THE COURT:  Let me -- let me just -- can

18   I see the exhibits that you intend to offer or --

19                   MS. ATWOOD:  Yes.

20                   And, Cam, are you planning on offering

21   any of this medical information, police reports, that

22   sort of thing?

23                   MR. TAYLOR:  I'm going to offer a little

24   bit of it, yes.

25                   MS. ATWOOD:  Okay.  Then that's --

1  that'll be the next thing to address.

2            MR. TAYLOR:  May I approach, Judge?

3            THE COURT:  Mm-hmm.

4            MR. TAYLOR:  Judge, I'm approaching and

5  handing you Defense 106 and 103, as they are

6  currently marked.

7            (Whispered discussion, off the record,

8  9:27 a.m. - 9:28 a.m.)

9            MR. TAYLOR:  And, Judge, my apologies.

10  I'm approaching with one more, Defense 108.

11            (Whispered discussion, off the record,

12  9:28 a.m. - 9:29 a.m.)

13            THE COURT:  First of all, I don't see

14  any dates on these at all.  I don't know when these

15  were sent.  I don't see any verification of who's

16  sending them and who's not sending them.  I don't see

17  how this is an actual business record that's been

18  kept in the normal course that would lend to its

19  authenticity.

20            MR. TAYLOR:  I'll respond to that point

21  whenever you're ready, Judge.

22            (Pause in proceedings, 9:29 a.m. -

23  9:30 a.m.)

24            THE COURT:  And do you plan to call

25  Nicholas Gusberg (phonetic) -- Goonsberg (phonetic)?

1          MR. TAYLOR:  I do not, Judge.  I only

2    plan to cross-examine Ms. Vance about her statements.

3          THE COURT:  Okay.  I'm -- 108 is not

4    admissible.  Go ahead and make your rulings --

5    your -- make your record.

6          MR. TAYLOR:  Thank you, Judge.

7          THE COURT:  Mm-hmm.

8          MR. TAYLOR:  I guess I would take

9    exception to that ruling.  I would make an offer of

10   proof, if I could grab that document --

11         THE COURT:  Mm-hmm.

12         MR. TAYLOR:  -- and just read it into

13   the record.  Judge, as far as my offer of proof, we

14   are offering what's marked as Defense 108 that I

15   would like to offer now, at this point, to be in the

16   record.

17         What that is, Judge, is a Facebook

18   conversation between the alleged victim in this case,

19   Meagan Vance, and some gentleman named Nicholas

20   Goonsberg.  My client can and would authenticate

21   that document.

22         Contained within that document, that we

23   believe are relevant, are statements from Ms. Vance.

24   And I'm quoting directly:  "Honestly, I am the

25   physical abuser.  I emotionally abuse, too.  I was

1    the first one to cheat.  It's not just him.  I play

2    the victim a lot in my life."

3                I would wish to cross-examine Ms. Vance

4    on those issues --

5                THE COURT:  Okay.

6                MR. TAYLOR:  -- or those statements.

7                THE COURT:  And I'll note, again, on

8    108, there's absolutely no date on those and there's

9    no authentication.  And I'm finding that it is highly

10   prejudicial and not relevant and that it will

11   be excluded.

12               And we'll make an exhibit list for you.

13               MR. TAYLOR:  Thank you, Judge.

14               THE COURT:  Mm-hmm.  As to the text --

15   the other messages, what would you like me to know

16   about those, Mr. Taylor?

17               MR. TAYLOR:  So, Judge, I guess kind of

18   sketching out the reason I want to offer these, I

19   want to cross-examine Ms. Vance on prior threats show

20   has made against my client.

21               These demonstrate several instances --

22   and there are dates on these, Judge, August 22nd,

23   2014 as to Defense Exhibit 103.

24               THE COURT:  And where's that located,

25   Mr. Taylor?

```
 1                   MR. TAYLOR:  It's the top corner by
 2      the -- by the paper clip.
 3                   THE COURT:  Okay.  And who put that date
 4      on there?
 5                   MR. TAYLOR:  Judge, I believe my client.
 6      As far as authenticating this, what I would do is,
 7      my -- if I was going to offer them as an exhibit, I'd
 8      call my client.  He would talk about how this is a
 9      conversation he had.
10                   He had it over G Chat.  He then printed
11      that conversation and it has been in his possession
12      ever since.
13                   THE COURT:  And so he typed it from the
14      G Chat or he printed it?
15                   MR. TAYLOR:  No, Judge.  So just to be
16      clear for the record, you know, G Chat is an on-line
17      chat database where people chat back and forth over
18      text.  If you just click the button on there and say,
19      "Print conversation," it'll just print the
20      conversation you just had.
21                   THE COURT:  And so he dated that?
22                   MR. TAYLOR:  I believe when it's
23      printed, the date is assigned to it, as in -- as in
24      the computer puts the date on the top.
25                   THE COURT:  Okay.
```

1           MR. TAYLOR:  So, Judge, with regard to

2      that, that conversation -- again, Defense 103 --

3      begins with an argument.  This is in the context of

4      their divorce.  Ms. Vance says, "If you don't sign

5      divorce papers" -- and this is the conversation

6      regarding money that they were arguing about.

7           My client responds, "Oh, the blackmail

8      again?"  Ms. Vance then responds, "Unlike you, I

9      don't commit fraud on my wife and try to steal all

10     her money."

11          She continues, "Anyways, if you aren't

12     signing the papers and showing you want to help me

13     out, I will be giving any statement necessary that is

14     truthful, as well as getting a lawyer and going after

15     you for fraud."

16          I believe those are the relevant parts

17     of that conversation.  And then they sort of get into

18     a back-and-forth spat.  So, Judge, the reason I want

19     to offer that is that a significant part of our

20     theory in this case is that Ms. Vance doesn't

21     actually have a problem with these videos being

22     out there.

23          The reason we believe that is important

24     is because in July of 2015, somebody tried to hack

25     into my client's FTP cloud server where these videos

1    had just been sitting for a very long time.

2              My client -- and we have evidence fort

3    his as well -- discussed that issue with Ms. Vance

4    and said, "Hey, did you hear about someone trying to

5    hack in and get our pornography?"  And she relies by

6    saying, "Yeah, I heard something about that."  She

7    doesn't seem alarmed in the least.

8              And so a significant part of our theory

9    of the case is that she's only bent out of shape here

10   when my client, the guy she wants to get rid of and

11   get out of her life, does it.  And when other people

12   seem to be attempting or sharing this pornography,

13   she does not actually care.

14             So, again, Judge, bias in this kind of

15   case is so incredibly relevant to the jury

16   understanding what witnesses are credible and what

17   are not and what their motives to fabricate their

18   testimony will be because in the end, this is a he

19   said/she said case.

20             So the fact that, on multiple prior

21   occasions, Ms. Vance has made other threats to my

22   client to get him to give her money or agree to her

23   wishes and she has threatened him with lawyers and

24   lawsuits and jail, we believe that is incredibly

25   relevant to assessing her credibility about what she

1    has to say about the issues in this case.

2                    And just to wrap up, Defense 106,

3    another one of these G Chat conversations, this one

4    dated May 16th of 2015, Ms. Vance makes statements,

5    "Benjamin, this is what's going to happen.  I'm

6    calling the landlord tomorrow and this lawyer.

7                    "They may have already been planning to

8    split the funds, but either way, you're going to

9    split it with me and be in a lot more debt and have

10   your paycheck subsidized for a very, very long time

11   to pay your debts back to me and possibly be sent to

12   jail.

13                   "And -- well, then you have -- then --

14   well, then you will have more lawsuits.  And fraud is

15   a serious, serious crime.  I can go after you for

16   committing fraud on the gas bill as well.  I have

17   ample proof.  You have until tomorrow morning when I

18   message you to think about it.

19                   "I've already chosen a lawyer, and I

20   offered you this cheaper chance to save us both.  I

21   100 percent will call the lawyer if you still do not

22   agree to this and will be taking you to court on two

23   counts of Fraud and at least one count of Harassment

24   from the Craigslist post.

25                   "Good night.  I hope you make a wise

1    decision before tomorrow."

2            THE COURT:  And, at this time, you're

3    simply reading her statements; is that correct?

4            MR. TAYLOR:  Correct.  So, Judge, those

5    types of statements, again, we believe would be so

6    incredibly relevant to this case, her allegations

7    against my client and the reasons why we believe she

8    has motives to fabricate in this case.

9            THE COURT:  Ms. Atwood?

10            MS. ATWOOD:  Could I look at this one?

11            (Pause in proceedings, 9:36 a.m. -

12    9:37 a.m.)

13            THE COURT:  So at this time, I'm

14    inclined to allow you to inquire into that,

15    Mr. Taylor.  I'm not going to allow you to offer the

16    exhibit unless your -- unless Ms. Vance can identify

17    it.  It is not her document.

18            And, therefore, if you wish to have it

19    entered in your case in chief, you can have your

20    client identify it.

21            MR. TAYLOR:  Thank you, Judge.

22            MS. ATWOOD:  Is -- is that in reference

23    to both of the exhibits he just talked about?

24            THE COURT:  Yes.

25            MS. ATWOOD:  Okay.  Can I see the other

1    one real quick?  Just --

2                    THE COURT:  It's 103 and 106, correct?

3                    MR. TAYLOR:  Correct.

4                    MS. ATWOOD:  Okay.  So, Judge, in

5    reviewing the stack of documents that have been

6    provided by Mr. Taylor, there's a few other things

7    that I wanted to address.  We've already talked about

8    the conversations between defendant and others.

9                    There are a stack of what looks like

10   medical records and -- and what appears to be an

11   advertisement for the Multnomah County Crisis Line.

12   These appear to be records of the defendant's when he

13   was having suicidal ideations in 2013 and 2016.

14                   I'm not entirely sure what the relevance

15   of this is to today's case.  It's not my

16   understanding that they've made any kind of mental

17   defect defense.

18                   And without having an expert witness to

19   testify about in what way this could potentially be

20   related to the allegations that are at issue, I don't

21   believe that the defendant, if he wants to testify

22   about this, would have sufficient knowledge to get

23   into medical details.

24                   And as for the advertisement, I don't

25   think that there's any real way that this needs to

1    some in.

2              THE COURT:  Mr. Taylor.

3              MR. TAYLOR:  So, Judge, again, one of

4    the elements of this crime is intent, right?  What

5    was the defendant's intent when he posted these

6    videos?  And we are basically conceding that at least

7    some of these videos were posted by my client.

8              As for what was his intent, the -- what

9    is going to be presented in the evidence and

10   testimony is that my client put these videos online

11   because he was about to kill himself.

12             And part of what he did before wanting

13   to kill himself was to spread a lot of things he had

14   created onto the internet as sort of a internet

15   memorial to himself.  So he gets on Facebook.  He

16   posts all of his personal photos.

17             He gets onto this website called GitHub

18   and he posts a substantial amount of -- of coding and

19   things like that that he had written in his

20   professional capacity.  And then, finally, he, as

21   he's going through all this stuff, finds these

22   pornography videos.

23             He looks back on them, realizes those

24   are the last time that he was truly really happy in

25   life.  And what he does is put them out into this

1   sort of sea of amateur pornography that's floating

2   around on the internet.

3            So that is what his intent was when he

4   put these videos up.  So that -- what -- what I'm

5   getting at there is his intent was to kill himself

6   and leave a mark on this world, not to harass,

7   humiliate or injure Ms. Vance.

8            So as far as his records that he was

9   being hospitalized for suicidal ideation and he was

10  carrying around these resources for crisis centers,

11  these are documents I wish to enter to prove up those

12  claims.

13           THE COURT:  And where is the foundation

14  for these?

15           MR. TAYLOR:  Well, my client --

16           THE COURT:  Are you calling a doctor?

17  Then it's hearsay.  It's not coming in.  It's not

18  coming in.  Unless the person that made the records

19  is here to bring them in, they're not coming in.

20           MR. TAYLOR:  I understand, Judge.

21           THE COURT:  Okay.  Anything else?

22           MS. ATWOOD:  Yes.  So there's also some

23  legal paperwork regarding restraining orders that

24  were filed during, looks like, 2013 in Multnomah

25  County.  This is kind of in the midst of their split

1   up.  They had -- both of them had independent arrests

2   for Harassment.  There were a number of issues of

3   that nature.

4          I don't see how the restraining order

5   is -- has any bearing on what the issues are in

6   today's case, especially considering it was from

7   three years ago and they both mutually filed them

8   against each other.

9          There's not, again, a -- a self-defense

10  claim to be made in this situation, so I don't

11  believe that there's any relevance to this.

12          MR. TAYLOR:  Judge, I brought those

13  along with me primarily to see what Ms. Atwood was

14  going to do with Ms. Vance on direct.  I don't have a

15  theory under which I admit those straight out the

16  gate.  The only reason I brought them was if I was

17  needing to confront Ms. Vance to contradict any

18  statement she made.

19          So at this point, I'm not intending to

20  offer those two exhibits.  If anything changes about

21  that, I'll bring it up.

22          THE COURT:  Okay.  Thank you.

23          MS. ATWOOD:  One last thing:  Defense

24  counsel brought today a copy of the victim's, like,

25  impact statement that she forwarded to, I believe it

1   was, Judge Upton over at the Law Enforcement Center

2   during the defendant's motion for release from

3   custody while this case was pending.

4            I don't -- I guess my first question

5   would be to you.  What would be the purpose of

6   offering this statement?

7            MR. TAYLOR:  So, Judge, this is a

8   statement, as Ms. Atwood said, that the victim

9   forwarded to the Court and her lawyer, basically -- I

10  can't remember if it was Ms. Atwood who stood up and

11  read it on her behalf or -- or her attorney.

12           But this statement, in our opinion,

13  contains blatant falsehoods relating to Mr. Barber

14  and this case.  And so if she's making statements to

15  the Court that are false, I intend to confront her

16  and have a discussion with her about those.

17           THE COURT:  And so -- I apologize,

18  Mr. Taylor.  So your intention would be to somehow

19  have a line of inquiry about her prior court

20  appearance in this case?

21           MR. TAYLOR:  She didn't actually appear.

22  She wrote this statement and had somebody read it to

23  the judge, so, yes.  I would be having a line of

24  inquiry about statements she's made in this case

25  regarding my client.

1              THE COURT:  And what -- what does this

2    statement say?

3              MR. TAYLOR:  Should I just read it to

4    you, Judge?

5              THE COURT:  Yes.

6              MR. TAYLOR:  Statement of Meagan Vance.

7    "I have several concerns about my safety of Benjamin

8    Barber is released.  Benjamin has a history of

9    harassing and threatening my safety, which has

10   continued since this case has begun.

11             "Benjamin was strongly emotionally

12   abusive to me in our relationship from 2010 to 2013,

13   involving harassment and even physical abuse if I did

14   not do what he wanted.  When I left him in 2013, he

15   began a downward spiral into believing that feminism

16   brainwashed me.

17             "He threatened to follow me across the

18   country and was arrested for trespassing at feminist

19   conferences.  Benjamin promised to try to damage my

20   life as much as possible since I left him in late

21   2013.  And his actions since show that he continues

22   to try to cause me alarm.

23             "For example, he has purchased the

24   domain names of my full name, and since this case

25   started, he has e-mailed to my work e-mail links to

1    the intimate images he posted of me.

2              "Additionally, I strongly believe that

3    he has mental illness, causing him to believe that I

4    am responsible for his struggles in life since I

5    left.

6              "For example, when Benjamin found out

7    that I had made a report to police, he sent me

8    repeated e-mails and called my boyfriend asking if I

9    was still going to attack him by going through with

10   the case.

11             "Benjamin has a history of finding my

12   address and other personal information through the

13   internet.  I am concerned that he has -- I am

14   concerned that as he continues to believe that I am

15   hurting him because I reported this crime, his

16   actions will continue to spiral downward into showing

17   up at my home or work."

18             THE COURT:  Okay.  And how is that

19   relevant to the State's case in chief in -- in your

20   defense, sir?

21             MR. TAYLOR:  Judge, because our opinion

22   is that this contains, again, blatant falsehoods.

23   For example, she makes a claim that Mr. Barber sent

24   links to these videos to her work.

25             That just didn't happen.  What he sent

1    -- and I -- I have another exhibit to that effect --

2    is proof that he had disabled these videos, proof

3    that he had removed them from the internet.

4            So if she's making a statement which --

5    regarding a judge's release decision of my client and

6    that statement is false, I believe that is certainly

7    a ripe ground, again, for cross-examination for bias

8    and overall truthfulness.

9            THE COURT:  Ms. Atwood?

10           MS. ATWOOD:  Your Honor, I guess I still

11   don't really think that it goes to the elements that

12   are at issue in the case.  And I also feel that

13   it's -- generally would be inappropriate to offer

14   against the victim a statement that she's entitled to

15   make as a -- as a crime victim.

16           She has a right to have input at a

17   release hearing.  She was not under oath at that

18   time.  So it -- it wouldn't really qualify as a prior

19   inconsistent statement.  She didn't even appear to

20   read it on her own behalf.

21           And there's a whole lot of collateral

22   information in there that's not particularly

23   relevant.  So, I mean, I -- I -- I just don't -- I

24   don't see why it should come in.

25           THE COURT:  Okay.  And I -- I'm not

1    going to allow that coming in.  That was made for

2    purposes of a release hearing during the pendency of

3    the crime.  It doesn't have anything to do with the

4    evidence that caused the crime to be charged.

5              And you're going to get the other stuff

6    in, so I'm not going to allow the victim's impact

7    statement to be presented to the jury.

8              MR. TAYLOR:  Judge, may I offer that for

9    the record and --

10             THE COURT:  Yes.

11             MR. TAYLOR:  -- take exception to --

12             THE COURT:  Mm-hmm.

13             MR. TAYLOR:  I did -- I've already

14   covered my offer of proof, as I just read it into the

15   record.

16             THE COURT:  Anything else, Ms. Atwood?

17             MS. ATWOOD:  I don't know.

18             Did you want to look through what I'm

19   intending to use today?

20             MR. TAYLOR:  Yes, I didn't get a

21   chance --

22             MS. ATWOOD:  (Indiscernible).

23             MR. TAYLOR:  -- to do that.

24             MS. ATWOOD:  So, yeah.  If we could have

25   a moment to look through the exhibits that the State

1    intends to offer in case he has any additional --

2              THE COURT:  All right.  And then --

3              MS. ATWOOD:  -- issues to raise.

4              THE COURT:  -- I also -- noting from the

5    misdemeanor complaint that this is nine separate

6    acts, I'm assuming that you're going to be electing

7    on each of these?

8              MS. ATWOOD:  I -- I've never received a

9    motion to make more specific.  I can do that if it

10   would make it more clear for the jury instructions

11   and things like that.  That's fine.

12             THE COURT:  Well, I'm just wondering how

13   you're going -- I mean, you've got nine separate --

14             MS. ATWOOD:  What the theory is --

15             THE COURT:  -- acts here.

16             MS. ATWOOD:  -- for the different

17   counts?  It's basically one count per website.

18             THE COURT:  Okay.  So your -- your jury

19   has to --

20             MS. ATWOOD:  Yes.

21             THE COURT:  -- six on each particular

22   theory.

23             MS. ATWOOD:  Yes.

24             THE COURT:  So the way this is laid out,

25   there's no way to know which theory you're presenting

1    to them.  So I'm assuming that you would be

2    requesting some sort of Boots instruction.

3              MR. TAYLOR:  Yes, Judge.

4              THE COURT:  So we need to get that taken

5    care of.

6              MS. ATWOOD:  We can do that.

7              THE COURT:  I intend to simply, when

8    they come in, tell them that Counts 1 through 9 of

9    Unlawful Dissemination and then just read the one,

10   you know, Count 1.  I'm not going to read nine

11   separate counts.

12             MR. TAYLOR:  And, Judge, I -- I think we

13   didn't let the Court know about this, but we have

14   come to a stipulation where the jury's not going to

15   need to view these videos, so --

16             MS. ATWOOD:  Well, I -- I've had some

17   time to think about that and I think that it would be

18   prudent of me, on behalf of the State, to not -- not

19   necessarily play the videos in evidence during the

20   course of the trial.

21             But I do intend to offer all of the

22   copied screenshots and the videos, themselves, that

23   were obtained by law enforcement.  I think that there

24   are -- way too many of the elements of the crimes can

25   be made more or less likely by viewing the videos,

1    including whether or not someone might reasonably

2    find that they would be harmed by these things being

3    posted.

4                    So I do intend to offer the disks

5    themselves into evidence, but not play them during

6    the trial.

7                    THE COURT:   Okay.   That makes sense.

8                    Anything on that, Mr. Taylor?

9                    MR. TAYLOR:   I offered the stipulation

10   as sort of a -- what I thought was a polite

11   concession.   So if they don't want it, it's all right

12   with me.

13                   THE COURT:   Okay.   And then, Ms. Atwood,

14   just in looking at your jury instructions on 14,

15   you're asking for a definition of "image" and a

16   definition of "disclose."

17                   MS. ATWOOD:   Yes.   They're included in

18   the statute itself, so I figured since they're

19   specifically pertaining to this new crime and aren't

20   defined elsewhere, that they should be added,

21   unless -- unless they are not relevant at all at the

22   end of the evidence.

23                   THE COURT:   Okay.   And so I'm assuming

24   that you're going to present me with what you --

25                   MS. ATWOOD:   Yes.

1        THE COURT:  -- believe the definition of

2    "image" and "disclose" is 'cause it's nowhere in the

3    jury instructions.

4        MS. ATWOOD:  Right.

5        THE COURT:  And then on "intimate

6    parts," I'm assuming you're just asking for 16.01.

7        MS. ATWOOD:  Yes.

8        THE COURT:  And then the "sexual

9    intercourse" and "deviant sexual intercourse" and its

10   definitions under 1600.420 and then 16 for "sexual

11   conduct."

12       MR. TAYLOR:  That's all fine with us,

13   Judge.

14       THE COURT:  Okay.

15       MS. ATWOOD:  Yes, Judge.

16       THE COURT:  All right.  So how long do

17   you think you need to look at her evidence,

18   Mr. Taylor?

19       MR. TAYLOR:  15 minutes or so, Judge --

20       THE COURT:  Okay.

21       MR. TAYLOR:  -- to review it.

22       THE COURT:  Mm-hmm.

23       MR. TAYLOR:  And I was just going to ask

24   your staff if I could, for my notes, double check

25   these.

1                    THE COURT:  And we will need to do an

2     exhibit list and have those be entered and then

3     return them to him.  And he needs to sign off on it.

4     That would -- just for purposes of the motion.  Thank

5     you.

6                    (Whispered discussion, off the record,

7     9:50 a.m.)

8                    THE COURT:  All right.  So we'll be off

9     the record, yes.  Do you --

10                   (*TRANSCRIBER'S NOTE*:  The audio record

11    ends midsentence.)

12                   (Recess taken, 9:50 a.m. - 10:13 a.m.)

13                   THE COURT:  Please be seated.

14                   All right.  So there's apparently some

15    issues on the State's exhibits; is that correct?

16                   MR. TAYLOR:  That's correct, Judge.

17                   THE COURT:  Okay.

18                   MR. TAYLOR:  Judge, we have two exhibits

19    we are arguing about.  I'm going to start with a

20    letter -- this is a letter from -- it's State's

21    Exhibit 1 -- letter that appears to be addressed to

22    my client dated March 3rd, 2015 from Portland State

23    University attorney on behalf of Ms. Vance.

24                   It expresses that Ms. Vance wishes to

25    have no further contact with the client.  And this is

1    arising in the context of the divorce, which was

2    still going on at this time.  "Cease and desist with

3    all contacts.  Your attempts to communicate are

4    offensive and unwanted.

5              "If you do not immediately refrain from

6    all future attempts to contact Ms. Vance, my office

7    will explore and file appropriate legal actions

8    against you, including but not limited to criminal

9    charges, Stalking, restraining and protective

10   orders," things like that.

11             So, Judge, I'm objecting to this on, I

12   guess, several grounds.  One, I think it is hearsay.

13   Two, and most importantly, I think it falls under

14   pretty much all the arguments the State just made to

15   exclude my evidence as far as prior communications

16   and animosity between these two parties, particularly

17   legal threats.

18             So, basically, on the same grounds the

19   State moved to exclude a good bit of my stuff, I

20   would be moving to exclude this.

21             THE COURT:  Okay.  Ms. Atwood.

22             MS. ATWOOD:  So, Judge, part of the

23   evidence that is -- that the State intends to offer

24   today is a series of communications that are leading

25   up to the investigation in this case.  So nothing

1    that we're intending to offer predates 2015.

2              But a lot of what we intend to offer

3    involves the victim repeatedly telling the defendant

4    that she wants nothing to do with him and no contact

5    from him, this being probably the strongest, I guess,

6    message that he received to that effect.

7              From our perspective, this evidence is

8    relevant to the defendant's knowledge of the victim's

9    lack of consent for him to be, I guess, distributing

10   materials that would be harmful to her, his intent,

11   in fact, to harm her and the -- oh, I forgot where --

12   what my last point was.

13             I can't think of what my last point was.

14   Sorry, Your Honor.  But we think that it's relevant

15   to his state of mind.  As far as how we intend to

16   offer it, I don't intend to offer the exhibit through

17   the victim.

18             I would ask her a question about whether

19   or not she saw this cease and desist from contact

20   from the -- the defendant during the course of the

21   spring of 2015.

22             If the defendant chooses to testify and

23   indicates that he had no reason to believe that his

24   actions toward her were offensive or harassing or

25   humiliating, which are elements of this crime, I

1    think that that exhibit would be relevant to his

2    knowledge of those things.

3                    THE COURT:  Okay.  And do you intend to

4    call the writer of that letter?

5                    MS. ATWOOD:  No.  It would be on the

6    basis that it was sent to him.

7                    THE COURT:  Okay.

8                    MS. ATWOOD:  It was received by him.

9                    THE COURT:  Okay.  So I think -- again,

10   I think under those contexts, if he gets up and says

11   he didn't know, that it would be relevant to inquire

12   as to whether or not he received the letter.  As far

13   as the admissibility, I think you have to have the

14   writer here in order to get it in.

15                   MS. ATWOOD:  In that case, I would offer

16   the victim as a rebuttal witness because it was her,

17   I guess, adoptive statement sent to him at the -- her

18   own request through her attorney because they were

19   not permitted to personally contact each other at

20   that point.

21                   THE COURT:  Okay.  And I'm going to

22   require that you have the writer of the letter.

23                   MS. ATWOOD:  Okay.

24                   THE COURT:  Okay.

25                   MR. TAYLOR:  Judge, may I briefly

1    respond to one issue Ms. Atwood raised --

2                    THE COURT:  Mm-hmm.

3                    MR. TAYLOR:  -- on that point?

4                    Our position would be that this letter

5    does not speak at all to his intent or state of mind.

6    This letter makes absolutely no reference to any sort

7    of videos or dissemination or anything like that.

8                    All it says is:  "In the context of this

9    divorce, don't talk to me anymore."  And, as I

10   mentioned earlier, Judge, we have a substantial

11   amount of evidence showing that after this letter,

12   Ms. Vance initiated conversation with my client.

13   She -- she reinitiated contact in that department.

14                   THE COURT:  Okay.  Well, I think what it

15   does is it actually -- the evidence that you're

16   asking to get in, 103 and 106, this is relevant for

17   the purposes of you getting that information in.

18                   So I would -- I appreciate your

19   objections and they've been noted, but given those

20   particular circumstances, I do believe it would be

21   relevant and admissible.

22                   But, again, simply to inquire, I will

23   not allow the exhibit itself in unless and -- unless

24   and until the State brings the actual author of

25   the document.

1              MR. TAYLOR:  Understood, Judge.  Judge,

2      the second piece of evidence the State is wanting to

3      offer that I'm going to object to is a printout of

4      what appears to be a Craigslist post featuring -- and

5      this is State's --

6              Is that 13?

7              MS. ATWOOD:  Yes.

8              MR. TAYLOR:  State's 13.  Judge, this is

9      a -- what appears to be a Craigslist post entitle

10     Wife Jailed Last Night for DV, Men for Women 28.  It

11     has a photograph, if the Court may see, of what

12     presumably appears to be Mr. Barber and Ms. Vance in

13     what appears to be a state of nudity, hugging each

14     other.

15             There's some other sort of

16     undecipherable, very small photos down here.  And

17     then it goes into a discussion about mental health,

18     assault, some sort of sex type of talk.

19             The next page is another what appears to

20     be Craigslist-posting-type thing, which shows a photo

21     of booking information from what I know from personal

22     experience to be the Multnomah County Sheriff's

23     Office online website.

24             And down below, it has the same text

25     that I previously mentioned.  Judge, I don't believe

1    this is relevant in the least to this case.  And if I

2    may look for a date, it appears -- I believe that

3    says 2013 -- October 27th, 2013.

4              So, again, on a -- a lot of the same

5    grounds that the State moved to exclude a substantial

6    portion of my evidence, I would be doing the same

7    thing.  I don't know who's going to authenticate

8    this.  I don't know how they intend to tie that to

9    Mr. Barber.

10             They can certainly speculate that

11   perhaps he posted that, but I think that's about it.

12   And the biggest thing, Judge, is that I think if the

13   State intends to offer this, then I think that blows

14   the door sort of wide open on a lot of stuff that the

15   State wants to keep out of this trial as far as

16   getting into things that happened in their

17   relationship.

18             And we're all of a sudden going to be

19   talking about how both parties got arrested for

20   domestic violence, you know, within a few months of

21   each other.  Both parties took restraining orders out

22   on each other.

23             And I think that's going to sort of open

24   the flood gates to a -- a lot of what, I think, both

25   parties don't want to get into.  But if that comes

```
1    in, we -- we would need to respond to that.  And

2    that's where that trial -- this trial would go.

3                THE COURT:  Okay.  May I see that

4    exhibit, please, Mr. Taylor?

5                MR. TAYLOR:  Yes, Judge.

6                THE COURT:  Thank you.

7                MR. TAYLOR:  And, again, this is

8    Defense -- or State's 13.

9                THE COURT:  And, Ms. Atwood.

10               MS. ATWOOD:  May I respond, Your Honor?

11               THE COURT:  Mm-hmm.

12               MS. ATWOOD:  So, I guess, to be clear,

13   what that exhibit depicts is the defendant and the

14   victim having sex in a photograph that he took.

15               And if you read the text of the post

16   that he clearly made when he respond -- I guess,

17   posted to Craigslist that this was his wife, it

18   refers to him being done with her and angry with her

19   because of things that she had done to him.

20               And his response, as you can see, was to

21   post sexually-explicit photos of her on the internet

22   as well as a picture of her mug shot from her arrest.

23   I believe that this is highly relevant, considering

24   what we've heard this morning about the defense's

25   intent to make a mental instability-type defense in
```

1    their case in chief.

2                  It's my understanding that the

3    defendant's argument is that his actions did not

4    arise out of anger or revenge and that his conduct

5    was a pure reflection of his mental breakdown at the

6    time, his depression.

7                  The fact that he has previously

8    responded in anger by posting sexually-explicit

9    photos and humiliating information about this victim

10   to the internet on a public website that she then

11   found, is relevant to rebut his defense and his

12   intent in this case.

13                 And as you know, as far as 404(3)

14   evidence goes, that evidence would be admissible as

15   proof of intent, motive, lack of mistake and

16   knowledge.  And all of those are relevant to this

17   case.

18                 THE COURT:  Okay.  And so it -- it seems

19   like it's a little premature this would come in after

20   the State's --

21                 MS. ATWOOD:  That's correct.

22                 THE COURT:  -- case in chief.  And so

23   I'm going to -- I'm not going to rule on this at this

24   point.  I'm going to kind of see where things go

25   before I make a ruling on State's Exhibit 13.

1              MS. ATWOOD:  Yes.

2              MR. TAYLOR:  And I guess the only thing

3     I -- I would want to mention on that point, Judge, is

4     that if this came in on the State's rebuttal case, we

5     would be seeking surrebuttal to -- to rebut a lot of

6     the allegations coming out of that.

7              THE COURT:  Okay.  And that would just

8     depend on what happens.

9              MR. TAYLOR:  Understood.

10             THE COURT:  Okay.  Anything else?

11             MR. TAYLOR:  I would -- and I'll be

12    totally honest, didn't get as much sleep as I

13    would've liked to last night, so if we could quickly

14    recap what has been excluded at this point and what

15    hasn't --

16             MS. ATWOOD:  That's probably a good

17    idea.

18             MR. TAYLOR:  -- so that neither of us

19    goes places on opening statement that we don't --

20             MS. ATWOOD:  Yes.

21             MR. TAYLOR:  -- need to go.

22             THE COURT:  Okay.

23             MR. TAYLOR:  My notes, obviously, have

24    the conversation with Nick Goonsberg.  The statements

25    made by Ms. Vance have been excluded.

1                   THE COURT:  Correct.

2                   MR. TAYLOR:  The Court has --

3                   THE COURT:  That's 108, correct?

4                   MR. TAYLOR:  The Court has excluded

5      discussion of Ms. Vance's release statement.

6                   THE COURT:  Correct.

7                   MR. TAYLOR:  The Court has excluded

8      documentation on Mr. Barber's suicide but, obviously,

9      that -- he can testify to that all he wants.

10                  THE COURT:  Right.

11                  MR. TAYLOR:  And then as far -- what I'm

12     hazy on is the -- is the Court's decisions on the --

13     the sort of old matters, the 2010, 2011 stuff.

14                  THE COURT:  And those were the -- the

15     attempts to solicit prostitution during the marriage,

16     correct?

17                  MS. ATWOOD:  Yes.

18                  THE COURT:  Those are the e-mails

19     that --

20                  MS. ATWOOD:  Well, the --

21                  THE COURT:  -- related --

22                  MS. ATWOOD:  -- the defendant's own --

23                  THE COURT:  Not prostitution, I'm sorry.

24                  MS. ATWOOD:  -- messages to others

25     soliciting sex.

1                   THE COURT:  Soliciting pornographic --

2                   MS. ATWOOD:  Yes.

3                   THE COURT:  -- in 2010.  And the -- the

4       Court will be excluding those.

5                   MR. TAYLOR:  Will the Court be excluding

6       just the exhibits or testimony to that matter?

7                   THE COURT:  Just the exhibits.

8                   MR. TAYLOR:  Okay.  So fair game to

9       discuss the matters.

10                  MS. ATWOOD:  Is that in reference to on

11      cross of the victim in the case?  'Cause that was

12      part of our objection, is she was not party to those

13      conversations and would have no personal knowledge.

14                  THE COURT:  Well, I think that it

15      doesn't come in chief.  It's going to come in in

16      defendant's case in chief and then you would have

17      rebuttal.

18                  MS. ATWOOD:  Yes.  I just wanted to make

19      sure he's not going to be able to cross her on these

20      things, basically, ring the bell that can't be --

21                  THE COURT:  Correct.

22                  MS. ATWOOD:  -- unrung, even if she

23      later says --

24                  THE COURT:  Correct.

25                  MS. ATWOOD:  -- "No.  I don't know what

1    you're talking about"?

2                    THE COURT:  Right.

3                    MS. ATWOOD:  Okay.

4                    MR. TAYLOR:  I -- sorry, Judge.

5                    THE COURT:  Yes.

6                    MR. TAYLOR:  I'm now a little bit

7    confused about our -- our rules because, you know,

8    Ms. Atwood's going to do direct examination of the

9    victim, talking about the big issues of consent, my

10   client's knowledge of that consent.

11                   Is the Court's position that I -- I

12   can't even touch 2010 and 2011 on crossing her or I

13   have to live with what she says and then my

14   client's --

15                   THE COURT:  Yes.

16                   MR. TAYLOR:  -- forget about that?

17   The --

18                   THE COURT:  You have to live with what

19   she says.

20                   MR. TAYLOR:  That's fine.

21                   THE COURT:  Okay.  Anything else then?

22                   MS. ATWOOD:  And then the exhibits

23   involving the conversations between the defendant and

24   the victim.  Was it 103 and 1-0 --

25                   THE COURT:  6.

1              MS. ATWOOD:  -- 6?

2              THE COURT:  Mm-hmm.

3              MS. ATWOOD:  Are those allowed as

4    exhibits or as part of questioning?

5              THE COURT:  In cross, they would be

6    allowed as part of questioning.  Obviously, in

7    defense's case, he would be able to offer them as

8    exhibits because at that point, he'll be able to lay

9    the foundation for their admissibility.

10             MS. ATWOOD:  Okay.

11             MR. TAYLOR:  Thank you for the

12   clarification, Judge.

13             THE COURT:  Okay.  And the parties have

14   had a chance to review some of the jury stuff?

15             MS. ATWOOD:  I have not quite gotten

16   to it.

17             THE COURT:  Okay.

18             MS. ATWOOD:  I'm only -- I'm only a few

19   pages in.

20             THE COURT:  Okay.  Mr. Taylor, what

21   about you?

22             MR. TAYLOR:  A little bit behind that,

23   Judge.

24             THE COURT:  Okay.  So what we have the

25   opportunity to do is go ahead and I'll give you

1    five minutes to review them.  Then what will happen

2    is my staff will go down and collect them.  That

3    takes approximately ten minutes.

4              So they'll be back up here and then

5    we'll just go ahead and -- and start.  So you'll have

6    about 15 minutes to continue your review of those.

7              MS. ATWOOD:  Okay.

8              THE COURT:  Okay.  So --

9              MS. ATWOOD:  And there's one thing that

10   I wanted to mention.  It doesn't have to do with the

11   evidence.  But the victim is outside.  She does

12   intend to watch parts of the trial throughout

13   the day.

14             But she has asked me to request that

15   this kind of operate in the same way that we would

16   deal with a restraining order-type hearing, where if

17   we're breaking for a recess or something, we can

18   verify that she leaves the building before the

19   defendant leaves the room.  She doesn't want to risk

20   running into each other.

21             THE COURT:  I'm assuming that you have a

22   victim's advocate with her, correct?

23             MS. ATWOOD:  Not at this particular

24   moment.  She has her attorney with her.

25             THE COURT:  Okay.  And so you're asking

1    that she leave the building?

2                    MS. ATWOOD:  No.  That -- that she be

3    allowed to leave the building before the -- the

4    defendant leaves the courtroom so that they're not

5    running into each other in the hallway.  Just -- does

6    that make sense?

7                    THE COURT:  So you want her to leave the

8    building before he is able to leave the courtroom?

9                    MS. ATWOOD:  If that's okay or vice

10   versa, only when we're breaking for any reason.

11                   THE COURT:  I will -- I'll give her

12   five minutes, but --

13                   MS. ATWOOD:  Okay.  That's fine.

14                   THE COURT:  -- I'm not going to have

15   somebody call and say she's out --

16                   MS. ATWOOD:  No, that's not --

17                   THE COURT:  -- of the building.

18                   MS. ATWOOD:  -- necessary.  Just a

19   little bit of leeway time.

20                   THE COURT:  Okay.

21                   MS. ATWOOD:  Yeah.

22                   THE COURT:  All right.  Anything else,

23   Mr. Taylor?

24                   MR. TAYLOR:  Not at this time, Judge.

25   Thank you.

1                    THE COURT:  Okay.  And I just -- I just

2       want to remind you, I -- I notice that your client

3       has raised his hand and given you some information

4       and tried to speak.

5                    I just would -- would ask that you

6       remind him that he -- what his role is in this

7       proceeding and that he needs to conform his behavior

8       to the rules of the Court.

9                    MR. TAYLOR:  Understood, Judge.

10                   THE COURT:  Thank you, sir.

11                   (Recess taken, 10:27 a.m. - 10:46 a.m.)

12                   THE COURT:  All right.  And so I just

13      want to double check before -- that we expect this to

14      be done by tomorrow, correct?

15                   MR. TAYLOR:  We do, Judge.

16                   THE COURT:  Okay.

17                   MS. ATWOOD:  Hope so.

18                   THE COURT:  Thank you.  I'm going on

19      vacation for two weeks after that, so --

20                   MS. ATWOOD:  Oh, lucky you.

21                   THE COURT:  Yeah.

22                   MR. TAYLOR:  I am also leaving on

23      vacation.

24                   THE COURT:  Okay.  Good.

25                   MS. ATWOOD:  I'm actually leaving on

1    vacation as well.

2                    THE COURT:  It's going to get done.  All

3    right.  Great.

4                    All right.  So ready?

5                    MR. TAYLOR:  We are.

6                    THE COURT:  Yes?

7                    MS. ATWOOD:  Let me go tell them that --

8    she wants to watch jury selection.

9                    (Whispered discussion, off the record,

10   10:46 a.m. - 10:47 a.m.)

11                   (The following proceedings were held in

12   open court, the prospective jurors being present,

13   10:47 a.m.)

14                   THE COURT:  Good morning.  I am

15   Beth Roberts.  I'm one of the 14 elected judges here

16   in Washington County.  And I just want to do a quick

17   check and make sure everybody's in the right seat.

18                   So, Mr. Garrison?  Thank you.

19                   And, Ms. Welsh?

20                   And then, Mr. Berry?

21                   JUROR BERRY:  Yes.

22                   THE COURT:  Thank you.

23                   And, Ms. Bergren, is that you?

24                   JUROR BERGREN:  Yeah.

25                   THE COURT:  Okay.  Just checking to make

1   sure everybody's in the right seat.

2           Then it looks like Mr. Gonzalez?   Thank

3   you.

4           And then Seat 18, Mr. Hayden?   Thank

5   you.

6           All right.  Welcome.  We're here today

7   to select a trial jury for the criminal case of State

8   of Oregon versus Benjamin J. Barber.  The State is

9   represented by Marie Atwood.

10          MS. ATWOOD:   Hello.

11          THE COURT:  And the defendant is

12  represented by Cameron Taylor and Christina Helregel,

13  who is not here yet.  In this case, the defendant is

14  charged with the offenses as follows:

15          In Counts 1 through 9, Unlawful

16  Dissemination of an Intimate Image, that the

17  defendant, on or about January 1st, 2016 and

18  June 21st, 2016, in Washington County, Oregon, did,

19  with the intent to harass, humiliate or injure Meagan

20  Vance, knowingly cause to be disclosed through an

21  internet website an identifiable -- identifiable

22  image of Meagan Vance, whose intimate parts were

23  visible and/or who was engaged in sexual conduct when

24  the defendant knew or reasonably should have known

25  that Meagan Vance did not consent to the disclosure.

1           Meagan Vance was harassed, humiliated

2    and/or injured by this disclosure and a reasonable

3    person would have been harassed, humiliated and/or

4    injured by this disclosure.  To these offenses, the

5    defendant has entered a plea of not guilty.

6           A plea of not guilty denies that

7    defendant is guilty of the offenses as alleged.

8    Under our system of justice, a defendant is innocent

9    of any crime or wrongdoing unless and until the State

10   proves the defendant's guilt beyond a reasonable

11   doubt.

12          Therefore, the burden is on the State to

13   prove the defendant's guilt beyond a reasonable

14   doubt.  Some of you may have served as jurors in

15   civil cases where lesser standards of proof apply.

16          For example, proof by a -- excuse me --

17   proof by a preponderance of the evidence or proof by

18   clear and convincing evidence.

19          In criminal cases, however, the State's

20   burden must be more convincing.  It must be beyond a

21   reasonable doubt.  Reasonable doubt is doubt based on

22   common sense and reason.  Reasonable doubt means an

23   honest uncertainty as to the guilt of the defendant.

24          Reasonable doubt exists when, after

25   careful and impartial consideration of all the

1     evidence in the case, you are not convinced the

2     defendant is guilty.  Each juror must be able to

3     judge this case fairly and objectively.

4               Therefore, if any juror knows or has any

5     association with any of the parties, the lawyers or

6     witnesses or if any juror has any knowledge of or has

7     formed any opinion about this case, it should be

8     brought to the Court's attention.

9               First of all, do any of you know

10    Mr. Taylor, Mr. Barber or Ms. Helregel or Ms. Atwood?

11            A JUROR:  No.

12            THE COURT:  Okay.  Everybody is shaking

13    their head.  The following people will be called as

14    witnesses in the case.

15            Ms. Atwood?

16            MS. ATWOOD:  Oh, sorry, Your Honor.

17            That would be Meagan Vance,

18    Thomas Duenas and Robert Rookhuyzen.

19            THE COURT:  Okay.  And does anybody have

20    any familiarity with those individuals?  Okay.  I've

21    been -- had an opportunity to discuss the case with

22    the attorneys.  The expectation is this is going to

23    be finished by tomorrow, so you're all here today.

24            Does anybody have anything going on

25    tomorrow, such as surgery that's been scheduled for a

```
 1    long period of time that can't be rescheduled or you

 2    have plane tickets to go somewhere on a vacation that

 3    the person that you're going with will never forgive

 4    you if you don't go?

 5              Anybody have anything like that?  Okay.

 6    I'm not seeing anybody indicate that that's going to

 7    be a problem.  Lastly, you simply heard the

 8    allegations in this case.

 9              But having heard those, do any of you

10    feel that your personal views concerning this type of

11    case might affect your ability to be fair and

12    impartial in this case?

13              Okay.  I'm seeing also nobody indicating

14    that that's going to be an issue for them.  The

15    lawyers are now going to have an opportunity to ask

16    you questions.  The purpose of these questions is not

17    to argue the case or to embarrass you, but rather to

18    determine your qualifications to serve on this

19    specific trial.

20              Please respond to the lawyers' questions

21    honestly and sincerely.  If you do not understand a

22    question, please ask the lawyer to restate -- restate

23    it for you.  If you can't hear something, please make

24    sure that we are aware that you are having some

25    difficulty hearing us.
```

1          Each side, at the conclusion, is allowed

2    to excuse a certain number of jurors.  If you are

3    excused, you should not feel that your attendance has

4    been without value.  We need a substantial group of

5    individuals so that an impartial jury can be

6    selected.  Your presence is always very important and

7    we appreciate you being here today.

8          Mr. Taylor, you may begin.

9          MR. TAYLOR:  Thank you, Judge.

10          Good morning, folks.

11          MULTIPLE JURORS:  Good morning.

12          THE COURT:  Oh, I'm sorry, I forgot to

13    swear you in.  Everybody needs to stand up.

14          THE CLERK:  Can I have you raise your

15    right hand?

16          (Prospective jurors sworn, 10:52 a.m.)

17          THE COURT:  Okay.  Thank you very much.

18          Mr. Taylor.

19          (Voir Dire recorded; not transcribed,

20    10:53 a.m. - 12:09 p.m.)

21          THE COURT:  All right.  So I'm going to

22    ask our trial jurors to stand up and so that you can

23    be sworn in as trial jurors.

24          THE CLERK:  If I could have you please

25    stand and raise your right hand.

1                    (Jury duly sworn and empaneled,

2        12:10 p.m.)

3                    THE CLERK:  Thank you.

4                    THE COURT:  All right.  Go ahead and

5        have a seat.  Normally, at this juncture, I would go

6        ahead and give you some preliminary instructions, but

7        I know it's -- we're getting into the noon hour and

8        probably need to get released.

9                    So I just want to remind you, you need

10       to be wearing your badges at all times and not to

11       discuss this case at this point.  You're -- you don't

12       know anything about the case, and so just go about

13       and have your lunch and we'll see you back here at

14       1:30 and then we'll begin, okay?  Thank you very

15       much.

16                   And, Marcela, you're going to take them

17       into the jury room, give them some instructions.

18                   (The following proceedings were held in

19       open court, out of the presence of the jury,

20       12:11 p.m.:)

21                   THE COURT:  Okay.  So if we can just

22       have the individuals back here at 1:25 --

23                   MS. ATWOOD:  Mm-hmm.

24                   THE COURT:  -- we'll get started.

25                   MR. TAYLOR:  Sounds great.  Thank you,

1    Judge.

2              THE COURT:  Thank you.

3                        * * *

4         (Noon Recess taken at 12:11 p.m.)

5

6                    *AFTERNOON SESSION*

7              (The following proceedings were held in

8    open court, out of the presence of the jury,

9    1:28 p.m.)

10             THE COURT:  Thank you.

11             All right.  So we're going to go ahead

12   and get started.  Just -- just --

13             MR. TAYLOR:  I'm just getting water.

14             THE COURT:  Okay.

15             MR. TAYLOR:  Sorry, Judge.

16             THE COURT:  That's all right.  Just so

17   you know, Ms. Welch, Juror No. 91, she asked my staff

18   if she could speak with me; that she has some

19   concerns about her employees 'cause she has five

20   employees that aren't able to do their work and that

21   she's feeling anxious.

22             And I just had my staff tell her that

23   she's a member of our jury and that these are things

24   that she should have brought up prior to being

25   selected for the jury.  So we're not going to have

1    anything further on that.

2            All right.  Ready to begin?

3            MS. ATWOOD:  Yes, Judge.

4            MR. TAYLOR:  Yes, Judge.

5            THE COURT:  Okay.  So let's go ahead and

6    bring our jury back.

7            (The following proceedings were held in

8    open court, the jury being present, 1:30 p.m.)

9            THE COURT:  Okay.  Welcome back from

10   lunch.  And as Ms. Welch is doing, if you need to

11   stand at any time, feel free to go ahead and stand.

12   I know it gets difficult to stay -- to remain seated

13   for long periods of time and it won't be a

14   distraction.  So if you need to do that, go ahead.

15            COURT'S PRECAUTIONARY INSTRUCTIONS

16            THE COURT:  All right.  So I'm going to

17   give you some precautionary instructions before we

18   begin.  The law that applies to this case will be

19   given to you, in part, by these precautionary

20   instructions.

21            After you've heard the evidence and

22   after the argument of the lawyers, I will give you

23   further instructions regarding the legal rules you

24   must follow in deciding this case.  Your duty is to

25   decide the facts from the evidence.  You and you

1    alone are the judges of the facts.

2               You will hear the evidence, decide the

3    facts and then apply those facts to the law that I

4    will give you.  This is how you will reach your

5    verdict.  In doing so, you must follow the law,

6    whether you agree with it or not.

7               To be an effective juror, you must also

8    not be influenced to any degree by personal feelings,

9    sympathy for, prejudice against any party, witness or

10   lawyer or any other participant in this case.

11              The evidence you are to consider in this

12   case consists of the testimony of witnesses and the

13   exhibits received in evidence.  Exhibits are physical

14   things, such as photographs and objects.  And you

15   will be able to examine the exhibits once you begin

16   deliberation.

17              You may draw any reasonable inferences

18   from the evidence, but you must not engage is

19   guesswork or speculation.  You will hear the opening

20   statements from the attorneys and then the evidence

21   will be presented.

22              At the conclusion of the evidence, the

23   lawyers will make their closing arguments to you.

24   The opening statements and closing arguments of the

25   attorneys are intended to help you understand

1    the evidence, although their statements and arguments

2    are not part of the evidence.  The fact that a

3    criminal charge has been filed against the defendant

4    is not evidence.

5              The defendant is innocent of any crime

6    unless and until the State proves the defendant's

7    guilt beyond a reasonable doubt.  From time to time,

8    a lawyer may make an objection to evidence.  I will

9    decide whether or not it is proper, under the law,

10   for you to consider such evidence.

11             Do not speculate about why the objection

12   was made or about why I ruled as I did.  If I

13   overrule an objection, the question may be answered

14   or the exhibit received.  If I sustain an objection,

15   the question cannot be answered or the exhibit may

16   not be received.

17             Whenever I sustain an objection to a

18   question, ignore the question and do not guess what

19   the answer would have been.  Sometimes I may order

20   that evidence be stricken from the record and that

21   you disregard or ignore that evidence.

22             When you are deciding this case, you

23   most not consider any evidence that I've told you to

24   disregard.  You must not interpret any statement,

25   ruling or remark I make during this trial as any

 1    indication that I have formed any opinion about the

 2    facts or the outcome of this case.

 3                    You and you alone are to decide the

 4    facts.  You must decide how believable the evidence

 5    is and what weight or value you give that evidence.

 6    You may take notes, if you wish, during the trial.

 7    However, please keep in mind that each party is

 8    entitled of the considered decision of each juror.

 9                    Therefore, during your deliberations,

10    you should not give undue weight to another juror's

11    notes if those notes conflict with your recollection

12    of the evidence.  Do not allow your note taking to

13    interfere with your ability to observe and evaluate

14    testimony.

15                    And whenever you leave the courtroom,

16    your notes should be left in the jury room.  Do not

17    discuss this case during the trial with anyone,

18    including any of the lawyers, parties, witnesses,

19    your friends or your family.

20                    That means you are not to communicate

21    with anyone by any means, such as text messaging,

22    e-mail or social media sites.  Do not discuss this

23    case with other jurors or look at other jurors' notes

24    until you have begun your deliberations at the end of

25    the case after you've heard all the evidence and the

1    arguments of the lawyers and been instructed on the

2    law that applies to this case.

3         Each of you must keep an open mind

4    throughout the trial and must not attempt to decide

5    this case until you begin your deliberations.  Do not

6    make any independent personal investigations into any

7    facts or locations connected with this case.

8         Do not look up any information from any

9    source.  Do not communicate any private or special

10   knowledge about any of the facts of this particular

11   case to your fellow jurors.  Decide the case only on

12   the evidence received here in court.

13        In addition to any conventional

14   research, you may not use any internet search engines

15   to look up any information about the case, the law

16   that applies to the case or the people involved in

17   the case, including the defendant, the witnesses, the

18   lawyers or myself.

19        And do not use any mapping programs

20   in -- in an attempt to locate or view any of the

21   locations that might be discussed in this case.  So,

22   basically, what you're being ordered to do is not to

23   communicate with anyone by any means concerning what

24   you see or hear in the courtroom and to not try to

25   find out more about this case by any means other than

1   what you learn in the courtroom.

2           Decide this case only on what happens

3   here in open court, where both the State and the

4   defense are aware of and have an opportunity to

5   question the sources of the evidence and to address

6   any legal issues that may arise.  That is the only

7   fair way in which to decide a case.

8           Also ignore any attempt at improper

9   communication.  If anybody tries to communicate with

10  you by -- about this case, tell that person you

11  cannot discuss the case because you're a juror.  If

12  that person persists, simply walk away and report the

13  incident to the Court.

14          Your phones and laptops must be turned

15  off while you're in court and while you're in

16  deliberation.  And at the end of the trial, I will

17  instruct you about the law that applies to this case

18  and you will begin your deliberations.

19          You will have to make your decision

20  based on what you recall of the evidence.  You will

21  not have a written transcript to consult, so I urge

22  you to pay close attention to the testimony as it is

23  given.

24          After you have rendered your verdict or

25  been otherwise discharged by me, you'll be free to do

 1    any research you choose and to share your experiences

 2    either directly or through your favorite electronic

 3    medias.  We will now hear the opening statements of

 4    the lawyers in which they will outline the evidence

 5    as they expect it to be.

 6                    Ms. Atwood.

 7                    MS. ATWOOD:  Thank you, Your Honor.

 8                         OPENING STATEMENT

 9                    MS. ATWOOD:  Good afternoon.  Today, you

10    are going to meet a young woman named Meagan Vance.

11    Meagan Vance is 26 years old.  She's soft spoken.

12    She's a school teacher at West Sylvan Middle School

13    here in Washington County.  She's in a committed

14    relationship with her boyfriend.  And all in all,

15    she's pretty satisfied and proud with where she's

16    come in life.

17                    But today, you're also going to hear

18    what it felt like for Meagan Vance to have her sense

19    of pride, her sense of stability and security and

20    self-esteem crushed at the hands of the defendant

21    when he decided to distribute sexual videos of her

22    across the internet several times to get revenge

23    against her for rejecting him.

24                    This is a revenge porn case.  So here's

25    the situation:  Meagan Vance used to be in a

1    relationship with the defendant.  They met each other

2    online in 2009, 2010 and began dating.  Their

3    relationship became serious.  They were committed to

4    one another.

5              And in -- eventually, in 2012, they got

6    married.  So Meagan will tell you, you know, when she

7    entered into this relationship, she was young.  She

8    was impressionable.  But she loved him.  And like any

9    person in a committed relationship, she did what she

10   could to make the relationship work.

11             And it wasn't always easy for them.  You

12   see, at the beginning of their relationship, Meagan

13   was living in Ohio studying toward getting her

14   teaching degree while the defendant was living here

15   in Portland.  So, as anyone who's been through a

16   long-distance relationship would tell you, it was

17   difficult.

18             But it was especially challenging for

19   Meagan because the defendant was particularly

20   outspoken about his dissatisfaction with her being

21   far away from him.  This went beyond someone just

22   missing their significant other while they're gone.

23             The defendant told Meagan that when she

24   left him alone, he -- she was committing sexual

25   abandonment on him.  He had needs that she couldn't

State's Opening Statement                    195

1    fulfill while she was spending time away.  And so he

2    proposed an idea to her to help him through the times

3    that she was going to be gone studying in Ohio.

4              His idea was that they make some sex

5    videos with each other.  And initially, Meagan was

6    apprehensive about this (indiscernible) and she

7    voiced to him her concerns.  She was concerned about

8    making the content in the first place.

9              She was concerned about the potential

10   ramifications for her career goals if anything were

11   to happen to those videos.  And the defendant

12   understood.  He listened.  And he told her he did not

13   want to jeopardize her career or her school.

14             He didn't want to jeopardize her in any

15   way.  He said that he would keep the videos for

16   personal use only during the times that she was gone

17   back in 2010, 2011 and would not disseminate them to

18   anyone.  Now, Meagan didn't have any reason during

19   that conversation --

20             THE COURT:  I apologize, Ms. Atwood.

21   Can I please instruct you to use "Ms. Vance"?

22             MS. ATWOOD:  I'm sorry, Judge.

23             THE COURT:  Thank you.

24             MS. ATWOOD:  I will.

25             Ms. Vance didn't have any reason during

1    that conversation or anytime after to have concern

2    about what would happen with those videos.  They

3    stayed together.  They were in a committed

4    relationship.  Their relationship moved forward.

5                    Ms. Vance moved back to Portland to be

6    with him.  They got married.  There was no concern

7    and the conversation did not arise again.  So as I'm

8    sure you can gather by this point, the marriage

9    didn't last.  This was a person who Ms. Vance loved

10   and trusted with these intimate experiences and the

11   relationship didn't pan out.

12                   Things turned south and she filed for

13   divorce in 2013.  The divorce was long.  The divorce

14   was especially hostile.  But, eventually, it was

15   over.  Ms. Vance moved to a different house.

16                   Ms. Vance finished school, started her

17   job as a teacher.  She got into a new relationship.

18   She moved on.  But the same could not be said for the

19   defendant.  The defendant, as you'll hear during the

20   course of the trial, continued to make contact with

21   Ms. Vance unsolicited, even after the divorce had

22   been finalized.

23                   You're going to see a series of

24   messages, texts, e-mails, that sort of thing that

25   span the time immediately preceding the investigation

1    of this case, late 2015 to early 2016.

2                And you're going to notice, when you

3    hear about and have a chance to read through those

4    communications, that the defendant's behavior

5    escalates.  At first, he's just texting her saying,

6    "I miss you.  I still love you.  I still want to see

7    you," no response.

8                Then he's complaining about being sad

9    and lonely.  He doesn't know what to do to improve

10   his life.  The messages then transition into full-on

11   threats to commit suicide, threats to light himself

12   on fire if she doesn't respond.  And eventually, they

13   just become blatant attacks.

14               The defendant blamed her for his current

15   station in life, said that he was homeless and

16   jobless and lonely because of her, that she ruined

17   his life and he had contempt for her because if it.

18               Now, again and again and again,

19   Ms. Vance told the defendant, "Do not contact me.  I

20   do not want to talk to you.  I do not want anything

21   to do with you."  But the defendant was not going to

22   accept rejection.  He was not willing to be ignored.

23               So he wanted revenge.  He still had the

24   videos that they had made early on in their

25   relationship and he knew exactly what he needed to do

1    with them now that she was in a functioning

2    relationship with a successful job, a new place to

3    live.

4              He had lost everything and he wanted her

5    to experience the same.  So he went on a spree,

6    essentially, posting these videos to website after

7    website after website, all of which were pornographic

8    websites, available to any member of the public,

9    without her knowledge or consent.

10             And, keep in mind, the videos that they

11   made were four videos total of them engaged in sexual

12   intercourse, fully naked.  You can see Ms. Vance's

13   face in the videos.  You can hear her voice.  You can

14   hear him refer to her by name.

15             So the defendant posted these videos to

16   numerous websites.  His intent at the time,

17   obviously, was to get back at her for causing his

18   current state of despair.  And he succeeded.  You're

19   going to get to hear from Ms. Vance today about how

20   it felt to find these things on the internet.

21             She's going to tell you what led her to

22   look for them.  And that's when we go back to the

23   conversations, to the unsolicited contacts that had

24   been streaming in from the defendant, becoming more

25   and more concerning.

 1              Ms. Vance is going to tell you that it

 2     got to a point where she thought that he was going to

 3     seek retribution against her and she knew him well

 4     enough to know that if there were any forum he would

 5     choose to exact that kind of revenge, it was going to

 6     be online.

 7              She'll tell you that, based on her

 8     relationship with him, she knew he was a tech-savvy

 9     person, heavily interested in technology, definitely

10     knew his way around a computer.  So it made sense

11     that this was the forum he selected.

12              So after she had received these

13     concerning e-mails and text messages from him, she

14     decided to poke around on the internet to see if he

15     was saying anything or doing anything in reference to

16     her to try to harm her life.

17              And she almost immediately located these

18     videos.  Now, something you're going to learn when

19     you get a chance to hear Ms. Vance's testimony is

20     that she is albino.  And that is a serious medical

21     condition, she'll tell you.

22              It affects her life in a lot of

23     significant and difficult ways.  She's got some

24     significant medical issues and physical issues that

25     go along with it.  And the defendant knew that this

1   was a challenge for her and always had been.

2            So to add insult to injury, when the

3   defendant went on his posting spree on the internet,

4   not only did he betray her consent and her trust, but

5   he decided to do it in the name of a fetish.  Every

6   single video that he posted was titled, "Albino

7   Porn."

8            He exploited her medical condition in an

9   effort to harm her.  So when she found the videos,

10  she was understandably horrified.  She was

11  humiliated.  She was embarrassed.  She was in fear

12  what this would do to her life, to her job, to her

13  relationship.

14           So her first thought when she found --

15  found them on the first website was, "I'll just

16  contact the website and ask them to take them off."

17  And she did.  But then she found them again and again

18  and again on site after site after site.

19           And these weren't anonymous posts.  The

20  posts that she was finding on these pornographic

21  websites were associated with user names.  They were

22  associated with user profiles.  And the user name

23  that was tagged in them was BarberB, the defendant's

24  last name, first initial.

25           She knew that he had done this to her

State's Opening Statement                  201

1    and she knew that he had done it on purpose.  And at

2    that point, she felt the need to call law

3    enforcement, so that's what she did.  And you're

4    going to get to hear from the officer who took that

5    call.

6              His name is Deputy Duenas.  He works for

7    the Sheriff's Office here in Washington County.

8    After taking Ms. Vance's initial statement, he did

9    a number of things.

10             First, he went online himself to see if

11   the videos were where she had found them, if they

12   were attached to this user name, BarberB, if they

13   were, in fact, explicit videos that identified her

14   easily.  And he found all of those things.

15             And he's going to tell you about where

16   and how he found the videos because he documented it

17   in screenshots and capturing the videos themselves.

18   So after he had established that what -- what she had

19   told him happened had happened, he tried, of course,

20   to contact the defendant numerous times via the

21   phone.

22             He even tried to go to the defendant's

23   house, but he was being evasive.  And that's because

24   instead of responding to law enforcement's attempts

25   to contact him, he was, again, contacting Ms. Vance.

1          After she had already sought law

2     enforcement help and after they had been trying to

3     find him, he contacted her to send her a series of

4     e-mails at work.  And you're going to get to read

5     those e-mails during your deliberations.

6          But, at first, he's begging her to drop

7     it, to drop the case, to drop the investigation.  He

8     is offering her money to make the investigation go

9     away.  He says he will do anything it takes.  He

10    promises to get the videos removed.

11          He even sent her a receipt showing that

12    he had requested from one of these websites to have

13    the video removed.  But the damage had been done.

14    So, eventually, he was located and interviewed by

15    Deputy Duenas.

16          He was upset about what was going on,

17    but he admitted that he had posted these videos

18    himself on his user name to multiple websites.  He

19    admitted that he knew that she had gotten the new job

20    doing what she had always wanted to do.

21          And he admitted that he had done what he

22    did because he was mad at her for ruining his life.

23    He told Deputy Duenas that he wanted her to

24    experience the pain and suffering that he did.

25    That's revenge, folks.

1              Now, the other person you're going to

2    hear from during the course of the trial, his name is

3    Detective Rookhuyzen.  He also works with the

4    Sheriff's Office.

5              He jumped on board the case after

6    defendant was initially arrested and did an even

7    further, more thorough search on the internet to make

8    sure he could try to encapsulate the full extent to

9    which these videos were disseminated.

10              You're also going to get a chance to

11    review his findings, hear his testimony and the

12    things that he preserved as evidence for this trial.

13              And one of the things he's going to tell

14    you is that, just a couple months after these were

15    posted by the defendant, by the time that he was able

16    to find them online, they had already been viewed by

17    thousands and thousands and thousands of people.

18              And those were thousands of violations

19    that Ms. Vance never consented to, that she had no

20    control or knowledge over and that she can never have

21    taken down.  Now, at the end of the trial, you're

22    going to be given a list of instructions and some of

23    that is going to include the elements of this crime.

24              So you're going to be asked to decide on

25    several counts of Unlawful Dissemination of an

1    Intimate Image.  And I want to read to you the

2    elements that you're going to be given.

3                    To prove the crime of Unlawful

4    Dissemination of an Intimate Image, the State must

5    show that the defendant knowingly caused images to be

6    disclosed through an internet website, that the

7    images were identifiable images of the victim, whose

8    intimate parts were visible or who was engaged in

9    sexual conduct, that the defendant knew or reasonably

10   should have known that the victim did not consent to

11   that disclosure, that the defendant acted with the

12   intent to harass, humiliate or injure the victim,

13   that the victim was, in fact, harassed, humiliated or

14   injured by the conduct and that a reasonable person

15   in that situation would have felt harassed,

16   humiliated or injured.

17                    Those are the elements that you're going

18   to be given at the end of the trial.  And I'm

19   confident that in the totality of the evidence that

20   you're going to hear and see, you are going to go

21   back into that deliberation room and think to

22   yourselves, if this isn't a case of revenge porn, I

23   don't know what is.

24                    The defendant was angry.  He was bitter,

25   and he wanted her to suffer because he was suffering.

State/Defendant's Opening Statement      205

1   This has affected her personal life, her professional

2   life and her relationship.  And she's going to

3   describe those effects to you.

4           The defendant knew -- not even

5   reasonably should have known -- he knew that she

6   didn't consent to the disclosure of these images

7   because they had a concrete conversation about it

8   when they were created.  And the only thing that had

9   happened since then was a nasty divorce.

10          When you go back inside the deliberation

11  room, I'm going to ask you to hold him accountable

12  for what he did, for the things that can never be

13  taken back from this victim.  And I'm going to ask

14  you to call revenge what it is and to find him guilty

15  on all counts.  Thank you.

16          THE COURT:  Mr. Taylor.

17                  OPENING STATEMENT

18          MR. TAYLOR:  Your job here today is to

19  decide a dispute of facts.  We're going to have,

20  apparently, quite a big dispute of facts.  Your job

21  is to listen to the evidence and testimony, decide

22  what is credible, what proof you have found, apply

23  those facts to the law and reach a verdict.

24          And in doing so, this trial is going to

25  take you to some strange places.  You're going to

Defendant's Opening Statement                206

1    meet two people who are toxic for each other; two

2    people who were in a relationship, probably never

3    should've been; two people who have a strong tendency

4    to make a mountain out of a mole hill.

5                   I'm obviously talking about Mr. Barber

6    and Ms. Vance.  To understand this case, you need to

7    understand the history of their relationship.  Now,

8    some of this will be duplicative of what Ms. Atwood

9    just told you.  They meet in 2009 on an internet

10   dating website, OkCupid.

11                  At that time, Mr. Barber is living here

12   in the Portland area.  Ms. Vance lives in Ohio.  They

13   strike up a conversation pretty quickly, get to know

14   each other, a lot of shared interests.  They're very

15   interested in the internet, technology, the nerd

16   subculture.  They share some other similarities.

17                  They both have issues with their

18   eyesight.  As Ms. Atwood mentioned, Ms. Vance is

19   albino.  She is nearly legally blind.  Mr. Barber is

20   blind in one eye from an ROTC accident in high

21   school.  So they have these shared interests and they

22   start chatting.

23                  After a while of talking over the

24   internet, their relationship starts to take a

25   romantic turn and they are officially in a

1    relationship.  And their relationship is built on a

2    lot of these shared interests, shared goals, things

3    they like to do with their lives.

4              And it was also built on a shared

5    interest in a sexually-progressive lifestyle.  They

6    are both young, into sort of liberal,

7    pushing-the-bounds side of things.  So together, they

8    get involved in a lot of these activities.

9              They make a lot of pictures and videos.

10   They're chatting over Skype, things like that, all

11   with a nudity, sexual overtone to it.  When they're

12   together, they're engaged in a lot of very

13   progressive sexual things:  Public sex, going to sex

14   clubs, exchanging these photographs, talking to other

15   folks on the internet to engage in threesomes,

16   foursomes.

17             And these videos that are the subject of

18   this trial play into that lifestyle because, again,

19   you're apparently going to hear disputed facts.  And

20   one of the big disputed facts is why those videos

21   were made.

22             You will hear evidence and testimony

23   that what they wanted to do, in part, was to meet

24   other couples to have these sexual encounters with.

25   And as part of this subculture, what people do is

Defendant's Opening Statement                    208

1    they like to advertise themselves.

2              So these couples will meet on Craigslist

3    or OkCupid, these internet sites, and they will chat

4    and they will exchange photos and videos of

5    themselves to sort of advertise what they have to

6    offer.  So they begun making these videos.

7              And I want to be clear about some of

8    these videos and what they contain.  There's four

9    videos in question.  They range in length from about

10   16 minutes long to 21, 22 minutes.  They are videos

11   of Mr. Barber and Ms. Vance having consensual sex,

12   clearly nothing coercive or strange about it.

13             They're recorded using Mr. Barber's

14   camera phone.  So set up the camera, have sex in

15   front of it and keep it.  The whole time, Mr. Barber

16   has always been the one in possession of these

17   videos.  You may hear evidence and testimony that

18   Ms. Vance had copies as well.

19             But these were definitely shared by both

20   of them, featuring both of them for shared purposes.

21   And, again, what were those purposes?  Obviously,

22   you're going to hear that because they were having a

23   long-distance relationship, they would like to

24   enjoy these videos when they were apart.

25             Second purpose, to disseminate and share

Defendant's Opening Statement                209

1    with other individuals that they met they were

2    looking to have these group sexual encounters with.

3    And the third reason is because, as part of this

4    lifestyle, they were interested in the idea of making

5    pornography and getting paid for it.

6              So these videos were sort of a demo

7    reel.  And you will hear testimony that forays were

8    made into finding out whether they could monetize

9    their sexuality.  So they keep living this lifestyle.

10   Again, they met in 2010, these videos were made in

11   early 2011.

12             Eventually, Ms. Vance moves out here.

13   They get married on 2012.  As Ms. Atwood said, it

14   isn't a good marriage; it's short.  Neither of us are

15   here to relitigate their divorce.  However, there are

16   some things that occurred during this time that will

17   bear on this case.

18             So as Ms. Atwood said, it was a long,

19   drawn-out divorce.  It was ugly.  A lot of things

20   were said over the year or so that it was going on.

21   There were accusations of a number of varieties.  And

22   you're going to hear some sort of shocking things

23   about some of these accusations.

24             At one point, an accusation of rape is

25   floated.  Now, Ms. Vance later repudiates this.  The

1    evidence and testimony you will hear, what I believe,

2    is that this accusation arises from the fact that

3    while they were dating, there was consumption of

4    alcohol and prescription pills by one or both

5    parties.

6              And, thus, they would have sexual

7    intercourse while they were intoxicated after taking

8    prescriptions and then consuming alcohol, the theory,

9    obviously, then being that if a person is

10   intoxicated, they may not be able to consent to

11   sexual relations and, therefore, it would be a

12   lack-of-consent theory.

13             These accusations are floated.  That is

14   obviously an ugly or serious allegation.  They're

15   later repudiated and nothing comes of it.  Other

16   accusations are the typical divorce accusations.

17   They get into it about money, issues with the

18   apartment, issues with shared property and it gets

19   pretty ugly.

20             You're going to hear evidence of

21   testimony, again, about that making a mountain out of

22   a mole hill.  Disputes over money and somebody owing

23   a gas bill turn into, "I'm going to get a lawyer and

24   I'm going to go after you for Fraud and I'm going to

25   get you thrown into jail," and "No, you're

1    blackmailing me."

2              So to be all fair, these accusations go

3    both ways.  But they're at each other's throats

4    constantly.  Divorce goes through in 2015.  Things

5    get quiet.  They don't talk for a little bit.  And

6    then as 2015 progresses, they get back in contact.

7              And, again, picking up on some of the

8    things Ms. Atwood had to say, their lives go in

9    different directions.  Ms. Vance's life generally

10   improves.  She finishes school, gets a job, meets a

11   new guy.  Her life's going well.

12             Mr. Barber is not so lucky.  Part of it

13   is the divorce.  He is subject to massive

14   garnishments of his wages, so any job he does get,

15   he's losing a great deal of his money.  He has

16   difficulty holding jobs.  He ends up losing his house

17   and he becomes homeless for a while.

18             And you'll hear that Mr. Barber -- and

19   Ms. Vance as well -- are both people who are

20   interested in the big picture.  What am I going to do

21   in the world?  How can I help people?  And by 2015,

22   Mr. Barber is feeling like he doesn't have much to

23   offer the world.  He's starts getting very depressed.

24             Now, during 2015, there's also some

25   conversation between them.  And, again, you'll hear

Defendant's Opening Statement                212

1    evidence and testimony about this.  A lot of it is

2    chatting and e-mails and things like that.  And it's

3    hot fish, cold fish.

4              One month it's, "I don't want to talk to

5    you.  Don't ever speak to me again."  A few months

6    later, for example, July of 2015, Ms. Vance is

7    initiating conversations, long and drawn-out pages

8    and pages of chat with Mr. Barber.

9              An important fact arises during a July

10   of 2015 chat.  You see these videos, they'd sort of

11   fallen by the wayside at this point.  You're not

12   going to hear any evidence that during the divorce,

13   any mention was made of them, any discussion was had,

14   if anyone laid out any rules about, "Oh, remember

15   those videos?"

16             No discussion or anything like that,

17   they just sort of fell in the background.  And where

18   they were -- or one of the places they were -- was on

19   Mr. Barber's FTP server, which, for those of you who

20   are not technologically savvy, it's kind of like

21   cloud.

22             And it's an older version of what we

23   think of now as a cloud where you upload whatever

24   content you have, your files, your photos, videos,

25   and you can keep them there.  And so they're just

1    floating up there in the cloud with some of his other

2    stored stuff.

3                   And, apparently, in July of 2015,

4    someone tries to hack into this cloud.  And there

5    were some allegations or threats made that people

6    were going to dox this pornography.

7                   And what doxing means -- again, taking

8    you in this internet rabbit hole -- the idea of

9    doxing is when somebody hacks into your computer or

10   your cloud or something like that and takes your

11   photos, videos, whatever and then spreads them around

12   on the internet.

13                  And somebody attempted to dox

14   Mr. Barber.  And in this conversation with Ms. Vance,

15   he tells her, "Did you hear that somebody tried to

16   dox our porn?"  And she says, "Yeah, I heard

17   something about that," doesn't seem to make any big

18   deal about it, completely unconcerned at that time.

19                  Things go on.  The rest of 2015 doesn't

20   go well with Mr. Barber.  No job, he loses his home,

21   extremely depressed.  His depression takes him to the

22   point where he is considering ending his own life.

23                  In January, he goes to OHSU, suicidal

24   ideations, spends some time, January through March,

25   working with a mental health service, trying to get

Defendant's Opening Statement                214

1    himself afloat, but he still has no job, no place to

2    live, no hope and he's kind of come to the end of

3    his line.

4              In April, things get really bad.  He has

5    made a plan to kill himself.  That's really all he

6    can think of.  And he thinks to himself, "Who's going

7    to care if I die?  What mark am I going to leave on

8    this world?"

9              'Cause all he's wanted to do is to

10   (indiscernible) technology, write software and things

11   like that, be remembered, make some difference.  He

12   knows that his server and all that is going to crash

13   when he stops paying the bill after he kills himself,

14   so he wants to leave his mark.

15             So he gets on line.  He gets on

16   Facebook.  He posts all of his personal photos from

17   his whole life, you know, when he was a kid and grown

18   up, posts all of his photos up there so they'll stay

19   there forever.

20             He gets on this website called GitHub,

21   which is a technology sharing website.  He posts all

22   of his code he's ever written and everything he can

23   just give to the world.  And as he's going through

24   these, he comes across these videos.

25             And he looks at them and he -- of

Defendant's Opening Statement          215

1     course, he remembers what they were and why they were

2     made.  And he looks at them and he says, "And this is

3     the last time I remember being happy," when he was

4     with Ms. Vance because, this whole time, he has

5     wanted to get Ms. Vance back.

6                You're going to see all these e-mails,

7     "I wish we could spend time together.  I wish you

8     would take me back.  I wish we were spending

9     Christmas together."  They're sad.  He wants her

10    back.  So he takes those videos and that's part of

11    the mark he wants to leave on this world.

12                It's part of a lifestyle he has lived

13    with Ms. Vance, that sexually-adventurous lifestyle.

14    And he decides he's going to throw these videos into

15    that sea of amateur pornography that lives in the

16    internet 'cause you'll hear evidence and testimony

17    that, for those of you who don't already know,

18    amateur pornography is a massive part of the

19    internet, the pornography that people enjoy on the

20    internet.

21                And he throws them out there in this

22    sea.  You're not going to hear any evidence and

23    testimony that he sent it to anyone, that he shared

24    it on Facebook or that it came into their sphere of

25    friends or people they know, nothing like that.

1        He just threw it out there and

2   (indiscernible).  And he's moving forward with his

3   plan to kill himself.  And then all of a sudden, the

4   skies open up and he gets this amazing job at Intel

5   doing exactly what he wanted to do.  And this is in

6   late April.

7        Decides not to kill himself.  Goes to

8   work.  Starts working a ton.  Way overtime, hours and

9   hours a week and he just forgets about these things.

10  They're just sitting there on the internet, not doing

11  anything.

12        Time goes on.  He sends Mr. Vance --

13  excuse me.  He sends Ms. Vance more e-mails, updates

14  on his life.  He says, "Good news.  I have gotten a

15  real job.  I'm doing all this work.  I'm so proud of

16  it.  I'm so happy.  I wish I could share it with

17  you."

18        Nothing threatening or harassing in

19  those e-mails, just more talk about how he misses

20  her.  He wishes they were back together.  He has

21  reservations about their relationship, how he wishes

22  they were together.

23        Brings us to June -- late June.

24  Ms. Vance somehow discovers these videos, whether

25  it's the manner which Ms. Atwood said -- however, she

1    finds these videos online.  She is obviously less

2    than pleased.

3                    She's a teacher.  She doesn't want those

4    things out there.  And this dude that she's tried to

5    get rid of this last year apparently put them up

6    there.  So first thing she does is get a lawyer.

7    Lawyer tells her, "Call the police."

8                    Calls into dispatch, said he's got this

9    revenge porn fix.  Deputy Duenas gets assigned to it.

10   He looks at it as this brand-new law.  He's going to

11   check it out.  Talks to Ms. Vance, tries to talk to

12   Mr. Barber, has trouble getting a hold of him because

13   he's working so, so much.

14                   Finally gets ahold of Mr. Barber.

15   Mr. Barber says, "Whoa, whoa.  Can we resolve this

16   civilly?  I didn't know.  I'm sorry.  I -- I

17   understand that she's bent out of shape.  I

18   understand what you're saying.  What can I do?"

19                   Tries to take the videos down, all these

20   types of things, tried to explain his side of the

21   story.  Deputy Duenas is not having it.  Eventually,

22   after several weeks, he makes a decision to arrest

23   Mr. Barber, asks Mr. Barber to turn himself in.

24   Mr. Barber does.  Here you are today.

25                   So, folks, what your job is going to be

Defendant's Opening Statement              218

1      is to hear the testimony, look at the evidence,

2      decide which facts have been proven to you and apply

3      them to the law.  And this is a somewhat lengthy law.

4                    There are numerous elements.  The State

5      most prove each and every one of those elements

6      beyond a reasonable doubt.  Some elements will be in

7      dispute, some will not be.  To have a complete crime,

8      the State, obviously, has to prove all of those

9      elements beyond a reasonable doubt.

10                   For example, there isn't a lot of

11     dispute that these were videos featuring the two of

12     them, that you can see them in the videos.  If

13     everything goes according to plan, you guys won't

14     even need to view these videos during this trial.

15                   You may see a short video or a

16     photograph, but you're not going to have to sit here

17     and watch these.  We don't dispute that.

18                   Other elements are going to be seriously

19     in dispute, his intent, consent, 'cause what you're

20     going to hear is that there is certainly a dispute of

21     fact about what, if any, discussions were had about

22     these videos, how they'd be shared, knowledge of how

23     they were being shared in the past, knowledge about

24     the people sharing them and what that would lead

25     Mr. Barber to reasonably believe, if he even

1    considered (indiscernible).

2              You're going to have questions about

3    whether someone can expect privacy in this type of

4    video, one that has already been shared, one that

5    features two people, one that was made by somebody

6    else.  These are all questions you'll need to

7    consider.

8              But the biggest and, perhaps, most

9    important issue in this case is that intent.  You

10   will not see evidence or testimony that when Ben

11   Barber sat down, put these videos on a website, that

12   he did it because he hates Ms. Vance, that he wanted

13   revenge.

14             He put them up there because he was

15   going to kill himself and that was the last time he

16   remembered being happy in this world.  There was no

17   malice in his heart when he put these videos up.

18             And if Ms. Vance takes offense to that,

19   as she very clearly will, Mr. Barber does regret that

20   today.  But it wasn't on his mind when he put these

21   videos up.  So at the end of this trial, I'm going to

22   come back and ask you to find him not guilty.  Thank

23   you.

24             THE COURT:  Thank you, Mr. Taylor.

25             All right.  Ms. Atwood, are you prepared

1      to call your first witness?

2                     MS. ATWOOD:  Yes, Judge.  The State

3      wishes to call Meagan Vance.

4                     THE COURT:  Thank you.

5                     THE CLERK:  If I could have you remain

6      standing and raise your right hand.

7                          ***MEAGAN VANCE***

8      Was thereupon called as a witness on behalf of the

9      State; and, having been first duly sworn, was examined

10     and testified as follows:

11                    THE CLERK:  Thank you.  You may be

12     seated.

13                    For the record, if I could please have

14     you state your name, spelling first and last.

15                    THE WITNESS:  My name is Meagan Vance.

16     My first name is spelled M-e-a-g-a-n.  My last name

17     is spelled V-a-n-c-e.

18                    THE COURT:  You may inquire, Ms. Atwood.

19     Thank you.

20                       DIRECT EXAMINATION

21     BY MS. ATWOOD:

22         Q    Good afternoon, Ms. Vance.  So I'd like to

23     start off just by asking you a couple questions about

24     yourself.

25         A    Mm-hmm.

M. Vance - D                   221

1        Q      Where do you live?

2        A      I live in Washington County.

3        Q      Is that in Beaverton or --

4        A      It's in Portland.

5        Q      -- or where?

6        A      It's almost Beaverton, but --

7        Q      Okay.

8        A      -- kind of in that in-between area.

9        Q      And how long have you lived there?

10       A      I have lived in different parts of

11   Washington County in the past year.

12       Q      Okay.  How old are you?

13       A      I'm 26.

14       Q      And what do you do for a living?

15       A      I am a special education teacher.

16       Q      And where do you teach?

17       A      I teach at West Sylvan Middle School.

18       Q      When did you start that job?

19       A      I started that job in August of 2015.

20       Q      What are the ages, roughly, of the students

21   that you work with?

22       A      I teach middle school.  I'm a seventh and

23   eighth grade teacher.

24       Q      Okay.  So I want to ask you a couple of

25   more personal questions about your health.  So you

1    are albino, right?

2          A    Yeah.

3          Q    Can you just explain briefly to the jury

4    what that means?

5          A    That basically means that I am visually

6    impaired.  I am legally blind.  I have some

7    sensitivity to light.  You might see me twitching a

8    bit with my eyes because the light kind of affects my

9    eyes.  I can't really see anyone's faces right now.

10   So I might not be making the best eye contact.  So

11   that's really how it affects me.

12         Q    And has this been something that you've had

13   to deal with in your day-to-day life for your

14   whole life?

15         A    Absolutely.  It's genetic, so from birth,

16   it's there.  It really impacts my life.  Because I do

17   teach special ed, it's a part of what I've gone

18   through, my students are going through.  And I really

19   connect with them on that.

20         Q    Okay.  So I want to shift gears and get

21   into some questions about your involvement in today's

22   case.  How do you know Benjamin Barber?

23         A    We were married.

24         Q    And do you see him in the courtroom today?

25         A    What do you -- I don't understand

1      your question.

2              Q      It's okay.  Yeah, I'm -- never mind.  When

3      did you meet Mr. Barber?

4              A      We met online in the fall of 2010.

5              Q      Okay.  And what website was that on --

6              A      It was on --

7              Q      -- do you recall?

8              A      -- OkCupid.

9              Q      And that's a dating website?

10             A      Yeah, it's a dating website.

11             Q      Okay.  So how did you guys start talking?

12             A      We casually just started talking online.

13     I was going to school in Ohio.  I was thinking about

14     graduation.  I didn't really know what I wanted to do

15     with my life.

16                    So I thought if I could talk to people

17     around the country and the world, maybe I can know

18     where I'm going in life a little bit more.  So we

19     just got to talking and really hit it off.

20             Q      And how far along were you in college at

21     that point?

22             A      I think I had just started my junior year

23     in college.

24             Q      And where was he living at the time?

25             A      He was living in Portland, Oregon.

M. Vance - D                              224

1      Q    Okay.  So how long did you guys chat before

2  your relationship became more serious?

3      A    I'd say about two to three months or so.

4  We talked for a while and then he decided he was

5  going to visit a few months after we had started

6  talking.  And we were basically -- I think it was

7  pretty much established that we were dating at the

8  point that he had visited me.

9      Q    Okay.  Do you recall, generally speaking,

10  when that visit happened?

11      A    It was in the fall of 2010, I think

12  October.  It -- it was a long time ago, so I think it

13  was around October, November --

14      Q    Okay.

15      A    -- it -- colder fall.

16      Q    Was that -- and that was him visiting you

17  in Ohio?

18      A    Yes.

19      Q    Okay.  At any point during the time that

20  you guys were long distance, did you visit him in

21  Portland?

22      A    Yeah.  I visited him on every single break

23  that I had, so my first break was in December of

24  2010.

25      Q    Okay.  Let's talk a little bit more about

1    these visits.  Was it -- generally speaking, was it

2    difficult being in a long-distance relationship for

3    you two?

4         A    It was difficult.  I -- I was excited

5    because I didn't really connect with anyone that I

6    had lived with.  I think it was harder on him, but it

7    definitely is harder than a typical relationship.

8         Q    And what did you guys do to keep in touch?

9    How did you contact each other?  Phone?  Internet?

10        A    A lot of phone contact, mostly Skype

11   because we -- you know, phone calls aren't that great

12   for talking for several months.  If you're dating,

13   you want to see each other's faces.  You want to

14   connect with each other.

15             So it's difficult to have that connection

16   when you're separate.  So you have to try to do what

17   you can to create a romantic relationship long

18   distance.

19        Q    Sure.  Did -- during the time that you guys

20   were long distance, did the defendant ever talk to

21   you about his feelings about being long distance or

22   any struggles he was having with that?

23        A    He had been in a long-distance relationship

24   before, he had told me, so he said it is a very

25   difficult thing that he doesn't like long term.  He

1    was willing to do it.

2            As the relationship progressed, it was

3    more -- more pushing and demanding as far as, "We

4    cannot continue a long-distance relationship.  It has

5    to be -- we have to live together."

6        Q    How long did things progress before it got

7    to that point?

8        A    Until about spring of 2012, which was

9    around the time I was graduating.  I had some

10   difficulty with graduation, so he was very intrusive

11   and demanding as far as me getting my teaching degree

12   so I could move with him.  He didn't want me to be in

13   school in Ohio any longer.

14       Q    Okay.  So did he ever explain to you

15   the reasons why the long distance was so difficult

16   for him?

17       A    The only conversation that I really

18   remember is just the sexual difficulty because when I

19   was visiting in December of 2010, he had expressed

20   that -- you know, when I was leaving, I wouldn't --

21   we wouldn't be able to have sex.

22            And it was difficult for him.  I think he

23   also missed just having female companionship of some

24   sort, so I think he had female friends that he'd

25   spend time with or hang out with when I was gone.

1       Q     So did you guys -- or did he offer any kind

2    of solution to help him, I guess, survive the bits of

3    time when you were away?

4       A     Yeah.  It -- I mean, it was very clearly

5    the videos that were made in 2010.  He -- he was very

6    upset at that point.  And he just was very angry that

7    I was leaving.

8             And he -- he felt kind of abandoned with

9    the relationship because we would visit each other

10   for a month and then I was going to go away.  So he

11   had expressed that to me, yeah.

12      Q     Do you roughly remember when that

13   conversation happened?

14      A     It was in December of 2010.

15      Q     And was he the person to bring up the idea

16   of making the videos?

17      A     Yes, absolutely.  He pretty much said,

18   like, "We -- we need to do this," so that he could

19   feel sexually satisfied.

20      Q     How did you initially feel about that

21   request when he made it?

22      A     I was pretty nervous.  We were talking

23   about all these, like, sexually-explorative type of

24   things.  But it was -- I just didn't think it was an

25   actually serious discussion.

M. Vance - D                        228

1                   So when he had asked that we actually make

2       videos, it was stressful for me because I -- I loved

3       him very much, but we didn't know each other that

4       long.  It had only been a few months at that point.

5                   So I was -- I didn't exactly feel

6       comfortable with it.  But this was someone that I

7       really loved and cared about like I hadn't had

8       before.  And I felt like it's something I had to do.

9            Q    And you were fairly young when you entered

10      into this relationship, right?

11           A    Yeah, I was 20.

12           Q    And how much relationship experience had

13      you had at that point in terms of long-term, adult

14      relationships?

15           A    That was my first adult relationship.  I

16      had some relationship that ended in my senior year in

17      high school and I had just focused on studying after

18      that.  So this was my very first adult relationship.

19           Q    So did you voice to him any specific

20      concerns that you had about making the videos or what

21      would happen with the videos?

22           A    We had a discussion because, early on, we

23      were talking about being together long term and what

24      was the best for both of us.  He really wanted me to

25      be a teacher.  I wanted to be a teacher.

1           And we had decided that anything that we do

2     is just between us because we didn't want anything

3     floating around that would jeopardize my career.

4           Q    How -- what -- what phase, I guess, of

5     your work toward your teaching degree were you at

6     at that point?

7           A    I was in my junior year in college at that

8     point, so I was at the point where it was getting

9     serious.  I'd taken all of my prerequisite classes

10    and I was actually being in the classroom for the

11    first time, working with kids.

12          My name was attached to my teaching and

13    everything, so that's the first time when I was

14    actually really in the community and practicing

15    teaching at that point.

16          Q    And so you had several concerns that you

17    voiced to him.  What led you to make the videos

18    anyway?

19          A    He -- that he had agreed.  He wanted me to

20    be successful just as much as I did.  It was -- it

21    felt very loving.  I was nervous about it, but he was

22    five years older than me.  I had trusted him like he

23    knew what he was doing.

24          And it was very much agreed that this

25    was between us.  We both wanted each other to be

1   successful, so there would be no way that he would

2   want to jeopardize that.

3        Q    And when --

4        A    I had no question.

5        Q    Sure.  And when did you guys actually

6   record the videos?

7        A    We recorded the videos in December of 2010.

8        Q    Do you recall where the videos were

9   recorded?

10        A    Yeah.  They were taken in his bedroom of

11   his apartment at the time.

12        Q    Where was he living, do you remember?

13        A    Southwest Portland.

14        Q    Did anybody else besides the two of you

15   participate in the creation or production of the

16   videos?

17        A    No.

18        Q    How did you, personally, feel while you

19   were making the videos?

20        A    I -- I felt uncomfortable.  I was very

21   nervous about it.  I didn't particularly enjoy it as

22   much as being intimate with someone without recording

23   video.  So I -- I didn't feel particularly happy

24   about it, but I knew I was doing something for my

25   partner.

1       Q     Once the videos were made, what happened

2   with them?

3       A     I -- I didn't hear anything from them at

4   that point.  I don't --

5       Q     So were they stored on disk or a drive?  Do

6   you recall anything about that?

7       A     I just assumed they were stored in his

8   phone.  Several years later, I found them on his

9   website, but I -- I just assumed he was using them as

10  he said he would to remember memories that we had had

11  and to have sexual satisfaction himself.

12      Q     Did you, personally, possess the videos at

13  any point?

14      A     I -- no, I didn't.  I didn't really have an

15  interest in having them, so --

16      Q     And beyond the first round of conversations

17  you had about your concerns, did you revisit the

18  conversation at any point after that time?

19      A     You mean later in our relationship --

20      Q     Yeah.

21      A     -- did we talk about it?  No.

22      Q     So to be clear, did you ever give him an

23  indication that you'd changed your mind about what

24  could happen with the videos?

25      A     Absolutely not.  It was very clear between

M. Vance - D                                    232

1    us that I'm going to be a teacher.  We don't want

2    these videos out there, especially 'cause I do look

3    very unique and -- absolutely not.  You know, we both

4    wanted to be successful together.  Why -- why would

5    we want to share that and jeopardize my career?

6         Q    So I want to turn back a little bit to fill

7    in the rest of the chronology of your relationship.

8    So correct me if I'm wrong, but you said you met in

9    2010 online, right?

10        A    Yeah.

11        Q    And in 2010 and 2011, you were in Ohio

12   while he was here?

13        A    I visited December of 2010 to January 2011.

14   I visited summer 2011 and then I came back December

15   2011.

16        Q    Okay.  Okay.  So at what point did

17   marriage come?

18        A    December 2011.

19        Q    And was that before you had officially

20   moved back here?

21        A    That was before I'd officially moved back.

22   I had to go back to Ohio to do student teaching and

23   then I came back after that.

24        Q    How long were you two married before you

25   filed for divorce?

1        A      So I -- we were married from December 2011

2   until October 2013, is when I officially left our

3   home and didn't come back --

4        Q      Okay.

5        A      -- and had pursued divorce.

6        Q      How long was the divorce pending before it

7   was finalized?

8        A      It was finalized April of 2015.  It -- it

9   didn't need to be.  It could've happened in two

10  weeks, but it lasted that long.

11       Q      And briefly speaking, how would you

12  describe the divorce?

13       A      It was very -- a nasty divorce.  I think

14  that's one thing him and I can agree upon.  It was a

15  very nasty divorce.  It had no reason to be nasty.

16  I just wanted it to be over.  I was okay with being

17  friends and just not being together.  It -- it was

18  not -- he didn't feel that way.

19       Q      And since the divorce was finalized, have

20  you gotten into a new relationship?

21       A      Yes, I have.

22       Q      And how long have you been in that

23  relationship?

24       A      Since June 2014.

25       Q      Okay.  And at what point did you -- I may

1   have already asked you this.  At what point did you

2   start working at West Sylvan?

3        A    August of 2015.

4        Q    Okay.  So I want to ask you some questions

5   about events leading up to this investigation.  You

6   just testified that things were finalized in the

7   divorce in 2015.  Between then and now, did your

8   relationship with the defendant change at all?  Did

9   things improve?  Did things get worse?

10        A    No, no getting better.  A couple of times,

11   I'd reached out and said, "Hey, can we be friends?"

12   But it was just -- it was a very vindictive

13   situation.  It was toxic.  I -- I loved him and I

14   wanted him to continue his life without me because

15   our life together was very toxic.  So I just exited

16   myself and tried to make the best of my life.

17        Q    Okay.  So you mentioned that you exited

18   yourself.  After you had stopped contact with the

19   defendant, did he continue trying to contact you?

20        A    Yeah.

21        Q    So I -- well, first, what avenues would he

22   use to make contact with you during 2015, 2016?

23        A    E-mail, phone call.  I'd block him on

24   Facebook and he'd get another account and contact me,

25   voicemails.  I eventually just changed my phone

1    number.  And I thought if I didn't respond after

2    telling him I didn't want to hear contact from him

3    that, eventually, he would just move on.

4         Q    Did that happen?

5         A    No.

6         Q    So I would like to show you a couple

7    of documents.

8              MS. ATWOOD:   Permission to approach the

9    witness, Your Honor?

10             THE COURT:   Yes, Ms. Atwood.

11   BY MS. ATWOOD:

12        Q    So I'm going to show you two documents.

13   The first one is what I've labeled as State's

14   Exhibit 2.  Do you recognize this document?

15        A    Yeah.

16        Q    Is this a copy of a text message -- or two

17   text messages that you received from the defendant?

18        A    Yeah.

19        Q    Can you tell when the text messages were

20   sent to you.

21        A    Well, the first one talks about

22   Thanksgiving plans and this was either the day of

23   Thanksgiving of the day before.

24             The second one says, "Merry Christmas.

25   Miss you, Ben."  And that was Christmas.  It looks

1    like it says December 24th and November 26th.

2         Q     Okay.  And that was of 2015?

3         A     Yeah.

4         Q     And are these accurate copies of text

5    messages that you received from him?

6         A     Yeah.

7               MS. ATWOOD:  Your Honor, we would offer

8    State's Exhibit 2.

9               MR. TAYLOR:  No objection.

10              THE COURT:  Thank you.  That'll be

11   received.

12              (State's Exhibit No. 2 received.)

13   BY MS. ATWOOD:

14        Q     So I'm also going to show you what I've

15   marked as State's Exhibit 3.  This is a two-page

16   document.  Do you recognize this document?

17        A     Yeah.

18        Q     Are these additional text messages that you

19   received from the defendant?

20        A     Yeah.

21        Q     And what's the general context of these

22   messages?

23        A     He -- he was -- he was texting me and

24   saying he doesn't want to burden me anymore.  He

25   wants to leave this world.  And he's -- he's just

1    saying that he doesn't know if he has a place in this

2    world.  He's considering setting himself on fire.

3    You know, these were very hard to receive.

4         Q    (Indiscernible).  Are these accurate copies

5    of texts that you remember receiving from him?

6         A    Yeah.

7              MS. ATWOOD:  Your Honor, we'd offer

8    State's 3.

9              MR. TAYLOR:  No objection.

10             THE COURT:  Thank you.  It'll be

11   received.

12             (State's Exhibit No. 3 received.)

13   BY MS. ATWOOD:

14        Q    Did you respond to any of these text

15   messages that he was sending you?

16        A    No, I didn't.  With these -- the suicide

17   texts, he had also called me around that time.  And I

18   had responded to the call and then I -- I hung up and

19   I -- I called a friend and asked for their advice.

20             And they're, like -- they just said, you

21   know, "You just need to move on.  He'll take care of

22   himself."  So then I just didn't respond from that

23   point.

24        Q    Sure.  So I'm going to continue showing you

25   some documents if that's okay.

1        A    Mm-hmm.

2        Q    Do you remember providing a series of

3   messages and -- and related correspondence to law

4   enforcement relating to this case?

5        A    Yeah.

6        Q    Okay.  So the first item I'm going to show

7   you is what I have labeled State's Exhibit 4.

8        A    Okay.

9        Q    Do you recognize that item?

10       A    Yeah.

11       Q    Is that a copy of a message that was sent

12   to you from the defendant?

13       A    Yes.

14       Q    And is that one of the messages that you

15   later turned over to law enforcement?

16       A    Yeah.

17       Q    Is it true and accurate to your

18   recollection?

19       A    Yeah.

20            MS. ATWOOD:  Your Honor, we would offer

21   State's Exhibit 4.

22            MR. TAYLOR:  No objection.

23            THE COURT:  Thank you.  It'll be

24   received.

25            (State's Exhibit No. 4 received.)

1    BY MS. ATWOOD:

2        Q    And I'm also going to show you what has

3    been marked as State's Exhibit 5 and State's

4    Exhibit 6.

5        A    Okay.

6        Q    Do you recognize these documents?

7        A    Yeah.

8        Q    Are they Facebook messages or copies of

9    Facebook messages that were sent to you from the

10   defendant?

11       A    One's a Google message and one's -- these

12   are Facebook messages and I remember receiving these.

13       Q    And do they accurately reflect the things

14   that you received from the defendant and said to the

15   defendant?

16       A    Yes.

17            MS. ATWOOD:  Your Honor, we'd offer

18   State's Exhibits 5 and 6.

19            MR. TAYLOR:  No objection.

20            THE COURT:  Thank you.  They'll be

21   received.

22            (State's Exhibit Nos. 5 and 6 received.)

23            MS. ATWOOD:  Thank you.

24   BY MS. ATWOOD:

25       Q    Now, in State's Exhibits -- I want to draw

1    your attention to Exhibits 5 and 6.  There are some

2    stickers on the back of them.

3         A    Okay.

4         Q    (Indiscernible) records.

5         A    Can you help me find them?

6         Q    Yeah.  Let's see, this is 6 and this is 5.

7         A    Okay.

8         Q    So in reference to State's Exhibits 5 and

9    6, I want to draw your attention to your responses to

10   the defendant.  Did you respond to him during those

11   conversations?

12        A    Yeah.

13        Q    And what was the nature of your responses

14   to him?

15        A    "I'm keeping records of these

16   conversations.  Do not contact me.  I don't want to

17   hear from you.  Please don't contact me again."

18        Q    Okay.

19        A    "And I told you numerous times not to

20   contact me.  Don't contact me again."

21        Q    And when were these messages sent?

22        A    One, he had sent in February 20 --

23   February 22nd, 2016.  I had responded February 27th.

24   They automatically went to my trash folder, so I

25   didn't see them right away.  And the other one, it

1    looks like I sent on March 20th of 2016.

2          Q      And what are the -- what's the gist or the

3    context, generally, of the defendant's messages to

4    you?

5          A      In -- they are, basically -- I'm sorry,

6    I forgot the question.  I was trying to figure out

7    which piece of evidence I was looking at.  Could you

8    repeat it?

9          Q      No worries.  What is the context of the

10   defendant's messages to you?

11         A      Just that he's trying to get his life

12   together, he hopes we can talk again soon, that he's

13   trying to get on Social Security disability.  He

14   referenced me in some sort of application for that.

15         Q      Okay.  So two more exhibits to show you.

16   These are what I have marked as State's Exhibits 7

17   and 8.

18         A      Okay.

19         Q      Do you recognize these documents?

20         A      Yeah.

21         Q      Are these copies of e-mails that were sent

22   to you from the defendant that you provided to law

23   enforcement?

24         A      Yeah.

25         Q      Are they accurate copies of the messages

M. Vance - D                    242

1      you received?

2          A    Yeah.

3                  MS. ATWOOD:  Your Honor, we'd offer 7

4      and 8.

5                  MR. TAYLOR:  No objection.

6                  THE COURT:  Thank you, Mr. Taylor.

7      They'll be received.

8                  (State's Exhibit Nos. 7-8 received.)

9      BY MS. ATWOOD:

10         Q    So in drawing your attention to those two

11     messages, you can see that the defendant is

12     discussing a lot about technology and computers and

13     things like that.  In your relationship with him, did

14     he have these interests?  Was he interested in

15     technology and computers, that sort of thing?

16         A    Yeah, absolutely.  Yeah.

17         Q    To what extent?

18         A    Anything he did was involving computers

19     and technology.  We were talking about making special

20     education devices together for people with

21     disabilities.  It was -- work was a big part of both

22     of our lives and it was very fun and exciting.  So

23     that's-- basically, our lives were revolved around

24     that and his was technology.

25         Q    Okay.  So looking at these exhibits as a

M. Vance - D                          243

1    whole, to your recollection, how -- how did it make

2    you feel to receive these kinds of repeated contacts

3    from the defendant?

4         A    Just for 7 and 8 or all of the messages?

5         Q    All of them.

6         A    At first, it was a little upsetting and

7    just, you know, he's having difficulty moving on.

8    I'll just ignore it.  And then it just -- it -- it

9    felt more stressful the more I got the messages

10   because they'd go from my school e-mail to my phone

11   and calls.

12            And when I changed my number, it went to

13   my work e-mail.  And once it hit my work e-mail, I

14   was very worried because it -- it was obvious he was

15   looking up my information.

16            I'd had never given him my work information

17   or e-mails.  So increasingly, it became more

18   stressful and less of a normal breakup and more of

19   this is a scary situation.

20        Q    So why did you feel like you might need to

21   seek legal or law enforcement help?

22        A    When I had found the first videos, I

23   thought, okay, I can make a copyright claim.  I can

24   get rid of these.  It was very stressful to see.  But

25   throughout this relationship, I've become good at

```
 1    just kind of separating that -- that overwhelming

 2    feeling and shock into just do what I need to do.

 3              And so when I received -- I saw more

 4    videos, I thought this was more than what I can

 5    handle, I should probably try to talk to my lawyer I

 6    had for my divorce to just see if she could offer me

 7    any help.

 8         Q    Okay.  So let's sort of take those things

 9    one by one.  You mentioned when you found the first

10    videos.  What led you to search the internet for

11    things having to do with you?

12         A    To search for the first videos or --

13         Q    Yes --

14         A    -- the other ones?

15         Q    -- the first ones.

16         A    These e-mails I had received via my work

17    e-mail was after several months of not responding to

18    him.  This was towards May -- end of May.  And I

19    thought that was a big change in his contact.  He was

20    contacting me from my work.

21              And from previous difficulties, in April of

22    2015, we got our divorce.  He didn't allow me to come

23    get my stuff, so I had to get a sheriff's permission

24    to enter his home to get my -- my stuff back.

25              And when we had done that, he had told me,
```

1    "I'm going to make a website called meaganvance.net

2    and I'm going to show all of your transgressions and

3    ruin you because you have ruined me."  And from --

4         Q     When -- when did that happen?  I'm sorry.

5         A     That happened maybe April or May 2015.  It

6    was after the divorce was finalized and the next

7    steps was to just get our stuff.

8         Q     So why did you think -- why did your mind

9    jump to looking for the sexual videos?

10        A     I had just done a search of my name and I

11   found the first videos linked to my name.

12        Q     Where were --

13        A     My --

14        Q     -- they located?

15        A     They were located on a porn website

16   called xHamster.

17        Q     So when you Googled your first and last

18   name, is that what happened?

19        A     Yeah.

20        Q     Okay.  So did you click on the videos, go

21   to xhamster.com?

22        A     Yeah.

23        Q     And what did you find there?

24        A     I found a profile he had had before and I

25   found our videos.  Yeah.  It was very clearly me and

M. Vance - D                    246

1    us and it brought -- brought back memories and it

2    was -- it was overwhelming to think that anyone could

3    just click on it and look at it.  And it was attached

4    to my name, so -- and I guess I was just kind of in

5    shock.

6        Q    Do you recall how many of the videos he had

7    posted to that particular site?

8        A    Four, one of each of them.

9        Q    Okay.  So what did you do when you found

10   them?

11       A    My lawyer, when I was going through the

12   divorce, said this might happen 'cause he had them

13   hidden on his website before that.  And if they did,

14   I could always try to file a DMCA copyright claim and

15   claim that this is part of my copyright and try to

16   delete them that way.  That worked for xHamster.

17       Q    So what did you -- you -- you contacted

18   their e-mail?  How did that work?

19       A    I -- I reported the videos, and I just,

20   like, explained, you know, that I was reporting on

21   part of these videos.  I don't want them online.

22   And, you know, it's a copyright issue.

23       Q    And to your knowledge, did you -- well, did

24   you go back and look to see if they were gone?

25       A    Yeah.

1        Q     Did they remove them after your request?

2        A     They removed them, but there are still

3    screenshots floating all over the internet.  Once

4    they're there, they're there.  So I could identify

5    myself in screenshots and my name in the comments

6    still, even though they're deleted.  So they did what

7    they could to get them gone and I'm -- I'm trying to

8    just be happy with that and just pretend it's not

9    there.

10       Q     So at the time that you found those initial

11   videos on xHamster, you didn't contact law

12   enforcement?

13       A     No, not at that point.  I had later, from

14   the advice of friends, you know, said, "Hey, I found

15   these online.  I tried to delete them."  And they had

16   said, you know, "Maybe -- just try to talk to the

17   lawyer you had before," 'cause I knew I couldn't

18   afford any help with it.

19             And that lawyer had just advised I -- I

20   should call law enforcement because this is against

21   the law and this is harassing and threatening

22   behavior.

23       Q     So how long was it between the first -- the

24   first time you found videos on xHamster and had

25   them -- them removed, how long was it between then

1    and when you found additional videos?

2        A    A couple of weeks.  I believe I found the

3    xHamster videos at the beginning of June.  And then I

4    happened to look later in June and I found them on --

5    I think I found at least nine websites that they were

6    on, including xHamster at that point.  So --

7        Q    So what led you to search again?

8        A    'Cause I had found them the first time.  My

9    lawyer had told me, when we were going through the

10   divorce, if he's posted them one place, you know,

11   it's typical that they post them everywhere.  You

12   should check.

13       Q    And did you follow any of these links to

14   the websites yourself?

15       A    Yeah, I found the links myself, actually.

16   I -- I would go through and search albino porn or my

17   name on the internet and any website I could find,

18   I'd copy and paste the URLs --

19       Q    Okay.

20       A    -- and send them to law enforcement.

21       Q    And to your recollection, were the videos

22   all publicly available?

23       A    Yeah.

24       Q    Did you personally have any accounts on

25   these pages or anything like that?

1         A      No.

2         Q      So let's talk about the videos themselves.

3    Were the videos you found during the second round

4    photograph searching the same ones as had been posted

5    on xHamster at first?

6         A      Yeah.   There were only four --

7         Q      Okay.

8         A      -- so they were posted everywhere.

9         Q      And --

10        A      It's the same videos.

11        Q      -- they were the same ones that were made

12   in 2010?

13        A      Yeah.

14        Q      So you mentioned before that you were

15   taking steps to try to preserve the links that you

16   found them on?

17        A      Mm-hmm.

18        Q      Did you compile a list of those URLs?

19        A      Yeah, I did.

20        Q      So I want to show you what has been marked

21   as State's Exhibit 10.  Do you recognize this

22   document?

23        A      Yes.

24        Q      Is that the list of links that you provided

25   to law enforcement?

1        A    Yeah.

2        Q    And are those -- is that an accurate list

3   of the links that you found the videos on and --

4   and compiled?

5        A    Yeah.

6             MS. ATWOOD:  Your Honor, we'd offer

7   State's 10.

8             MR. TAYLOR:  No objection.

9             THE COURT:  Thank you.  It'll be

10  received.

11             (State's Exhibit No. 10 received.)

12  BY MS. ATWOOD:

13        Q    Roughly, how many links did you have listed

14  on that list there?

15        A    It's hard for me to count 'cause I --

16        Q    It's okay.

17        A    -- I can't see well.

18        Q    Don't worry.

19        A    It -- it looks like about 15.

20        Q    Did you also take any steps to document

21  what you had found in screenshots and things like

22  that?

23        A    I did.  After I deleted the xHamster

24  videos, I realized I really actually needed to take

25  screenshots that these are there to try to protect

M. Vance - D                           251

1    myself.  And so I did try to make as many screenshots

2    as I could and provide the evidence.

3         Q    So I'm going to show you what is marked as

4    State's Exhibit 9.  Feel free to review that.  It's a

5    big packet.  But do you recognize that set of

6    documents?

7         A    Yeah, that -- yeah, so far, I'm

8    recognizing.

9         Q    Okay.

10        A    Not fun to look at.

11        Q    Are these copies of the screenshots that

12   you were compiling to provide to law enforcement?

13        A    Yeah.

14        Q    And do they -- are they true and accurate

15   to your recollection?

16        A    Yeah.

17             MS. ATWOOD:  Your Honor, we would offer

18   State's Exhibit 9.

19             MR. TAYLOR:  No objection.

20             THE COURT:  Thank you.  They will be

21   received.

22             (State's Exhibit No. 9 received.)

23   BY MS. ATWOOD:

24        Q    So you mentioned that after you found

25   these additional links and website postings, that you

M. Vance - D                    252

1    contacted friends and then your attorney and then law

2    enforcement --

3         A    Yeah.

4         Q    -- is that accurate?

5         A    Yeah.

6         Q    So do you remember having a conversation

7    with Deputy Duenas on June 22nd, 2016?

8         A    That fits the time frame when I was talking

9    with him.

10        Q    Okay.  Did you and the deputy work out a

11   plan to attempt to call the defendant?

12        A    Yeah.

13        Q    And why did you guys do that?

14        A    They wanted to hear that -- him saying that

15   he had did it because, you know, just having a user

16   name on a website isn't enough.  They wanted to hear

17   intent and that he was upset with me and, you know,

18   he had a revengeful reason for -- for doing it and

19   that he had posted them.

20        Q    And when you guys tried to make this

21   pretext phone call, did he answer?

22        A    No.

23        Q    How about text messages?  Did you try to

24   text him?

25        A    He responded to text message.

M. Vance - D                    253

1        Q    But what did he say in the text messages?

2        A    First he asked who it was.  I said who it

3    was.  I -- I hadn't talked to him in a while.  So,

4    you know, once I'd confirmed, yes, it's Meagan Vance,

5    he asked me what was going on and, you know, that he

6    was working and that he was busy.

7             You know, "Is it an emergency?  Let's talk

8    about it.  Or is it not an emergency?"  And at that

9    time, I told him, "I saw the videos.  We need to talk

10    about it right now."  And it ended at that point.

11        Q    He didn't --

12        A    He didn't --

13        Q    -- respond?

14        A    -- respond.

15        Q    So did he make any further contact with

16    you, personally, after that point?

17        A    Yes, yes.

18        Q    I would like to show you State's

19    Exhibits 11 and 12.  This is State's Exhibit 11.  Do

20    you recognize this exhibit?

21        A    Yeah.

22        Q    Is this a copy of a message that was sent

23    to you from the defendant?

24        A    Yeah.

25        Q    And does it true and accurately depict the

1    message he sent?

2        A    Yeah.

3             MS. ATWOOD:  We would offer State's

4    Exhibit 11.

5             MR. TAYLOR:  No objection.

6             THE COURT:  Thank you.  It'll be

7    received.

8             (State's Exhibit No. 11 received.)

9    BY MS. ATWOOD:

10       Q    And this is State's Exhibit 12.  Do you

11   recognize that exhibit?

12       A    Yeah.

13       Q    Is that a copy of another e-mail forwarded

14   to you from the defendant?

15       A    Yeah.

16       Q    And -- and is that a true and accurate copy

17   of that e-mail?

18       A    Yeah.

19            MS. ATWOOD:  Your Honor, we'd offer

20   State's Exhibit 12.

21            MR. TAYLOR:  No objection.

22            THE COURT:  Thank you, Mr. Taylor.

23   It'll be received.

24            (State's Exhibit No. 12 received.)

25   ////

1   BY MS. ATWOOD:

2        Q    And what was the nature of the contact he

3   made with you in State's Exhibits 11 and 12?

4        A    Well, it was very clear to me when I'd

5   received it that he knew something was going on

6   because he said, "Please stop trying to ruin my life.

7   I just got a job.  My life's been nothing but

8   suffering."

9             He's been living in hopelessness.  He

10  doesn't want to continue that and he basically wants

11  to make a deal with me to get rid of these videos so

12  he could keep his job and that he wants to talk to me

13  about that.

14            That other piece of evidence is he

15  forwarded something he had sent to one of these porn

16  websites and he had said, "I had upload the -- I had

17  uploaded these to xHamster," and he was showing that

18  he had removed three videos on one website.

19            He forwarded me that little receipt that he

20  had tried to remove those videos and sent them up to

21  my work e-mail.

22       Q    And these contacts were made with you after

23  you had already contacted law enforcement?

24       A    Yeah.

25       Q    Okay.  So just to be clear, up to this

M. Vance - D                            256

1    point, had you ever given him any indication that you

2    would consent to the dissemination of this video --

3    or these videos?

4         A    No.

5         Q    I want to ask you some questions about how

6    this has affected your life at all.

7         A    Okay.

8         Q    So let's start with on a professional

9    level, how has this affected you or harmed you

10   professionally, if at all?

11        A    Well, on one end, I see it as a ticking

12   time bomb.  I teach middle school.  I am very open

13   about my unique disability.

14             And, you know, anytime a kid or a parent

15   can find this video and whether or not I'm a good

16   teacher, it's just not appropriate for these images

17   of me to be seen in my professional life.

18             On the other end, once I had received

19   these links to porn websites on my work e-mail, law

20   enforcement told me I need to talk to my supervisor

21   and tell them I did not want to receive these e-mails

22   with links to porn and that there was a case being

23   filed.

24             I had to talk to my supervisor and say that

25   so that porn wasn't seen on my work e-mail as a

1    teacher.  So that's -- that's how it's affected my

2    work life so far.  And, you know, someday, someone

3    could find these videos and my career could be over

4    or very negatively affected.

5          Q    How about your personal life and a personal

6    sense of well being?

7          A    It's stressful.  I have a long history of

8    Ben getting something embarrassing of me and posting

9    it online.  This isn't the first time he's posted

10   images of me without my consent.

11                    MR. TAYLOR:  Objection.

12                    THE COURT:  Sustained.

13                    You will strike that.

14   BY MS. ATWOOD:

15         Q    So let's just talk about from --

16         A    Okay.

17         Q    -- these postings that were found in

18   this -- June of this year and -- and how that's

19   impacted you personally.

20         A    Okay.  It's been very stressful to deal

21   with this.  I'm really just trying to pretend it's

22   not there so I don't get really upset about it.  And

23   it's stressful to continue to have this battle going

24   on between him and I, so --

25         Q    Has it affected your sonce of closure about

1   your relationship?

2        A    Yeah, yeah.

3        Q    And what about your new relationship?

4        A    It really affects that, too.  It's kind of

5   difficult to continually go through a past

6   relationship and to mourn that while I'm in a

7   different relationship.  So I've been wanting to

8   spend a lot more time alone and just, you know, have

9   some emotional, relationship-type issues come up.

10             MS. ATWOOD:  Those are all my questions

11   for now.  Thank you.

12             THE WITNESS:  All right.  Thank you.

13             THE COURT:  Okay.  Mr. Taylor.

14                   CROSS-EXAMINATION

15   BY MR. TAYLOR:

16        Q    Good afternoon, Ms. Vance.  How are you?

17        A    As good as I can be.

18        Q    Understandable.  Excuse me.  Give me just

19   one moment to get set up, please.

20        A    Mm-hmm.

21        Q    All right.  So I guess, let me start with a

22   couple big-picture questions.  At this time, you

23   don't want Ben Barber in your life anymore, correct?

24        A    Yeah.

25        Q    You would like to see him permanently

1    removed?

2          A    I -- yeah.  I don't think we should have

3    any contact with each other.  I don't want that at

4    all.

5          Q    Don't want to see him, don't want to talk

6    to him, nothing?

7          A    Nothing, yeah.

8          Q    I want to talk to you a little bit about

9    the content of these videos just to make sure we're

10   all clear on everything.

11         A    Okay.

12         Q    Talking about four videos?

13         A    Yeah.

14         Q    Both you and Mr. Barber are featured more

15   or less equally in those videos?

16         A    Yes.

17         Q    All right.  And in those videos, you guys

18   are having sex?

19         A    Yes.

20         Q    All right.  Those videos were made, do I

21   understand it correctly, using his camera on his

22   phone?

23         A    Yes.

24         Q    All right.  And they were then put on his

25   computer or something like that?

1        A    I don't know what he did with them from

2    that point.  I know they were recorded on his phone.

3        Q    All right.  I want to talk to you some

4    about the sort of circumstances that led to the

5    creation of these videos.

6        A    Okay.

7        Q    You've testified that Mr. Barber basically

8    coerced you into doing this?

9        A    Yeah.

10       Q    You felt -- you told us earlier you felt

11    pressured to be in these videos?

12       A    Yeah.

13       Q    Okay.

14       A    I wanted to sexually provide to my partner

15    and he was telling me it wasn't enough at the time

16    and he needed that.  He --

17       Q    At any point, did you indicate to him that

18    you didn't want to make these videos?

19       A    I indicated to him that I wasn't ready.  I

20    didn't want to have videos sent everywhere; that if

21    this was just between us and if this was going to

22    sexually satisfy him and was just for him, I was okay

23    with that because I didn't want him to feel

24    abandoned.

25       Q    But you certainly consented to making

1    the videos?

2          A    I consented to making the videos.

3          Q    And you knew, obviously, there was a camera

4    set up, that it was being recorded, all that stuff?

5          A    Yes.

6          Q    Okay.  So, again, just to kind of beat this

7    point to death, Mr. Barber didn't take these videos

8    from you, correct?

9          A    No.

10          Q    He didn't hack into your personal website

11    or anything like that and steal them?

12          A    No, no.  He --

13          Q    They've been --

14          A    They were made consensually.  We had agreed

15    what they were -- the purpose was for him.  They were

16    made consensually and he had recorded them.  I knew

17    they were being recorded.

18          Q    And they have been in his possession the

19    entire time?

20          A    Yeah.

21          Q    Now, you talked some on direct about this

22    idea that during your divorce, you maybe mentioned

23    these things to your lawyer.  Did I understand your

24    testimony correctly?

25          A    Yes.

```
 1        Q    Those videos were never actually mentioned
 2   in any of the divorce proceedings, though, correct?
 3        A    Yes.
 4        Q    So, I mean, in the hundreds of pages of
 5   documents and filings talking about everything from,
 6   like, give me back my rain boots, all that stuff, the
 7   videos are never mentioned?
 8        A    Yes.  They were not officially mentioned
 9   at that point.  It wasn't a law yet, so my lawyer was
10   discussing that with me unofficially, you know,
11   "Maybe you want to do this in the future once this
12   becomes a law."
13        Q    But you never preemptively mentioned
14   anything about it?  You never -- you never discussed,
15   "Hey, now that we're getting divorced, get rid of
16   those videos," or -- or --
17        A    Yeah.  Well, at the time, they were on his
18   website.  If you typed in, like, "sexy with four
19   exes" or something from his website, you could find
20   them.  But he wasn't advertising them.  So it made me
21   uncomfortable, but he wasn't publicly trying to
22   show them.
23             So it felt very uncomfortable, but I knew
24   that the nature of our relationship, it -- when you
25   go through a divorce, there's just things you --
```

 1    you're not going to battle about.  It's not going to

 2    go anywhere.  And I just really wanted to have our

 3    relationship over with.

 4            So at that point, I was just going to leave

 5    it there and, you know, wait until it became a law.

 6    I didn't know if I'd get legal representation for

 7    that at that point, so my concern was really just

 8    getting a divorce, just moving on with our lives.

 9       Q    So if I understand you correctly, you were

10    thinking about them and thinking that maybe down the

11    line, this would become a law and you could get him

12    for that?

13       A    I -- my lawyer had suggested that, you

14    know, this is an option you could take.  I was not

15    concerned about the videos because I didn't think

16    anyone could find them.  And -- I was going to say

17    something else and I don't remember.

18       Q    Please help me understand your testimony

19    because --

20       A    Yeah.

21       Q    -- on one hand, you've testified that you

22    had a conversation with your lawyer -- what sounds

23    like an in-depth conversation -- that you were

24    worried about them and this and that.  But you also

25    just said you weren't worried about them.  So were

1    you worried about them then or not?

2         A    I was worried about them, but I was also

3    worried about a lot of other things pertaining to the

4    divorce.  I was worried about getting my birth

5    certificate from him.

6              I was worried about those sorts of things.

7    And until the point where I went to get my stuff and

8    he said, "Hey, I'm making a website about you that's

9    going to be called meaganvance.net.  Look for it."

10             At that point, I knew he was going to seek

11   vengeance and publicly shame me because he told me

12   that.  And that was in the end of April 2015.  Before

13   that point, I was not concerned.  I didn't think

14   anything would come of it.

15        Q    Okay.  So it wasn't until April of 2015

16   that you became concerned?

17        A    Yeah.  I became concerned because he said

18   he was going to make a website and he -- he bought

19   that URL.  So at that point, I was worried, yes.

20        Q    So this is the threat you've mentioned

21   several times?

22        A    Mm-hmm.

23        Q    Now, your testimony up to this point has

24   never -- thanks.  Let me withdraw that and rephrase

25   that question.  I guess what I want to talk to you

 1    about following that is, April 2015, you're

 2    testifying you became concerned about these videos?

 3        A    Not in particular the videos because I

 4    didn't know they were there.  I was concerned about

 5    him making a website about me.  I didn't know what he

 6    was going to put on it.  I assumed probably videos or

 7    something of that nature.  But he just said he was

 8    going to make a website about all my transgressions,

 9    so --

10        Q    And to be fair, you guys have gone back and

11    forth very much over the years about transgressions

12    on each side?

13        A    Yeah.  But it's mostly -- I ended the

14    relationship and I really just tried to move on.  I

15    have, you know, told him that I hope he has a good

16    life.  I wanted to be, you know, friends with him.  I

17    wanted to resolve.

18             And he was -- he was angry with me.  He was

19    trying to do anything he could to stop it and keep me

20    from being able to get a divorce and move on.  So I

21    felt like I was trying to protect myself as much as I

22    could.  I don't want to seek any other vengeance on

23    him because I -- I just want to move on.

24        Q    I want to make sure I understand your

25    testimony correctly.  In April of 2015, when

1    Mr. Barber made this supposed threat about this

2    website, there was no mention then of the videos?

3          A    He had not mentioned the videos --

4          Q    So he certainly --

5          A    At that time.

6          Q    -- didn't say, "I'm going to make a website

7    with these pornographic videos"?

8          A    He did not say, "I'm going to make a

9    website with pornographic videos."

10         Q    He didn't even allude to the pornography?

11         A    He said it would be of my transgressions,

12   whatever that means.

13         Q    You guys have gone back and forth over

14   the years and accused each other of different

15   transgressions.  Would you agree with that?

16         A    We've certainly argued a lot.  I don't

17   think we've gone back and forth talking about

18   transgressions.

19              Certainly, I don't deny the fact that we

20   had a lot of arguments through going through the

21   divorce.  I don't feel like I added more flame to the

22   fire as far as blaming him for so many things.  When

23   I left, I wanted it over.

24         Q    Getting back to my question, would it

25   clarify my question to put it like this:  In the

1    past, both you and Mr. Barber have accused each other

2    of committing crimes?

3          A    I think I accused him of committing Fraud

4    at one point.

5          Q    You threatened him to go to jail?

6          A    I don't remember that.  If you have, you

7    know, evidence of that, I'd love to look at it.  It

8    was a long time ago, so --

9                    MR. TAYLOR:  May I approach --

10                   THE WITNESS:  -- I don't really remember

11   every detail.

12                   (Pause in proceedings, 3:02 p.m. -

13   3:03 p.m.)

14   BY MR. TAYLOR:

15         Q    I guess I'm going to mark here to assist

16   you if that's all right.

17         A    That sounds good.

18         Q    Read these two top paragraphs, please.

19         A    So what I had said and then his one-line

20   response?

21                   THE COURT:  To yourself, please.

22                   THE WITNESS:  Okay.  So what's your

23   question with this?

24   BY MR. TAYLOR:

25         Q    May I?

1          A     Yeah.

2          Q     Thank you.  What I was clarifying was your

3    recollection that you had, in the past, made threats

4    to have Mr. Barber arrested for crimes and have him

5    sent to jail.

6          A     Yeah.  I don't -- I don't remember that,

7    but I don't deny that I might have said something

8    nasty like that.  What had happened is I put a $2,000

9    deposit down on our house and I was -- I had left and

10   I was trying to get some sort of that deposit back

11   when I had left.

12               And it was probably heated -- a heated

13   argument where he was threatening me as well.  So

14   that's kind of an isolated bit of lines, but I don't

15   deny that I could have said that.

16         Q     So you guys have both -- you would agree

17   that, to your recollection, you guys have both gone

18   back and forth with these types of threats before?

19         A     Yeah.  We went through a nasty period when

20   I first left.

21         Q     Okay.

22         A     And there were very, very nasty things said

23   back and forth for a few months.

24         Q     I want to talk some about your relationship

25   with Mr. Barber back during the good times, so 2010,

M. Vance - X                          269

1    2011.

2         A    Okay.

3         Q    All right.  So when you guys first met, you

4    were living in Ohio, he was living here in Portland?

5         A    Yes.

6         Q    All right.  And you testified this was your

7    first sort of serious, adult relationship?

8         A    Yes.

9         Q    And you would agree that you guys were

10   involved in sort of the sexually adventurous side

11   of life?

12        A    We were involved.  But we had talked about

13   it and it was fun to talk about.  So we had talked

14   about going to a sex club.  We had talked about

15   meeting with another couple, kind of spur of the

16   moment when I was visiting him.  So we had talked

17   about it.

18        Q    And you guys actually did converse with at

19   least one other couple, correct?

20        A    Yeah.  The day before I flew back to Ohio,

21   we -- I think, maybe, we had posted some sort of ad

22   or something on Craigslist and we got a response from

23   a couple.  And, you know, it kind of started with Ben

24   saying, "Would you like to try swinging?"

25             And, you know, I was, like, "Why not?  You

M. Vance - X                                270

1    know, I'd love to try."  So we got a response the

2    night before I was leaving from the couple.  And

3    it -- it didn't pan out because the time sensitivity.

4    So we had talked about it; it never came to fruition.

5        Q    So to clarify a few points, you were aware

6    these postings were being made?

7        A    I was aware that there was some sort

8    of posting made or some way that the couple could

9    contact us.

10       Q    And you were in agreement with that?

11       A    Yes.

12       Q    Sounded like a good plan?

13       A    I was nervous about it, but I was kind of

14   at the point in my life where, you know what?  I'm

15   going to be very open minded.  And, you know, why not

16   try?  I didn't know what was in the posting.  I don't

17   remember how the contact was made, but there was

18   definitely a couple that had responded.

19       Q    And you, as part of this, did have contact

20   with another side of that couple, right?

21       A    Yeah.  When I had gone back to Ohio, I had

22   talked to the male of that couple.

23       Q    So there was discussions going on in your

24   relationship about having these threesomes,

25   foursomes, what have you?

1        A     Well, when I had gone back to Ohio the next

2   day and I eventually started talking to this man, we

3   developed a friendship.  It wasn't focused on, "Oh,

4   my Gosh, I'm so excited for us to do swinging."  It

5   was building some sort of, you know, friendly

6   relationship.

7        Q     So there was no sexual aspect to it at all?

8        A     There was a sexual aspect, but it wasn't,

9   you know, talking about all of us getting together.

10  So it -- it really didn't work out.

11              It was, you know, two young people

12  thinking, "Oh, this is a great idea," and then it --

13  it wasn't really something that worked out or that I

14  that I would decide to do.

15       Q     You would agree that during your

16  relationship with Mr. Barber, you guys, together or

17  separately in connection, created a substantial

18  amount of photos and videos and things like that?

19       A     I remember a few, but I also know that we

20  did some sexual things on Skype and he might've taken

21  some photos of me.  I had later seen that he had a

22  lot of photos of me from Skype that I didn't know

23  about.  So I guess there was substantial.  I didn't

24  know about all of them until later.

25       Q     So suffice it to say there was a great deal

M. Vance - X                              272

1    of nude technology happening?

2         A    There was some that was consensual both

3    ways.

4         Q    Following up on that.  You guys had some

5    discussions about the idea of making more

6    pornography; is that correct?

7         A    One day when I was visiting, we had talked

8    about, "Oh, wouldn't that be interesting to make porn

9    together?  We could make a lot of money."  But then,

10   you know, within a short period of time, we'd

11   actually seriously talked about that and said, "No,

12   that's not -- that's not something for us."

13        Q    So --

14        A    That's an interesting thing for people to

15   do, but not for us when we're going into our careers.

16        Q    So there was certainly discussion about the

17   possibility of it happening and then you're saying

18   later you guys decided not to?

19        A    There was a mention of it and then a later

20   discussion and confirmation that, no, soon after.

21        Q    So I want to talk to you about 2015 some.

22        A    Okay.

23        Q    April, your testimony is that he made this

24   threat about a website?

25        A    Mm-hmm.

1       Q    Was that threat made in person, online?

2       A    That was made in person when I had left his

3    home after trying to get my stuff.

4       Q    So we don't have any sort of recording or

5    proof of that conversation?

6       A    No.  It was -- it -- I had heard it, the

7    sheriff that was with us had heard it and my

8    boyfriend had heard it.  So it was -- it was verbal.

9       Q    We're not hearing it from any of the

10   other folks?

11      A    No.

12      Q    All right.  So you testified some about

13   sort of the conversations you guys had throughout

14   2015.  Your testimony, as I understood it, was a lot

15   of the time, you didn't want to speak to Mr. Barber,

16   but then sometimes you would reach out and talk to

17   him and things like that?

18      A    Yeah.

19      Q    And you were aware this whole time

20   Mr. Barber wanted to be back in a relationship with

21   you?

22      A    No, not the whole time.  No.

23      Q    Different --

24      A    Sometimes he would say, "I just want to be

25   friends.  I don't want anything else," or, you

1    know -- it's -- it was not clear to me that he wanted

2    to get back with me.  At one point, he -- he had a

3    different girlfriend and everything, so it --

4         Q    He definitely wanted you back in his life,

5    would that be fair to say, either as friends or a

6    relationship or whatever?

7         A    Sometimes that was clear.

8         Q    I want to talk to you specifically about

9    that conversation I mentioned in July of 2015.

10        A    Okay.

11        Q    So July of 2015, you guys have an extended

12   what appears to be a G Chat conversation; is that

13   correct?

14        A    There might be.  If you have it, I can look

15   at it.

16             MR. TAYLOR:  May I approach, Judge?

17             THE COURT:  Mm-hmm.

18             (Whispered discussion, off the record,

19   3:11 p.m. - 3:12 p.m.)

20   BY MR. TAYLOR:

21        Q    I'm going to show you Defense 101.  If you

22   can just maybe flip through that.  And --

23        A    Okay.

24        Q    -- I don't need you to read and digest the

25   whole thing right now.

1          A     Okay.  This is the conversation I thought

2     you were talking about and I just wanted to confirm.

3     From what I see, I remember this conversation, not

4     vividly, but this sounds like things I would say at

5     that point in time.  Do you want me to look through

6     every page of it?

7          Q     I'd like to direct your attention to a

8     certain part of it and if I can actually have the

9     document back --

10         A     Yeah.

11         Q     -- for a minute.  Thank you.  What I want

12    to ask you about is part of this conversation where

13    Mr. Barber informed you that somebody had attempted

14    to dox the pornography that was kept on his FTP

15    server.

16         A     Okay.

17         Q     Do you recall having that conversation?

18         A     Yeah.

19         Q     Do you recall your response to that

20    conversation?

21         A     Yeah, I do.  And I remember -- I didn't

22    really expect that to some up in conversation.  And

23    these same people that he thought were going to dox

24    him were people that I was actually talking to.

25               And, you know, I was just telling them,

M. Vance - X                              276

1    like, "He's going to make this website.  He does have

2    these videos on his personal website.  He -- you

3    know, he said he was going to make this website of my

4    transgressions."

5              And so they had seen that and they were

6    kind of protective over me that they didn't want

7    these things shared.  I don't know what had happened

8    in his situation or who had talked to him, but,

9    apparently, he thought people were going to dox us,

10   according to these videos.  And I knew that these

11   people weren't going to; they were protecting me.

12        Q    So you knew that.  You didn't share that

13   information with Mr. Barber, though, right?

14        A    Yeah.  I was dishonest to him about that

15   'cause I didn't -- I didn't want to get in a fight

16   about it.

17        Q    So your response to him was, "Yeah, I got

18   some messages about it," that's about it?

19        A    Yeah.  It was -- I was just playing stupid.

20   I was, like, "Oh, interesting."

21        Q    You would agree that would leave him with

22   the impression that you were unconcerned about it?

23                  MS. ATWOOD:  Objection, Your Honor.

24                  THE COURT:  Sustained.

25                  THE WITNESS:  What was the question

1    again?

2                    THE COURT:  There is no question.

3    BY MR. TAYLOR:

4        Q    Don't worry about it.

5        A    Oh, okay.

6        Q    I want to ask you some questions about

7    those e-mails Ms. Atwood discussed with you.

8                    (Whispered discussion, off the record,

9    3:14 p.m.)

10                   THE WITNESS:  We can hunt for them

11   together.

12   BY MR. TAYLOR:

13       Q    If I could just take the pile of

14   exhibits --

15       A    The stack --

16       Q    -- up there?

17       A    -- yeah.

18       Q    I'm going to go a little scatter shot and

19   just cover the ones I want to discuss with you, all

20   right?

21                   THE COURT:  That's fine.

22                   THE WITNESS:  Okay.

23   BY MR. TAYLOR:

24       Q    All right.  So regarding the e-mail that

25   was sent to your work e-mail on June 26th of this

1   year --

2          A     Okay.

3          Q     -- specifically the one showing that the

4   xHamster links had been disabled --

5          A     Okay.

6          Q     -- those, obviously, were not working links

7   to these videos, correct?

8          A     As far as I remember, these -- you would

9   click on them and it would show, like, a mini

10  screenshot.  And then you would try to click on that

11  screenshot to open up the video and then the video

12  wouldn't show.  That's as far as I remember.

13               There were videos that had been deleted

14  like that.  I don't remember if those were the exact

15  ones he had sent to me.

16         Q     And to be clear, this e-mail that I'm

17  talking about was the only e-mail that was ever sent

18  to you or anyone else with any sort of link to this

19  video; is that correct?

20         A     From Benjamin, yeah.

21         Q     All right.  So he didn't send anyone else

22  any links or anything like that?

23         A     Not that I have seen.  I wouldn't know if

24  he would send them to other people, but --

25         Q     Fair enough.

1        A    -- that's what I'd seen.

2        Q    As far as things he sent to you, nothing

3   more and no active links?  He never sent you links

4   that went to actual working videos?

5        A    He never sent me to any other links other

6   than that --

7        Q    Okay.  So no --

8        A    -- e-mail.

9        Q    -- no taunting e-mails about, "Ha-ha, look

10  at this link"?

11       A    It wasn't, "Ha-ha, look at this link."  It

12  was, "I had posted these videos.  Look.  I'm deleting

13  them.  Please don't seek legal action."

14       Q    "Confirmation, I've disabled them.  I'm not

15  seek -- please don't seek legal action."

16       A    He had not disabled all of them, though.  I

17  want to be clear about that.  So --

18       Q    Did you, when you viewed them, found other

19  working ones?

20       A    There were other working videos all over

21  the internet.

22       Q    So Mr. Barber, around the same time, sent

23  you a number of e-mails, all to the tune to, "Please

24  stop trying to ruin my life.  I'll do anything you

25  want.  I'll give you my next paycheck," stuff like

1   that?

2        A     I don't remember the, "I'll give you my

3   next paycheck."  I'd like to look at it to confirm

4   that, but everything else, yes.  He sent me a series

5   of e-mails after law enforcement had contacted him.

6        Q     Showing you State's 11.  If you could have

7   a look at it there.

8        A     Yeah.  It says, "I'll send you my first

9   paycheck and every other paycheck."  So he's trying

10  to give me money so I could make this stop.  That's

11  what he was saying.

12       Q     So June 26th, 27th, which is after you

13  discovered these videos and had contacted Deputy

14  Duenas, Mr. Barber reaches out to you and tries to

15  basically settle this in a civil manner?

16       A     Yes.  After he had heard from law

17  enforcement, he was willing to settle it.

18       Q     He was, in fact, more or less begging you,

19  right?

20       A     That -- that's what it looks like, yeah.

21       Q     I'm going to ask you some questions about

22  the State's 7.  This is the May 30th, 2016 e-mail.

23       A     Okay.

24       Q     So as far as our timeline goes, your

25  testimony is that you discovered the videos at what

1    point?

2        A    I discovered the videos at the beginning

3    of June.

4        Q    All right.  So May 30th, you hadn't

5    discovered the videos yet?

6        A    I don't think so as of May 30th.  The

7    receiving e-mails at the end of May was my reason

8    for taking another look on the internet to see if

9    there was anything.

10                THE COURT:  And I apologize, what year

11   did you say?

12                MR. TAYLOR:  This is May 30th of this

13   year, 2016, Judge.

14                THE COURT:  Okay.  Thank you.

15   BY MR. TAYLOR:

16       Q    In this e-mail, he's talking a lot about

17   all the work he's doing and how he's got the job at

18   Intel, stuff like that?

19       A    I don't know 'cause I don't have the

20   e-mail.

21       Q    My apologies.

22       A    Yeah.  He was talking about all the work

23   he's been doing, all the growth he's made and that

24   he -- he has contempt for me even though he loves me.

25   And then he goes on to talk about his contempt

1    for me.

2         Q     Certainly no reference to any videos, any

3    pornography, anything like that?

4         A     No reference to videos, just a vague, "I

5    have contempt for you."

6         Q     Sure.  And that's been consistent

7    throughout this divorce, right?

8         A     Yeah.

9         Q     This sort of vague contempt?

10        A     Yeah, mm-hmm.

11        Q     So that's nothing new?

12        A     It's -- it's nothing new.  It's certainly

13   not nice to hear, but it's nothing new.

14        Q     So we're now talking -- because it seems --

15   your testimony seems to be that a lot of these videos

16   were uploaded in April; is that correct?

17        A     Yeah.  When I had looked in June, I had

18   seen them posted towards the beginning of April.  It

19   said, "Posted on April 3rd," for example.

20        Q     So in this May 30th e-mail, six, seven

21   weeks after these videos were posted, there's no

22   mention of them at all?

23        A     Yeah, I didn't know they were posted.

24        Q     Well, he doesn't mention them, 'cause this

25   e-mail comes out before --

1      A      He doesn't --

2      Q      -- it was mentioned.

3      A      -- mention it either, yeah.

4      Q      He certainly doesn't --

5      A      Yeah.

6      Q      -- you know, make any new --

7      A      Yeah.

8      Q      -- threats, make any reference to

9    pornography, nothing like that?

10     A      He -- he just continues saying, "I have

11   contempt for you," and then also just talking about

12   his growth and -- yeah.

13     Q      All right.  The next e-mail I'm going to

14   ask you about is State's Exhibit 8.  That is, looks

15   like, the June -- I don't believe there's actually a

16   date on it -- the June 19th e-mail.

17     A      Okay.

18     Q      Take a look at that.

19     A      Okay.

20     Q      All right.  So that comes in even after the

21   May 30th one.  And this is presumably after you've

22   discovered the videos; is that correct?

23     A      What is the date on it?  I didn't look at

24   the date.

25     Q      June 19th.

1          A      June 19th.  That must have been after I had

2    found the first videos at least.

3          Q      The title of that e-mail is, "Hello Again,

4    Dear Friend"?

5          A      Yeah, that's pretty vague.

6          Q      You'd agree that doesn't sound like

7    somebody who's angry with you?

8          A      No, it doesn't sound angry.  It's -- it

9    didn't sound like it was talking directly to me

10   either.  It was -- it was just very vague, so I just

11   thought he was blogging to me or something.

12         Q      It's an -- it's an e-mail sent to you

13   titled, "Hello Again, Dear Friend."  It wasn't sent

14   to anybody else?

15         A      Yeah.  Well, I guess I just -- when I saw

16   it, it said, "Dear friend," and it -- it -- I

17   thought, you know, he would say more or reference my

18   name or something.  We had been married.  And "dear

19   friend" out of the blue just kind of threw me off,

20   but he had sent it to me, yes.

21         Q      Don't -- you do agree that it doesn't

22   sound, again, like someone who is angry with you?

23         A      No.  It sounds like someone who -- he was

24   just talking about what he was doing with his work

25   and that, you know, everyone else has family to go to

1    and he doesn't.

2         Q    He's lonely, things like --

3         A    He's lonely.

4         Q    -- that?

5         A    He doesn't have anything else going on.

6         Q    The contempt is gone, huh?

7         A     In that e-mail, he didn't write about

8    contempt.

9         Q    Didn't say anything bad or anything mean or

10   anything like that?

11        A     Not in that e-mail.  He has a pattern of

12   trying to talk to me kindly and once I respond to

13   him, then he starts to share that contempt and anger.

14   So I -- I know to not respond because if I respond,

15   then he'll start to discuss everything I've ever done

16   wrong in his mind and that -- that's why I don't

17   respond.  I care.  I -- I just can't respond for our

18   sakes.

19        Q    I'm going to ask you a question about the

20   contents of one of these messages.

21        A    Mm-hmm.

22        Q    This would be State's 5.  February 22nd,

23   2016, he sends you a message?

24        A    Uh-huh.

25        Q    Yeah.  And that, again, is a -- is a brief

1    message, expresses a wish to be friends again?

2        A    Yeah, "I hope we can become friends again."

3        Q    So nothing threatening or contemplative or

4    anything like that on February 22nd?

5        A    No, not threatening.  If I respond to him

6    and don't block him, it becomes threatening.  It

7    always starts out unthreatening.

8        Q    Second question -- there's not a sticker on

9    this one.

10               MS. ATWOOD:  I think it's a two-page --

11               MR. TAYLOR:  Oh, this must be part of

12    State's 6.

13               THE WITNESS:  Yes.

14    BY MR. TAYLOR:

15        Q    So this is a Facebook message?

16        A    Mm-hmm.

17        Q    March 20th?

18        A    Mm-hmm.

19        Q    And that is March 20th, 2016?

20        A    Yes.

21        Q    Okay.  And that is another one of these

22    sort of sad, lonely e-mails?

23        A    Yes.  But this -- I had blocked him on

24    Facebook.  We had dissolved any friendship.  He said

25    he did not want to be friends with me.  And he

1    would -- kept harassing and threatening me.  He'd try

2    to use any information he could.

3              And at that point, I had already blocked

4    him in every medium.  So, you know, before it was him

5    e-mailing my work.  And then this is him creating a

6    new Facebook account to contact me because I had

7    blocked him before.  So he had known I didn't want to

8    hear from him, and I just repeated, "I don't want to

9    hear from you."

10   Q    You would agree that there's nothing

11   threatening or angry in that?

12   A    No.  There's something kind of weird about

13   it, just that he had referenced me on some sort of --

14   getting social security document when we haven't

15   talked for a long time.

16             And I said, "Please leave me alone."  That

17   was a little weird, but it was -- it -- it wasn't

18   threatening.  It was kind of a -- you know, "My life

19   is in shambles.  Can I put you on this document?"

20   sort of thing.

21   Q    So March 30th, 2016, this e-mail and then

22   we're talking April is when you believe the videos

23   were posted?

24   A    Yeah.

25   Q    So there's no mention in his e-mail or

1    Facebook message directly prior to when you believe

2    these videos were posted, nothing at all threatening

3    or angry at that time?

4         A    Nothing he had said to me that was

5    threatening or angry because I had blocked him on so

6    many mediums.  And I -- I pretty much know at this

7    point he wants to do anything to harm me.  So I know

8    these e-mails are friendly and he misses me, but I --

9    I don't think he thinks toward -- helpfully towards

10   me.

11        Q    Those are your beliefs?

12        A    That's -- yeah, from that history -- our

13   history.  I just know that it can't continue.

14        Q    However, you agree that in this evidence,

15   there is no indication of his anger or his contempt

16   for you?

17        A    There's no mention of contempt.

18        Q    Just, in your words --

19        A    Yes.

20        Q    -- sadness.

21        A    Sadness, desperation, wanting me to help

22   him.

23        Q    And then I guess we are sort of working

24   backwards in time, but I'll wrap up with State's

25   Exhibit 2 and 3 --

```
 1        A    Okay.

 2        Q    -- text messages?

 3        A    Yes.

 4        Q    Nothing threatening in those?

 5        A    Just the fact that he was contacting me

 6   after I said, "Do not contact me anymore," several --

 7   for several months.

 8        Q    Understood.

 9        A    Yeah.

10        Q    You -- you had repeatedly expressed you

11   don't want him to talk to you?

12        A    Yeah.

13        Q    It's pretty clear he can't get over you,

14   right?

15        A    Well, I mean, he would say, "I want to be

16   friends again," so it was pretty clear he wanted me

17   in his life again.  Yeah, he wanted me in his life.

18   I didn't know in what context, but he would say he

19   missed me and hopes we can be friends again.

20        Q    Mm-hmm.

21        A    And so --

22        Q    So we're in agreement that November and

23   December of 2015, as well as what appears to be early

24   January 2016, no threats, no contempt, nothing

25   like that?
```

```
 1        A    Yeah.  It's just out of the blue, "I want
 2   to meet you on Thanksgiving," after months of saying,
 3   "Don't contact me."  It was not vengeful in any way.
 4   It was just, "Please hang out with me.  I miss you.
 5   I'm going to commit suicide."  But that's no anger
 6   towards me.  And he actually says in there, "I'm
 7   sorry to burden you," in one of those.
 8        Q    I forgot if I had wanted to ask you
 9   questions about this.  Just give me a second to read
10   this last e-mail.
11        A    That's fine.
12             (Pause in proceedings, 3:28 p.m.)
13   BY MR. TAYLOR:
14        Q    Oh, State's Exhibit 4.
15        A    Okay.
16        Q    Have a look at this.  That is a message
17   on OkCupid, which, again, is an online dating site
18   we've discussed?
19        A    Yeah.
20        Q    Do you recall -- there's a date on that of
21   February.  Do you recall if that was '15 or '16?
22        A    I imagine '16.  It's kind of -- I -- I
23   don't remember -- I don't know exactly.  I think it's
24   2016.  I had blocked his profile and I guess he had
25   another profile and messaged me.
```

1                   It goes automatically to a trash folder

2       because of the settings I have to protect myself.  So

3       I didn't see this message for a very long time.  I

4       had actually only seen it, at the very least, in

5       April of 2016, when I dug later.

6           Q    All right.  So February 2016, another

7       unwanted communication.  Anything threatening in

8       there?

9           A    I think it's 2016, but I'm not certain.

10      Let me see if anything's threatening.  Nothing

11      threatening, but just keeps repeating that "I don't

12      want to court you.  I just want to talk about work

13      lives."

14                  And it says, "E-mail me or text message me

15      maybe once or twice a month."  So he's -- he's

16      telling me to contact him.  Not threatening, but not

17      asking me to contact him, telling me to contact him.

18      There you go.

19          Q    And we're going to assume -- correct me if

20      I'm wrong -- this was February 2016 because in

21      February 2015, you guys were still in the divorce,

22      right --

23          A    Yeah.

24          Q    -- grappling with that?

25          A    Yeah, so I would assume February 2016.

1        Q    All right.  So we have a substantial volume

2    of conversations between you and Ms. -- Mr. Barber

3    ranging from November 2015 to June of this year.   In

4    those, he makes no references to threats against you

5    or threats to ruin your life?

6        A    Not from what we've looked at, just the, "I

7    have contempt for you."

8        Q    Right.  That was the closest we come in --

9        A    Yeah, in this 2016 section.  He has made

10   threats to me otherwise, but not in texts sent to me

11   in this beginning to middle of 2016.

12       Q    Ma'am, if you could clarify that, I -- I --

13   I don't understand what you're saying.  Are you

14   saying that there is supposedly more evidence out

15   there that we haven't seen?

16       A    No.  There -- there is a -- a piece of

17   evidence that was sometime in 2015 that was basically

18   saying I was on his shit list and he was going to

19   seek retribution or something like that.  But that

20   was 2015.  This 2016 portion, he was just trying to

21   send me friendly messages so I'd respond.

22       Q    All right.  So we are in agreement that

23   November 2015 up until these videos explode, there is

24   no threats?

25       A    Yeah -- well, yeah.  When he had sent me

 1    the text messages for -- the -- there was one kind of

 2    vague threat that he had sent me in a voicemail after

 3    I didn't respond to his saying he'd commit suicide.

 4    But I don't have that evidence so I can't show that

 5    to you.  That is the only time in that period.

 6        Q    So at the most -- or at the least, by and

 7    large, no threats in any of the communications

 8    we've seen?

 9        A    No direct threats in the communications

10    we've seen.

11        Q    Okay.  When did you acquire an attorney in

12    this case?

13        A    It was June --

14             MS. ATWOOD:  Your Honor, I'll object.

15             THE WITNESS:  Oh, okay.

16             THE COURT:  Sustained.

17             MS. ATWOOD:  I don't see the relevance.

18             THE COURT:  Sustained.

19    BY MR. TAYLOR:

20        Q    Let's talk about -- you talked to

21    Ms. Atwood about the embarrassment you feel about

22    these videos?

23        A    Yeah.

24        Q    To be very clear on a number of topics,

25    nobody in your life has ever reached out to you and

1    said, "Hey, Ms. Vance, I saw these videos"?

2         A    Not yet.

3         Q    So nobody, to your knowledge, has seen them

4    that you know?

5         A    Not that I know of.

6         Q    All right.  And, again, we mentioned

7    earlier, you're not aware of them being sent to

8    anyone?

9         A    They -- with this couple in 2011 in -- or I

10   think it was 2010 -- there's evidence showing that

11   they were sent to someone, but beyond that, they were

12   just posted publicly.

13        Q    All right.  They certainly weren't sent to

14   your family, your friends, your work, your employer

15   or anything like that?

16        A    Not these videos, to my knowledge.  He has

17   sent e-mails to my family talking about my sexual --

18             MR. TAYLOR:  I'm going to object.

19             THE WITNESS:  Okay.

20             MR. TAYLOR:  Sorry, ma'am.  That's not

21   responsive to my question.

22             THE WITNESS:  Sorry.

23   BY MR. TAYLOR:

24        Q    If you'll give me a minute just to review

25   my notes.

1         A     Mm-hmm.

2                    (Pause in proceedings, 3:34 p.m.)

3    BY MR. TAYLOR:

4         Q     You mentioned making a copyright claim on

5    some of these.  Can you --

6         A     Yeah.

7         Q     Can you explain that?

8         A     That's what my previous lawyer had said

9    could even though that law wasn't in place yet.  And

10   it -- it worked to get rid of those videos on that

11   website.

12        Q     Have you, at any point, taken out a

13   copyright on these videos?

14        A     No.

15        Q     The last thing I want to talk to you about,

16   on direct, you testified that on the xHamster sites,

17   these were somehow connected to your name?

18        A     Yes.

19        Q     However, you also testified that all of

20   these videos were titled, "Albino Porn"?

21        A     Yes.

22        Q     All right.  A couple things I want to talk

23   to you about there.

24        A     Mm-hmm.

25        Q     First off, you've been on pornographic

M. Vance - X                                    296

1    websites before?

2        A    Yeah.

3        Q    Okay.  You're familiar with, you go on a

4    website and there's just a ton of videos?

5        A    Mm-hmm.

6        Q    And they all have titles?

7        A    Yeah.

8        Q    And the titles are all usually referencing

9    the content?

10       A    Yeah.

11       Q    The most distinct feature of that video?

12       A    Mm-hmm.

13       Q    The content of these videos you made with

14   Mr. Barber are pretty normal sex, you would say?

15       A    Yeah.

16       Q    Very, I guess, vanilla, for lack of a

17   better word?

18       A    Yeah.

19       Q    All right.  So there's nothing about

20   the activities in the videos that are particularly of

21   note that would distinguish them from other types of

22   pornography?  It's just two people having sex on a

23   bed?

24       A    Yeah, I -- referencing my name was a

25   little --

     1          Q     I'm going to ask you some questions
     2    about that --
     3          A     Yeah.
     4          Q     -- in just a minute.
     5          A     Yeah.
     6          Q     I'm specifically talking about the titles
     7    right now.
     8          A     Okay.  Just the titles, not the
     9    description.
    10          Q     And I guess my questions is:  You would
    11    agree that in these videos, there's nothing
    12    particularly of note?  There's nothing particularly
    13    wild happening.  It's, as we said, vanilla sex
    14    between male and female in a bed --
    15          A     Yeah --
    16          Q     -- in a house?
    17          A     -- two people having sex.
    18          Q     So the only particularly distinguishing
    19    factor of -- of this content from anything else is
    20    the fact that you're albino, correct?
    21          A     Yes, and my face is in it.  I don't know
    22    if that --
    23          Q     Sure.
    24          A     -- makes --
    25          Q     But lots of people's faces are in porn

1    videos; you would agree?

2         A    Most of the time, yes.

3         Q    All right.  So the distinguishing

4    characteristic of these videos is that you happen to

5    be an albino person?

6         A    Yeah.

7         Q    So you would agree that given that

8    pornographic videos tend to be titled after a

9    distinguishing feature, the idea of titling these

10   videos, "Albino Porn" isn't completely out of the

11   blue, it's the most distinguishing feature of the

12   videos, correct?

13        A    It is, but it also singles me out.

14        Q    So last thing I want to ask you about is

15   this claim that there were names associated with

16   this.

17        A    Mm-hmm.

18        Q    So your testimony on direct was that on

19   the xHamster videos, your name was somehow connected

20   to them?

21        A    Yeah, and the description was just, "Meagan

22   Vance."  That was the -- that was it for the

23   description for each of the xHamster videos.

24        Q    Are we seeing any screenshots or evidence

25   of any of that?

 1          A    I -- I don't know if we have it today.  I

 2     had sent it to the deputy working on the case.  But I

 3     had deleted those videos and so we had screenshots of

 4     videos titled, "Albino Porn," that are deleted

 5     connected to that description.

 6                    MR. TAYLOR:  Thank you.  That's my

 7     only question.

 8                    THE WITNESS:  Okay.

 9                    THE COURT:  All right.  So we're going

10     to take a brief break.  We've been sitting for about

11     two hours and I'm sure that we need to kind of walk a

12     little bit.

13                    So I'm going to go ahead and have you

14     return to the jury room, give you about ten, 15

15     minutes and then we'll bring you back out and

16     continue.

17                    (Whispered discussion, off the record,

18     3:39 p.m.)

19                    (The following proceedings were held in

20     open court, out of the presence of the jury,

21     3:39 p.m.:)

22                    THE COURT:  So when we come back, she'll

23     just be on the stand and you can do your redirect.

24                    MS. ATWOOD:  Sure.

25                    THE COURT:  Okay.  All right.  15 --

1    ten, 15 minutes.

2                    MS. ATWOOD:  Thank you.

3                    MR. TAYLOR:  Thank you, Judge.

4                    THE COURT:  You may step down now,

5    Ms. Vance.  Thank you.

6                    THE WITNESS:  Yes.

7                    (Recess taken, 3:39 p.m. - 3:55 p.m.)

8                    THE COURT:  All right.  So there was

9    some confusion with the exhibits.  Did we get that

10   all cleared up?

11                   MS. ATWOOD:  Yes, Judge.

12                   THE COURT:  Okay.  Great.

13                   And, Ms. Vance, if you'll please retake

14   the stand.

15                   THE WITNESS:  All right.

16                   MS. ATWOOD:  Your Honor, there is an

17   issue I wanted to raise to the Court before bringing

18   the jury back in.  Based on Ms. Vance's testimony

19   that her boyfriend was present during the incident in

20   April of 2015, where the defendant made a threat

21   toward her, he's here today.

22                   And I've spoken with Mr. Taylor and told

23   him that I plan now on calling him as a witness for

24   that purpose because she was crossed about whether or

25   not anyone else could vouch for the statement having

 1    been made.  So there's another witness that I intend

 2    to call.

 3                   THE COURT:  Okay.  Mr. Taylor?

 4                   MR. TAYLOR:  I don't think I have an

 5    argument against it.

 6                   THE COURT:  Okay.  So did you want him

 7    excluded then until he testifies?

 8                   MR. TAYLOR:  I told Ms. Atwood, at this

 9    point, I -- I mean, I -- the bell's kind of already

10    been unrung --

11                   THE COURT:  Okay.

12                   MR. TAYLOR:  -- any cross I would do on

13    what has already happened.

14                   THE COURT:  Okay.  Thank you.

15                   (The following proceedings were held in

16    open court, the jury being present, 3:56 p.m.)

17                   THE COURT:  And I heard a question.  You

18    may sit wherever you want.  Feel free to move about

19    the cabin.

20                   Okay.  You may redirect.

21                   MS. ATWOOD:  Thank you, Your Honor.

22                   REDIRECT EXAMINATION

23    BY MS. ATWOOD:

24        Q    So I just have a couple of things that I'd

25    like to clarify with you based on the -- the

1    discussion you had during cross-examination.

2            You were shown an exhibit of a message

3    thread between you and the defendant where you were

4    mutually threatening various legal actions against

5    each other.  Do you remember being shown that

6    message?

7        A    Yeah.

8        Q    Just to clarify.  In this case, regarding

9    this particular investigation, seeking law

10   enforcement was not your first resort, right?

11       A    Absolutely not.

12       Q    In fact, you had already tried on your own

13   to handle the issue with the website?

14       A    Yeah, I didn't want to get into it.  I just

15   wanted it -- the videos gone.

16       Q    And then you spoke to friends and then you

17   spoke to an attorney and then, finally, felt that it

18   was necessary to seek law enforcement help?

19       A    Yeah.

20       Q    You were also asked some questions on

21   cross-examination about what defense counsel

22   described as your sexually-adventurous relationship

23   while you were with the defendant.

24       A    Mm-hmm.

25       Q    Specifically, you were asked questions

1    about the dialogue or relationship between you and

2    defendant and then another couple who you were

3    talking to or planning to meet with as a group; is

4    that --

5         A    Yeah.

6         Q    -- right?  You mentioned that you were

7    aware that the defendant was having conversations

8    with these individuals.  Were you aware of the

9    contents of the conversation at all?

10        A    No.  I -- I had heard that they had -- he

11   had talked to them.

12        Q    Okay.  But you didn't have any knowledge of

13   what he was saying or sending to them at that point?

14        A    No, not at that point.

15        Q    And what caused the potential relationship,

16   we'll call it, between you and the defendant and this

17   other couple to end?

18        A    When I had gone back to Ohio, I was talking

19   to the guy from the relationship and developing a

20   friendship and he was talking to the woman from the

21   relationship and she was wanting to meet with him

22   alone.

23        Q    By "him," who do you refer to?

24        A    Benjamin --

25        Q    Okay.

1        A       -- Barber.  And he and I had talked

2   together.  He -- he had asked me after they had had a

3   conversation, could he meet with this woman while I

4   was in Ohio?  And I was very upset and said, "No."

5   We had an argument about it because I wasn't

6   comfortable with it.

7              I didn't know that they were discussing

8   this without my permission.  And we had talked later

9   and realized that their relationship didn't seem

10  healthy.  They seemed to be seeking us out as an --

11  something instead of their relationship.

12             And we just decided to not talk to them

13  anymore, that this -- you know, when you meet with

14  other couples or talk with them, that they could be

15  seeking you as a couple for an exit from their

16  relationship.  So at that point, we did not want to

17  try that again.

18       Q      And to be clear, the purpose for you being

19  open to this relationship was to participate in some

20  kind of sexual encounter, potentially; is that

21  correct?

22       A      Yes, as four people.

23       Q      Okay.  But at any point in time, did you

24  agree as part of this potential relationship to

25  record or disseminate any of your sexual contact with

1    these individuals?

2         A    Not that I recall, no.

3         Q    Okay.  You also were asked about whether

4    or not a substantial amount of photos and images and

5    things like that were created through the course of

6    your relationship with the defendant.  And you

7    mentioned that you guys usually contacted each other

8    on Skype?

9         A    Mm-hmm.

10        Q    Would -- would that be in a video chat?

11        A    Yeah, a video chat.

12        Q    Okay.  You mentioned that you later found

13   out that there were a substantial amount of images

14   you didn't previously know about?

15        A    Yes.

16        Q    What -- were those from Skype --

17   screenshots --

18        A    Those are screenshots --

19        Q    -- from Skype?

20        A    -- from Skype.  We originally, you know,

21   had sexual conversations and did sexual things on

22   Skype video chat.  And later, I'd found out that, oh,

23   you can take screenshots from that.  So I found a

24   folder of those screenshots later on in our

25   relationship.

1          Q     And, again, to be clear, when you were

2    engaging in these sexual conversations or acts with

3    the defendant over Skype, is this just the two of

4    you involved?

5          A     Just the two of us.

6          Q     And did you ever -- what -- what -- well,

7    how did you feel when you found that he had been

8    saving them as images?

9          A     It was -- I felt like my trust had been

10   violated a little bit because I didn't say it was

11   okay for him to take them.  But I also felt that I

12   didn't tell him, "Don't take pictures of me."  And

13   from what I had seen, those pictures weren't shared

14   with other people, so I let it go.

15         Q     Because you thought he was, if anything,

16   using them just for his personal use?

17         A     I thought it was just a personal thing.

18         Q     Okay.

19         A     And I didn't -- I didn't want to have an

20   argument about it.  And I had consented to, you know,

21   having that Skype video conversation between us.  So

22   if there were photos taken that he had for his own

23   personal use, I was already consenting to do sexual

24   things with him.

25               So for his personal use, that -- it was

1    disheartening, but it wasn't cause for an immediate

2    breakup or something --

3        Q    Okay.

4        A    -- in my mind.

5        Q    And during the time that these things were

6    going on, the Skype conversations, the conversation

7    with the other couple, that was when you guys were

8    still in a relationship together, right?

9        A    Him and I?

10       Q    Yes, you and -- and the --

11       A    Benjamin and I, yeah, yes.

12       Q    Okay.  So it wasn't -- none of this

13   occurred post-divorce?

14       A    No, this was early in the relationship.

15       Q    Okay.  You were also asked a few questions

16   about a 2015 conversation where he, the -- he, the

17   defendant, mentioned to you this idea of doxing some

18   pornography of you.

19            And you -- you said that you had learned

20   that this -- you already knew this was happening from

21   some individuals.  Can you clarify what the -- what

22   the situation was?

23       A    The situation was there were some people

24   that knew him that he had done some --

25            MR. TAYLOR:  Objection.

```
 1                    THE WITNESS:  Oh, sorry.

 2                    THE COURT:  Just a second.

 3                    MS. ATWOOD:  What's the nature of the

 4       objection?

 5                    THE COURT:  Overruled.

 6                    THE WITNESS:  Could you --

 7                    THE COURT:  You may continue.

 8                    THE WITNESS:  -- repeat the question?

 9       BY MS. ATWOOD:

10            Q    Yeah.  I'm just asking for a little more

11       detail about the -- the situation surrounding the

12       2015 conversation involving the doxing of the

13       pornography.  You made mention that you already knew

14       that some individuals were aware of -- of -- of

15       videos being hidden on a website.  What was that all

16       about?

17            A    So there were some friends that I had had

18       that I told, you know, that these videos were hidden

19       on his website.  I had recently seen that he had made

20       the website meaganvance.net and, you know, I'd -- I

21       opened up to them about it.

22                    And, apparently, someone, you know, talked

23       to him about it and he construed that as people were

24       going to dox him and what it was that people had told

25       him -- these friends had told him that if he --
```

1              MR. TAYLOR:  I'm going to object to

2    this, Judge.  It's hearsay.

3              THE COURT:  Overruled.

4              MS. ATWOOD:  Thank you.

5    BY MS. ATWOOD:

6        Q    Go ahead.

7        A    -- that if he continued with this website

8    and posted things about me, that he did have a lot of

9    stuff on his website that they had had as well.  I

10   wasn't okay with that, but I think that's enough

11   detail with that situation.

12       Q    Okay.  I'm just kind of going line by line

13   here.  You were asked a few questions about the

14   e-mail that you received from the defendant with the

15   receipt from the xHamster website --

16       A    Mm-hmm.

17       Q    -- showing that he'd asked to have the

18   links removed.  And you described that you -- you

19   could actually click the link that was sent to you on

20   your work address?

21       A    I could click on it.  I do not remember if

22   it said videos had been deleted or not.  I -- I am

23   pretty certain that they were deleted videos, but

24   it -- it still had the title.

25       Q    And did it take you to the website?  It

1      took you to xHamster.com?

2          A    Yeah.

3          Q    So the next thing I want to ask you about

4      is the -- let's see here -- series of questions

5      regarding all the contact you were receiving in the

6      months leading up to this investigation beginning.

7          A    Mm-hmm.

8          Q    Defense counsel asked you numerous times

9      that there were no actual threats involved in those

10     e-mails that you were going through on the stand.  Do

11     you remember that line of questioning?

12         A    Yes.

13         Q    I want to point your attention to an

14     exhibit that defense counsel went over with with you.

15     So I want to turn your attention back to this

16     exhibit.  This was the one you were handed when asked

17     questions about the doxing conversation.  Can you

18     review for me a few lines prior to that --

19         A    Start right here?

20         Q    -- portion on the conversation?

21              (Pause in proceedings, 4:07 p.m. -

22     4:08 p.m.)

23              THE WITNESS:  Yes.

24     BY MS. ATWOOD:

25         Q    So you -- you mentioned to defense counsel

1    that there was a conversation you recalled where the

2    defendant specifically mentioned wanting to seek

3    retribution against you.  Was that that same

4    conversation?

5        A    The same conversation as what?

6        Q    The one that you just looked at.

7        A    Yeah, it's right here.

8        Q    Okay.

9        A    Yeah.

10       Q    I can take that back from you.

11            THE COURT:  Did you offer that,

12   Ms. Atwood?

13   BY MS. ATWOOD:

14       Q    And you also mentioned that during one of

15   the times that the defendant was text messaging you,

16   I believe, early in January, maybe, of 2016, making

17   suicidal statements --

18       A    Yeah.

19       Q    -- that he had also called you?

20       A    He had called me, yeah.

21       Q    You mentioned that during the phone call,

22   he did make something that amounted to a threat to

23   you.  What was that?

24       A    He had called me and then I guess he had

25   called me again because I didn't -- I hung up the

1    conversation.  And it was a voicemail.  I don't

2    remember what was exactly on the voicemail other

3    than, "You've ruined my life."

4            He was crying and that I had caused him to

5    be homeless.  Beyond that, I don't remember what else

6    was in it, but it was just very clear he thinks I had

7    ruined his life.  There was also some anger that I

8    hadn't responded to his phone calls further.

9        Q    And the anger, were you getting that

10   through his statements or his tone or both or --

11       A    His tone of -- of voice with the voicemail.

12   It started with, "Argh, why aren't you calling me

13   back?" or, you know, what -- something to that

14   extent.

15       Q    Okay.  So the last few things that you were

16   asked about had to do with whether or not the -- to

17   your knowledge, the defendant has disseminated these

18   videos to anyone that you know personally.  You were

19   asked if he -- if he sent them to your family, your

20   friends or anything like that?  And you said, "No,"

21   to your knowledge?

22       A    Not to my knowledge.

23       Q    But based on your own search of the

24   websites, these are publicly accessible?

25       A    Yes.

M. Vance - ReD                              313

1        Q    Okay.  And all anybody would've had to do

2    is Google your name?

3        A    Yes, my name or "Albino Porn."

4        Q    Okay.  Let's talk about "albino porn."  You

5    were also asked a few questions about the tag on

6    all these videos.  When you searched for your name

7    initially --

8        A    Mm-hmm.

9        Q    -- did you, at some point, transition to

10   searching for the term "albino porn" to see what else

11   was out there?

12       A    Yes.

13       Q    And what did you find as far as the amount

14   of albino porn on the internet is concerned?

15       A    There is one other person that is in

16   pornography that is albino that comes up when you

17   search "Albino Porn."  So what I've seen is four

18   videos of us and one video of this other possible

19   porn star or something.

20       Q    But other than that --

21       A    So it's a very --

22       Q    -- it's you?

23       A    Other than that, it's me.

24            MS. ATWOOD:  Those are all my questions.

25   Thank you.

1              THE COURT:  Okay.

2              THE WITNESS:  All right.

3              THE COURT:  Ms. Vance, you may step

4    down.  Thank you.

5              THE WITNESS:  Thank you.

6              THE COURT:  Ms. Atwood, you may call

7    your next witness.

8              MS. ATWOOD:  Yes, Your Honor.  I'd like

9    to quickly call Micah Goldstein.

10             THE CLERK:  If I could have you please

11   approach the witness stand and have you remain

12   standing and raise your right hand.

13                    ***MICAH GOLDSTEIN***

14   Was thereupon called as a witness on behalf of the

15   State; and, having been first duly sworn, was examined

16   and testified as follows:

17             THE CLERK:  You may be seated.

18             And for the record, if I could have you

19    please state your name, spelling your first and last.

20             THE WITNESS:  My name's Micah Goldstein;

21   M-i-c-a-h, G-o-l-d-s-t-e-i-n.

22             THE COURT:  You may inquire, Ms. Atwood.

23             MS. ATWOOD:  Thank you.

24   ////

25   ////

1                    <u>DIRECT EXAMINATION</u>

2    BY MS. ATWOOD:

3         Q    Good afternoon.  I just have a couple of

4    very quick questions for you.  What is your

5    relationship to Meagan Vance?

6         A    I'm her boyfriend.

7         Q    And were you her boyfriend during April,

8    May 2015?

9         A    Yes.

10        Q    You've heard some testimony mentioned

11   already about an in-person conversation between the

12   defendant and Ms. Vance during April of 2015.

13        A    Mm-hmm.

14        Q    Do you recall that conversation?  Do you

15   have personal knowledge of that?

16        A    Yeah, I was there.  We were trying to get

17   back some of her property with a -- a sheriff, who

18   also witnessed the interaction.

19             And the -- the defendant tried to tell me

20   that I should go look at this website he was making,

21   that he was going to talk about her transgressions

22   and -- and -- and -- and it was -- he was -- he

23   was -- I think he was trying to put a wedge

24   between us.

25        Q    Okay.  Did he tell you the name of the

1    website he had created?

2         A    Yeah.  Meaganvance.net, which I -- I did

3    Google and it exists, but there's no website there.

4    But it was registered in his name --

5         Q    Mm-hmm.

6         A    -- so it's, yeah, definitely him.

7              MS. ATWOOD:  Those are all my questions.

8    Thank you.

9              THE COURT:  Mr. Taylor.

10                  CROSS-EXAMINATION

11   BY MR. TAYLOR:

12        Q    Mr. Goldstein, so you're Ms. Vance --

13   Ms. Vance's boyfriend?

14        A    Yes.

15        Q    How long have you guys been dating?

16        A    Over two years now.

17        Q    So you probably are not a fan of

18   Mr. Barber?

19        A    No.

20        Q    Don't like him being around your lady?

21        A    Well, he's not around her, so I'm -- yeah.

22   I wish he'd leave us alone, yeah.

23        Q    I --

24        A    I think that -- because that's what Meg

25   wants.  I mean, if -- if she wanted contact with him,

1    that -- that would be her prerogative.  But -- but

2    she's made it clear she doesn't.

3         Q    So you weren't initially on any witness

4    list in this case, were you?

5         A    No.

6         Q    And you've sat in here and listened to this

7    whole trial?

8         A    Yeah.

9         Q    Sat there and watched Ms. Vance testify?

10        A    Mm-hmm.

11        Q    And you are now a witness testifying to the

12   same things, correct?

13        A    Yeah.

14        Q    All right.  You talked about Mr. Barber

15   wanting to drive a wedge between you two?

16        A    Mm-hmm.

17        Q    Has he ever succeeded in doing that?

18        A    No.

19        Q    Never -- never any breaches?

20        A    No, he's tried, but, no, he's not

21   succeeded.

22        Q    To your knowledge?

23        A    To my knowledge?  No.  He's not succeeded

24   actually driving a wedge between us.

25                  MR. TAYLOR:  All right.  Those are all

1    my questions for you.  Thank you.

2              THE COURT:  Okay.  Ms. Atwood, any

3    redirect?

4              MS. ATWOOD:  Nothing further --

5              THE COURT:  Okay.

6              MS. ATWOOD:  -- of this witness.

7              THE COURT:  Mr. Goldstein, you're free

8    to step down.

9              And is this witness excused?

10             MS. ATWOOD:  Yes.

11             THE COURT:  Okay.  Any objection,

12   Mr. Taylor?

13             MR. TAYLOR:  No, Judge.

14             THE COURT:  Thank you.

15             You may call your next witness.

16             MS. ATWOOD:  Next witness is Thomas

17   Duenas.

18             THE COURT:  And we will be stopping at

19   5:00 today, just so everybody knows.  Okay.

20             THE CLERK:  If I could have you raise

21   your right hand.

22                    ***THOMAS DUENAS***

23   Was thereupon called as a witness on behalf of the

24   State, and, having been first duly sworn, was examined

25   and testified as follows:

1          THE CLERK:  Thank you.  You may be

2    seated.

3          If I could have you please state your

4    name for the record, spelling your first and last.

5          THE WITNESS:  My name is Thomas Salas

6    (phonetic) Duenas.  Duenas is spelled D-u-e-n-a-s;

7    Thomas, T-h-o-m-a-s.

8          MS. ATWOOD:  May I inquire?

9          THE COURT:  You may inquire, yes.  Thank

10   you.

11         MS. ATWOOD:  Thank you, Your Honor.

12                   <u>DIRECT EXAMINATION</u>

13   BY MS. ATWOOD:

14      Q    Good afternoon.  Where do you work?

15      A    I work at the Washington County Sheriff's

16   Office.

17      Q    And what do you do there?

18      A    I'm a deputy for the Washington County

19   Sheriff's Office.

20      Q    How long have you been a sheriff's deputy?

21      A    Approximately 13 years.

22      Q    And generally speaking, what kind of

23   training and experience did you have to get to become

24   a deputy?

25      A    Well, we have the State Academy.  At -- at

T. Duenas - D                              320

1     that time, it was Monmouth.  In 1995, I was actually

2     hired as a police officer in the Eugene Police

3     Department, so I had to attend their regional

4     academy.  In addition to the State Academy and when I

5     got hired here in 2003, I had to attend their

6     in-house academy.

7          Q    Okay.  So do you have training in

8     conducting investigations and interviewing and things

9     like that?

10         A    Yes.

11         Q    Relating to criminal matters?

12         A    Yes.

13         Q    Did you conduct an investigation on June

14    22nd, 2016?

15         A    Yes.

16         Q    And during that investigation, did you

17    contact an individual named Meagan Vance?

18         A    I did.

19         Q    And what led you to contact her?

20         A    She actually made a phone call into

21    dispatch in a -- about -- about a, at that time, it

22    was a Harassment call.  It was coded as a Harassment

23    call.

24         Q    And when you say, "Coded," what do you

25    mean?

T. Duenas - D                          321

1        A    When the call came out on my screen, it --

2   it said, "Harassment," on it.

3        Q    Okay.

4        A    So it -- it basically, identifies the --

5   the title of the crime, as -- as -- as far as they

6   could tell.

7        Q    Okay.  Were you able to have a contact with

8   her over the phone.

9        A    Yes.

10       Q    Is that how you made contact?  And based on

11   the conversation that you had with her, did you

12   conduct a further investigation into her statements?

13       A    I did.

14       Q    And during the course of that

15   investigation, what did you do?

16       A    I went online and I was able to look at

17   certain websites, pornographic websites, that -- that

18   Ms. Vance said that she was on.

19       Q    And when you say, "She was on," what do

20   you mean?

21       A    That you could see that she was in the

22   video in a sexual act.

23       Q    And where you aware of a potential suspect

24   of the investigation at that point?

25       A    Yes.

1        Q     Who was the suspect?

2        A     She told me it was her -- her ex-husband,

3    Mr. Benjamin Barber.

4        Q     Okay.  So when you went forward with your

5    investigation online, what websites did you look at?

6        A     Redtube, PornTube, TNAFlix, EmpFlix,

7    Pornhub, porn.com, everythingsextube.com [sic],

8    xHamster.com.

9        Q     And did you select these websites in

10   reference to the ones she had listed to you?  Is that

11   why you went to these places?

12       A     Yes.

13       Q     Okay.  So when you went to these websites,

14   what did you find?

15       A     That there were videos of Ms. Vance,

16   several -- four videos in particular, that were

17   scattered between all -- all those websites of her

18   and Mr. Barber engaging in sex.

19       Q     Could you see her in an identifiable way in

20   the videos?

21       A     Yes.

22       Q     How were you able to identify her in

23   the videos?

24       A     Well, in our initial contact -- my initial

25   contact with Ms. Vance was over the phone.

1        Q      Yeah.

2        A      So I did not know what she looked like

3    initially, so I had to access a DMV file to

4    get her -- to see what she looked like.  And on that

5    and watching the video of that, I could determine

6    that that was the same person.

7        Q      Okay.  And the content of the videos

8    was sexual --

9        A      Yeah.

10       Q      -- in nature?

11       A      Yes.

12       Q      Were the individuals in the videos fully

13   nude?

14       A      Yes.

15       Q      What did you do to document what you

16   had found?

17       A      We had downloaded the -- the videos that

18   we were able to download on a disk and took

19   screenshots of the sights that showed the -- the

20   videos that were displayed.

21       Q      Okay.  And did you save your documentation

22   onto CDs?

23       A      Yes.

24       Q      I am going to show you what I've marked as

25   State's Exhibit, I believe, 13 -- no, 14 and 15.  Do

1    you recognize these exhibits?

2         A    Yes, I do.

3         Q    Are these this disks that you loaded your

4    findings onto as part of your investigation in

5    this case?

6         A    Yes.

7         Q    And are those, in fact, the original disks

8    that were entered into evidence?

9         A    Yes.

10              MS. ATWOOD:  Your Honor, we would offer

11   14 and 15.

12              MR. TAYLOR:  No objection.

13              THE COURT:  Thank you.  They'll be

14   received.

15              (State's Exhibit Nos. 14-15 received.)

16   BY MS. ATWOOD:

17        Q    So after you had collected and preserved

18   the evidence that you found online, did you try to

19   contact Mr. Barber?

20        A    Yes, I did.

21        Q    What did you do to try and make contact

22   with him?

23        A    With a -- we tried -- we tried with the --

24   with the help of Ms. Vance trying to get him on the

25   phone or text him.  And eventually, I tried to locate

1    him with databases available to me to his last

2    address.  And eventually, it just came down to phone

3    call after phone call after phone call or of me

4    calling him.

5         Q    Were you successful in calling him?

6         A    Yes I was.

7         Q    How -- how long did it take before you were

8    able to actually get ahold of him?

9         A    Well, he actually called dispatch in

10   response to my phone calling.  So he called back on

11   the 26th of June.

12        Q    So that would've been --

13        A    Four days.

14        Q    -- four days after you had been trying to

15   contact him?

16        A    I want to say I didn't try to contact him

17   'til the 23rd.

18        Q    Okay.  So three days of you trying to hunt

19   this guy down, basically?

20        A    Correct.

21        Q    Okay.  So when he contacted dispatch, did

22   you personally speak with him?

23        A    I spoke to him over the phone.

24        Q    And did you ask him about the case you were

25   investigating?

1        A    I did.

2        Q    What did you ask him?

3        A    Well, after I -- I identified who he was,

4    he asked me about this being a civil issue at first.

5    And I basically wanted to ask him if there was

6    agreement between him and Ms. Vance about posting

7    those videos online.

8             And he said that there was not an

9    agreement.  And I also asked him why he would post

10    the videos.  And he said that Ms. Vance accused him

11    of raping her and that she had ruined all of his

12    friend -- his relationships and friendships.

13        Q    And did he talk to you at all about any

14    contact he had had with Meagan at that point?

15        A    Well, he said he got an e-mail about a

16    digital copyright from her after he had posted the

17    videos.

18        Q    And what else did he tell you about his

19    reasons for posting videos?

20        A    He said he blamed her for being homeless

21    and that he -- he ended up losing everything because

22    that -- because that -- she had accused him of

23    raping -- he had -- she -- she accused him of raping

24    her.

25        Q    And did you guys talk at all about when he

1    posted the videos?

2         A     Yes.  He -- he -- he said he posted the

3    videos either in February or March of 2016.

4         Q     And what was the rest of your conversation

5    with him?

6         A     I asked him if -- if he was aware that she

7    was a teacher and he said he was.  And I asked

8    that -- if he put the videos out there knowing

9    that -- knowing that she was a teacher and he said,

10   "Yes."

11              I asked if he thought that the videos might

12   humiliate or embarrass her and then he commented that

13   they did a nude bike ride in Portland.  I -- oh, I

14   asked him if there were only the four videos and he

15   told me that was, quote, "Correct," unquote.

16        Q     Did you talk to him at all about whether or

17   not he had any profiles on the websites you'd looked

18   at?

19        A     I asked him if there was an account name

20   that he used to post the videos.  And he said, quote,

21   "Probably," unquote, use, quote, "BarberB," unquote.

22        Q     So he told -- he identified to you BarberB

23   as being his account?

24        A     Correct.

25        Q     Okay.  And did you talk to him at all about

1    how many sites he posted these on?

2        A    I -- I told him that Ms. Vance gave me

3    about seven sites that -- that the videos were posted

4    on and that he told me he only put them on two or

5    three.

6        Q    You mentioned that when you asked him at

7    first whether he thought these might humiliate or

8    embarrass her, he kind of avoided answering the

9    question.  Did he make any further statements about

10   that?

11       A    Yeah.  He said that it -- it may be

12   embarrassing to her, but that he did not gain

13   anything when he posted the videos.

14       Q    Did you talk to him at all about

15   potentially placing him under arrest?

16       A    I did.

17       Q    And what was that conversation like?

18       A    Well, we were on the phone and he didn't

19   tell me where he was and he wasn't willing to meet

20   with me.  He was rather upset and was afraid of

21   losing his job.  And when he spoke to me on the 26th,

22   I believe that's a Sunday.

23            And so I -- I'm guessing that he works --

24   he's going to be working on Monday.  So I -- I gave

25   him some time to -- to accumulate days and work

1   around his work schedule so that he could meet with

2   me and get arrested.

3        Q    So you were trying to sort of be flexible

4   for his benefit?

5        A    Correct.  I didn't want -- I told him I

6   didn't want him to lose his job, saw that I was going

7   to -- I was going to try to be -- come on in.  I --

8   we could do it on a -- on a weekend so that he comes

9   in on a weekend, that he could possibly get out by

10  Monday.

11       Q    Okay.  Did he make any other statements to

12  you that were different about his reasons for posting

13  the material?

14       A    He -- he believed that the Constitution

15  protected his right to free speech and he believed

16  that this was a form of free speech.

17       Q    Now, the conversation that you had with

18  him over the phone, you said, was on the 26th; is

19  that right?

20       A    Correct.

21       Q    When did you make personal contact with

22  him?

23       A    July 17th.

24       Q    Okay.  And where was that contact?

25       A    In front of our East Precinct at 3700

1    Southwest Murray Boulevard.

2         Q    Okay.  And just for the record, do you see

3    Benjamin Barber in the room today?

4         A    I do.

5         Q    Can you identify where he's seated and what

6    he's wearing?

7         A    He's seated to the left of Mr. Taylor in

8    the middle of the table.

9         Q    And what -- what is he wearing?

10        A    It looks like a darker, long-sleeved shirt

11   with a green inner shirt and black pants, black

12   shoes.

13             MS. ATWOOD:  Okay.  Your Honor, let the

14   record reflect he's identified the defendant.

15             THE COURT:  Okay.  The record will so

16   reflect.

17   BY MS. ATWOOD:

18        Q    So on the 26th when you -- sorry not the

19   26th -- the 17th, when you made personal contact with

20   the defendant, how did that contact go?

21        A    He -- he was -- well, he -- he -- he met me

22   and he was pretty upset.  So, you know, I gave him

23   some time to collect himself a little bit.  I gave

24   him credit 'cause he came to meet me.

25        Q    And did he talk to you at all about why he

1    was upset?

2         A    Yeah.  He said that he's been -- he's been

3    harassed by Mrs. Vance's lawyers for the past two

4    years and that every time he gets a job, that

5    Mrs. Vance and her associates, they bombard his work

6    online and he ends up losing his job.

7         Q    At that point, did you place him under

8    arrest?

9         A    I did.

10        Q    And did the arrest process go smoothly?

11        A    It did.

12        Q    And what else did you talk to him about

13   after he was arrested?

14        A    After he was arrested.  I asked if he had

15   taken the videos off -- off the sites and he said

16   that he did and that also sent a -- Ms. Vance a

17   receipt that shows that he -- he had asked for the

18   videos to be pulled.

19             I asked him if he was sure he removed the

20   videos from all the sites.  He said he took them off

21   the sites that he knew about.

22        Q    Okay.  Did you have any further contact

23   with the defendant or with Ms. Vance past that point?

24        A    Not -- not personal contact.  Actually, I

25   take that back.  I -- I did see him one other time,

1    but it wasn't because of -- it wasn't -- it wasn't

2    in --

3         Q    Not in furtherance of the investigation?

4         A    Correct.

5              MS. ATWOOD:  Okay.  Those are all my

6    questions.  Thank you.

7              THE COURT:  Okay.  Mr. Taylor, did you

8    wish to inquire of this witness?

9              MR. TAYLOR:  Please.

10             THE COURT:  Thank you.

11                  CROSS-EXAMINATION

12   BY MR. TAYLOR:

13        Q    Good afternoon, Deputy.

14        A    Good afternoon, sir.

15        Q    How you doing?  If you'll give me just half

16   a second to get set up.  I want to talk to you some

17   about your training and experience first.  You talked

18   to Ms. Atwood, you've been a police officer, what,

19   about 13 years?

20        A    With -- with Washington County, I've been

21   here 13 years.  I was originally hired in 1995 by the

22   Eugene Police Department, so I had worked there from

23   1995.  And then I came here in 2003 when I took a

24   position as a deputy.

25        Q    What detail have you been working for the

1    last couple years?

2         A    Patrol.

3         Q    I see you around the courthouse all the

4    time.

5         A    Yes, you do.

6         Q    Do you also work security here in the

7    courthouse?

8         A    Yes, I do, sir.

9         Q    How is that split up?

10        A    Court security's on a Monday and a Tuesday.

11   I work Wednesday, Thursday, Friday, Saturday, Sunday

12   on the road.

13        Q    You work seven days a week?

14        A    Sometimes.

15        Q    All right.  In all that training and

16   experience you talked to Ms. Atwood about, you took

17   classes at the police academy on investigation and

18   things like that?

19        A    Yes.

20        Q    I want to talk to you some about sort of

21   best policing practices, all right?  So one of the

22   things you take classes on is report writing, right?

23        A    Correct.

24        Q    So you're a police officer.  You go out on

25   all kinds of calls all the time, right?

1          A     Yes.

2          Q     Way too many to keep track of in your head?

3          A     There's a lot, yeah.  It's real hard to

4     keep track of them -- all of them.

5          Q     And that's why you write a report, right?

6          A     Yes.

7          Q     Once you complete a call, sometime before

8     the end of your shift, you sit down at the computer

9     and write your report up, correct?

10         A     Yes.

11         Q     And you bring that report with you to

12    court?

13         A     Yes.

14         Q     And you refresh your memory from it?

15         A     Yes.

16         Q     And let's be fair.  For example, in this

17    case, when you're testifying about statements

18    Mr. Barber made, that's verbatim from your report?

19         A     Some of it is verbatim.  Not right --

20    they're quoted, yes.

21         Q     Right.  And basically, when you've just

22    testified to all of Mr. Barber's statements, you

23    basically just read your report line for line?

24         A     For the most part, yes.

25         Q     All right.  And, again, that's so you

1    can remember what happened because you can't possibly

2    remember all the details of every conversation you

3    have?

4         A    Correct.

5         Q    For example, four months ago, you and I had

6    a conversation about this case?

7         A    We did?

8         Q    Is that a question or a statement of fact?

9         A    We did.

10        Q    Do you remember the context of that --

11        A    Actually --

12        Q    -- the specifics of what --

13        A    -- I do.

14        Q    -- was said?

15        A    You -- you approached me and asked me if

16   there was another Deputy Duenas that worked for the

17   Washington County.  And I said, "No, there isn't."

18        Q    There you go.  All right.  So let me --

19   I've -- I've suddenly lost myself in my notes.  My

20   apologies.  When you talked to Ms. Vance -- and we're

21   going to go kind of chronologically through --

22        A    Sure.

23        Q    -- what you've talked about.  When you

24   talked to Ms. Vance, did she tell you how she found

25   these videos online?

1      A     She looked for them herself.

2      Q     Any more details than that?

3      A     I -- I -- if I remember correctly, that --

4            MS. ATWOOD:  Your Honor, I'm going to

5      object to this line of questioning.  The questions

6      call for hearsay.

7            THE COURT:  Sustained.

8      BY MR. TAYLOR:

9      Q     You met with Ms. Vance in person on June

10     22nd, correct?

11     A     Not in -- not June 22nd -- I did not meet

12     with her in person on June 22nd.

13     Q     When did you meet her in person?

14     A     I think it was the 24th that I met with her

15     in person.

16     Q     Where was that at?

17     A     3700 Southwest Murray Boulevard, our East

18     Precinct.  She --

19     Q     Was she alone?

20     A     -- came in.  No, she was not.

21     Q     Who was she with?

22     A     She was with -- with a young man I think

23     she identified as her boyfriend.

24     Q     Okay.  Have you ever spoken to Ms. Vance's

25     attorney?

1       A    Yes.

2       Q    How many times?

3       A    Once.

4       Q    What was the nature of that conversation?

5            MS. ATWOOD:  Objection, Your Honor.

6  Question calls for hearsay.

7            THE COURT:  Sustained.

8  BY MR. TAYLOR:

9       Q    You viewed a number of websites related to

10  this case, correct?

11      A    Yes.

12      Q    All right.  Which websites did you go to?

13      A    I went to porn.com, everysextube.com,

14  xhamster.com, Pornhub, PornTube, RedTube, EmpFlix,

15  TNAFlix.

16      Q    On which of those websites did you find

17  videos related to this case?

18      A    I found videos on -- excuse me -- PornTube.

19  I also found videos at TNAFlix and everysextube.com,

20  PornHub and Porn TV.

21      Q    So on which ones did you not find videos?

22      A    I -- I don't remember.

23      Q    Are you familiar with pornographic

24  websites, Deputy?

25      A    More so now than before, yes.

1        Q      Have you ever received any training or

2    experience -- scratch the experience.  Have you ever

3    received any training on pornographic websites and

4    investigations?

5        A      No.

6        Q      Have you ever received any training on

7    computer investigations?

8        A      I have.

9        Q      What was the nature of that training?

10       A      Our certifications for our LEDS and

11   our databases.

12       Q      So that involves using the Law Enforcement

13   Database System?

14       A      Some of it, yes.

15       Q      All right.  So that's talking about looking

16   up warrants, looking up criminal history.  That's

17   what LEDS does, right?

18       A      Correct.

19       Q      Have you received any training on forensic

20   computer investigation?

21       A      No.

22       Q      All right.  So do you know what a -- a

23   mirror is?

24       A      In regards to forensic computer, no.

25       Q      All right.  So do you know how to do

1    IP traces?

2         A    No.

3         Q    Do you know what an IP trace is?

4         A    I've -- I think I do.  It's when I -- I'm

5    able to backtrack where that computer was located or

6    the IP address of the computer, where that thing I'm

7    looking for came from.

8         Q    The idea being that if you have some

9    internet posting or something like that, you could

10   trace the IP back and find out what computer it

11   actually came from?

12        A    Yes.

13        Q    All right.  Did you do any IP tracing in

14   this case?

15        A    No.

16        Q    All right.  Did you do any forensic

17   investigation to determine what, if any, of these

18   videos was actually linked to Mr. Barber?

19        A    I did not.

20        Q    All right.  So no -- no search warrants, no

21   traces, no nothing like that?

22        A    Correct.

23        Q    Now, Mr. Barber later spoke to you about

24   those websites, correct?

25        A    Yes.

T. Duenas - X                          340

1          Q     His posting of the videos?

2          A     Yes.

3          Q     He told you he posted to two or three

4    websites?

5          A     Yes.

6          Q     He didn't mention these other ones that had

7    the content?

8          A     Correct.

9          Q     So are you aware of whether any of those

10   sites were mirrors of the other sites?

11         A     I am not aware.

12         Q     All right.  Did you do any investigation to

13   look into whether either -- if any of those sites

14   pull content from other sites automatically?

15         A     I did not.

16         Q     So you wouldn't be able to say what, if

17   any, of these videos Mr. Barber actually posted

18   himself versus which were pulled off of a different

19   website by a bot or something like that?

20         A     Correct.

21         Q     So it's entirely possible that he could

22   have posted these videos on one website and then

23   they'd get automatically pulled to a bunch of

24   different other websites?

25         A     Possible.

 1        Q     Are you aware of the frequency with which

 2   that happens in internet pornography?

 3        A     Not personally.  I -- I just know that I've

 4   been told it has happened.

 5        Q     So it does occur?

 6        A     Yes.

 7        Q     You're aware of that?  So on June, was it

 8   23rd or 24th, that you attempted to set up a phone

 9   call with Ms. Vance --

10        A     24th.

11        Q     -- and Mr. Barber?

12        A     24th.

13        Q     24th.  And what you were trying to do was

14   set up a pretext phone call, correct?

15        A     Correct.

16        Q     Pretext phone call is an investigative tool

17   that you've been trained on?

18        A     Yes.

19        Q     And in a pretext phone call, you would have

20   the complaining witness call the person they are

21   accusing and get them to try and admit to things on

22   the phone, right?

23        A     Correct.

24        Q     And you record those conversations?

25        A     Yes.

1        Q     So you know about recording conversations?

2        A     Yes.

3        Q     And that's some bang-up evidence right

4    there, right?

5        A     Can be.

6        Q     If it happens?

7        A     Correct.

8        Q     Hypothetically, you've got a recorded phone

9    call where a suspect admits to an entire crime?

10       A     Yes.

11       Q     All right.  So you're aware of recording

12   interviews, phone calls, things like that?

13       A     Yes.

14       Q     In this case, you did not actually end up

15   recording any of these interviews or conversations

16   that you had?

17       A     Correct.

18       Q     All right.  However, the technology does

19   exist at the Washington County Sheriff's Office to do

20   that?

21       A     Yes.

22       Q     It is done in many cases?

23       A     Yes.

24       Q     All right.  So I want to kind of go back

25   to your conversations with Mr. Barber.  Earlier, you

1    said that, yes, you more or less summarized those

2    conversations in your report?

3         A     I -- some of it -- some of it is -- is

4    quoted -- his quotes, like what -- what he told me.

5         Q     There -- there are brief quotations and

6    then large sections of paraphrasing?

7         A     Correct.

8         Q     All right.  So obviously, your report and

9    the testimony that comes from it does not represent

10   the complete conversation?

11        A     It -- correct.

12        Q     All right.  So -- I mean, just naturally,

13   there are parts that are going to get left out?

14        A     Correct.

15        Q     All right.  So when you talked to

16   Mr. Barber, you talked about a number of things he

17   discussed in the past, right, things that happened in

18   the past between him and Ms. Vance?

19        A     Correct.

20        Q     And he was basically trying to explain

21   everything to you, right?

22        A     Yes.

23        Q     All right.  So he kind of just goes off on

24   you and throws all this back story at you of their

25   whole, long history, right?

1        A    Correct.

2        Q    And you're kind of just catching what you

3    can and condensing it down into a report?

4        A    Yes.

5        Q    A lot to take in?

6        A    Yes.

7        Q    All right.  So you'd agree, likely, some

8    details may have been missed?

9        A    Yes.

10       Q    All right.  Did you think at any point to

11   record these interviews?

12       A    No.

13       Q    All right.  I want to turn to some of the

14   specific discussions that were had.  Mr. Barber first

15   talked to you about the idea of this being a civil

16   matter, correct?

17       A    Yes.

18       Q    He wasn't even aware that this was a crime?

19       A    I -- I don't know.

20       Q    He starts talking to you about civil

21   (indiscernible) money and something like that?

22       A    I -- he just said it -- that -- he made

23   reference of it being a civil issue.

24       Q    Is that all he had to say on the point or

25   is that just what your report includes?

1        A    He asked if it was civil --

2        Q    Mm-hmm.

3        A    -- and --

4        Q    -- no more details?

5        A    No.

6        Q    All right.  You asked him about that --

7   whether there was any agreement about these videos

8   and he said that there was not any agreement?

9        A    Correct.

10       Q    Okay.  And then you went in to the whole

11  asking him, "Why'd you do this?"  And he sort of

12  throws that whole back story at you and the tortured

13  history of everything?

14       A    Yes.

15       Q    All right.  He included a lot of talk about

16  his current circumstances?

17       A    Yes.

18       Q    All right.  So, first off, presently, he

19  had a job.  He was terrified of losing it?

20       A    Yes.

21       Q    He talked to you about the whole

22  homelessness thing, how he hadn't worked for a long

23  time, all that stuff?

24       A    Yes.

25       Q    Talked about his depression, thinking about

1   killing himself, all that stuff?

2        A    I don't know if he told me that.  I don't

3   remember that, if he -- if he told me that or not.

4        Q    You don't recall?

5        A    I don't recall.

6        Q    Okay.  He talked about losing a year of

7   his life, losing employment, ruined friendships, all

8   that stuff?

9        A    Yes.

10        Q    He told you that he was scared?

11        A    He was scared of losing his job and going

12   back to what he -- going back to what he had been

13   doing.

14        Q    And he also made a point to let you know

15   that he did not share these videos with any of her

16   friends?

17        A    Yes.

18        Q    Now, after you talked to Mr. Barber on

19   June 26th, you guys talked then over e-mail a bunch,

20   right?

21        A    He sent me -- he sent me some e-mail.  And

22   I -- I'm not sure.  My -- my responses were -- were

23   about our meeting still, I think, if I'm -- I think

24   that's what it was.  He -- he sent me a bunch of

25   e-mails and I sent him something about making sure

1    that we were meeting.

2           Q     So you guys exchanged about eight to ten

3    e-mails.  Does that sound about right to you?

4           A     I don't remember.

5           Q     All right.  And the e-mails he sent you

6    were voluminous, correct?

7           A     You know, I don't remember reading --

8    reading all of those e-mails.

9           Q     So he was sending you stuff about the case

10   and you didn't read them?

11          A     I -- I don't remember what he said on those

12   e-mails and I don't even know if they were duplicates

13   of what Ms. Vance had.

14          Q     Did you even click the links that he sent

15   you?

16          A     I did not click links that he sent me.

17          Q     All right.  So Mr. Barber is a suspect in

18   this case, sent you what sounds like a large e-mail

19   with a lot of links and stuff in it and it didn't

20   make it into your report and you didn't even click

21   the links?

22          A     I did not click the links.

23          Q     And it's never discussed anywhere in your

24   report, those conversations?

25          A     Correct.

1        Q    All right.  So fair to say, your reports

2    that you're testifying from are missing some facts

3    about this case?

4        A    They're missing that -- what were in the

5    links.  That's what they're missing.

6        Q    I mean, they don't even make reference of

7    any e-mails?

8        A    The e-mails he sent me, I think, were after

9    the arrest.  No, I take it back.  The e-mails he sent

10   me were after our discussion on the 26th.

11       Q    And the e-mails refer to him turning

12   himself in to you --

13       A    Correct.

14       Q    -- at a later date?

15       A    Correct.

16       Q    All right.  So during the pendency of this

17   case, lots of e-mails.  Nothing came of them?

18       A    Yeah, I didn't read them.

19       Q    All right.

20       A    I'm sorry I didn't click on the links.

21       Q    Were you interested in hearing Mr. Barber's

22   side of the story?

23       A    I -- I was very interested in hearing his

24   side of the story.  But I want to hear it from him,

25   from him, not from clicking this e-mail or that

1    e-mail.

2         Q    So July 17th, he turns himself in to you,

3    right?

4         A    Yes.

5         Q    And, again, you guys have a conversation

6    out in the parking lot?

7         A    Yes.

8         Q    That conversation not recorded either?

9         A    Correct.

10         Q    But summarized in your police report?

11         A    Yes.

12         Q    All right.  And he's talking about

13    Ms. Vance's lawyers chasing him around the last

14    couple years?

15         A    Yes.

16         Q    He's talking about losing jobs and things

17    like that?

18         A    Yes.

19         Q    Is that when you talked to him about

20    Ms. Vance's lawyer contacting you?

21         A    I think I did say that -- that she called

22    me up.

23         Q    And you guys talked some about the videos?

24         A    Yes.

25         Q    And he said that he removed all the ones

1    that he knew about?

2        A    Yes.

3        Q    And he had sent Ms. Vance proof of that,

4    right?

5        A    Well, he said he sent her some kind

6    of receipt.

7        Q    If you'll give me a minute to kind of look

8    over things.  I think those are all my questions, but

9    let me just double check.

10       A    Sure.

11                  (Pause in proceedings, 4:47 p.m.)

12   BY MR. TAYLOR:

13       Q    This last topic I want to touch in with you

14   real quick is this crime itself, Unlawful

15   Dissemination of an Intimate Image.  Have you ever

16   heard of this crime before this case?

17       A    Not -- not in those terms, no.

18       Q    Had you ever investigated a case like

19   this before?

20       A    No.

21       Q    All right.  At some point, you called

22   Ms. Atwood here for some clarification on the case --

23       A    For --

24       Q    -- on the crime; is that correct?

25       A    Correct.

1      Q     Make sure you understood it?

2      A     Yes.

3      Q     All right.  'Cause it is a brand new

4   charge?

5      A     It's -- it's a new -- a fairly new law,

6   yes.

7               MR. TAYLOR:  Those are all my questions.

8   Thank you, Deputy.

9               THE COURT:  Okay.  Ms. Atwood, do you

10  have brief questions?

11              MS. ATWOOD:  I do.

12              THE COURT:  Okay.

13              MS. ATWOOD:  I think I can get through

14  these.

15              THE COURT:  Great.  Thank you.

16                   REDIRECT EXAMINATION

17  BY MS. ATWOOD:

18     Q     So I just want to ask you a couple of

19  follow-up questions.  To start with, you were asked

20  some questions about your training relating to

21  computer investigations.  And it's clear that you

22  aren't -- you don't have an extensive training in

23  computer forensics, right?

24     A     Correct.

25     Q     But do you use computers in your day-to-day

1    life?

2          A     Yes.

3          Q     How often?

4          A     Every day.

5          Q     So do you understand how to navigate

6    the internet --

7          A     Yes.

8          Q     -- find websites --

9          A     Yeah.

10         Q     -- download files --

11         A     Yes.

12         Q     -- things like that?

13         A     Yes.

14         Q     And those are the sort of things that you

15   were required to do during your investigation in this

16   case?

17         A     Yes.

18         Q     You were also asked whether or not you

19   conducted any extensive investigation trying to find

20   a way to associate these posts with the defendant.

21   And, specifically, defense counsel asked you about

22   this -- something called IP tracing.  And that's not

23   something that you did in this case, right?

24         A     Correct.

25         Q     But when you got online and went to the

T. Duenas - ReD                         353

1    websites that had been listed to you, did you find

2    that the posts were associated with a particular user

3    name?

4         A    Yes.

5         Q    What was the user name?

6         A    BarberB.

7         Q    And was that the same user name that he

8    later admitted to you he had posted the videos on?

9         A    Yes.

10        Q    You were asked a couple of times about

11   whether or not you recorded your interviews with the

12   defendant.  Is it common practice, in your

13   experience, to record every interview that you do?

14        A    It is not.

15        Q    And -- and why not?

16        A    First of all, we are not issued recorders,

17   so we have to make a special effort to even get one.

18   I don't carry one around.

19             I'm not issued one.  I have access to some

20   at certain precincts and I can utilize those.  But I

21   actually have to make that special effort to -- to

22   get -- get that orchestrated.

23        Q    Okay.  And in this case, when you met with

24   the defendant, he was -- he -- he turned himself in.

25   He voluntarily met you, right?

1           A       Yes, he did.

2           Q       He was being cooperative?

3           A       Yes, he did.

4           Q       And during your conversation, he admitted

5    what he did?

6           A       Yes.

7           Q       And you included the facts of that

8    conversation in your reports as accurately as you

9    could, correct?

10          A       Yes.

11          Q       So you were asked a few questions about

12   the defendant's reaction to your questioning about

13   the investigation.  And defense counsel asked you

14   whether he told you he was scared about losing his

15   job and whether he clarified to you that he'd never

16   sent these videos to her friends.  And you said that

17   those are both accurate, right?

18          A       Correct.

19          Q       But didn't he also state to you -- and --

20   and for reference, this would be in the third full

21   paragraph of your second report.  Didn't he say to

22   you that he posted these images because of the pain

23   and suffering that she'd caused him?

24          A       Well, because he -- she accused him of

25   raping her and that he lost -- he ruined all the

 1   friendships and he lost a year of his life or --

 2        Q    Okay.  The last thing I want to ask you

 3   about is the defendant's statements about removing

 4   the videos.  He did make a statement to you that he

 5   had all the videos removed, right?

 6        A    The ones that he knew about.

 7        Q    And in -- in an effort to prove this to

 8   you, he said that he had sent the victim, Meagan, a

 9   receipt, right?

10        A    Correct.

11        Q    So he told you he had sent her one receipt,

12   but hadn't he already admitted to you at that point

13   that he'd posted the videos to at least two or three

14   sites?

15        A    Yes.

16        Q    And you, yourself, found them on more sites

17   than that even, right?

18        A    Yes.

19             MS. ATWOOD:  Those are all my questions.

20   Thank you.

21             THE COURT:  Okay.  And you may step

22   down.  Thank you.

23             And is this witness excused?

24             MS. ATWOOD:  Yes.

25             THE COURT:  Any objection, Mr. Taylor?

1              MR. TAYLOR:  No, Judge.

2              THE COURT:  Okay.  Great.

3              MS. ATWOOD:  (Indiscernible.)

4              THE COURT:  Okay.  So we're going to go

5     ahead and break for the day.  I'm just going to ask

6     that you're all back here at ten to 9:00 in the jury

7     room.  And if you just want to go ahead and file in

8     there, Marcela will be in to give you some

9     last-minute instructions.

10             Again, remember that you're not to

11    discuss this case, not to do any independent research

12    on anything that you've heard here today.  There's

13    nothing for you to consider unless and until you

14    are sent to deliberate, okay?  Thank you.

15             A JUROR:  (Indiscernible) return time?

16             THE COURT:  Return time?  8:15.

17             (The following proceedings were held in

18    open court, out of the presence of the jury,

19    4:53 p.m.:)

20             THE COURT:  Okay.  So as far as

21    scheduling tomorrow, I believe we have an 8:30

22    sentencing and a 1:15 sentencing.  You have one

23    witness left; is that correct?

24             MS. ATWOOD:  Yes.

25             THE COURT:  Okay.  And, Mr. Taylor, you

1    intend to call your client --

2              MR. TAYLOR:  I do --

3              THE COURT:  -- is that correct?

4              MR. TAYLOR:  -- Judge.

5              THE COURT:  And how long do you think

6    that will take?

7              MR. TAYLOR:  My direct?  45 minutes.

8              THE COURT:  Okay.  Again, I want to

9    remind the parties that nobody's going to be here

10   next week, so we need to make sure that we are moving

11   at a clip that we get this thing to the jury

12   tomorrow.

13             MS. ATWOOD:  Yeah.

14             MR. TAYLOR:  Understood, Judge.

15             THE COURT:  All right.  Thank you.

16                       * * *

17   (Court adjourned, Volume 3, 11-9-16 at 4:54 p.m.)

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                    I, Katie Bradford, Court Reporter of the

3    Circuit Court of the State of Oregon, Twentieth

4    Judicial District, certify that I transcribed in

5    stenotype from a digital audio recording the oral

6    proceedings had upon the hearing of the

7    above-entitled cause before the HONORABLE

8    BETH L. ROBERTS, on **November XX, 2016**;

9                    That I have subsequently caused my

10   stenotype notes, so taken, to be reduced to

11   computer-aided transcription under my direction; and

12   that the foregoing transcript, **Volume 3 of 4,**

13   **Pages 113 through 357**, both inclusive, constitutes a

14   full, true and accurate record of said proceedings

15   taken from a digital audio recording and so reported

16   by me in stenotype as aforesaid.

17                    Witness my hand and CSR Seal at

18   Portland, Oregon, this 11th day of January, 2017.

19

20

21                    _____
                      Katie Bradford, CSR 90-0148
22                    Court Reporter
                      CSR Expires:  9-30-17
23                    (503) 267-5112

24

25