1        IN THE CIRCUIT COURT OF THE STATE OF OREGON

2            FOR THE COUNTY OF WASHINGTON

3

4   STATE OF OREGON,                )
                                    )
5        Plaintiff,                 )  Washington County
                                    )  Circuit Court
6        v.                         )  No. 16CR46339
                                    )
7   BENJAMIN JAY BARBER,            )  CA A163786
                                    )
8        Defendant.                 )  *Volume 4 of 5*

9

10          *TRANSCRIPT OF PROCEEDINGS ON APPEAL*

11            BE IT REMEMBERED that the above-entitled

12   Court and cause came on regularly for hearing before

13   the Honorable Beth L. Roberts, on Thursday, the 10th

14   day of November, 2016, at the Washington County

15   Courthouse, Courtroom No. 304C, Hillsboro, Oregon.

16                  APPEARANCES

17        Marie Atwood, Deputy District Attorney,
          Appearing on behalf of the State;
18
          Cameron Taylor and Christine Helregel,
19        Attorneys at Law,
          Appearing on behalf of Defendant Barber.
20

21
          KATIE BRADFORD, CSR 90-0148
22              Court Reporter
              (503) 267-5112
23
     Proceedings recorded by digital audio recording;
24   transcript provided by Certified Shorthand Reporter.

25

1                         <u>GENERAL INDEX</u>

2                           <u>VOLUME 4</u>

3                                                    <u>Page No.</u>

4     November 10, 2016 Proceedings              362

5     Case Called; Parties Introduced            362

6     State Rests                                436

7     Colloquy, re:  Demurrer                    437

8     Court's Ruling                             437

9     Defendant's Motion for Judgment of Acquittal    437

10    Court's Ruling                             452

11    ***AFTERNOON SESSION***                    514

12    Defendant Rests                            564

13    State Rests on Rebuttal                    569

14    State's Closing Argument                   569

15    Defendant's Closing Argument               602

16    State's Rebuttal Argument                  627

17    Court's Instructions                       637

18    Bailiff Sworn                              645

19    Jury Retires to Deliberate                 646

20    Verdict                                    648

21    Jury Dismissed                             649

22    Colloquy, re:  Scheduling                  650

23    Reporter's Certificate                     654

24                            *  *  *

25

```
 1                      WITNESS INDEX

 2                        VOLUME 4

 3    FOR THE STATE:      Direct   Cross   Redirect   Recross

 4    Robert Rookhuyzen    363     393      418

 5    Meagan Vance         434

 6    (on Rebuttal)

 7    Meagan Vance         566     568

 8    FOR THE DEFENDANT:

 9    Benjamin Jay Barber  456     523      559

10                         *  *  *

11

12

13                      EXHIBIT INDEX

14    FOR THE STATE:                   Offered   Received

15    No. 16    (CD)                    426       426

16    No. 17    (Craigslist post)      531       531

17                         *  *  *

18

19

20

21

22

23

24

25
```

1    (Volume 4, Thursday, November 10, 2016, 9:01 a.m.)

2                    P R O C E E D I N G S

3                    (Whereupon, the following proceedings

4    were held in open court, out of the presence of

5    the jury:)

6                    THE COURT:  Good morning.  Please be

7    seated.

8                    Okay.  We're here on the State of Oregon

9    versus Benjamin Jay Barber, beginning Day 2 of our

10   jury trial.  Ms. Atwood is here on behalf of the

11   State.  And --

12                   MS. ATWOOD:  Those are the definitions I

13   set out (indiscernible).

14                   THE COURT:  Mr. Taylor and Ms. --

15                   MR. TAYLOR:  Helregel.

16                   THE COURT:  -- Helregel --

17                   MS. HELREGEL:  Helregel.

18                   THE COURT:  -- are present with the

19   defendant.  And are we ready to proceed?

20                   MS. ATWOOD:  I believe so, Your Honor.

21                   MR. TAYLOR:  Yes, Judge.

22                   THE COURT:  All right.  Let's go ahead

23   and bring our jury back in.

24                   (The following proceedings were held in

25   open court, the jury being present, 9:03 a.m.)

1            THE COURT:  Good morning.  Welcome back.

2    We're ready to begin.

3            Ms. Atwood, you may call your next

4    witness.

5            MS. ATWOOD:  Thank you, Your Honor.

6    We'll call Robert Rookhuyzen.

7            THE CLERK:  If I can have you remain

8    standing.  Raise your right hand.

9                    ***ROBERT ROOKHUYZEN***

10   Was thereupon called as a witness on behalf of the

11   State; and, having been first duly sworn, was examined

12   and testified as follows:

13           THE CLERK:  Thank you.

14           THE WITNESS:  Okay.

15           THE CLERK:  You may be seated.

16           For the record, if I could have you

17   please state your name, spelling the first and last.

18           THE WITNESS:  Sure.  My name is Robert

19   Rookhuyzen; R-o-b-e-r-t, R-o-o-k-h-u-y-z-e-n.

20           THE COURT:  Okay.  Ms. Atwood, you

21   may inquire.

22           MS. ATWOOD:  Thank you, Judge.

23                  DIRECT EXAMINATION

24   BY MS. ATWOOD:

25       Q    Good morning.

1        A    Good morning.

2        Q    Where do you work?

3        A    I work for the Washington County

4   Sheriff's Office.

5        Q    And how long have you worked there?

6        A    I just hit my 15-year mark in September.

7        Q    What do you do at the Sheriff's Office?

8        A    So I'm currently a violent crimes

9   detective.  I -- I investigate mostly robberies,

10  homicides, adult sex crimes.  And I'm part of the

11  Washington County Major Crimes Team.  And as part of

12  that, I respond to all homicides in the county as

13  well as officer-involved shootings.

14       Q    Before you were a detective, were you

15  a deputy?

16       A    Yes.

17       Q    What is the difference in your duties

18  between what you did before and what you do now?

19       A    So I like to tell people that it's kind of

20  like when somebody goes into a hospital.  There's the

21  triage person that kind of sees why you're there and

22  then they decide if you're going to stay or you're

23  going to go.  And then they refer you on kind of this

24  more specialized care.

25            So a patrol deputy, they respond to any

R. Rookhuyzen - D                          365

1    kind of 9-1-1 call.  They're kind of generalists, if

2    you will.

3              So any kind of call that comes up, they

4    have to be prepared to go to that.  And then if

5    something requires more followup that's going to be

6    lengthy or require a lot of time, then it goes on to

7    detectives.

8         Q    Okay.  So did you go through the basic

9    training and police academy to become a deputy --

10        A    Yes.

11        Q    -- when you started working?  And what kind

12   of additional training did you have to do to become

13   a detective?

14        A    So it's a competitive process to become a

15   detective.  So, basically, you just have to show your

16   proficiency on the road.  So I was promoted.  After

17   seven years as a deputy, I was promoted to corporal

18   and then I did that for a few years and then I was

19   promoted again through a competitive process to be a

20   detective.

21             So some of the specialized training I did

22   in my first five years, I was assigned to child abuse

23   investigations, so I handled mostly sex crimes

24   against children.  And so as part of that, I went to

25   international and local trainings and basically a lot

1    of on-the-job experience through lots of cases.

2         Q    Okay.  So during your time working as a

3    child abuse detective and the -- and the cases you do

4    now, do you have experience and training in dealing

5    with computer or internet-related crimes?

6         A    Yes.

7         Q    What kind of crimes are those?

8         A    Oh, what kind of crimes and --

9         Q    What -- what kind of crimes have you

10   worked on?

11        A    So a lot of crimes now involve -- you know,

12   have a computer-related component, whether it's a

13   suspect's computer, a victim's computer, tablet

14   device, cell phones, Facebook, social media, there's

15   a lot of different crimes now.  Anything from sex

16   crimes to homicides, we -- we rely on digital

17   evidence.

18        Q    So would you say that that comes up or has

19   come up pretty frequently in your experience?

20        A    Yes.

21        Q    So do you have experience in seizing and

22   searching digital or technology-related items?

23        A    Yes, mostly seizing.  I'm not a digital

24   forensics examiner.  We have specialists who do that

25   for us.  That requires a lot more training and that's

R. Rookhuyzen - D                                    367

1    not really anything that I'm super interested in.

2    But, yeah, as far as obtaining it and, you know,

3    writing search warrants for it and giving it to the

4    experts, I do that.

5        Q    Okay.  I'd like to draw your attention to

6    the investigation in this case.  How did you become

7    involved with this case?

8        A    So back on August 25th of this year, I was

9    assigned to basically do followup on a case that

10   had -- that had come in through Deputy Duenas.

11       Q    And what was the nature of the followup you

12   were suppose to do?

13       A    I was suppose to see what kind of digital

14   footprint there was as far as, you know, whether

15   videos were still on certain pornographic websites,

16   whether we could preserve those for evidence and

17   basically find out information through search

18   warrants as to when an account was created, when the

19   videos were posted and/or deleted, that kind of

20   stuff.

21       Q    Okay.  And you mentioned before that what

22   you would typically do is try to seize an item from

23   someone to obtain information about things like

24   digital footprint; is that right?

25       A    Correct.  And -- and this case was a little

1    bit different because we were getting information

2    from a third party, these individual websites.

3         Q    Why were you unable to seize anything as

4    far as physical evidence is concerned?

5         A    So my understanding at the time I got

6    involved was that Mr. Barber was transient and we

7    didn't know, you know, where he was or where a

8    computer would be located.

9         Q    So was the nature of your investigation

10   suppose to be you investigating things online?

11        A    Yes.

12        Q    Okay.  Where did you start?

13        A    So I -- I started with a few different

14   websites.  Should I -- should I go through the

15   websites?

16        Q    Well, let me ask you a couple of questions

17   before we get there.  Were you able to review

18   anything before you began your own individual

19   investigation?

20        A    Yes.  I reviewed all the reports that

21   Deputy Duenas had written and there was also some

22   information provided by Ms. Vance, specifically

23   websites where she had, you know, encountered these

24   videos still being active online.

25        Q    Okay.  So how -- is -- is that where you

1    began your search then?

2          A    Yes.

3          Q    Did you follow the list of websites that

4    were provided by her?

5          A    Yes.

6          Q    And -- and any additional information

7    provided by Deputy Duenas?

8          A    Yes.

9          Q    Okay.  So why don't we just go through your

10   investigation piece by piece?  What was the first

11   thing that you did?

12         A    So what we just talked about, basically, I

13   went down the list item by item and went through the

14   different websites and basically went to every active

15   link where she had seen, you know, a video involving

16   her and Mr. Barber.

17         Q    And how were you planning on preserving

18   what you found on the website?

19         A    So there's an add-on to the browser I use

20   and basically you can direct it to save any

21   multimedia content that you see on a website.  So

22   it's basically something anyone can do.

23         Q    Okay.  What was the first website that you

24   went to?

25         A    So the first website I went to was

1    Pornhub.com.

2         Q    And was that one of the sites that was

3    listed on the materials provided by Ms. Vance?

4         A    Yes.

5         Q    Okay.  What did you observe when you went

6    to Pornhub.com?

7         A    So I first looked at, like, terms and

8    conditions for users.  I saw on their terms and

9    conditions page that made clear that no user could

10   use the website to break any laws.

11            I found information -- basically a -- a web

12   form that someone can fill out if there was a video

13   on their site that they didn't want on there or that

14   had been put up there without consent.  So,

15   basically, it's a way -- a mechanism to have a video

16   removed.

17            I found out who their attorney was and I

18   found out that they were headquartered in Cyprus.

19   Not Cypress, California, but Cyprus, the country.

20   And then I went to a profile called BarberB, which I

21   had been told and got information it belonged to the

22   defendant.  And I saw that that profile was still

23   active.

24            And then I took screenshots of all the

25   things I just talked about and -- and placed that

1    into evidence.

2            And then when I clicked on that specific

3    profile, the BarberB profile, it showed that two

4    videos were still active online.  And both were --

5    both had been labeled "Albino Porn."

6            And one was 16 minutes and one second in

7    length and the other one was 18 minutes and 46

8    seconds in length.  And I saw that each of them

9    had -- I should say, they had several thousand views.

10   Q    Do you recall or did you record anywhere

11   how many views you saw were listed at that time?

12   A    Yes.  On -- and -- and I just -- just for

13   clarification, this is back on August 30th of this

14   year.  One of the videos on that website had 2,464

15   views and the other one had 1,771 views.

16   Q    So before we move to the next site you

17   looked at, I want to ask you a couple of follow-up

18   questions.  You mentioned that you had looked for

19   where they were headquartered and where their, I

20   guess, legal process would be directed.  Why did you

21   look for those things?

22   A    So I knew early on that we were -- you

23   know, one of the goals of the investigation was to

24   obtain information from these websites.  And I know

25   that all these websites would require some kind of

1    legal process, like a subpoena or a search warrant.

2         Q     And when you observed the two videos that

3    were still active, did you try to download those?

4         A     Yes.  I was able to preserve those through

5    the browser add-on and I placed a copy into evidence.

6         Q     Okay.  And was that evidence on a disk?

7         A     Yes.

8         Q     What -- when you observed the videos, what

9    did you see as far as the content was concerned?

10        A     So both videos depicted consensual sex

11   between Mr. Barber and Ms. Vance.  It appeared to be

12   taking place in a bedroom.  And in one of the videos,

13   Ms. Vance appeared to be tied up.

14        Q     What was the next website that you went to?

15        A     So the next website I went to was called

16   RedTube.com.  And I guess I want to mention, too, the

17   first website being called Pornhub, it actually is

18   kind of a -- a -- I guess, a main website, if you

19   will, and several others are subsidiaries.  So

20   RedTube and a couple more that we're going to talk

21   about are subsidiaries of Pornhub.

22        Q     And is that something that would be typical

23   for you to see in the investigations you've done?

24        A     No.  I -- I don't -- I don't know that it

25   would be.

1        Q     Okay.  So RedTube was -- how -- how did

2    you -- how could you tell that it was a subsidiary or

3    an associate website of Pornhub.com.

4        A     So it is part -- it's -- it's clear, like,

5    in the terms and conditions and legal page that

6    you're dealing with Pornhub as the main entity and

7    this is a subsidiary.  For example, RedTube handles

8    the -- any support questions or the legal issues that

9    I mentioned before.  It refers you back to Pornhub.

10       Q     And was the -- did you visit a part of the

11   website to find that information on -- on RedTube or

12   was that information you had already learned from

13   Pornhub?

14       A     No, it's -- it's on both.

15       Q     Okay.  So what did you find when you went

16   to RedTube.com?

17       A     So I found out that there was a profile

18   called BarberV -- BarberB, sorry, that contained

19   active videos.  It showed -- basically, the profile

20   for BarberB showed to be a male -- a 31-year-old male

21   named Benjamin, a male with an interest in men and it

22   showed him to be in Newberg, Oregon.  And it showed

23   the last log on to be five months earlier.

24       Q     And that specific identifying information,

25   was that different than what you had seen on Pornhub?

1        A    Yes, it was.

2        Q    What did you see on RedTube as far as

3   videos that had been uploaded?

4        A    So -- and like I said, it -- it showed four

5   active videos and they were all labeled "Albino

6   Porn."  And they were -- it showed that all these

7   videos had been added or uploaded to the website on

8   April 6th of this year.

9             And so there were four of them.  One was 21

10  minutes and 25 seconds in length.  One was 16 minutes

11  and 1 second in length.  Another one was 18 minutes

12  and 46 seconds in length.  Another one was 21 minutes

13  in length.  And, again, these had hundreds of views

14  each.

15       Q    Were any of the videos that you observed on

16  RedTube.com the same videos that you had seen on

17  Pornhub?

18       A    Yes.  So Pornhub had two active videos and

19  RedTube had four.  Two of the four were the same.

20       Q    As far -- and -- and the other two were

21  different videos?

22       A    Correct.

23       Q    They weren't duplicates?

24       A    Correct.

25       Q    And as far as the views were concerned,

1      were there the same or different number of views on

2      RedTube versus Pornhub?

3              A      Completely different.

4              Q      How many views did you find on the videos

5      on RedTube.com.

6              A      So on RedTube, one of them had 586 views,

7      one had 487 views, one had 1,009 views and another

8      one had 506 views.

9              Q      And were you able to download these videos

10     to preserve them as well?

11             A      Yes.

12             Q      And what was the content of the other

13     videos that weren't redundant from the previous

14     website?

15             A      So the videos appeared to depict consensual

16     oral and vaginal sex in a bedroom setting.

17             Q      What was the next website you went to?

18             A      So the next website I went to was called

19     Porn.com.

20             Q      Did you, again, look for any sign of legal

21     services information or a place to send a contact to?

22             A      I did.  And -- and this particular website

23     didn't have any kind of contact information.

24             Q      Did it appear to be another subsidiary or

25     affiliate of Pornhub or RedTube?

1        A     I don't believe so.

2        Q     And when you went to Pornhub.com, you

3   mentioned there was -- on the page itself, the -- the

4   different subsidiaries were listed.  Was Porn.com one

5   of those?

6        A     I don't believe so.

7        Q     What did you observe when you went to

8   Porn.com?

9        A     So I looked on this website, again, for

10  profile information belonging to BarberB.  And it

11  showed that that profile -- you know, the -- the

12  person behind the profile had joined five months

13  earlier, so back in March of '16, at the time I was

14  looking at it.

15       Q     And this was the same user name as was on

16  the previous two websites?

17       A     Yes.

18       Q     What did you observe when you went to that

19  user name's profile?

20       A     So what it showed was -- it showed that

21  there were four videos on that profile, but when I

22  clicked on the link to see those videos, I saw a

23  message that indicated that no videos had been

24  uploaded yet, so kind of contradictory.

25       Q     And was that significant to you?  What did

1    you take that to mean?

2         A    Well, I -- I took that to mean that there

3    had been videos there, but then they'd -- they'd been

4    removed for some reason.

5         Q    Okay.  Did you record or preserve any

6    information from Porn.com?

7         A    What I did, since the videos weren't active

8    anymore, is I did screenshots that showed, you know,

9    basically what I just testified to, that there were

10   four there and then when I clicked on them, that it

11   showed that they weren't -- or that they'd been

12   removed.

13        Q    Okay.

14        A    Or, I'm sorry, that no video had been

15   uploaded yet.

16        Q    Just bear with me for a second.  What was

17   the next website that you went to?

18        A    So the next website I went to was called

19   TNAFlix.com.

20        Q    And did you notice whether or not that

21   website appeared to be an affiliate or a subsidiary

22   of any others?

23        A    Yeah, it appeared to be independent.

24        Q    What did you notice as far as their

25   location or legal services were concerned?

1      A      There was no legal or law enforcement

2   contact information.  And they had a basic -- a basic

3   web form just for general support or questions.

4      Q      Okay.  And what did you observe when you

5   went to TNAFlix.com as far as these videos were

6   concerned?

7      A      So I -- I found two active videos there.

8   Both were labeled "Albino Porn," which is -- which

9   had been the same at all the other websites.  One was

10  16 minutes and 1 second in length and had 61 views.

11  And the other one was 21 minutes 25 seconds in length

12  and had been viewed 90 times.

13     Q      Did you notice whether or not, on

14  TNAFlix.com, there was a user name associated with

15  those videos?

16     A      Yes.  It was -- it was basically under the

17  BarberB profile, also.

18     Q      Were you able to download these videos to

19  preserve them as well?

20     A      Yes.

21     Q      What was the next website that you went to?

22     A      The next website I went to was called

23  EMPFlix.com.

24     Q      And did that website appear to be

25  affiliated with any others?

1       A    Yes.  It appeared to be part of the

2    previous website, the TNAFlix.

3       Q    How could you tell?

4       A    I think it -- I think it says so.

5       Q    Okay.  Did you find any legal contact

6    information on that website?

7       A    No.

8       Q    What did you --

9       A    They just -- oh, I'm sorry.  They just have

10   a general support/contact web form.

11      Q    Okay.  What did you find as far as any

12   videos or information relating to this case?

13      A    So I showed -- so, basically, again, the

14   reason I was here was Ms. Vance had provided links to

15   where she had seen videos in the past.  So what I got

16   here was that none of those links were still active.

17   So I got a message that said the movie requested was

18   not found.

19      Q    And when you searched for them, did you

20   take the verbatim length that was provided on

21   Ms. Vance's list?  You didn't just type into a search

22   bar or something like that?

23      A    Correct.  I was going to the exact

24   web location.

25      Q    Okay.  Were you able to preserve

1    information about -- well, I guess, any information

2    that you had found on this website?

3         A    So what I did, again, when there were no

4    links that were active that went anywhere, I just

5    took screenshots of the message, basically, that said

6    the video was not available.

7         Q    What was the next website you visited?

8         A    So the next website I went to was called

9    Thumbzilla.com.

10        Q    Is Thumbzilla an affiliate of any others?

11        A    Yes.   Thumbzilla is also run by

12   Pornhub.com.

13        Q    What did you find as far as contact or

14   legal information?

15        A    So there was not any separate contact

16   e-mail address -- excuse me -- or separate legal law

17   enforcement contact information.   I later learned

18   that Pornhub handles those requests when they get

19   subpoenas and search warrants.

20        Q    Up to this point, did you notice whether

21   any of these websites describe how a person can

22   upload a video?

23        A    Yeah, each one's a little bit different.

24   In fact, Thumbzilla does not require an account, so

25   basically, you could upload anonymously.   The other

1    ones that we've talked about, you're basically --

2    create a -- a user account and then you can upload

3    and kind of have this profile and people can follow

4    you or be notified if -- if you upload something new.

5        Q    But Thumbzilla was just -- you could upload

6    without being registered in any way?

7        A    Right.  Think of kind of like -- well, I

8    guess that you can't even use YouTube as an example.

9    Yeah, it's -- it's more anonymous.

10        Q    Okay.  How many links did you look at

11    on Thumbzilla?

12        A    On Thumbzilla, so it looks like I got 14,

13    but one of them was redundant, so I think 13 total.

14        Q    And I just want to go one by one through

15    the links that you looked at.  What did you find as

16    far as the first link was concerned?

17        A    Okay.  So the first link I went to, I got

18    an error message that the page wasn't found.

19        Q    And I -- I guess just by way of background,

20    did you look through -- or did you search for these

21    in the same order that they were listed on

22    Ms. Vance's paperwork she provided?

23        A    Yes.

24        Q    Okay.  So the first link took you to a -- a

25    page that said the page was not found?

1          A    Correct.

2          Q    Okay.  What about the second link?

3          A    The second one I went to, I found a video

4    tat was 16 minutes and 1 second in length.  It had

5    been viewed 2,550 times.  And again, these are

6    back -- this is back on September 2nd that I was

7    looking at this.

8          Q    What about the third link?  Well, let me

9    back up.  The video that you found on the second

10   link, was that -- what was the content of that video?

11         A    It shows consensual vaginal sex.  And I

12   recognized it as being one of the same videos that we

13   talked about, so based on the people involved --

14   there's a bed frame, there's some background art in

15   the room.  I recognized all that stuff.

16         Q    Did you download a copy of that video?

17         A    Yes.

18         Q    Were you able to place that into evidence

19   along with the others?

20         A    Yes.

21         Q    Okay.  So what about the third link that

22   you followed?

23         A    So the next link I went to, I got a message

24   that said the video had been deleted by its uploader.

25         Q    So there wasn't any thumbnail or any record

```
 1        of what the video was -- that it looked like?

 2            A      Correct.

 3            Q      Okay.  What about the fourth link?

 4            A      So the next link I went to, I got a message

 5        that said that the video had been deleted by

 6        its uploader.

 7            Q      And the next link?

 8            A      The next one I went to, I got an error

 9        message that said the video could not be found.

10            Q      And were you capturing the -- the

11        information you were finding, even on the links that

12        had been removed, in any way?  How were your

13        capturing it?

14            A      Yes.  So the -- so the links that weren't

15        active, I'm just doing the screenshot of the screen

16        and then putting that into evidence as well.  Just --

17        it shows the link that I went to.  Of course, I can

18        attest to the date and time and then showing the

19        result that I got.

20            Q      And what about the -- I think we're on the

21        sixth link?

22            A      So the next one I went to was an active

23        link.  It was a video.  It was 18 minutes and 45

24        seconds in length.  It had been viewed 1,833 times as

25        of September 2nd.
```

1              And, again, I recognized the people and the

2    background as being the same from the other videos.

3    And this video showed vaginal sex.

4        Q      Did you download that video to preserve it?

5        A      Yes.

6        Q      Okay.  What did you find on the next link

7    you followed?

8        A      So the next link I went to, I got an error

9    message that said the page could not be found.

10       Q      Did you screenshot that message?

11       A      Yes.

12       Q      And what about the eighth link?

13       A      The next one, I got a message that the

14   video had been deleted by its uploader.

15       Q      And the ninth link?

16       A      The next one, I got a message that the

17   video had been deleted by its uploader.

18       Q      And as far as those two links are

19   concerned, you captured screenshots of those as well?

20       A      Yes.

21       Q      And what about the tenth link?

22       A      I got an error message that the page could

23   not be found.

24       Q      And the 11th?

25       A      I got a message that the video had been

1      deleted by its uploader.

2           Q      And the 12th?

3           A      I got a message that the video had been

4      deleted by its uploader.

5           Q      And, finally, the 13th?

6           A      I got an error message that the page could

7      not be found.

8           Q      You were able to capture all of these as

9      part of your investigation?

10          A      Yeah, again, screenshots.

11          Q      Okay.  What else did you do as your

12     investigation continued in this case?

13          A      So as you move forward with this, you know,

14     I -- I'd learned which videos were active and

15     whatnot.  So at that point, I prepared a search

16     warrant affidavit and prepared search warrants for

17     three different websites:  The Pornhub.com,

18     RedTube.com and Thumbzilla.com.

19          Q      And why did you select those websites?

20          A      So those were websites that had active

21     content and where I knew how to contact the website.

22          Q      Okay.  So the one -- the websites that you

23     had visited that didn't have any legal contact

24     information provided, where would you -- what would

25     you have done with a search warrant in that

1    situation?

2        A    There's -- yeah, you -- there's no where to

3    go, really.

4        Q    Did you initially attempt to contact the

5    websites via any other means?

6        A    Yes.  I had sent e-mails -- like I said,

7    Pornhub -- maybe I didn't say this, but Pornhub had

8    their attorney's information online also, so you

9    could send an e-mail.

10       Q    Were your e-mails -- was there any response

11   to the e-mails that you had sent?

12       A    They were -- they were slow to respond at

13   some -- sometimes.  Sometimes they were really fast

14   to respond, but, yeah, they responded.

15       Q    And just so that I'm clear, the -- was the

16   only physical contact information location

17   information that you knew on about these websites,

18   the address in Cyprus?

19       A    Correct.

20       Q    Was that usual or unusual to you in

21   any way?

22       A    Well, some -- sometimes corporations have

23   their headquarters in foreign countries so they don't

24   necessarily have to comply with -- with our subpoenas

25   or search warrants.  So it didn't super surprise me.

1        Q     And in your experience as a detective,

2   particularly involving child abuse-type cases, have

3   you investigated cases dealing with child

4   pornography?

5        A     Yes.

6        Q     Do you have a difficult time executing

7   search warrants on websites like that?

8        A     Absolutely.

9        Q     What kind of information did you request in

10  your search warrants?

11       A     So I'm just going to refer to that real

12  quick.

13       Q     Sure.

14       A     So on -- I'll start with Pornhub.  What I

15  was looking for there was I wanted them to search the

16  BarberB user account.  I wanted them to search the

17  two active videos there and the ten videos that had

18  been there.

19             And what I was looking for was any and all

20  user profile information for Pornhub user BarberB,

21  including the date and time he -- he became a user,

22  any associated e-mail addresses, any associated

23  physical mailing address.

24             I was looking for the date and time the two

25  active videos had been posted and I asked for the

1    date, the time and the circumstances the other ten

2    videos were removed or deleted.

3            And then I was looking for any and all

4    evidence of the crime of Unlawful Dissemination of

5    the Intimate Image.

6        Q    And that was just in regards to

7    Pornhub.com?

8        A    Correct.

9        Q    What about RedTube?

10       A    So for RedTube, very similar.  I wanted

11   them to search the BarberB user account.  I was

12   looking for any and all user profile information for

13   the user name BarberB, including the date and time he

14   became a user, any associated e-mail addresses, any

15   associated physical or mailing addresses.

16           And then for the four active videos there,

17   I wanted to know the date and time the videos were

18   posted.  And then also mI was looking for any and all

19   evidence related to the crime of Unlawful

20   Dissemination of an Intimate Image with Ms. Vance as

21   a victim.

22       Q    And what about the third website,

23   Thumbzilla?

24       A    So for Thumbzilla, because there's not a

25   user account, I basically went through each of the --

1    the links, both the dead links and the active links,

2    where there was still web content.

3              And I asked for the date and time those

4    were posted and I asked for the IP address, the

5    internet protocol address, of the user who uploaded

6    and, where appropriate, removed the videos.  And --

7         Q    What is an IP address?  If you can

8    just describe.

9         A    So an IP address is assigned to a user,

10   like, if they're using a computer or a cell phone or

11   whatever is, to get onto the internet.  And those

12   are -- those are tracked and assigned.

13        Q    Are they tracked by location?  How does

14   it work?

15        A    Well, so an IP address, when we learn a

16   bit, we can narrow it down and say, hey, this IP

17   address belongs to Comcast in Oregon or it belongs to

18   CableOne in Virginia.

19              So it helps us narrow it down and then

20   we're able to subpoena or, by search warrant, get the

21   actual subscriber who belongs to that IP address.

22        Q    And why did you want to get IP addresses

23   for just Thumbzilla?

24        A    So Thumbzilla, again, you don't have to

25   have any kind of account.  It's more anonymous, if

1    you will.  Anyone can upload and there's less

2    tracking.  On the other websites that we've talked

3    about, you had to be a user.

4              So you had to go in and create an account.

5    You had a password.  It's -- it's -- yeah.  I -- or I

6    felt like I already knew who we were dealing with on

7    those, especially when the last name matched the

8    person that I was -- you know, learned was the

9    suspect in this particular case.

10   Q    So I -- I think I may have cut you off

11   while you were describing the information you were

12   looking for from Thumbzilla.  You -- you asked to IP

13   addresses and what else?

14   A    So I was looking for the dates and the

15   times that the particular videos were uploaded and,

16   where appropriate, where they had been removed -- or

17   when they had been removed, sorry.

18   Q    And when you applied for these search

19   warrants, were they signed off on by a judge?

20   A    Yes.

21   Q    When you executed the search warrants, how

22   successful was any response that came back to you?

23   A    So I would have to say the response was

24   pretty minimal.

25   Q    What do you mean by that?

1           A     I asked for -- you know, we just talked

2     about Thumbzilla, for example.  I asked for all the

3     IP addresses and they didn't provide that.  They

4     provided, you know, information about when videos had

5     gone up, when some of them had been deleted.  They

6     provided, you know, when the user accounts were made,

7     but all in all, it was not 100-percent responsive.

8           Q     Is that surprising at all to you?

9           A     It's unusual.

10          Q     Why?

11          A     Usually, when we provide a -- a business

12    with a search warrant, they provide the information

13    that's in there.

14          Q     At what point, I guess, as -- as far as the

15    timeline is concerned, did you get the search

16    warrants executed and how long was it before you

17    received any information back about them?

18          A     So I -- I -- let me check my notes.  So the

19    warrants were signed by Judge Upton on October 11th.

20    And I hadn't heard anything back by Halloween, so I

21    started e-mailing, following up and then I started

22    getting some e-mail responses.

23          Q     So based on your experience as a deputy and

24    a corporal and now a detective and your independent

25    investigation into this case, did you believe a crime

1      had been committed?

2             A      Yes.

3             Q      What crime was that?

4             A      It's a new statute called Unlawful

5      Dissemination of an Intimate Image.

6             Q      And what was the basis for your belief that

7      that crime had been committed?

8             A      My belief was that these videos were posted

9      after a breakup, from what I -- you know, from what I

10     read in police reports, a very nasty breakup, a very

11     long and protracted nasty breakup.  And they were

12     posted after that, essentially.

13            Q      Okay.

14            A      In an attempt to humiliate -- humiliate and

15     embarrass Ms. Vance.

16            Q      And who did you understand to be the

17     perpetrator of that offense?

18            A      Benjamin Barber.

19            Q      Did you ever have any personal contact with

20     him or with the victim in the case?

21            A      No.

22            Q      Okay.  Was the extent of your job to try

23     to, as you described it, get the full picture of the

24     internet footprint?

25            A      That's correct.

1                    MS. ATWOOD:   Okay.   I believe those are

2     all my questions for now.   Thank you.

3                    THE WITNESS:   Thank you.

4                    THE COURT:   Mr. Taylor.

5                    MR. TAYLOR:   Ms. Helregel, actually.

6                    THE COURT:   Okay.   Ms. Helregel.

7                    CROSS-EXAMINATION

8     BY MS. HELREGEL:

9          Q     All right.   So, Detective Rookhuyzen, you

10    attended the police academy for 2002 for basic

11    training?

12         A     Yes.

13         Q     And then in 2011 for detective training?

14         A     Yes.

15         Q     And you took some classes there -- you took

16    some classes there?

17         A     Yes.

18         Q     But you didn't take one in computer

19    forensics, you said?

20         A     I'm not certified computer forensics, just

21    I've -- I've had training in that and I know what it

22    is.

23         Q     Okay.   So are you familiar with what a

24    mirror is?

25         A     In the usual context or in the computer

1    context?

2         Q    In the computer context.

3         A    Yes.

4         Q    All right.  So can you kind of describe

5    what you -- what your impression of what a mirror is

6    in the computer context?

7         A    Sure.  My -- my limited understanding of

8    that is, if you have a website that is heavily

9    trafficked, they'll have a mirror website.  Say,

10   there's one in the United States.  There's one in

11   Germany.  There's one in Chile.

12              And basically based on where you are, it'll

13   direct traffic to those to take pressure, if you

14   will, off -- off the main server.  The content will

15   be the same.  The user won't even know a difference.

16   But my understanding is that it'll, you know, direct

17   traffic to relieve pressure on the main site.

18        Q    So those websites, they would duplicate

19   content --

20        A    Yes.

21        Q    -- from each other?  Would that be the same

22   as a subsidiary?

23        A    Well, I -- I guess I wasn't being clear.

24   My understanding would be that the content would be

25   shared, not necessarily stored and duplicated, but --

R. Rookhuyzen - X                       395

1    but shared.  Does that make sense?

2         Q    And they would have different URL websites?

3         A    Yes.

4         Q    Okay.  And so you noticed in this case that

5    some of these websites were subsidiaries or mirrors

6    of each other?

7         A    Yes, ma'am.

8         Q    And so that would have been Pornhub and

9    RedTube and Thumbzilla?

10        A    Correct.

11        Q    And then it sounded like EMPFlix and

12   TNAFlix?

13        A    Yeah.  Those two are also related to

14   one another.

15        Q    And those are the ones that you confirmed

16   were mirrored?

17        A    As far as relationships?

18        Q    Yes.

19        A    Yeah, I think that's fair to say.

20        Q    But you're uncertain as to the rest of

21   them?  They could have been mirrors of each other?

22        A    Correct.

23        Q    Okay.  And so what that means is that

24   someone could post one website and then it gets

25   copied to all these other websites?

1          A    Yes, potentially.

2          Q    Without that person who originally posted

3     it even knowing?

4          A    No.  My understanding from the ones that

5     we've talked about is that separate accounts were

6     created.

7          Q    Right.  We'll talk about that in just

8     a minute.

9          A    Okay.

10         Q    And what about IP tracing?  So you talked

11    about that a little bit.  Have you -- you've done

12    those before?

13         A    Yes.

14         Q    And so you know how to complete an IP

15    trace?

16         A    Yes.  We subpoena or search warrant request

17    the information from a provider.

18         Q    Okay.  So I want to talk and move on to

19    what you did in this case.

20         A    Okay.

21         Q    So the district attorney asked you to look

22    into these websites where videos were allegedly

23    posted?

24         A    Yes.

25         Q    And you read Deputy Duenas' reports to

1    do that?

2          A    Correct.

3          Q    And you took notes on everything you did?

4          A    Yes.

5          Q    And, Detective Rookhuyzen, so you're

6    familiar with the internet?

7          A    Yes.

8          Q    And you're familiar with creating user

9    names?

10         A    Yes.

11         Q    You're familiar with how easy it is to

12   create a user name?

13         A    Yes.

14         Q    How anyone can create a user name

15   like BarberB?

16         A    Yes.

17         Q    I could have created it?

18         A    Yes.

19         Q    You could have created it?

20         A    Yes.

21         Q    Ms. Vance could have created it?

22         A    Yes.

23         Q    And there's a way to find out who,

24   specifically, created an account?

25         A    There's ways to narrow it down.  So just --

R. Rookhuyzen - X                          398

1    just to be clear and fair, I have one IP address at

2    my house related to my cable internet, but anyone at

3    my house using any device is going to show that same

4    IP address.

5         Q    Okay.  So there's a way to figure out which

6    household created (indiscernible)?

7         A    Yeah, or -- or a business.  So, you know,

8    the -- the Starbucks across the street is going to

9    have one that hundreds of people can use.

10        Q    And so that would require getting a

11   search warrant?

12        A    Yes.

13        Q    Checking the IP address?

14        A    Yes.

15        Q    And seeing if it matched the person that

16   you suspect created the account?

17        A    Correct.

18        Q    And you didn't do that in this case?

19        A    I did do that in this case.

20        Q    But you weren't able to figure it out in

21   this case?

22        A    It wasn't provided by the website.

23        Q    So you weren't able to definitively figure

24   out who created these accounts?

25        A    Correct.

1       Q     All right.  And so, Detective, you're also

2    familiar with pornographic websites?

3       A     Yes.

4       Q     As part of your job?

5       A     Yes.  Thank you --

6       Q     And you talked --

7       A     -- thank you for clarifying.

8       Q     And we talked about how they -- they can

9    mirror content as well?

10      A     Yes.

11      Q     And so these websites are just -- they're

12   kind of a mass?

13      A     They're kind of what?

14      Q     They're kind of a mass.  They're all

15   connected to each other?

16      A     Not all of them, but some of them are

17   connected to one another.

18      Q     But a lot of them.  And it's hard to figure

19   out exactly which ones?

20      A     Sure.  Some of them make that really clear

21   and some, you're right, they don't.

22      Q     Okay.  So no one necessarily had to post to

23   each of these sites?

24      A     My understanding is that -- is that they

25   were separate accounts created on these different

 1    websites.

 2         Q     But no one had to have necessarily post it

 3    to each of these sites, though?

 4         A     My understanding is that if it was a true

 5    mirror, then we would be seeing the same number of

 6    views per video.  So -- so I -- I think -- I think

 7    that's responsive to your question.

 8         Q     Okay.  And so this is also just the nature

 9    of these websites.  Someone could download the

10    pornography and then re-upload it to another site?

11         A     Absolutely.

12         Q     And that wouldn't necessarily be the

13    original poster?

14         A     So I think that would be fair to say for

15    Thumbzilla, which doesn't require specific user

16    accounts and logins.  But for the other ones, I

17    would -- I would disagree with that.

18         Q     But again, someone could have created

19    these accounts --

20         A     Someone definitely created --

21         Q     -- with the exact same name?

22         A     Someone definitely created these accounts.

23         Q     Someone else, though.  Me?

24         A     No, it -- it could be the same person.

25         Q     It could be anyone, though?

1        A     It could be the same person, too.

2        Q     But it could be anyone else?

3        A     And it could be the same person.

4        Q     And, again, we're not 100-percent certain

5   of who exactly created those accounts?

6        A     That's fair to say.

7        Q     Okay.  Give me a second to just check

8   my notes.

9        A     Sure.

10       Q     All right.  So I want to move on and start

11  talking about each of the sites in detail.

12       A     Okay.

13       Q     All right.  So the first one I want to talk

14  about is PornTube.  You didn't check this website?

15       A     Just to be clear, you said PornTube?

16       Q     PornTube.

17       A     Correct.  I don't see it on the list where

18  she had seen -- where Ms. Vance had previously seen

19  videos.

20       Q     Okay.  But this was in Officer --

21  Deputy Duenas' report --

22       A     Okay.

23       Q     -- as being one of the websites.

24       A     So let me just check it.  And you -- you

25  said PornTube, correct?

1       Q      PornTube --

2       A      Okay.

3       Q      -- yes.

4              THE COURT:  My apologies.  T-w-o or

5       t-u-b-e?

6              MS. HELREGEL:  T-u-b-e.

7              THE COURT:  Thank you.

8              THE WITNESS:  That's correct.

9       BY MS. HELREGEL:

10      Q      All right.  So you didn't go on this

11      website?

12      A      Correct.

13      Q      Didn't look for an account?

14      A      Correct.  I don't see that in my notes.

15      Q      And didn't try to see if there were any --

16      any of these videos on PornTube?

17      A      Correct.  I don't see that in my notes.

18      Q      All right.  So EverySexTube, same thing.

19      This was in Officer Duenas' report.

20      A      In Deputy Duenas' report?

21      Q      Yes.

22      A      No.  I don't have that in my notes or

23      report at all.

24      Q      So it looks like it would have been in his

25      June 25th report, EverySexTube.com.

1        A    Is that the first -- yeah, very first one.

2        Q    Very first report.

3        A    Okay.  Correct.  And -- and just to be

4   clear, there's no direct links or, you know, account

5   information.

6        Q    Okay.  But you didn't go on that website

7   and look for any accounts?

8        A    No.

9        Q    Any account that was named BarberB?

10       A    No.

11       Q    And you didn't check on this website for

12   any of these videos?

13       A    Not sure how I'd do that, but, no.

14       Q    Through -- potentially, through the tags

15   that had been provided, "Albino Porn,"

16   (indiscernible).

17       A    Got you.  No, I did not.

18       Q    Okay.  So I want to go -- move on to

19   xHamster then.  This was also in Deputy Duenas'

20   report.

21       A    Okay.

22       Q    And this was the website that Ms. Vance

23   reported first seeing the pornography on.

24       A    Okay.

25       Q    And you didn't check this website?

1          A     No.   The information in his report that the

2     videos were removed.

3          Q     All right.   So you didn't e-mail -- try and

4     e-mail their staff to figure out anything about those

5     videos, though?

6          A     That's correct.

7          Q     See who had posted them?

8          A     Correct.

9          Q     When they had been posted?

10         A     Correct.

11         Q     And you didn't look to see if those links

12    were associated with a specific profile?

13         A     Well, first of all, I didn't have links,

14    so, no.

15         Q     All right.   But in the case of other

16    websites where there had been deleted videos, you did

17    attempt to contact those websites?

18         A     Yes.   Where there were specific links that

19    had been provided, I was able to narrow it down to a

20    website and, obviously, go after the legal contact

21    information.

22         Q     So you just didn't look for any of the

23    videos on xHamster?

24         A     Correct.

25         Q     Okay.   All right.   So let's move on to the

1    sites you did check.

2         A    Okay.

3         Q    First one is Porn.com.  So you didn't find

4    any videos on Porn.com?

5         A    Correct.  No active videos.

6         Q    Okay.  And you saw that there was an

7    account that was created five months ago?

8         A    That's correct.

9         Q    But you have no idea when the last login

10   was for that account?

11        A    Correct.

12        Q    All right.  And when you checked that

13   profile, there were no videos there?

14        A    On Porn.com?

15        Q    Yes.

16        A    So it was kind of weird.  So like I

17   testified, there were four videos.  When you click on

18   the profile, it shows that that person has four

19   videos.  But then when you click on the videos link,

20   it says that he hasn't uploaded any videos yet.

21        Q    Okay.  So you have no idea whether there

22   were even ever four videos?

23        A    I have good reason to believe there were

24   four videos.

25        Q    But you have no idea what those four

```
 1   videos were?

 2        A    That's fair to say.

 3        Q    All right.  And so, again, kind of going

 4   back to the subsidiary and everything, you don't know

 5   whether Porn.com was a mirror website of someone

 6   else?

 7        A    I think that's fair to say, also.

 8        Q    All right.  And you didn't e-mail Porn.com?

 9        A    There was no legal law enforcement contact

10   information.

11        Q    Did they have any contact information

12   posted on their website?

13        A    Not that I saw, not even a general support.

14        Q    All right.  So you weren't able to give --

15   to serve them a warrant?

16        A    Correct.

17        Q    Look for them?

18        A    Correct.

19        Q    So really no evidence that there was

20   anything posted on Porn.com?

21        A    That's fair to say.  There were four videos

22   at some point, but not at the time I was doing my

23   research.

24        Q    And no way to figure out what those four

25   videos were?
```

1          A     Correct.

2          Q     All right.  So how about for EMPFlix?  You

3    went on there, but you didn't see a -- did you check

4    for an account?

5          A     So this appears to be another one where you

6    don't need an account.

7          Q     Okay.  So you couldn't find an account

8    called BarberB on EMPFlix?

9          A     Correct.  And I was looking by exact links

10   and they don't appear to be in any -- in any, like,

11   profile folder.  There appear to just be random

12   numbers get assigned to uploads.

13         Q     All right.  So you have no way of knowing

14   what -- who posted these videos?

15         A     Well, there were -- there were no active

16   videos when I was doing my research.

17         Q     Okay.  And so none of these links worked?

18         A     Correct.

19         Q     So, again, no videos on EMPFlix either?

20         A     Correct.

21         Q     No way of knowing what those videos that

22   may have -- may have been there previously even were?

23         A     That's right.

24         Q     All right.  And you didn't get a warrant

25   for EMPFlix?

1          A     No.

2          Q     You tried to contact them, but you got an

3    error message?

4          A     Correct.

5          Q     And you couldn't go anywhere beyond that?

6          A     Correct.

7          Q     All right.  So TNAFlix is the next one.

8    You saw two videos on there?

9          A     Yes.

10         Q     But can't confirm whether or not those were

11   mirrored or -- or subsidiaries from another site?

12         A     It appears to be an independent website.

13         Q     Appears to be, but not 100 percent certain?

14         A     Correct.

15         Q     All right.  And so you also didn't check to

16   see who had created this BarberB account?

17         A     I'm sorry, say that again.

18         Q     You didn't check to find out who created

19   the BarberB account?  No IP address (indiscernible).

20         A     It's -- it's -- it's kind of a dead end.

21   There's -- again, there's no legal or law enforcement

22   contact information --

23         Q     Okay.  And you don't know --

24         A     So -- so I would say I went absolutely as

25   far as I could go.

R. Rookhuyzen - X                     409

1        Q    Okay.  And so you don't know when this

2   account was created either?

3        A    Correct.

4        Q    All right.  And you contacted them, but it

5   looks like you never heard back from TNAFlix?

6        A    I didn't see any law enforcement or contact

7   information on my -- on the first go around.  Let me

8   look one more place.

9             Okay.  It looks like a few days later, I

10   did find a contact portal for them.  I sent a

11   response asking when BarberB joined the account and

12   when the two videos were posted.  And I don't think I

13   ever heard back.  I think you said that.

14        Q    Okay.

15        A    Yeah.

16        Q    So you never heard back from them?

17        A    That's correct.

18        Q    And you didn't follow up with them?

19        A    You can't force someone to respond, so --

20   but, no, I didn't hear back.

21        Q    Okay.  And you never got a search warrant

22   for TNAFlix?

23        A    Correct.  All I had was the e-mail address.

24        Q    All right.  So Thumbzilla is the next one.

25        A    Okay.

1        Q     And you said there was no account here

2    either?

3        A     Correct.  Yeah.  This website is basically

4    people log on and upload stuff, but you don't have to

5    have an account.

6        Q     So there's no way of knowing who posted

7    those videos?

8        A     Like -- like we talked about, you can

9    narrow it down by IP address, which they did not

10   provide.

11       Q     Okay.  So you don't know who posted

12   those videos?

13       A     That's fair to say.

14       Q     And there was no account associated with

15   them, obviously?

16       A     Right.

17       Q     All right.  And this was another website

18   that was a subsidiary of Pornhub?

19       A     That's correct.

20       Q     Okay.  So you didn't double check whether

21   the (indiscernible) in this case was mirrored from

22   Pornhub or published independently?

23       A     Well, some of the videos, again, were the

24   same length and the same content.  So whether they

25   were uploaded independently or mirrored, you know --

1    again, my -- my best belief -- my strongest belief

2    here, would be that we would see a duplicate number

3    of views, everything, but -- but they're different

4    from site to site.

5         Q    But you're not certain of that?

6         A    It -- it makes sense to me, but you're

7    right.  I -- I can't say with certainty.

8         Q    Because if someone went and viewed the

9    video on Thumbzilla, that wouldn't necessarily mean

10   the views would go up on, say, RedTube or Pornhub?

11        A    It -- it would seem that they were mirrors

12   in sharing content from one main source.

13        Q    But you don't know that?

14        A    That's -- that's correct.

15        Q    All right.  And so in this case, you got a

16   search warrant for Thumbzilla, but they didn't get

17   you the IP addresses, you said?

18        A    Correct.

19        Q    All right.  And so kind of -- let's move on

20   to RedTube next.

21        A    Okay.

22        Q    Again, operated -- a subsidiary of Pornhub?

23        A    Right.

24        Q    Kind of the same deal, not 100 percent sure

25   whether this content was mirrored from Pornhub or

1    not?

2          A    I think that's fair to say.

3          Q    All right.  And in this case, you saw that

4    the BarberB last logon was five months prior to when

5    you checked?

6          A    Yes.

7          Q    And -- but the videos were uploaded in

8    April, which was four months prior?

9          A    Yes.

10          Q    So the videos were uploaded after the

11    last logon?

12          A    That's what that appears to show.

13          Q    So it seemed like they were automatically

14    uploaded?

15          A    I don't know.

16          Q    The person wasn't logged in when they were

17    uploaded, it looks like?

18          A    No, I don't -- I don't think that part's

19    possible.  But I think it's also kind of approximate.

20    So when was the user last seen and it gives an

21    estimate.  It doesn't give an exact date.  It gives

22    an estimate.

23          Q    But it appears as though the videos were

24    uploaded four months prior.

25          A    Yeah.  So I was -- I guess I should point

1    out, so on -- it was August 31st of this year that I

2    was looking at these.

3            And it kind of showed for that profile, the

4    last logon was five months earlier.  But, yeah.  It

5    shows the videos added on a specific date, which was

6    April 6th of '16.

7            I think it's also a good potential that

8    someone could remain logged in.  So unless they

9    physically or manually log out, that it shows them

10   continuously logged in, if that makes sense.

11       Q    But there's no way of knowing that in

12   this case?

13       A    Correct.

14       Q    Okay.  All right.  So the last one is

15   Pornhub.

16       A    Okay.

17       Q    And you got a warrant for Pornhub?

18       A    Okay.

19       Q    But you didn't figure out whether the

20   account -- who had created the account?

21       A    I think -- so give me just one second to

22   answer that.  So your question is, did I find out if

23   I heard back who created that account?

24       Q    Yeah.

25       A    Okay.  So I learned that the user BarberB

1    was related to an e-mail address,

2    starworks5@gmail.com, and the account was created on

3    March 31st of 2014.

4        Q    Okay.  But you didn't use the warrant to

5    find out the IP address or who posted any of the

6    videos?

7        A    Correct.

8        Q    And you didn't ask for the IP address of

9    the person who created the account?

10       A    No.

11       Q    Okay.  So these warrants --

12       A    And -- and I guess I'll just -- is it okay

13   to expand on -- expand on that real quick?

14       Q    Let's move on to the next question.

15       A    Okay.

16       Q    So you got three warrants in this case?

17       A    Yes.

18       Q    But there were nine websites that these

19   videos were supposedly posted to?

20       A    So, obviously, I had Deputy Duenas' report,

21   but I wasn't looking at nine websites.  I looked at

22   one, two, three, four, five, six, I think.

23       Q    Okay.  So we started out with nine

24   websites.  You only looked at six of them?

25       A    Yes.

1        Q    And you only got search warrants for three

2   of those?

3        A    Correct.

4        Q    All right.

5        A    The ones with active content.

6        Q    Okay.  And so just to really make this

7   clear, you never actually confirmed whether -- who

8   created the BarberB account?

9        A    I'll need you to be more specific.

10       Q    You were never actually able to pinpoint

11  exactly who created the BarberB account in these

12  cases?

13       A    I'll need you to be more specific.

14  Which website?

15       Q    For any of them.

16       A    No, that's not true.  So Pornhub responded

17  that the person who created their accounts on Pornhub

18  was related to the e-mail address

19  starworks5@gmail.com.

20       Q    But you were never able to get a first and

21  a last name for the person who created the account?

22       A    From the website?

23       Q    Yeah.

24       A    I don't think it's required.

25       Q    Or an IP address?

1        A     No, they would not provide the IP address.

2        Q     Okay.  All right.  So I just have a few

3    more questions for you.  So you didn't talk to

4    Mr. Barber in this case?

5        A     No.  By the time of my involvement, he was

6    represented.

7        Q     Okay.  And you didn't talk to Ms. Vance

8    about this case?

9        A     Nope.

10       Q     Didn't try to clear up some of the websites

11   through her?  Get some more links for the ones you

12   didn't check?

13       A     No, I -- I had what was provided.

14       Q     Okay.  And you never got a search warrant

15   for Mr. Barber's laptop?

16       A     I just want to make it real clear that in

17   order to get a search warrant, we had to be really

18   specific as to the information that we're looking for

19   and we have to know where something's located.

20             So, again, my understanding when I got

21   involved at the end of August was that he was

22   transient and I had no idea where he would have been,

23   where a computer device would have been located,

24   whether it was a computer or a tablet or -- or

25   something else.  So I found myself lacking on the

1    specificity requirement.

2         Q    Okay.  Detective Rookhuyzen, are you aware

3    that Mr. Barber's address was provided to the Court

4    and the district attorney numerous times throughout

5    this case?

6         A    I -- I'm certain of that.  That's -- that's

7    usually the requirement.  But what that means is if

8    someone has a computer on January 1st, I can't assume

9    they have it on January 17th.

10             So, again, it's -- it's not fresh

11   information.  I had no details anywhere of whether it

12   was a computer, whether it was a tablet, whether it

13   was a PC, a desktop, a laptop.  I need lots more

14   information in order to apply for a search warrant.

15        Q    Okay.  And you didn't try and find out any

16   of this information that you would have needed?

17        A    I would say I -- I tried with what I could.

18   Yes, I did try.

19        Q    Okay.  So just a few more questions for

20   you.  So you -- essentially, your sole job on this

21   case, you just went on the websites to see if the

22   videos were there?

23        A    No.  I also prepared three search warrants

24   for service.

25        Q    Okay.  And you didn't look at whether the

 1    venue -- ultimately, I guess, you didn't figure out

 2    which of these posts were original and which ones

 3    were mirrored?

 4        A    I -- you know, I -- I think that's been

 5    asked and answered.  I tried my -- my best.

 6    Professional belief here is that the ones -- I mean,

 7    clearly, there was duplicate content.

 8              So of the videos were the same exact

 9    videos.  But, again, I'm -- I'm going off of the

10    accounts and they're different accounts.  So -- I --

11    I -- and by that I mean views, the views of the

12    videos.

13              MS. HELREGEL:  Okay.  No further

14    questions.

15              THE WITNESS:  Thank you.

16              THE COURT:  Ms. Atwood.

17              MS. ATWOOD:  Thank you, Judge.

18                   REDIRECT EXAMINATION

19    BY MS. ATWOOD:

20        Q    So I kind of want to go through some things

21    one by one that you were asked on cross-examination.

22    Starting with the creation of a user name, you were

23    asked whether or not you understood how someone, even

24    possibly anyone, could create a user name online,

25    right?

R. Rookhuyzen - ReD                            419

1          A    Yes.

2          Q    And defense counsel asked you if there was

3    any way you could be sure who created the user name

4    BarberB, right?

5          A    I was asked that, yes.

6          Q    During your initial viewing of -- of the

7    websites as part of your investigation, you made

8    mention that there was some identifying information

9    associated with the user name BarberB.

10         A    Would you repeat that?

11         Q    Let me ask it a different way.

12         A    Okay.

13         Q    I want to turn your attention to what you

14   investigated as -- on Pornhub.com.

15         A    Okay.

16         Q    What kind of identifying information did

17   you find on that website, associated with the user

18   name BarberB?

19         A    Okay.  So a couple of things.  On that

20   website, it showed the BarberB was related to a

21   31-year-old heterosexual male in Portland, Oregon.

22              It showed the most recent login to be two

23   months earlier.  It -- and then, like I testified,

24   later on, the website provided information that was

25   related to that e-mail address.

1        Q     And that was the starworks5@gmail.com?

2        A     That's correct.

3        Q     Okay.  Let's see here.  Could you tell when

4    he joined the website?

5        A     Yes, that -- well, I learned that later.

6        Q     Go ahead.

7        A     Okay.  So I learned that later.  That came

8    back after the search warrant.  And it said that

9    the user BarberB, related to the e-mail address

10   starworks5@gmail.com, was registered on 3-31 of 2014.

11   Sorry, March 31st, 2014.

12       Q     Okay.  So he'd been a member for a pretty

13   long time, it sounds like?

14       A     Correct.

15       Q     And as far as identifying information, you

16   found on -- let's see.  Sorry, let me back up a

17   little bit here.  On Porn -- no, not Pornhub.  I just

18   asked you about Pornhub.  RedTube.com, what

19   identifying information was on that website --

20       A     On --

21       Q     -- associated with BarberB?

22       A     On that website, for the BarberB profile,

23   it shows him to be -- or, I'm sorry, the profile

24   showed the account holder to be a 31-year-old man

25   with an interest in men.  It showed him to be in

R. Rookhuyzen - ReD                            421

 1    Newberg, Oregon and, again, the last issue -- or the

 2    last login to be about five months earlier.

 3         Q    Okay.  So there was some identifying

 4    information associated with the user name, right?

 5         A    Yes.

 6         Q    Age, location, that sort of thing?

 7         A    Yes.

 8         Q    So there is a way to narrow it down to who

 9    it is?

10         A    Yes.  Oh, just to be fair, though, that

11    is -- that's self-reported information.

12         Q    What do you mean by that?

13         A    So people can type that in, is my

14    understanding.

15         Q    When they register on the website?

16         A    Right.  They -- they assign -- they put

17    their own age in.  They put their own location in.

18         Q    And, presumably, it would be someone with

19    personal knowledge of that information they would

20    write that information with?

21         A    Yeah.

22         Q    Okay.  And then that -- that narrowing was

23    further narrowed when you got an exact e-mail address

24    associated with this individual?

25         A    Yes.

R. Rookhuyzen - ReD                    422

1        Q    Okay.  You were asked in reference to the

2   website as a whole, whether or not you -- you were

3   asked numerous times whether or not you could be

4   absolutely sure or there was a way to confirm who

5   created these accounts.  You did have a chance to

6   review the reports of Deputy Duenas, right?

7        A    Yes.

8        Q    So you were aware at the time of your

9   investigation that the defendant admitted to

10  creating accounts?

11       A    Yes.

12       Q    Under the user name BarberB?

13       A    Yes.

14       Q    Okay.  And you were, at one point, cut off

15  a little bit when you were trying to respond to a

16  question about your -- the findings you were made

17  aware of after you got your search warrants executed.

18  What were you made aware of after you got your search

19  warrants executed?  What information did they respond

20  to you with?

21       A    Okay.  So what I got from them was

22  on Thumbzilla, there were -- at one point, there were

23  12 -- 12 videos.  Ten had been deleted, but two were

24  still active.

25       Q    And what categories of information were

1    they willing to provide you?

2        A    So they provided information on how all the

3    videos had been titled.  And without exception, all

4    of the videos had been titled "Albino Porn."

5            It showed the status, you know, whether

6    they were still active or whether they were deleted.

7    And then they provided information on when they were

8    uploaded.

9        Q    And what did you find when that information

10   was provided to you?

11       A    So the information on whether -- or when

12   items were located was the active videos were posted

13   on March 21st of 2016.

14           And a couple of the deleted ones were also

15   post -- posted on that same day, March 21st, 2016.

16   There were also one, two, three, four uploaded on

17   April 19th of 2016.  And then there were four videos

18   uploaded on April 21st of 2016.

19       Q    You mentioned already that they responded

20   to you with information about what -- the status of

21   the videos being deleted versus active.  They did

22   explain to you what "deleted" means?

23       A    Just that they had been removed.

24       Q    By whom?

25       A    Some of them -- some of the sites, they

R. Rookhuyzen - ReD                        424

1    were specific, and I think we talked about this

2    already, was whether it had been removed by the

3    uploader or whether it just wasn't available anymore.

4         Q    And just to draw your attention to the

5    response that you received from the individuals at

6    Thumbzilla, can I show you that document --

7         A    Sure.

8         Q    -- and talk with you?

9         A    Oh, so Thumbzilla said that the -- when

10   the -- when the status of the video showed deleted,

11   they were all deleted by the uploader.

12        Q    And this is the uploader with the user name

13   BarberB, e-mail starworks5@gmail.com?

14        A    Yes, ma'am.

15        Q    So there -- it looks like from what you

16   said, there were three individual dates when all four

17   videos were uploaded, first on March 21st, then again

18   on April 19th, then again on April 21st?

19        A    That's correct.

20        Q    So it looks like this person is repeatedly

21   uploading, removing, uploading, removing --

22        A    Yes.

23        Q    -- these videos?

24        A    Yes.

25        Q    What did you learn with respect to the

R. Rookhuyzen - ReD                        425

1    privacy settings that were associated with the

2    videos?

3         A    So it looked like videos were uploaded both

4    public and a few of them were private.  It looks like

5    mostly public setting, but some were private

6    settings.

7         Q    And the two that remained active at the

8    time you were able to start your investigation, what

9    was the setting related to those?

10        A    They were available to the public.

11        Q    And the time lengths of the videos, was

12   that information relayed to you?

13        A    Yes.

14        Q    Did the lengths of the videos correspond

15   with the videos you had already collected during your

16   investigation?

17        A    Yes.

18        Q    Okay.  And just as a matter of course, I'm

19   going to show you what I believe is marked as State's

20   Exhibit 16.  It's preservation of the videos.  Do you

21   recognize this exhibit?

22        A    Yes.

23        Q    Is that a disk that you prepared through

24   the course of your investigation?

25        A    Yes, it is.

1      Q    Is that the disk that you were able to

2  record your preservation of these videos on?

3      A    Yes.

4      Q    And that's the actual original disk that

5  you prepared?

6      A    Correct.

7           MS. ATWOOD:  Your Honor, we'd offer

8  State's 16.

9           MR. TAYLOR:  No objection.

10           THE COURT:  Thank you.  It'll be

11  received.

12           (State's Exhibit No. 16 received.)

13  BY MS. ATWOOD:

14      Q    So the next thing I want to -- oh, and I

15  guess, just as an aside to that, you were asked a few

16  questions about the websites that you did not examine

17  through this portion of your investigation.

18           I want to make sure that it's clear why you

19  limited your investigation.  So did you limit your

20  search to websites only where specific links were

21  provided to you?

22      A    Yes.

23      Q    Why did you do that?

24      A    The -- that information came directly from

25  Ms. Vance.  I -- I knew it to be accurate and, yeah,

R. Rookhuyzen - ReD                          427

1      it was very specific.  So that's -- that's why I

2      focused on that.

3          Q    And were you trying to avoid basically

4      going just on a directionless chase for information?

5          A    It's a little bit awkward on your work

6      computer with other detectives around to be doing

7      this kind of stuff, so, yes.  I did not wander off

8      onto other sites.

9          Q    And as far as the sites that you didn't

10     personally go to, PornTube, PornTV, EverySexTube and

11     xHamster, because you read Deputy Duenas' reports,

12     you were aware he had already investigated those

13     websites?

14         A    Yes.  On the night that he got this case,

15     he and another deputy did look into several websites.

16         Q    Okay.  And since you read his reports as

17     part of your investigation, you're aware that he had

18     already taken steps to preserve screenshots and the

19     videos themselves --

20         A    That --

21         Q    -- of those websites?

22         A    That was already in evidence, yes.

23         Q    Okay.  And you were specifically asked a

24     couple questions about Porn.com, which you did

25     attempt to search, right?

R. Rookhuyzen - ReD                      428

1        A    Yes, I did look at that.

2        Q    This was the website where the profile

3    associated with the defendant showed four videos, but

4    then when you tried to access the videos, it said

5    there were no videos there?

6        A    Correct.

7        Q    You were asked by defense counsel whether

8    you had any idea -- you personally had any idea what

9    those videos were.  Do you remember answering that

10   question?

11       A    Yes.

12       Q    Okay.  And you said that you personally did

13   not -- could not tell from your investigation what

14   they were?

15       A    Right.

16       Q    So you were aware then that that website

17   was also investigated by Deputy Duenas, right?

18       A    It may have been.

19       Q    And in referring you to his --

20       A    Yes.  It looks like it is in his report.

21       Q    -- first report, he was able to capture the

22   information that was relevant to those videos?

23       A    I'm sorry, can you ask that again?

24       Q    Sure.  I was just referring you to

25   Deputy Duenas' first report where he describes the

R. Rookhuyzen - ReD                    429

1    websites he visited, including Porn.com.  Were you

2    aware that he was able to get screenshots of the

3    videos posted to that website?

4         A    I know he was able to get some screenshots,

5    yes.

6         Q    Okay.  You were asked a few questions about

7    whether or not you attempted to get a search warrant

8    for any specific device, like a computer or a tablet

9    or something like that.

10        A    Correct.

11        Q    And you stated that not only did you not

12   know what device to ask for, but you didn't know

13   where the device was.

14        A    Correct.

15        Q    Defense counsel asked you whether you were

16   aware that the defendant had provided his address to

17   the Court during the dependency of this and you said

18   that you expected that had happened?

19        A    Right.

20        Q    When a case is pending and a person is

21   represented by an attorney, do you generally initiate

22   other contacts with the defendant in that situation?

23        A    No.

24        Q    Why?

25        A    'Cause they're represented by an attorney.

1       Q    So you're not allowed to speak with the

2  defendant in that situation?

3       A    In very limited circumstances, right.

4       Q    Okay.  So in this situation, would you have

5  been able to just go contact the defendant and start

6  asking him more questions about wanting to search

7  his devices?

8       A    No.  I mean, he would have to waive, you

9  know, his Fifth Amendment rights to -- to talk to me,

10 essentially, right to counsel.

11      Q    And that's something that's pretty serious

12 to you to -- to do properly in your job --

13      A    Absolutely.

14      Q    -- abide by those rules?  I want to ask you

15 about mirror websites now.  You stated that in your

16 experience, if a website is actually a mirror

17 of another, the contents should appear the same,

18 identical, right?

19      A    Right.

20      Q    And so in -- in your professional

21 experience, a website wouldn't be a mirror if it

22 reflected a different user name?

23      A    No, I -- I mean, I would not think so.

24      Q    What about things like different time of

25 joining, different upload date?  Would that reflect a

R. Rookhuyzen - ReD                    431

1    mirror to you?

2         A    These are all signs that it's different,

3    that it's different content, not -- not shared

4    content.

5         Q    And you already mentioned the different

6    number of views was significant to you as these not

7    being mirror websites?

8         A    That -- that really stood out to me, yeah.

9         Q    Okay.  And -- and -- and speaking of the

10   views that you recorded during your interview or your

11   investigation, how many views total would you

12   estimate were seen at this time?

13        A    So, again, this is going back to September

14   2nd when I was completing my research on these

15   websites.  On September 2nd of this year, there had

16   been 11,357 views of these videos that we've been

17   talking about.  These are the ones that were still

18   active.

19        Q    Now, getting back to the question of mirror

20   websites, you were asked specifically if, because

21   Pornhub, RedTube and Thumbzilla were affiliates,

22   whether they could be mirrors, right?

23        A    Right.

24        Q    But in your experience, if different videos

25   appear on two different websites, would that be

1    a mirror?

2          A    No.

3          Q    And in this case, you, in fact, found that

4    on -- sorry -- Pornhub.com, there were two videos; is

5    that right?

6          A    Yes.

7          Q    And these were the videos that were how

8    long?  What were the lengths?

9          A    16 minute 1 second, 18 minutes 46 seconds.

10         Q    But when you traveled to RedTube.com, you

11   located four videos, right?

12         A    Correct.

13         Q    And these included two that were totally

14   independent from those videos?

15         A    Correct.

16         Q    So in your experience, would it even be

17   possible to directly mirror content when you don't

18   have access to the content itself?

19         A    Correct.

20         Q    Does that make sense?

21         A    That's fair, yeah, that's right.

22         Q    So in this situation, RedTube could not

23   have mirrored from Pornhub because they were

24   reflecting two totally different videos?

25         A    Correct.

R. Rookhuyzen - ReD                    433

1      Q    And -- and -- and RedTube was also a site

2    where there was a registered user name BarberB?

3      A    Correct.

4      Q    And then, again, the same information

5    relating to Thumbzilla, you were actually provided 13

6    independent lengths on that website, correct?

7      A    Yes.

8      Q    And just to clarify, when you applied for

9    search warrants to the Pornhub website, RedTube and

10   Thumbzilla, did you include all the information that

11   you wanted to get from them?

12     A    Yes.

13     Q    And in your experience, when dealing with

14   pornography websites and executing search warrants,

15   are they typically very cooperative with that type

16   of information?

17     A    This is actually my first case dealing with

18   them, but -- but in my field, generally, the answer

19   is no.

20            MS. ATWOOD:  Okay.  Those are all my

21   questions.  Thank you.

22            THE WITNESS:  Thank you.

23            THE COURT:  Okay.  You may set down.

24            THE WITNESS:  May I be excused?

25            THE COURT:  Any need for him?

1              MS. ATWOOD:  Stick around.

2              THE COURT:  You may not be excused.

3              THE WITNESS:  Thank you.

4              THE COURT:  Okay.  Ms. Atwood, your

5    next witness.

6              MS. ATWOOD:  Judge, the State would

7    recall Meagan Vance at this time.

8              THE COURT:  Okay.

9              THE CLERK:  If I can have you remain

10   standing and raise your right hand.

11                    ***MEAGAN VANCE***

12   Was thereupon recalled as a witness on behalf of the

13   State; and, having been duly sworn, was examined

14   and testified as follows:

15              THE CLERK:  Thank you.

16              For the record, if I could have you

17   please state your name.

18              THE WITNESS:  My name is Meagan Vance,

19   M-e-a-g-a-n, V-a-n-c-e.

20              THE COURT:  You may inquire.

21                    DIRECT EXAMINATION

22   BY MS. ATWOOD:

23        Q    I just want to ask you a couple of quick

24   questions about the defendant.  You had, obviously,

25   during your relationship, the divorce and after, have

1    had a significant amount of online conversation with

2    him; is that accurate?

3        A    Yes.

4        Q    Have you ever encountered the user name

5    BarberB?

6        A    Yes.

7        Q    How many times, would you say?

8        A    The entire time I've known him, he has used

9    two user names, BarberB and Endomorphosis (phonetic).

10   He has a website -- or he had or either still has it,

11   BarberB.net.  I think he has an e-mail address with

12   that.  It's BarberB@BarberB.com.  That's all I can

13   remember right now at this time.  But it's -- it's

14   since I've met him.

15       Q    Okay.  And are you familiar with an e-mail

16   address of starworks5@gmail.com?

17       A    Yeah.  That's the associated e-mail address

18   with him, other than BarberB@BarberB.net, that I've

19   known the entire time I've been with him.  And

20   starworks5 is also his user name I met him on

21   OkCupid.

22            MS. ATWOOD:  Okay.  Those are all my

23   questions.  Thank you.

24            MR. TAYLOR:  No cross, Judge.

25            THE COURT:  Okay.  Thank you.  You can

1    step down, Ms. Vance.  Thank you.

2              Okay.  Ms. Atwood.

3              MS. ATWOOD:  Your Honor, those are all

4    the State's witnesses.  At this time, we'd rest.

5              THE COURT:  Okay.  Thank you.

6              All right.  We're going to go ahead and

7    take a break.  So I'm going to have you go ahead and

8    go back into the jury room.  We'll call you back out

9    in about ten minutes.

10             (The following proceedings were held in

11   open court, out of the presence of the jury,

12   10:20 a.m.)

13             THE COURT:  Okay.  So I'm looking at the

14   misdemeanor complaint.  So what are we doing with it?

15             MS. ATWOOD:  Yeah.  So I did prepare a

16   list and I will forward to you now -- well, if I can

17   find it.  Here we go -- of the Counts 1 through 9 in

18   order and which website they would refer to.  I've

19   forwarded a copy to the defense and to Your Honor.

20             THE COURT:  Thank you.

21             Okay.  You want a minute to look at

22   that, Mr. Taylor?

23             MR. TAYLOR:  Just a minute to compare my

24   notes.  Thank you, Judge.  And I'll be able when the

25   Court's ready.

```
1                    THE COURT:  In a moment, just thinking.

2                    MR. TAYLOR:  Absolutely.

3                    THE COURT:  Okay.

4                    MR. TAYLOR:  So, Judge, first off, as a

5      matter of preservation, at this time I would renew

6      arguments made in our demurrer that my client should

7      be acquitted of all counts because his actions are

8      protected by Article I, Section 9 -- Article I,

9      Section 8 of the Oregon Constitution, as well as the

10     First Amendment of the United States Constitution.

11                   If the Court is interested in hearing

12     any additional argument on that point, I'd be happy.

13     Otherwise, I will rest on the arguments that were

14     already made at demurrer.

15                   THE COURT:  And I will just tell you,

16     Mr. Taylor, I was not the judge that entertained

17     your demurrer and I'm not going to overrule

18     Judge Butterfield's decision.

19                   MR. TAYLOR:  Understood, Judge.  Thank

20     you.

21                   THE COURT:  Thank you.

22                   MR. TAYLOR:  So, Judge, at this time, I

23     am going to move for a judgment of acquittal on

24     different grounds.  And here's what I'm going to get

25     at.  And I think the Court knows where I'm going.  So
```

1    State's brought nine counts.  The State's elected --

2    they each apply to a different website.

3              What I'm focusing on, as -- as a

4    preliminary matter, is a voluntary act associated

5    with each website.  So this statute requires that he

6    knowingly caused the videos to be posted on the site.

7              And so I'd like to kind of go through

8    each site and recall -- sort of discuss the evidence

9    that seems to have come in or lack thereof with

10   regard to each site.

11             Obviously, Your Honor, no standard is --

12   in light most favorable to the State, could a

13   rational finder of fact find proof beyond a

14   reasonable doubt.

15             I believe that, at least with several of

16   these websites, that proof is, in fact, lacking in

17   this case.  So, Judge, I want to start with Count 2,

18   which is RedTube.com.  The information we have is

19   that that is a subsidiary of some type of Pornhub,

20   which is Count 1.

21             The information seems to be speculative

22   at best as to whether Mr. Barber was, in fact, the

23   person who uploaded those.  Whether -- and -- and

24   what I'm getting at here is particularly -- there's

25   information that whoever the profile was that was

1    BarberB on RedTube.com uploaded the videos in April,

2    specifically, April 6th.

3              According to the deputy, the last logon

4    for that person was five months prior.  And, you

5    know, we've gone back and forth with these sites and

6    how they are connected, what sort of shared

7    information there is.  And what we know is that,

8    obviously, Pornhub and RedTube are affiliates.

9              It is completely unclear from the

10   State's case whether logging onto and creating an

11   account on Pornhub creates one automatically on

12   RedTube.  We know that's certainly possible because

13   they are affiliated.

14             And the question then becomes if, in

15   fact, Mr. Barber uploaded these to Pornhub, what

16   proof is there that there was any separate and

17   distinct act of uploading them to RedTube, given the

18   fact that they are affiliated, things like that.

19             And there is a number of questions

20   regarding, as I mentioned, the dates and how they add

21   up.  So it seems like everything relating to RedTube,

22   as far as proof of a voluntary act, is speculative at

23   best.  No concrete information exists to distinguish

24   it from the associated website Count 1, Pornhub.

25             So on those grounds, I believe a motion

1    for Judgment of Acquittal should be granted on Count

2    No. 2.

3                    THE COURT:  Okay.  Do you want

4    Ms. Atwood to respond independently.  Would that help

5    you?

6                    MR. TAYLOR:  What -- what would the

7    Court prefer?

8                    THE COURT:  I -- how -- do you want to

9    respond to each count?

10                   MS. ATWOOD:  I can do that.

11                   THE COURT:  Okay.

12                   MS. ATWOOD:  That might make it a little

13   easier.  So just to encapsulate the information

14   that's been relayed both through the witnesses and

15   through the exhibits that the State has provided,

16   which will be available to the jury, as I mentioned

17   pretrial, I did not intend to play these videos or,

18   you know, display these screenshots in court here

19   today.

20                   I -- I think that that would have been

21   inappropriate in light of the nature of the charge.

22   But the screenshots and the videos themselves do

23   relay a significant amount of information that the

24   jury is going to have at their disposal, including

25   the fact that not only was this the same user name

1    that was associated with the defendant, but that on

2    RedTube, his login -- or his join information said

3    that he joined in April 2016, as opposed to Pornhub,

4    which he had joined in 2014.

5              The last login dates were different on

6    each of those websites.  The videos themselves are

7    different on each of those websites.  And the

8    detective testified that in his experience, a login

9    date can be misleading because a person may remain

10   logged in for a substantial period of time without

11   logging out.

12             And that would skew the date as far as

13   the last time a video could have been posted.  So I

14   think that the fact that the defendant was the only

15   one to possess these videos, that's been established

16   through the evidence, he had a clear motive to

17   continue posting them and that he was posting them

18   around these same times of April 2016.

19             That information was relayed by the

20   detective through the search warrant response, that

21   there is easily more than enough information for him

22   to be found independently guilty on the Count 2

23   RedTube account, as opposed to the Count 1 Pornhub

24   account, because there is clearly different

25   information on each of those, indicating a wholly

1     independent user profile.

2                THE COURT:  Okay.  And in reviewing my

3     notes, it's clear that they have different contents

4     on them and so I will deny the motion for judgment of

5     acquittal in the light more favorable to the State on

6     Count 2.

7                MR. TAYLOR:  Thank you, Judge.  I'll

8     turn now to Count 3, which is Porn.com.  Judge,

9     obviously, similar grounds.  I'm moving here looking

10    for a voluntary act showing there was some separate

11    and distinct transaction with regard to Porn --

12    Porn.com.

13               What we seem to know about that side is

14    that the videos, whatever they were, if they existed,

15    were not found by the detective.  He -- I believe the

16    quote I have written down is that he had no idea what

17    they were.

18               And we lack generally, any specificity

19    as to Porn.com and what is associated with that.  So

20    I move on those grounds on that count.

21               THE COURT:  Okay.  And I believe that

22    there's testimony and video from Duenas on Porn.com

23    because I --

24               MS. ATWOOD:  That is correct.

25               THE COURT:  -- I reviewed the videos so

1        that I could accurately address these issues.  So

2        there is sufficient evidence on Porn.com.

3                    MR. TAYLOR:  And, Judge, we'll move on

4        to TNAFlix.  TNAFlix and EMPFlix, which is Count 7,

5        these ones get very strange.  What we know -- and I'm

6        looking at the State's --

7                    THE COURT:  Go ahead.

8                    MR. TAYLOR:  I'm looking at some of

9        the State's evidence, one of their e-mails with

10       Detective Rookhuyzen from the PornHub-Thumbzilla

11       search warrant returns.

12                   Note that this -- and this is from Joyce

13       Karestia (phonetic).  "Note that Thumbzilla is just a

14       mirror of Pornhub; therefore, the user information

15       recorded is the same."

16                   So, Judge, with regard --

17                   THE COURT:  Repeat that.

18                   MS. ATWOOD:  Wait.

19                   THE COURT:  I'm sorry, Mr. Taylor.  Were

20       you talking about --

21                   MS. ATWOOD:  I thought we were talking

22       about TNA?

23                   THE COURT:  -- TNA or -- now, you're

24       going -- talking about Thumb --

25                   MR. TAYLOR:  My mistake.

1                    THE COURT:  Okay.

2                    MR. TAYLOR:  So, sorry.

3                    THE COURT:  That's okay.

4                    MR. TAYLOR:  We're talking about TNAFlix

5        and EMPFlix, specifically, TNAFlix.  On TNAFlix, they

6        seem to have found two videos.

7                    My notes seem to indicate that there is

8        not much beyond that linking or -- or any sort of

9        further detail demonstrating that there was any,

10       again, separate, voluntary act.  And admittedly,

11       Your Honor has the exhibits in front of them -- you

12       and I do not.

13                   THE COURT:  And this is Exhibit 9 and

14       indicating, by BarberB, 52 views, with the

15       photographs.  So as to TNA, I believe there is

16       sufficient evidence to proceed.  However, I don't --

17       if you'd like to address Count 7, I think you were

18       kind of addressing that.  I don't recall any evidence

19       on EMPFlix.com.

20                   MS. ATWOOD:  Sure.  So some of that also

21       appears in the exhibits.  EMPFlix was -- it is an

22       affiliate of TNAFlix, but there were four videos

23       uploaded.  Those links were preserved by the victim

24       in June 2016.  They're part of her list.  And then

25       the videos were shown to have been removed before

1    September 2016.

2                    In looking at the case, as far as the

3    circumstantial evidence is concerned, that matches

4    with the timeline of the victim contacting law

5    enforcement, who then tried to contact the defendant,

6    who then went on, I guess as a response to his

7    posting spree, a removal spree of the videos, trying

8    to clean up the trail associated with the case.

9                    So the links were there and the victim,

10   her testimony and the exhibits associated with her,

11   can confirm that.  However, the fact that they were

12   removed shows that -- the voluntary act of removal

13   would have required a -- a voluntary act of posting.

14                   So I think that that's enough

15   circumstantial evidence that the defendant did engage

16   in this act.  And legally speaking, the statute in

17   question does indicate that to find the person guilty

18   of this crime, he has to cause to be disclosed

19   intimate images of another person on an internet

20   website.

21                   We've heard testimony already that the

22   defendant is a very tech-savvy and computer-aware

23   person who does a lot with the internet, including

24   his own job and including harassing the victim in

25   several ways.

1              And I think that the jury could find,

2    considering he clearly has been a member of several

3    porn websites, some of them for years at this point,

4    that he knew that he would cause to be disclosed any

5    information that he had posted to a website,

6    potentially, to its affiliate whose information is

7    linked to the same site.

8              So on either ground, I think there's

9    evidence to find he voluntarily did it independently

10   on EMPFlix and then voluntarily and intentionally

11   removed them because the videos on TNAflix were still

12   available or in the alternative, that he voluntarily

13   and intentionally posted the videos on TNAflix with

14   the full knowledge that they would end up on EMPFlix.

15             THE COURT:  Mr. Taylor.

16             MR. TAYLOR:  Judge, we would disagree

17   with the State's assertion that some sort of

18   knowledge of something that could happen down the

19   line qualifies as a voluntary act in this -- for a

20   separate and distinct transaction as the counts are

21   charged.

22             I also disagree with the -- the State's

23   assertion that there is substantially different

24   evidence between TNAflix versus EMPFlix.  And I would

25   also point out that the fact that somebody later went

1    and tried to clean up videos -- we obviously know

2    Mr. Barber did that at Ms. Vance's request or -- or

3    what appeared to be a request for that.

4              The fact that he went around the

5    internet looking for things to try to clean up does

6    not show, by any means, that he committed a separate

7    act posting these to EMPFlix versus TNAFlix.

8              MS. ATWOOD:  Can I clarify, Your Honor?

9              THE COURT:  Mm-hmm.

10             MS. ATWOOD:  So my argument more gets to

11   the fact that there were two videos posted to each

12   TNAFlix and EMPFlix.com.  They were both visible to

13   the victim and their links were preserved by her.

14             However, what is striking about the

15   videos themselves is that the videos posted to

16   TNAFlix were still active by September 2016, whereas

17   the videos posted to EMPFlix had been removed by

18   September 2016.

19             And as you heard from the deputy, his

20   testimony -- or the detective's testimony, in his

21   experience, a website that's truly a mirror would

22   reflect the same content.

23             MR. TAYLOR:  Judge, I would only point

24   out that the deputy didn't know -- I do not believe

25   could offer any sort of certainty to that testimony.

1    He offered his belief and that was about it and no

2    sort of explanation or extrapolation on the technical

3    mechanics of why his belief that they would have the

4    same number of views would be the same because what

5    clearly seems to happen, based on the discussions

6    we've had during this case, is that pornographic

7    videos get put online and then other pornographic

8    websites copy them to increase their own amount of

9    content.

10              THE COURT:  Well, I don't think

11   anybody's been -- presented an expert witness to tell

12   us what pornographic websites do.  So I don't think

13   that's in evidence or it can be considered and it

14   probably shouldn't even be argued 'cause you don't

15   have that sort of expert testimony here to tell the

16   jurors what happens to pornographic websites.

17              But I -- I mean, I think on Counts 6 and

18   7, I just don't think there's enough.  And so I will

19   grant the JOA on Thumbzilla and the EMPFlix.  There's

20   nothing -- there's no BarberB profile.  There's no

21   links on EMPFlix.  And so I will grant the JOA on 6

22   and 7.

23              As to 5, I think there's sufficient

24   evidence on XHamster.  And that's the screenshots

25   that are presented and the user name and then

1   obviously his own admission that he posted them on

2   XHamster.  So anything else?

3                    MR. TAYLOR:  That leaves us with just 8

4   and 9, Judge.

5                    THE COURT:  Mm-hmm.

6                    MR. TAYLOR:  So PornTV and PornTube were

7   both ones that Deputy Rookhuyzen did not speak to in

8   the least, which means that we are left with what

9   Deputy Duenas and Ms. Vance had to say about those.

10  And, again, Judge, Deputy Duenas, by and large, was

11  very surface level as far as his discussion of what

12  he did.

13                   When I asked him point blank, "Can you

14  tell us which videos were on which sites?" he looked

15  at me and said, "No, I cannot at this time."  So I

16  don't think, again, there is evidence of any sort of

17  separate or distinct act about PornTube or PornTV.

18                   We don't have -- we didn't get anything

19  from Detective Rookhuyzen about whether those are

20  independent sites, different times of upload, things

21  like that.  So the evidence the State has relied on

22  to prove separate and voluntary acts in most of its

23  argument is greatly lacking with regard to PornTube

24  and PornTV, from what my notes show.

25                   THE COURT:  Okay.

1          MS. ATWOOD:  May I respond?

2          THE COURT:  Mm-hmm.

3          MS. ATWOOD:  Your Honor, with reference

4     to PornTV, Deputy Duenas' testimony not only includes

5     the fact that the user name associated on that

6     website was BarberB, but that the four videos labeled

7     "Albino Porn" were all there.

8               He had preserved them in screenshots

9     that are in the State's exhibits that we've offered

10    today -- or yesterday, I guess.  And with reference

11    to this website, it's not an affiliate of any of the

12    websites and -- and I think that's clear in the

13    exhibits themselves.

14              So I think there is sufficient evidence

15    regarding PornTV due to the unique user name

16    associated with this person, the titles of the

17    videos, the fact that the website's independent and

18    the fact that we have all this information preserved

19    in screenshots and video is sufficient for Count 8.

20              THE COURT:  I did not note in my review

21    anything about PornTV in -- in looking at the videos

22    that were presented in evidence yesterday.  So I'm

23    probably -- I need to just double check that and see.

24              I apologize, I -- I just -- I don't have

25    that evidence right in front of me and I don't show

1    the screenshots in the State's Exhibit 9.  I don't

2    have anything either, so I'm -- I'll give you a

3    ruling on that in a minute.

4              MS. ATWOOD:   Sure.

5              THE COURT:   That's PornTV and PornTube.

6    I'm sort of in the same situation.

7              MS. ATWOOD:   Again, PornTube was one of

8    the websites that was investigated by Deputy Duenas.

9    That was the one -- the only one that he was actually

10   able to capture, download the videos themselves from.

11   And there were uniquely three videos uploaded to that

12   website which differentiate from the others.

13              And I think that again the fact that

14   they're the videos that only the defendant had

15   possession of would be sufficient evidence in the

16   light most favorable to the State.

17              THE COURT:   Okay.  So let me go look at

18   those.

19              Anything else, Mr. Taylor?

20              MR. TAYLOR:   I would respond by only

21   saying I understand what the State is saying, but I

22   don't think any of that speaks to the separate and

23   voluntary act that we're looking for.  So --

24              THE COURT:   Okay.

25              MR. TAYLOR:   -- that's where I'm at

1    with those.

2              THE COURT:  All right.  And let me just

3    go, again, look at the evidence I have regarding

4    those two.

5              MR. TAYLOR:  May I?

6              THE COURT:  So if you don't mind, we'll

7    just take a five-minute break while I do that.

8              MR. TAYLOR:  Thank you very much, Judge.

9              THE COURT:  Okay.  Thank you.  Or ten

10   minutes.

11             (Recess taken, 10:39 a.m. - 10:53 a.m.)

12             THE COURT:  Okay.  Thank you.  So I had

13   an opportunity to review the videos and Deputy

14   Duenas' testimony.  So there is sufficient evidence

15   on Counts 8 and 9 to proceed forward.  So judgment of

16   acquittals as to 6 and 7.

17             MR. TAYLOR:  And that's all I have for

18   the Court at this time.

19             THE COURT:  Okay.  And at this time, are

20   we ready to resume?

21             MR. TAYLOR:  Yes, Judge.

22             MS. ATWOOD:  I guess, are you going to

23   have a colloquy with him or is he just doing --

24   testifying?

25             THE COURT:  I assume he's testifying.

1           MR. TAYLOR:  He's going to testify.

2           MS. ATWOOD:  Okay.  Then the only thing

3   that I wanted to bring to your attention was just to

4   renew my concern about the defendant trying to bring

5   up the fact that he's filed this federal case against

6   the victim or her attorney or me during the course of

7   his testimony.

8               I don't think that that would be proper

9   testimony at all, in addition to the fact that the

10  victim has retained an attorney during the pendency

11  of this case.  That was asked of the victim during

12  her cross-exam.  I objected to it and you sustained,

13  so I would hope that the same ground rules would be

14  linked for his testimony.

15          THE COURT:  Okay.  And my understanding

16  is that the federal stuff isn't coming in?

17          MR. TAYLOR:  I have no intention of

18  going anywhere near that.

19          MS. ATWOOD:  It's --

20          THE COURT:  And you've had a discussion

21  with your client regarding the fact that that's not

22  coming in?

23          MR. TAYLOR:  Maybe I'll step outside,

24  have a real quick --

25          THE COURT:  Okay.

1                    MR. TAYLOR:  -- further discussion on

2      that point.  If you'll give us two minutes --

3                    THE COURT:  Sure.

4                    MR. TAYLOR:  -- Judge.

5                    THE COURT:  Of course.

6                    MR. TAYLOR:  Okay.

7                    (Recess taken, 10:55 a.m. - 10:57 a.m.)

8                    THE COURT:  Okay.  So you've had an

9      opportunity to have a conversation with your client,

10     correct?

11                   MR. TAYLOR:  Yes, Judge.  Thank you.

12                   THE COURT:  Okay.  Anything else then?

13                   MR. TAYLOR:  No, just stretching.

14                   THE COURT:  Okay.  Great.  We'll go

15     ahead and bring the jury back.

16                   And, Mr. Taylor, will you be doing the

17     direct?

18                   MR. TAYLOR:  Correct.

19                   THE COURT:  And this will be your

20     only witness?

21                   MR. TAYLOR:  Yes.

22                   THE COURT:  And I think we'll probably

23     go a little bit into the noon hour if we need to.

24                   MR. TAYLOR:  And then close afterwards?

25                   THE COURT:  Yeah.  Well, I don't know

1    if Ms. --

2                    MR. TAYLOR:  All right.

3                    THE COURT:  (Indiscernible).

4                    MR. TAYLOR:  Whatever we need to do.

5                    (The following proceedings were held in

6      open court, the jury being present, 10:58 a.m.)

7                    THE COURT:  Okay.  You may call your

8      first witness.

9                    MR. TAYLOR:  Judge, at this time, the

10     defense calls the defendant, Benjamin Barber.

11                    THE CLERK:  I'll have you remain

12     standing and raise your right hand.

13                    ***BENJAMIN JAY BARBER***

14   Was thereupon called as a witness on his own behalf;

15   and, having been first duly sworn, was examined and

16   testified as follows:

17                    THE CLERK:  Thank you.  You may be

18     seated.

19                    For the record, if I could have you

20     please state your name, spelling first and last.

21                    THE WITNESS:  My name -- my name is

22     Benjamin Jay Barber, B-e-n-j-a-m-i-n, J-a-y,

23     B-a-r-b-e-r.

24                    THE COURT:  You may inquire.

25                    MR. TAYLOR:  Thank you, Judge.

B. Barber - D                    456

1                    DIRECT EXAMINATION

2      BY MR. TAYLOR:

3           Q    Good morning, Mr. Barber.  How are you

4      doing today?

5           A    Stressful.

6           Q    Why are you stressed out?

7           A    'Cause I didn't sleep very much.

8           Q    Okay.  You nervous?

9           A    Yeah.

10          Q    All right.  Let's start with some basic

11     questions, all right?

12          A    Yeah.

13          Q    How old are you?

14          A    31 years old.

15          Q    What do you do for work?

16          A    I -- my last position was called

17     infrastructure engineer at Intel and I'm also a

18     software engineer.

19          Q    Do you have a college degree?

20          A    No.

21          Q    Do you have a law degree?

22          A    No.

23          Q    All right.  Where do you live?

24          A    I live at 165 Northeast Jackson Street,

25     Hillsboro, Oregon 97124.

```
 1         Q    So, like, right over there?

 2         A    Yeah.

 3         Q    All right.  How long have you lived there?

 4         A    I've lived there since June.

 5         Q    All right.  More basic questions.  Do you

 6    know the complainant in this case, Ms. Vance?

 7         A    Yes.

 8         Q    How long have you known her?

 9         A    I've known her since 2009.

10         Q    And are we correct that you guys had a

11    romantic relationship and then were later married?

12         A    That's correct.

13         Q    All right.  Let me ask you some questions

14    about that relationship, all right?

15         A    Mm-hmm.

16         Q    All right.  When did you first meet

17    Ms. Vance?

18         A    I first met Mrs. Vance in -- I'm sorry,

19    Ms. Vance, rather, in the fall of 2009 on the website

20    OkCupid.

21         Q    All right.  What caused you guys to click?

22         A    In that we both had experienced problems

23    with vision and that she wanted to use her career in

24    order to help people that had vision issues, as did

25    I, but using technology.
```

1        Q    All right.  What kind of vision problems do

2    you have?

3        A    I was shot in the eye during a training

4    exercise in the Reserve Officer Training Corps.

5        Q    When you guys first met, were you guys

6    living in the same area?

7        A    No, I was living in Portland, Oregon.  She

8    was living in northwest Ohio.

9        Q    All right.  When you guys first met, was

10   it automatically a romantic relationship or was it

11   platonic for a time?

12       A    It was platonic for a time.

13       Q    About how long?

14       A    For at least six months.

15       Q    All right.  How did it come to turn into a

16   romantic relationship?

17       A    Basically, we were talking about her

18   romantic endeavors and I was trying to give her

19   advice in regards to those.  And then eventually we

20   became more romantically attached to each other.

21       Q    All right.  So it just kind of worked its

22   way into place?

23       A    Yeah.

24       Q    Mutual attraction?

25       A    Yeah.

B. Barber - D                    459

1        Q    All right.  How old were you at this time?

2        A    25.

3        Q    And how old was Ms. Vance?

4        A    20.  No.  Actually that's when we got

5   married, I think, was when -- well, yeah.  I think 20

6   to 25 would be correct.

7        Q    All right.  Was it a serious relationship?

8        A    Yeah.

9        Q    Like, right from the get go or did it kind

10   of ease into that?

11        A    It had to ease into that, from platonic

12   into a serious relationship.

13        Q    So when you guys first started dating, were

14   you guys -- were you guys still not living in the

15   same towns?

16        A    Yeah, that's correct.

17        Q    All right.  How long did you all have this

18   long-distance relationship for?

19        A    I'd say another -- probably over a year,

20   so, like, maybe a year and six months or so.

21        Q    All right.  How'd that work?  Did you guys

22   see each other?

23        A    Yes.  Every two months, one of us would fly

24   across the country to see the other or between

25   two-weeks and one-month --

B. Barber - D                    460

1          Q    All right.

2          A    -- period of time.

3          Q    Was that difficult or stressful for you

4    guys to work with?

5          A    Yeah, it was -- yeah.  It was stressful

6    in both scheduling and retaining work and also the

7    finances involved with flights.

8          Q    All right.  Did you guys end up moving in

9    together at any point?

10         A    Yes, we did.

11         Q    When was that?

12         A    That was, I think, in June of 2012.  No, at

13   the beginning of June 2013, sorry.

14         Q    So was that before or after you got

15   married?

16         A    That would be after we got married.

17         Q    So you guys got married when you were still

18   long distance?

19         A    That's correct.

20         Q    All right.  I need to ask you some

21   questions about the sexual side of your relationship

22   with Ms. Vance, all right?

23         A    Yes.

24         Q    All right.  Obviously, your relationship

25   was a sexual relationship?

1          A    That's correct.

2          Q    Was it a monogamous relationship?

3          A    No, it was not.

4          Q    Can you expand on that?  Why was it not a

5     monogamous relationship?

6          A    Because she isn't heterosexual and she has

7     an attraction to both men and women and I allowed her

8     to have a non-monogamous relationship with me.

9          Q    All right.  Did you guys have, like, an

10    expressed agreement to that effect, that it was going

11    to be a non-monogamous relationship?

12         A    Yes.  In our marriage contract, I had

13    stipulated that she would be able to have

14    relationships with members of the same sex.

15         Q    But prior to that, when you guys were just

16    dating, did you guys talk about it?

17         A    Yes.

18         Q    All right.  Would you characterize y'all's

19    sexual relationship as on the conservative end of the

20    spectrum or the more progressive side of the

21    spectrum?

22         A    The more progressive side of the spectrum.

23         Q    All right.  Why would you say that?

24         A    That was because we engaged in a lot of

25    behavior that isn't very conservative in regards to

B. Barber - D                              462

1   our sexual activities.

2        Q    Can you give me some examples of that?

3        A    Yeah.  That would include having group sex,

4   having sex in public or outdoors.  It involved going

5   to swinging clubs like the Paris Theatre, being the

6   volunteer organizers for the Naked Bike Ride.

7        Q    All right.  Did you guys participate in the

8   Naked Bike Ride?

9        A    We were actually the -- a part of the

10  organizing group of the Naked Bike Ride.

11       Q    All right.  What is the Naked Bike Ride?

12       A    The Naked Bike Ride is an event where

13  thousands upon thousands of people get naked and

14  ride through the streets of Portland.

15       Q    In a public place?

16       A    In a public place, yeah.

17       Q    And you guys both did that?

18       A    Yes.  We were both naked in -- when we

19  did that.

20       Q    All right.  Who was the driving force

21  behind this more progressive sexual side of things?

22  Was one or the other or was it a mutual thing?

23       A    It was mutual, but in November 26th of

24  2010, she stated to me that, "I cannot do routine sex

25  thing for a while; it's just boring."

1       Q    Mr. Barber, if you could just talk to me.

2       A    Yeah.

3       Q    All right.  All right.  So let's clarify

4    that.  Can you answer my question again?  Who was the

5    driving force or was it either party or was it a

6    mutual thing?

7       A    It was primarily her, but I'm not too

8    conservative or worried about conservative morals.

9       Q    All right.  So were you guys both

10   interested in doing these activities?

11      A    Yeah.

12      Q    Did you force Ms. Vance to do them?

13      A    No.

14      Q    Did you coerce her into doing them?

15      A    No.

16      Q    All right.  So we heard a good bit of

17   testimony from her yesterday that all this stuff,

18   was -- was your idea and she felt like she was

19   pressured into it and things like that.  Do you

20   recall hearing that testimony?

21      A    I recall hearing that testimony.

22      Q    Is that your recollection of what y'all's

23   relationship was like?

24      A    No.

25      Q    All right.  So let's talk about some of

B. Barber - D                                464

1     these sort of specific activities.  You mentioned

2     some voyeurism.  Can you expand on that?  What did

3     you guys -- did you guys engage in voyeurism?

4          A    I mean, we engaged in watching other people

5     have sex; and, for instance, the Paris Theatre.  And

6     we were having sex in public places, like municipal

7     parks and in, for instance, theaters and, like, OMSI.

8          Q    And what time period was all this

9     happening?  Was this when you were dating, when you

10    were married, all of it?

11         A    That was all of it, yeah.

12         Q    All right.  Did you guys engage or seek

13    out other couples or partners to have sexual

14    relationships with?

15         A    Yes.

16         Q    And where did you look for those types

17    of people?

18         A    OkCupid and on Craigslist.

19         Q    All right.  And, again, sort of following

20    up with Ms. Vance's testimony yesterday, what is your

21    recollection of whose idea that was?  Was -- did you

22    guys have discussions about it?  Was anyone forced

23    into doing it?

24         A    Nobody was forced into it.  Basically, my

25    understanding was that she had some bisexual

B. Barber - D                                465

1    tendencies that she never got to explore and if we

2    got married, she would never get to explore that.

3            And so I was fine with her having other

4    relationships as long as they were not romantic and

5    didn't interfere in our relationship with each other.

6    And we were both aware of what was going on with the

7    other person's partner.  And so that was, you know,

8    fine with me at the time.

9        Q    So do I understand, contrary to what

10   Ms. Vance said yesterday, that you were not the

11   driving force behind this behavior?

12       A    That's correct.

13       Q    All right.  Following up in this same line

14   of questionings, did you two ever make any forms of

15   pornography, whether that's videos, pictures,

16   whatever?

17       A    Yeah.

18       Q    All right.  What types of pornography did

19   you guys create?

20       A    We created audio/visual and pictorial forms

21   of pornography.

22       Q    So videos and pictures?

23       A    That's correct.

24       Q    All right.  And why'd you do that?

25       A    Well, we were doing that for several

B. Barber - D                              466

1    reasons.  One was because we were trying to, I guess,

2    capture some excitement in our lives.  We also were

3    sharing them when we were apart from each other, so

4    we would have video chats on Skype, for example.

5           Or when we would go down -- when we go out

6    to, for instance, the Bagby Hot Springs, we'd be nude

7    and take pictures of each other or we'd take pictures

8    of each other in bedrooms or we took videos of each

9    other.  And we also shared these with other people on

10   Craigslist and on OkCupid.

11       Q    All right.  So I guess I'm going to follow

12   up asking you some questions about the sharing.  You

13   said you shared these photos with other folks on

14   Craigslist and OkCupid?

15       A    Yeah.

16       Q    And what the purpose of sharing them with

17   other people on those websites?

18       A    Because when you're soliciting sex with

19   other people, you generally want to know whom or what

20   they're going to be like when you're going to meet

21   them in person.

22       Q    And was Ms. Vance aware that these photos

23   were going onto these websites?

24       A    Yes, she was.  And she was a participant in

25   these experiences and was actually what's called

B. Barber - D                    467

1    carbon copied in the e-mail chains between these

2    participants and also replied to them and had seen

3    their pictures in addition.

4         Q    So Ms. Vance was aware that this was all

5    going on?

6         A    Yeah.  And she was carbon copied and had

7    actually seen the pictures of the other people

8    involved and these videos were produced mere days

9    before we had solicited encounters with other people

10   and she was CCed into those e-mails and responded to

11   e-mails coming from those other people directly

12   to her.

13        Q    And what was her attitude about all this

14   sharing of photos and videos and things like that?

15        A    It was actually exciting.  It's

16   exhilarating, you know, to have a rush to have

17   someone find you attractive, to have some new and

18   novel experience you didn't have before.  It's

19   exciting.

20        Q    All right.

21        A    Yeah.

22        Q    Ms. Vance talked to us some yesterday about

23   long conversations you guys seemed to have had about

24   these photos and videos and never distributing them

25   to anyone else.  Do you recall her giving that

1    testimony?

2        A    No.

3        Q    Do you recall her saying that yesterday?

4        A    Oh, yes, I recall her saying that

5    yesterday.  I don't recall the original statements

6    that she stated.

7        Q    All right.  So from what you remember, did

8    you guys have these conversations?

9        A    No.  I don't recall us having these

10   conversations because otherwise, we wouldn't have

11   been sharing these photos with other people.

12       Q    Did she express concerns to you about these

13   things impacting her possible career or things

14   like that?

15       A    No.  Because if that was the case, then we

16   wouldn't have been organizing the Naked Bike Ride

17   together, being taken photos of by the Willamette

18   Week Nude Painting of people in public.

19       Q    All right.  So you're saying she must not

20   have been concerned in your opinion because you guys

21   were out naked in public and getting photographed and

22   things like that?

23       A    Yeah.

24            MS. ATWOOD:  Objection, Your Honor.  He

25   can't speak to what the victim's concerns were.

1              THE COURT:  Okay.  That will be

2     sustained and you'll disregard his response.  It will

3     be stricken.  Thank you.

4     BY MR. TAYLOR:

5          Q    I guess just to recap then, Mr. Barber, do

6     you recall Ms. Vance ever telling you that she was

7     concerned around this time about possible

8     ramifications of y'all's activities?

9          A    No.  She never expressed that she was

10    concerned about them.

11         Q    Were there any other uses that you guys had

12    for this pornographic material you were making?  You

13    said enjoying it yourselves and also using it to

14    solicit other couples.  Any other uses?

15         A    We also had a -- a friend named Ashley

16    Caron (phonetic) who had talked to us about her

17    work --

18              MS. ATWOOD:  Objection, Your Honor.

19    Hearsay.

20              THE COURT:  Sustained.

21              THE WITNESS:  We also solicited --

22              THE COURT:  Sir.

23              THE WITNESS:  What?

24              THE COURT:  When the question is

25    sustained, that means you don't answer.

B. Barber - D                          470

1                    THE WITNESS:  Oh, okay.

2                    THE COURT:  Okay.

3     BY MR. TAYLOR:

4          Q    Did you do anything else with these videos?

5          A    We solicited offers of making commercial

6     pornography.

7          Q    All right.  How did that come about?

8     Without discussing things other people told you, but

9     how did you and Ms. Vance come to discuss that issue?

10         A    We were underneath the impression that

11    there was a substantial amount of money to be made

12    and that it would be able to supplement our income

13    and so we solicited people who were commercially

14    producing pornography on the website Backpage.

15         Q    All right.  Was Ms. Vance aware of this?

16         A    Yes.

17         Q    Did you guys have conversations to

18    that effect?

19         A    Yes.

20         Q    All right.  Did she express any concerns to

21    you then about that activities and behavior?

22         A    No.

23         Q    All right.  So when did you guys make the

24    videos that are in question in this case?

25         A    Between December 31st of 2010 and January

1    6th of 2011.

2         Q    Where were they made?

3         A    They were made in my bedroom.

4         Q    We heard Ms. Vance testify yesterday that

5    she was uncomfortable making these videos and things

6    like that.  Is that what you recall?

7         A    No.

8         Q    Did she ever express to you during the

9    making of these videos that she was uncomfortable or

10   concerned or anything like that?

11        A    No.

12        Q    What did she say?

13        A    We were in the talks about looking for

14   other couples and going to swinging clubs, which we

15   hadn't been to, or the Paris Theatre a couple of days

16   prior to this experience of making these films and

17   that we were trying to find -- I mean, the Paris

18   Theatre has, I guess, older folks.  And we were

19   trying to find some younger folks to be with.

20        Q    All right.  Did you guys eventually meet

21   any other people that you were interested in having

22   sex with?

23        A    I mean, we discussed it with some other

24   people, yes.

25        Q    As part of that, did you ever exchange

1    these videos in question with any other people?

2         A    Yes.  I had uploaded these to my FTP server

3    and had shared them with the other couple with a

4    password-protected account.

5         Q    All right.  So let's expand on some of

6    that.  What can you explain in very lay terms what an

7    FTP is?

8         A    An FTP is essentially sort of like a

9    private cloud that you, yourself, control, as opposed

10   to a public cloud, which anyone can access.  And you

11   can use that for sharing files to each other or to

12   other people.

13        Q    So do I understand correctly, it's kind of

14   like the -- the iCloud a bunch of us might have where

15   it's this server up in the internet ether where the

16   person who owns it can put documents, videos, things

17   like that?

18        A    Yes, except for not owned by Apple.

19        Q    Right.  And following up with something

20   else you said, you can share that information with

21   other people?

22        A    Yeah.

23        Q    And how do you do that?

24        A    You would give them the URLs, the universal

25   resource locator, to those files, along with an

1    access password and user name to be used to be able

2    to authenticate against.

3         Q    So, basically, you send him a link and

4    a password?

5         A    Yeah.

6         Q    All right.  And once somebody has the link

7    and the password, can they then access that material?

8         A    Yeah.

9         Q    And what can they do with it?  Can they

10   just view it?  Can they download it?

11        A    They can download it.  They can view it.

12             MS. ATWOOD:  Your Honor, I'm going to

13   object at this point.  I feel like he's not

14   established a foundation for his knowledge of how

15   this works.

16             THE COURT:  Sustained.

17   BY MR. TAYLOR:

18        Q    Mr. Barber, what do you do professionally

19   for work?

20        A    I am a cloud systems engineer at -- I was

21   previously a cloud systems engineer at Intel where I

22   managed 6,000 servers that had 21,000 genomes for the

23   Knight Cancer Institute.

24        Q    How long have you been doing this type of

25   work for?

1        A    Over ten years.

2        Q    In your time doing this type of work, have

3    you used things like FTP servers and cloud servers?

4        A    Extensively.

5        Q    All right.  If you had to ballpark, what

6    percentage of your professional working life is

7    involved with these types of servers?

8        A    100 percent of my work involves using

9    servers.

10        Q    Does that include FTP servers?

11        A    That includes FTP servers.

12        Q    Now, returning to the questions I was

13    asking you, once somebody has the password and link

14    to an FTP cloud, can they download material?

15        A    Yeah.

16        Q    Once somebody has done that, do you have

17    any control over what they do with it?

18        A    They can recopy it to any device that they

19    have.  They can put it -- upload it to another

20    web service.

21        Q    So, basically, they can do whatever they

22    want with it?

23        A    Yeah.

24        Q    All right.  So getting back to the story

25    you were telling us, you guys met another couple.

1      Did you exchange the links to the FTP and password

2      information with them where this pornography was

3      stored?

4           A      Yeah.

5           Q      Was Ms. Vance aware that this had happened?

6                  MS. ATWOOD:  Your Honor, I'm going to

7      object.  He has no knowledge of the personal

8      awareness.  He can't testify to that.

9                  MR. TAYLOR:  I'll rephrase.

10                  THE COURT:  Thank you.

11     BY MR. TAYLOR:

12          Q      Did you and Ms. Vance have discussions

13     about that happening?

14          A      Yes.

15          Q      Did she indicate to you at that time any

16     concerns about it getting out or anything like that?

17          A      No.  And she was carbon copied into the

18     e-mail chains themselves.

19          Q      So yesterday, Ms. Vance testified that you

20     guys had, specific to these videos, an express

21     agreement to keep them under lock and key, to never

22     give them to anyone or let anyone see them.  Is that

23     what you recall about these?

24          A      That's not what I recall.

25          Q      What do you recall about any, if any,

1    discussion of what these videos were going to be

2    used for?

3         A    My discussion was in regards to using them

4    to try to find other couples who were younger than

5    the older couples that we had seen at the Paris

6    Theatre and trying to find someone that we could have

7    some group sex with and also maybe make some

8    pornography and use them for -- for solicitations.

9         Q    All right.  Let's turn away from sex and

10   pornography for a bit.  Did you and Ms. Vance

11   eventually get married?

12        A    Yeah.

13        Q    When was that?

14        A    That was in December 27th of 2012.

15        Q    And you testified earlier that shortly

16   after that, you guys ended up moving in together in

17   early 2013?

18        A    That's correct.

19        Q    All right.  When you guys got married, how

20   were things going in your relationship just

21   generally?  Good, bad?

22        A    Well, she was still trying to complete

23   her undergraduate degree.  And she was underneath a

24   tremendous amount of stress and had dropped -- or

25   chosen to drop out of her undergraduate degree.  So I

B. Barber - D                                477

1     had flown to Ohio to try to help her with her

2     homework and get her graduated so she could come move

3     to Portland.

4            Q     So you guys were having some stress in your

5     relationship?

6            A     Yeah.

7            Q     All right.  It is obviously correct that

8     you and Ms. Vance are no longer married?

9            A     That is correct.

10           Q     When did you get divorced?

11           A     We got divorced in April 2015.

12           Q     All right.  So, obviously, the marriage did

13    not work.  Is that a fair statement?

14           A     That's a fair statement.

15           Q     All right.  Is it a fair statement that it

16    was mutually not working?

17           A     I was making a significant amount of effort

18    to try to make it work, but it was not working, yes.

19           Q     All right.  After you guys got divorced, so

20    I guess we're talking early 2015, how did you feel

21    about Ms. Vance?

22           A     I felt that she had an extremely negative

23    view of me and had specifically done a lot to try to

24    inflict emotional distress in me.

25           Q     All right.  And that's part of the whole

1    divorce and all that type stuff that's been discussed

2    throughout this trial?

3         A    Yeah.

4         Q    So there was a lot of negative feelings, it

5    sounds like, both ways.  Would you agree with that?

6         A    That's correct.

7         Q    All right.  And I had some discussion with

8    Ms. Vance yesterday about some sort of back-and-forth

9    mutual threats you guys made to each other about, you

10   know, fraud and blackmail and things like that?

11        A    Yeah.

12        Q    Was that an accurate account of sort of how

13   that went, you guys both back and forth?

14        A    I would usually try to refrain and she

15   would escalate things to try to forcefully get her

16   way.

17        Q    All right.  During this time, did you want

18   to continue a relationship with Ms. Vance?

19        A    One of our marriage agreements were that we

20   would be able to seek marriage therapy together and

21   we had never gone to marriage therapy together.  And

22   I was asking and begging for that to happen.

23        Q    All right.  So you wanted to do therapy and

24   possibly reconcile?

25        A    That's correct.

B. Barber - D                              479

1        Q     All right.  During -- so -- so the divorce

2   was a long divorce, correct?

3        A     Mm-hmm.

4        Q     Ms. Vance moves out in late 2013.  The

5   divorce doesn't go through until early 2015, correct?

6        A     That's correct.

7        Q     And there were proceedings and things like

8   that happening and lawyers and that kind of stuff?

9        A     Yeah.

10        Q     All right.  During all of that time, was

11   there any discussion between you and Ms. Vance or you

12   and an attorney representing Ms. Vance about these

13   videos?

14              MS. ATWOOD:  Objection, Your Honor.  His

15   discussions with the victim's attorney, if any, would

16   be hearsay.

17              THE COURT:  Sustained.

18   BY MR. TAYLOR:

19        Q     Did anyone ever tell you -- or did

20   anyone --

21              MS. ATWOOD:  Objection, Your Honor.

22              THE COURT:  Sustained.  You may finish

23   your question, Mr. Taylor.

24   BY MR. TAYLOR:

25        Q     My question is:  During the divorce, was

1       there any discussion, to your knowledge, about these

2       videos?

3                       MS. ATWOOD:  I'll object one more time.

4       Without knowing the participants of the discussion, I

5       don't believe we can rule out that this would be a

6       hearsay statement.

7                       MR. TAYLOR:  Judge, I'm asking for --

8       for its effect on the listener.

9                       THE COURT:  Okay.  You may answer the

10      question, sir.

11                      THE WITNESS:  There was never any

12      discussion during or before the divorce about any

13      sort of videos or any discussions about what -- what

14      happened to them.

15      BY MR. TAYLOR:

16          Q    All right.  After you guys split up --

17      well, let me follow up on that at some point.  So at

18      any point prior to, let's say, June of 2016, has

19      Ms. Vance come to you and said, "Don't share these

20      videos," or anything like that?

21          A    No.

22          Q    Has she mentioned them at all to you in the

23      last four years?

24          A    There was one time when we had a discussion

25      about that in July of 2015 when I informed her

B. Barber - D                              481

1     that --

2          Q     We'll get to that in a few Mr. Barber.

3     I guess, aside from that conversation, any other

4     discussion about the videos?

5          A     No.

6          Q     She ever express to you any concerns about

7     keeping them under lock and key or destroying them or

8     anything like that?

9          A     No.

10         Q     All right.  After you guys get divorced, so

11    we're talking early 2015, where were you living?

12         A     What -- at what point, again?

13         Q     Early 2015.

14         A     Oh, I was living in my house at 2030 --

15    2637 Southwest Water Avenue, Portland, Oregon 97201.

16         Q     All right.  Were you working at that time?

17         A     Yes.

18         Q     All right.  So let's talk about 2015 and

19    that year, all right?

20         A     Okay.

21         Q     Let's start with this.  Big picture, how

22    did 2015 go for you?  Did it go well or did it go

23    poorly?

24         A     In early 2015, I had a new relationship and

25    a new job working for a financial services company.

B. Barber - D                    482

1    In February of 2015, Ms. Vance decided that she had

2    wanted to get back with me before the divorce had

3    finalized.

4              And so I had told the woman that I had been

5    seeing and had been living with me that she would

6    have to -- have three days to move out and that me

7    and my ex-wife would -- were going to be getting back

8    together.  And then she decided that she had changed

9    her mind sometime afterwards.

10             MS. ATWOOD:  Your Honor, I'm going to

11   object to his testimony about her changing her mind

12   about anything.

13             THE COURT:  Sustained.

14   BY MR. TAYLOR:

15      Q    Did you end up getting back together with

16   Ms. Vance at any point?

17      A    After the --

18      Q    On a -- on a long-term --

19      A    After the divorce, we did have some sexual

20   relations in July of 2015.

21      Q    All right.  So going back to sort of what I

22   was initially asking about, regarding your living

23   situation, your work, how did 2015 go for you?

24      A    Somebody had contacted my workplace to say

25   that I had committed some theft and fraud and then

1    there was a --

2                    MS. ATWOOD:  Objection, Your Honor.

3    This is hearsay.

4                    THE COURT:  Please direct your client to

5    answer the question, okay?

6                    MR. TAYLOR:  I will.

7                    THE COURT:  Thank you.

8    BY MR. TAYLOR:

9         Q    Mr. Barber, if you could just focus on some

10   big-picture principles with me right now.

11        A    Okay.

12        Q    Did 2015 go well for you or poorly for you?

13        A    Poorly for me.

14        Q    All right.  Were you employed throughout

15   2015?

16        A    I was employed initially.

17        Q    All right.  Did you end up losing a job?

18        A    Yes, I did.

19        Q    Were you able to regain employment?

20        A    No.

21        Q    All right.  How long were you without

22   employment in 2015?

23        A    For, I would say, seven months.

24        Q    And is that the later part of 2015?

25        A    That is correct.

1      Q     All right.  How about your housing

2  situation?  Were you housed in 2015 continuously?

3      A     No.

4      Q     Did you lose housing at some point?

5      A     Yes.

6      Q     Were you able to regain housing?

7      A     No.

8      Q     So where were you living?

9      A     I was living on the rooftop of an

10 industrial warehouse.

11     Q     All right.  So overall, towards the end of

12 2015, how were you feeling about your life?

13     A     I was awfully depressed because I wasn't

14 able to afford the basic necessities of life.

15     Q     All right.  Were you upset, in particular,

16 at Ms. Vance or just generally upset?

17     A     I was generally upset because I was trying

18 to apply for lots of jobs and I was trying to -- to

19 basically get into a place to live, but I was not

20 able to and take care of my basic needs.

21     Q     All right.  And so how did that make you

22 feel about things?

23     A     Well, in the beginning of January, there

24 was an ice storm and I was living on top of this

25 warehouse and freezing to death and I was

```
 1      contemplating killing myself and lighting myself on

 2      fire to sort of -- so that -- so people know that

 3      there's -- I was being picked on, I guess and that I

 4      was going through some tough time.

 5               It's like the -- there's, like, this

 6      Buddhist monk in Vietnam that I have some good

 7      feelings for who protested in the form of lighting

 8      himself on fire.

 9          Q    All right.  So you felt at that time -- and

10      I'm just summarizing what I understand you to be

11      saying, is that sort of the world was out to get you

12      and nothing good was happening in your life?

13          A    Yeah.

14          Q    All right.  Did you try to get any help for

15      your mental health situation?

16          A    Yeah, I went to Oregon Health Sciences

17      University.

18          Q    And when you went there, what was the

19      reason you wanted to go there?

20          A    Because my sister and brother had told me

21      that they had some previous experiences and I would

22      be able to get through it.  And my brother related

23      some experiences of Iraq and that he had --

24               MS. ATWOOD:  Objection, Your Honor.

25               THE WITNESS:  -- been able to pull
```

B. Barber - D                                      486

1    through it.

2                    MS. ATWOOD:  Hearsay.

3                    MR. TAYLOR:  Effect on the listener,

4    Judge.

5                    THE COURT:  Overruled.

6                    MR. TAYLOR:  But I will move on.

7    BY MR. TAYLOR:

8         Q    I guess, let me put it like this,

9    Mr. Barber.  When you walked into OHSU in January,

10   what did you tell them the reason for your visit was?

11        A    That I was thinking about killing myself.

12        Q    And were you, in fact, doing that?

13        A    Yeah.

14        Q    All right.  So did things improve after

15   that?

16        A    Not for another six months.

17        Q    All right.  And we'll get to that in a few.

18   Did you work with any other organizations to try and

19   get help, things like that?

20        A    Yeah, Cascadia Behavioral Healthcare.

21        Q    All right.  Overall, did that help?

22        A    I mean, it's really like they're -- they

23   don't actually have any ability to help you with your

24   material circumstances.  All they can do is just

25   listen to you talk at them.

1       Q     All right.  So I want to turn back to a

2   couple of specific things in 2015, particularly the

3   July 2015 conversation with Ms. Vance you mentioned

4   earlier.

5       A     Yeah.

6       Q     Who initiated that conversation?

7       A     She had.

8       Q     All right.  And in what form did that

9   conversation take?  Was it in person, over e-mail?

10      A     It was in text message.

11      Q     All right.  I want to direct you to a -- a

12  specific part of that conversation.  Were you aware

13  at that time that there was something going on with

14  the pornography in question in this case?

15      A     Yeah.  I had been informed by an individual

16  by the pseudonym of (indiscernible) that the porn was

17  being put on the internet.

18      Q     All right.  So you had heard that, somehow,

19  this porn was getting out?

20      A     Yeah.

21      Q     Were you aware of where that pornography

22  was?

23      A     I mean, I know where it had been previous

24  to this, yeah.  It had been on my cloud server.

25      Q     All right.  Had you shared it with anyone

1   at that point?

2       A    I mean --

3       Q    Recently?

4       A    Not recently, no.

5       Q    All right.  Had you even thought about

6   it lately?

7       A    No.

8       Q    All right.  Did you talk to Ms. Vance in

9   that conversation about what you had heard?

10      A    Yeah.

11      Q    What -- do you recall what you said?

12      A    I said, "Are you aware that some of your

13  friends have been spreading our porn on the

14  internet?"

15      Q    And how did she respond?

16      A    She said, "Yeah, I heard something

17  about that."

18      Q    What was your impression of that response?

19  Like, what did that response say to you?

20      A    That she really wasn't too concerned about

21  it.  I mean, neither -- I wasn't too concerned about

22  it because we had both been in public naked and I

23  didn't really have any shame and it really didn't

24  affect my material circumstances in life.

25      Q    So Ms. Vance told us a story yesterday that

1    there was this big back story that she was aware of

2    this attempts to access the pornography and she may

3    have been involved in it to some extent.  Did you

4    know anything about that?

5         A    No.  I didn't know anything about her being

6    involved with that.

7         Q    All right.  And speaking of Ms. Vance, when

8    was the last time, I guess, prior to the last day or

9    two, that you even saw Ms. Vance in person?

10        A    In April of 2016, she came by to get a pair

11   of boots, a tea kettle and maybe, like, a potted

12   house plant.

13        Q    Prior to that, when was the last time you

14   saw her?

15        A    I delivered most of all of her things to

16   her house in Southeast Portland.

17        Q    And do you remember when about that was?

18        A    That was in December of 2014.

19        Q    All right.  Let's turn back to the

20   discussion we were having about late 2015 and how

21   things were not going well for you, all right?

22        A    Mm-hmm.

23        Q    Did you communicate with Ms. Vance during

24   that time?

25        A    In late 2015, yeah.

1       Q     All right.  And were your communications

2   with Ms. Vance more or less accurately summarized in

3   the exhibits the State offered yesterday, those text

4   messages and things like that?

5       A     Yeah.  That would be an accurate reflection

6   of the messages, yeah.

7       Q     All right.  And then moving into 2016, how

8   about the e-mails the State introduced?  Did you send

9   those e-mails?

10      A     Yes.

11      Q     Does that all sound about accurate?

12      A     That is about accurate.

13      Q     All right.  How did you feel about

14  Ms. Vance during that time period, the -- late 2015

15  to early 2016?

16      A     Well, I mean, she was the -- the only

17  person who really understood me because I don't

18  really have many friends left anymore and I stopped

19  talking to a lot of them because I didn't feel like

20  it was appropriate to burden them with my problems.

21  And she was someone who kind of knew me.

22            And I, basically, just kind of stick to

23  only a few people and try to focus on work and stuff.

24  And so I felt like she would have an understanding of

25  how I feel.  And so I wanted to just have the person

B. Barber - D                           491

1    who I had, like -- a lot of -- a lot of my goals and

2    aspirations are tied to her, like wanting to help

3    the -- the blind.

4              And I discovered, when I was trying to find

5    a cure for albinism, a way to genetically engineer

6    plants to use melanin for photosynthesis and so a lot

7    of my personal --

8              MS. ATWOOD:  Your Honor, I'm not seeing

9    the relevance of this testimony.  I don't --

10             THE WITNESS:  Sorry.

11             MS. ATWOOD:  -- remember what the

12   question was.

13             THE WITNESS:  Yeah, I forgot what the

14   question was, too.  I'm sorry.

15   BY MR. TAYLOR:

16      Q    The question related to my client's

17   feelings towards Ms. Vance during late 2015 to early

18   2016.

19      A    I mean, I love her.  I have a lot of -- a

20   lot of who I am is tied up in her and a lot of my

21   goals were tied up in things I had experienced

22   with her.

23      Q    Were you angry at Ms. Vance around this

24   time?

25      A    No, I was lonely.

B. Barber - D                          492

1      Q    Did you want to get back together with her?

2      A    I mean -- sorry.  I mean, we had a -- an

3  understanding of what the social contract that she

4  had -- had been in a relationship, so I couldn't be

5  with her.  But I wanted to be at least pen pals or

6  have someone to lay my emotional burdens on because I

7  didn't feel like it was -- I had anyone else to -- to

8  talk to.

9      Q    So let's kind of move forward in time.  We

10  heard some testimony that in April of 2015, some of

11  these videos were uploaded to some websites.  To be

12  clear, did you upload these videos to any websites?

13      A    Yeah.

14      Q    What websites did you upload these videos

15  to?

16      A    I had uploaded them to Pornhub and to

17  xHamster and I uploaded them to Porn.com.

18      Q    All right.  Why did you upload these videos

19  to those websites?

20      A    'Cause I didn't have any money at the time

21  and I was thinking about killing myself, so I don't

22  really have any way to keep anything that I have

23  around.

24           I put all my source code, which is the

25  computer programs that I make, on websites like

1    GitHub and GitLab so that other people can reuse the

2    work that I did, like shortcuts if they wanted to do

3    their own work.

4              And I put all of the rest of my photo

5    collection on Facebook and I was basically trying to

6    find some way that there'd be some record of me in

7    this world after I killed myself because I had wanted

8    to -- thought about a couple of times walking into

9    traffic or jumping over one of the bypasses.

10        Q    When you put these videos online, were you

11   thinking about Ms. Vance in particular?

12        A    No.  I was thinking about what I had

13   left over.

14        Q    All right.  Did you upload them intending

15   to cause her harm or embarrassment or anything like

16   that?

17        A    No.  I hadn't tried to harm her in any way.

18        Q    Okay.  Let me ask you a specific question

19   about one of those websites.

20        A    Yeah.

21        Q    We heard testimony from Ms. Vance yesterday

22   that on xHamster, her name was associated with the

23   posting.  Do you recall hearing that testimony?

24        A    I heard that testimony, yeah.

25        Q    Do you recall at any point putting

B. Barber - D                              494

1    Ms. Vance's name on the xHamster videos?

2         A    No, I do not.

3         Q    Around the time that you put these videos

4    online, did you put -- or did you send them to anyone

5    in particular?

6         A    I didn't send them to anyone at all.

7         Q    Did you put them on any sort of, like,

8    social media sites or anything like that?

9         A    No.

10        Q    Did you send links to any of these postings

11   you made to any of her friends or family or employer

12   or anything like that?

13        A    I didn't send anyone any of the links to

14   any of those photos.

15        Q    So that was April of this year, correct?

16        A    Yeah.

17        Q    All right.  You are obviously still here.

18   What changed in your life?

19        A    I had been able to get a job at Intel

20   through some networking and trying to talk to people

21   who were currently at Intel.  And I had been offered

22   a -- basically, the job I'd always wanted to do,

23   which was to work on computation of genetics

24   professionally.

25        Q    All right.  Did you accept that job?

1        A    Yeah.

2        Q    How'd that make you feel?

3        A    It felt like I was going to be able to

4    change the world 'cause I was working on cancer

5    genomes and I thought I'd be able to genetically

6    engineer plants to stop global warming.

7        Q    All right.  So the stuff you always wanted

8    to do?

9        A    Yeah.

10       Q    All right.  Did that change your mood and

11   attitude about life?

12       A    Yeah.  I basically worked all day, every

13   day nonstop because I really loved that kind of work.

14       Q    How much were you working?

15       A    Literally any waking moment I could.

16       Q    I mean, how many hours a day are we

17   talking?

18       A    Like, sleeping every other day ten hours

19   and the rest of time would be working.  So, like, 34

20   hours and then ten hours sleeping.

21       Q    So you were busy?

22       A    Yeah.

23       Q    So this work took you out of your

24   depression, despair that you'd been in?

25       A    Yeah.

B. Barber - D                                    496

1        Q        Were you eventually able to find housing

2   as well?

3        A        Yeah.

4        Q        All right.  So your life improved?

5        A        Yeah.

6        Q        And you're happy about that?

7        A        Yeah.

8        Q        All right.  And with all this work you're

9   doing and things you had going on in your life, did

10  you think about these videos?

11       A        No.

12       Q        And did you forget about them?

13       A        I mean, I didn't forget about it.  Just --

14  it doesn't cross my consciousness, so my

15  consciousness filled with other things.

16       Q        All right.  So just kind of in the back of

17  your mind, not really thinking about it?

18       A        Yeah.

19       Q        All right.  So when was the next time you

20  heard anything about these videos?

21       A        I heard about them when a got a text

22  message from Ms. Vance.

23       Q        And were those the text messages that she

24  discussed yesterday?

25       A        Yeah, that's correct.

B. Barber - D                                    497

1          Q    So she texted you, says she needs to talk?

2          A    Yeah.  And I asked her if it was an

3     emergency.

4          Q    All right.  Did you know why she was

5     texting you?

6          A    Not initially.

7          Q    All right.  Did you eventually figure it

8     out?

9          A    Yeah, she asked me about the videos.

10         Q    All right.  Was that in that same

11    conversation?

12         A    That was that -- the same conversation,

13    yeah.

14         Q    So what went through your mind then?

15         A    That I'm not going to porn websites at

16    work.

17         Q    Were you at work when you received these

18    text messages?

19         A    Yeah.

20         Q    All right.  So how did you react after

21    that?

22         A    I was assuming that she was upset about the

23    videos and I would get to talk to her about it when I

24    had some time off on a Saturday.

25         Q    All right.  Did you, at any point in June,

1    have any conversation with Ms. Vance?

2           A    You -- in June?  The -- you mean the

3    conversation over text message?

4           Q    Aside from that, did you have any other

5    conversations with Ms. Vance?

6           A    Oh, I -- I told her in June that I had

7    gotten this job where I was working with a bunch of

8    Ph.D.s on cancer research.

9           Q    Pardon me.  My question was poor form.

10   After the text messages about the videos --

11          A    Oh, after -- after the text messages.

12          Q    -- did you have any more discussion back

13   and forth with Ms. Vance?

14          A    Yeah.  I told her that I would take down

15   the videos and that if she wanted to, I would give

16   her my entire paycheck and every other paycheck as

17   long as I could keep my job.

18          Q    And, again, are those communications that

19   you're discussing accurately reflected in those

20   exhibits the State previously offered?

21          A    Yeah, that's correct.

22          Q    Those are the, "Please don't ruin my life.

23   I'll do whatever you want"?

24          A    Yeah.

25          Q    All right.  When was the first time you

B. Barber - D                          499

1    heard that the police were involved in this case?

2         A    After I got a voicemail Saturday afternoon

3    from Thomas Duenas.

4         Q    Did you know exactly what he was

5    talking about?

6         A    Well, I mean, he left me a voicemail saying

7    that he needed to talk to me about the pornographic

8    films, yeah.

9         Q    So his -- his voicemail explained what he

10   was calling about?

11        A    Yeah.

12        Q    Did you know at that time that this was a

13   criminal matter?

14        A    No, I did not know that.

15        Q    What'd you think?

16        A    I thought it was, like, a civil matter,

17   like she claimed that she owned the videos and a --

18   and a DMCA request and that would mean it's a civil

19   thing.  And that I -- she may have -- I thought at

20   the time she may have accused me of something else.

21             And so I -- I told him I didn't threaten

22   her with it, did not send it to anyone.  I wasn't

23   trying to blackmail or extort her.  And so I said,

24   you know, "Why is this anything to do with criminal?"

25   You know, "I own these.  These are mine."

B. Barber - D                         500

1        Q    And you're now talking about the actual

2   discussion that you had with Deputy Duenas; is

3   that correct?

4        A    Yeah.

5        Q    And that was a discussion over the phone,

6   right?

7        A    Yeah.

8        Q    On about June 26th?

9        A    Yeah.

10       Q    All right.  And you heard Deputy Duenas

11  talk about his recollection of that conversation

12  yesterday, correct?

13       A    Yeah.

14       Q    In your opinion, did he accurately

15  characterize the things that you said?

16            MS. ATWOOD:  Objection, Your Honor.

17  Can't speak to the --

18            THE COURT:  Sustained.

19            MS. ATWOOD:  -- testimony of the

20  witness.

21  BY MR. TAYLOR:

22       Q    What do you recall telling him in that

23  conversation?

24       A    I recall telling him that there was a long

25  history of false complaints that were -- had been

B. Barber - D                    501

1    lodged against me in the past and I iterated through

2    examples of those and then I asked him if I'm being,

3    you know, complained about, "Why isn't -- did she

4    tell you that her friends had engaged in the same

5    pattern of behavior when they tried to also release

6    the same exact videos?"

7        Q    So you were kind of trying to tell him the

8    whole back story?

9        A    Yeah.  I had said, you know, "I've been

10   accused of Fraud and I've been accused of Theft and

11   I've been accused of all these other things

12   repeatedly in an attempt to hurt me."  And I included

13   the -- the rape allegation, which is the only one

14   that he included in that report.

15       Q    All right.  Did you talk to him about why

16   you uploaded these videos?

17       A    Yeah.

18       Q    What did you tell him about why you

19   uploaded the videos?

20       A    That I was in such a state of depression

21   that I was going to kill myself when I uploaded them.

22       Q    All right.

23       A    I mentioned that the -- the reason why I

24   had been homeless was because my workplace had -- I

25   had not being able to keep a stable job with my

B. Barber - D                    502

 1   workplace being barraged with complaints of Theft and

 2   Fraud and my professional life being ruined with

 3   these sort of false accusations.

 4        Q    So, again, you kind of just gave him the

 5   whole story?

 6        A    Yeah.

 7        Q    All right.  I've lost my place.  Give me

 8   one moment.  Did Ms. Vance ever ask you to remove the

 9   videos from the websites?

10        A    I had gotten a DMCA request, but it didn't

11   say who it was from.  It said that these have been

12   flagged, that, "You are not the copyright holder.  If

13   you disagree, send us a statement underneath a

14   district court that you are the owner of the videos

15   and that this is an error."

16        Q    All right.  Did you end up removing any of

17   the videos in response to that?

18        A    I sent a -- what's called a counter notice

19   with -- rights, that I am the owner of these videos.

20   These -- this -- this notice has been placed as an

21   error.  I'm the owner.

22        Q    All right.  Returning to your involvement

23   with Deputy Duenas, timeline seems to be that June

24   26th, you guys talked on the phone and then July

25   17th, you eventually turned yourself into him at the

B. Barber - D                    503

1    East Precinct, correct?

2        A    Yeah.

3        Q    In the time between those, did you have any

4    other interactions with Deputy Duenas?

5        A    I sent him a bunch of links which

6    corroborated the oral testimony that I gave him

7    because I like to be meticulous and detail oriented.

8             So I sent him all of the examples of false

9    accusations that had been lodged previously, the

10   conversation where the videos had been originally

11   uploaded to my private cloud server and the

12   conversation between the four of us.

13            And I also had included the people who had

14   tried to upload the videos in an attempt to blackmail

15   me.  And I had sent that, including highlighted

16   sections that -- so he wouldn't have to read through

17   the entire thing.  He could just click, you know, and

18   get to the highlighted portion that was relevant.

19       Q    So you sent him a giant e-mail trying to

20   explain your side of the story; is that correct?

21       A    Yeah, that's right.

22       Q    All right.  Did he respond to that?

23       A    He did not respond to that.  He responded

24   to another one where I asked him about our meeting

25   time and he said that he had something going on on

1    one day, so he had to reschedule for the next day

2    afterwards.  I think he had some sort of training to

3    deal with.  And so he rescheduled for two days

4    afterwards.

5        Q    Okay.  So this conversation was about how

6    you guys were going to proceed, but no conversations

7    about the substance of the things that you had sent

8    him?

9        A    I mean, I asked him if he had gotten it and

10   I said I'm -- "I know that you have kind of, like,

11   you know, a bunch of things to do.  Here's a list of

12   all the stuff I cited."

13       Q    All right.  So you eventually turned

14   yourself in to him on July 17th, correct?

15       A    Yeah.

16       Q    All right.  How'd you feel when you went in

17   that day?

18       A    I was afraid that I was going to basically

19   become homeless and jobless again.

20       Q    All right.  Were you upset?

21       A    Yeah.

22       Q    All right.  Did you tell Deputy Duenas more

23   things related to this case on July 17th?

24       A    I -- I -- when I turned myself in, I asked

25   him if he had gotten my e-mail that I had sent him

B. Barber - D                          505

1    previously.  You know, I basically reiterated what

2    they -- what the topics of the e-mails were about,

3    essentially, and, you know, previous incidences of a

4    restraining order, how this was going on while there

5    was a restraining order.  He --

6                  MS. ATWOOD:  Objection, Your Honor.

7    Relevance.

8                  THE COURT:  Sustained.  And be stricken.

9    BY MR. TAYLOR:

10        Q    Did you have a discussion with him, just in

11   general, about, again, telling your side of the

12   story?

13        A    Yeah.

14        Q    All right.  So, Mr. Barber, I guess, let me

15   just wrap up with a few pretty simple questions,

16   okay?  Did you put those videos on websites?

17        A    Yeah.

18        Q    Which websites did you put the videos on?

19        A    I put them on xHamster, Pornhub and

20   Porn.com.

21        Q    Did you put them on any other websites?

22        A    No.

23        Q    Were you aware that they were getting put

24   on any other websites?

25        A    No.

1        Q     Why did you put those videos on those

2    websites?

3        A     Because I was going to kill myself and I

4    had no one that really cares, no impact I'd left on

5    the world and it'll be known that anyone knows

6    existed after I'm dead.

7        Q     Did you put them up there to hurt

8    Ms. Vance?

9        A     No, I didn't tell anyone.  I didn't ask her

10   for any money.  I just basically put them up there

11   and pretty much just disappeared from the world.  I

12   wasn't talking to anybody.

13       Q     So were you trying to get revenge on her?

14       A     No.

15             MR. TAYLOR:  All right.  Those are all

16   my questions.  Thank you.

17             THE COURT:  Thank you, Mr. Taylor.

18             Ms. Atwood, did you wish to --

19             MS. ATWOOD:  I actually have a couple of

20   matters for the Court --

21             THE COURT:  Okay.

22             MS. ATWOOD:  -- if that's okay.

23             THE COURT:  All right.  So we'll go

24   ahead and take a short break and then hopefully deal

25   with this quickly and then we'll bring you back out

1    for a couple -- maybe another 20 minutes or so.

2    Thank you.

3                    (The following proceedings were held in

4    open court, out of the presence of the jury,

5    11:48 a.m.)

6                    MS. ATWOOD:   So, Judge, I want to

7    revisit a couple of pieces of evidence we discussed

8    before trial began, first, being the cease-and-desist

9    notice that the defendant was given in the spring of

10   2015 regarding not having any contact with the victim

11   and her beliefs that he was harassing and threatening

12   her in many ways and that he had posted Ms. Vance's

13   personal information online in order to further

14   harass and intimidate her.

15                   His testimony specifically was -- and I

16   wrote this down -- that in the spring of 2015, the

17   victim was attempting to reconcile with him and he

18   didn't have any idea at that point in time that she

19   would have felt -- that she gave him any idea that he

20   could not disseminate any sort of video, audio/visual

21   images that they had created during the course of

22   their relationship.

23                   And I think this is -- directly speaks

24   to his knowledge that he was not suppose to be

25   disseminating information about her on the internet

1  at that point in time.

2        The second piece of evidence obviously

3  being the prior Craigslist post where the defendant

4  states that he had put forth so much time and energy

5  dealing with the victim's PTSD, depression, anxiety,

6  that he was done with her and soliciting sex on his

7  own to other people and in the time that he was doing

8  that, doing so with photos of them having sex, in

9  addition to a photo of a mug shot that he had pulled

10  from the internet of her.

11        His testimony being that he did not have

12  any intent whatsoever to harm her by disseminating

13  explicit images of her on the internet is completely

14  contradicted by the evidence that he had clearly done

15  so in the past with a malicious intent.

16        THE COURT:  Mr. Taylor.

17        MR. TAYLOR:  So, Judge, I guess I'll

18  take them one at a time.  The PSU letter, I think

19  Ms. Atwood can cross my client and ask him questions

20  about Ms. Vance's statements.  And if -- I think

21  he -- she could also ask the question, you know, "Did

22  a lawyer tell you not to do that?"

23        I don't think she gets to enter the

24  exhibit.  I don't think she can authenticate it and

25  we don't have the lawyer here, which is what

1    Your Honor mentioned yesterday when we discussed it.

2    So that's kind of where I come down on that issue.

3              As far as the Craigslist post, that

4    Craigslist post appears to be from 2013.  I think

5    Mr. Barber's testimony was pretty clear and I tried

6    to keep it pretty concise on this matter, is -- and

7    it was that they had an ugly divorce.  There was

8    animosity back and forth between both parties.

9              Mr. Barber didn't contradict that in any

10   way.  That's been the sort of theme and understanding

11   of this trial, is that from 2013 to early 2015, this

12   nasty divorce was happening.

13             So I don't know how a Craigslist post

14   from 2013 particularly plays into the intent issue

15   that is relevant, which is the intent in early 2016.

16   It's a three-year difference.  There are clearly a

17   substantial number of events that happened during

18   that time.

19             But furthermore, I think -- I think

20   there's some concerns with entering that exhibit as

21   far as opening up doors to more questions and sort of

22   getting deeper into relitigating this divorce and

23   everything that happened there, which we have

24   attempted to truncate away from this trial.  So

25   that's where I come down on that issue, Judge.

1           THE COURT:  Okay.

2           MS. ATWOOD:  Can I add, Your Honor?

3           THE COURT:  Mm-hmm.

4           MS. ATWOOD:  Just a couple of things.

5    As far as the defendant's testimony about their

6    marriage and the things that went on during their

7    marriage, I disagree with defense counsel that it was

8    limited to purely testimony that this was a rough

9    time in that it was -- and, you know, there was

10   animosity throughout the relationship.

11           He did testify that through -- from the

12   move-in in 2013 to the divorce, their relationship

13   was stressful, that he was the one trying to make

14   efforts to make it work to no avail, that the victim

15   had animosity toward him and was trying to harm him,

16   that she was the escalator and that he wanted to --

17   nothing but to reconcile, essentially.

18           This obviously directly contradicts that

19   testimony as well.  So I -- I think it's

20   independently relevant on multiple grounds.

21           THE COURT:  Okay.  So as far as the

22   letter from the attorney, you are welcome to inquire

23   about that.

24           Again, I've already made a ruling that

25   unless you bring that witness in or have somebody

1    with personal knowledge of the creation of that, it's

2    not coming in as an exhibit.  However, I do believe

3    that he's opened the door to the 2013 post, so that

4    will come in.

5                MR. TAYLOR:  Judge, can I address one

6    issue related to that?

7                THE COURT:  Yes.

8                MR. TAYLOR:  So as you know, that post

9    is titled, "wife arrested for DV last night," and

10   includes a mug shot.  So Ms. Atwood is obviously

11   going to be offering that.  That's her choice to do.

12               I -- I -- the fact of the matter is both

13   parties had arrests for Harassment in 2013 and prior

14   to the divorce proceedings beginning.  Furthermore,

15   both took out restraining orders on each other

16   throughout this time.

17               And what I want to be clear on is that

18   my position is that if Ms. Atwood wants to ask

19   questions about that and bring that in, I understand

20   the Court's ruling.  However, I don't believe that at

21   all opens the door for her to pursue any line of

22   questioning with regard to my client about his arrest

23   for Harassment.

24               I don't think he's invited that in any

25   way.  We've been very careful to keep any mention of

1    that out of this trial.

2                 THE COURT:  I would agree.

3                 MS. ATWOOD:  With me not asking him

4    questions about an arrest that he had?  I wasn't

5    intending to do that.

6                 THE COURT:  Okay.

7                 MR. TAYLOR:  And if I can have half a

8    moment to make sure Mr. Barber understands exactly

9    that issue that we just discussed, would that be all

10   right, Judge?  I'm just going to walk over here --

11                THE COURT:  Sure.

12                MR. TAYLOR:  -- and talk with him.

13                THE COURT:  And, Ms. Atwood, how long do

14   you think your cross is going to take?

15                MS. ATWOOD:  It's hard to say.  I took a

16   lot of notes.  Maybe a half hour.  Or were we going

17   to break now or --

18                THE COURT:  Well, I was hoping -- I have

19   a 1:15 and I'm going to ask you to step back from the

20   bar, please.

21                MS. ATWOOD:  Sorry, Judge.

22                THE COURT:  I have a 1:15 sentencing, so

23   I hate to delay.  If we could go -- you think it'll

24   take a half an hour?

25                MS. ATWOOD:  At least -- yeah.  I mean,

1    I don't want to, I guess, constrict myself in my

2    opportunity --

3                    THE COURT:  Sure.

4                    MS. ATWOOD:  -- to cross him.

5                    THE COURT:  Okay.  So probably what

6    we'll do is when we bring them back, we'll just break

7    for lunch then.

8                    MS. ATWOOD:  That's fine.

9                    THE COURT:  Okay.

10                    MR. TAYLOR:  Thank you, Judge.

11                    THE COURT:  You're welcome.  And

12    we're -- Mr. Taylor, we're just going to break for

13    lunch.

14                    MR. TAYLOR:  Oh, okay.  Sorry.

15                    THE COURT:  That's all right.  Do you --

16    Ms. Helregel?

17                    MR. TAYLOR:  I'll let her know whenever

18    she pops back up.

19                    THE COURT:  Okay.  So let's go ahead and

20    bring them in.

21                    Do you -- do you want us to wait for her

22    to return?  She might have --

23                    MR. TAYLOR:  No, we're good.

24                    THE COURT:  Are you sure?

25                    MR. TAYLOR:  Yes.

1              THE COURT:  Okay.

2              (Whispered discussion, off the record,

3    11:55 a.m. – 11:56 a.m.)

4              (The following proceedings were held in

5    open court, the jury being present, 11:56 a.m.)

6              THE COURT:  All right.  So at this time,

7    we're going to go ahead and take our lunch break.

8    Thank you for coming back.

9              And if you -- everyone can be back here

10   at 1:30 in the jury room, we'll get started as soon

11   as everybody's back and hopefully get going right

12   away, okay?  All right.  Thank you.  Again, remember

13   to wear your -- your badges when you're out and about

14   and not to discuss the case.  Thank you.

15             Mr. Barber, you can step down.  Thank

16   you.

17                      * * *

18        (Noon Recess taken at 11:57 a.m.)

19

20             *AFTERNOON SESSION*

21             (Whereupon, the following proceedings

22   were held in open court, out of the presence of the

23   jury, 1:39 p.m.)

24             THE COURT:  All right.  So you should

25   have drafts of the jury instructions.

1          MS. ATWOOD:  I only have the verdict

2    form.

3          THE COURT:  Okay.  Did you -- do you

4    have the jury instructions, Mr. Taylor?

5          MR. TAYLOR:  I got a copy, yes, Judge.

6          THE COURT:  Of the jury instructions?

7          MR. TAYLOR:  Yes, shall we pool

8    together?

9          MS. ATWOOD:  Yes.

10         (Whispered discussion, off the record,

11    1:39 p.m.)

12         MR. TAYLOR:  And, Judge, I guess a quick

13    question, is this copied and pasted from the State's

14    requested instruction, the Unlawful Dissemination

15    one?

16         THE COURT:  Yes.  And if you look, I

17    just changed it as you requested with putting --

18         MS. ATWOOD:  The names?

19         THE COURT:  -- the names in.  And then,

20    obviously, on criminal charge, if you'll look on Page

21    3, I'll have to change that.  And then I've

22    highlighted non-expert opinion evidence.  I'm not

23    sure that you're still requesting that --

24         MS. ATWOOD:  (Indiscernible) that's --

25         THE COURT:  -- or what that's being

1   requested.

2                    MR. TAYLOR:   And allow me to reread that

3   instruction --

4                    THE COURT:   Sure.

5                    MR. TAYLOR:   -- to refresh my own

6   recollection.   So I would continue to request that

7   instruction, Judge.   I think it goes to the issue --

8   the detective made several comments about the issue

9   of mirroring websites and things like that.

10                   And then when we followed up on it, he

11  was just kind of like, "That's what it leads me to

12  believe," when he was discussing the -- the view

13  numbers and things like that.   And I think I plan to

14  hit on that in my closing argument some.

15                   MS. ATWOOD:   I just don't recall him

16  ever actually stating, "It was my opinion that X, Y,

17  or Z."   He was just relaying what was consistent to

18  him based his experience.

19                   THE COURT:   No, I think he did make

20  some --

21                   MS. ATWOOD:   He did?

22                   THE COURT:   Yeah.

23                   MS. ATWOOD:   Okay.

24                   MR. TAYLOR:   In the form of, "That leads

25  me to believe this, that thing."   He said things like

1    that.

2                    THE COURT:  Yes.

3                    MR. TAYLOR:  And, Judge, I think at this

4    point, I would also like to request the instruction

5    on voluntary act.

6                    THE COURT:  What number is that?

7                    MR. TAYLOR:  Oh.

8                    (Pause in proceedings, 1:41 p.m.)

9                    MR. TAYLOR:  It's in the first section I

10   know that, up towards the very end.  That would be

11   10.65, Judge.

12                   THE COURT:  Thank you.  Let me look at

13   that.

14                   And, Ms. Atwood, have you looked at

15   voluntary act?

16                   MS. ATWOOD:  No, can I take a look at

17   that?  Do you have it (indiscernible)?

18                   MR. TAYLOR:  I've got the number.

19                   MS. ATWOOD:  I can look it up really

20   quick.

21                   (Pause in proceedings, 1:42 p.m. -

22   1:43 p.m.)

23                   MR. TAYLOR:  Does the Court have a copy?

24                   THE COURT:  Uh-huh.  I'm not inclined to

25   give it in it's entirety.

1               Ms. Atwood --

2               MS. ATWOOD:  My computer is being a bit
3      slow.  Could you read it to me?  I don't -- I
4      don't -- can't recall it off the top of my head.

5               THE COURT:  Okay.  So it says, "For
6      criminal liability, Oregon law requires the
7      performance of a voluntary act or omission.  Act is
8      defined bodily movement.  Voluntary act is a bodily
9      movement performed consciously.  Omission is a
10     failure to perform an act, the performance of which
11     is required by law.

12               "Conduct and act or omission and it's
13     accompanying mental state.  To act, either to perform
14     an act or omit such acts."  And C6, "Culpable mental
15     state means intentional knowing, reckless and with
16     criminal negligence."

17               MS. ATWOOD:  So what portions would you
18     want to --

19               MR. TAYLOR:  I don't need the portions
20     about culpable mental state and I don't need the
21     portions about omissions.  I'm mainly asking for the
22     several sentences in the beginning about voluntary
23     actions.

24               MS. ATWOOD:  And, Your Honor, I think
25     that the mental states outlined in the elements of

1      the crime are sufficient to get the point across.

2                    THE COURT:  Yeah.  I don't think that

3      this is an appropriate instruction for this case and

4      so I will decline to give it.  You're welcome to make

5      your exceptions.

6                    MR. TAYLOR:  I will make an exception.

7      That's all.  Thank you, Judge.

8                    THE COURT:  Thank you.

9                    And did you have a chance to look at the

10     verdict form?

11                   MS. ATWOOD:  Yes, Judge.  The only

12     other -- well, hold on.

13                   (Pause in proceedings, 1:44 p.m. - 1:45

14     p.m.)

15                   MS. ATWOOD:  Judge, I think these look

16     fine to me.  I didn't see anything in the

17     instructions that I would ask to have changed.

18                   MR. TAYLOR:  And nothing else from me at

19     this time, Judge.

20                   THE COURT:  Okay.  And just if you look

21     at the definitions on Page 4.

22                   MS. ATWOOD:  Mm-hmm.

23                   THE COURT:  I am going to make a few

24     changes there.  "Intimate parts," I'm going to get

25     rid of the dashes.  And it's actually "mean." not

1    "means."  And then "sexual intercourse," get rid of

2    the dash and put "means."  And "deviate sexual

3    intercourse," get rid of the dash and put "means."

4                    MR. TAYLOR:  I -- do we even need

5    deviate sexual intercourse?

6                    THE COURT:  I don't think we do, but if

7    you look at "sexual conduct" it says, "Sexual

8    intercourse or deviate sexual intercourse or

9    masturbation."

10                   MS. ATWOOD:  Right.

11                   THE COURT:  So.

12                   MS. ATWOOD:  And, I mean, by the

13   definition, some of these videos would include one --

14                   THE COURT:  Deviate sexual intercourse.

15                   MS. ATWOOD:  -- and the other or the

16   other, so --

17                   MR. TAYLOR:  That's fine.

18                   THE COURT:  All right.  So is everybody

19   ready to resume?

20                   MS. ATWOOD:  My question is:  Do you

21   expect us to just -- to not take any further breaks

22   between and the end of closing?

23                   THE COURT:  Well, that would be my hope,

24   but I'm sure it's not going to happen.

25                   MS. ATWOOD:  Okay.  I just didn't know.

1      I could go ahead and set this up now and make sure

2      that's all good to go.  Should I -- should I do that

3      now?  Okay.

4                      THE COURT:  That'd be great.  Do you

5      intend to call rebuttal?

6                      MS. ATWOOD:  Yes, just very brief.

7                      THE COURT:  Okay.  And, Mr. Taylor, will

8      you be ready to go once State's done with their

9      rebuttal?

10                     MR. TAYLOR:  Always.

11                     THE COURT:  Okay.

12                     (Pause in proceedings, 1:45 p.m. -

13     1:47 p.m.)

14                     MS. ATWOOD:  Do you know if -- does this

15     podium usually block it?  Should I move this then?

16                     THE CLERK:  (Indiscernible) we can

17     move it.

18                     THE COURT:  Just standing to stretch,

19     Mr. Taylor?

20                     MR. TAYLOR:  Yep --

21                     THE COURT:  Okay.

22                     MR. TAYLOR:  -- as usual, Judge.

23                     THE COURT:  Just checking.

24                     MR. TAYLOR:  I'm -- I'm winding up for a

25     new surgery in a month or so.

```
 1                    THE COURT:  Oh.

 2                    MS. ATWOOD:  Yikes.

 3                    MR. TAYLOR:  Yep.

 4                    DEFENDANT BARBER:  Are you too tall?

 5                    MR. TAYLOR:  Yep.

 6                    (Pause in proceedings, 1:48 a.m.)

 7                    DEFENDANT BARBER:  Can I look at the

 8       jury instructions, please?

 9                    MR. TAYLOR:  Yeah.

10                    DEFENDANT BARBER:  Your Honor, can I

11       make a remark for a moment?  (Indiscernible) can I

12       write it down or do you want me to tell it to you or

13       what?

14                    (Whispered discussion, off the record,

15       1:48 p.m. - 1:49 p.m.)

16                    THE COURT:  Do you need a moment,

17       Mr. Taylor?

18                    DEFENDANT BARBER:  Yes, please.

19                    MR. TAYLOR:  Very briefly, Judge.

20                    (Whispered discussion, off the record,

21       1:49 p.m. - 1:50 p.m.)

22                    MR. TAYLOR:  We're ready to go, Judge.

23                    THE COURT:  Okay.  And, Mr. Barber, if

24       you'd like to rejoin us on the stand.  Thank you,

25       sir.  And you're still under oath.
```

```
 1                    DEFENDANT BARBER:  Understood.

 2                    THE COURT:  Thank you.

 3               And then we'll bring the jury back in.

 4                    (The following proceedings were held in

 5    open court, the jury being present, 1:51 p.m.)

 6                    THE COURT:  Okay.  We're ready to

 7    resume.

 8                    Ms. Atwood.

 9                    MS. ATWOOD:  Thank you, Your Honor.

10                    THE WITNESS:  Test.

11                         CROSS-EXAMINATION

12    BY MS. ATWOOD:

13         Q    Good afternoon.  You had a pretty lengthy

14    direct testimony.  And I want to talk to you about a

15    number of things pertaining to your relationship with

16    Meagan Vance, your marriage to her and your conduct

17    in the past year or two.

18               So I want to start by talking about your

19    sexual relationship that you had when you were dating

20    and married to Ms. Vance.  You defined that in your

21    own words as progressive, right?

22         A    Yeah.

23         Q    And based on your testimony, you seemed

24    to remember having several conversations with her

25    throughout your relationship about being not
```

1    necessarily monogamous various types of

2    experimentation; is that right?

3         A    Yeah, that's correct.

4         Q    Were these in-person conversations?

5         A    Yes, it was also included in our marriage

6    contract.

7         Q    Okay.  So there was a lot of talk about

8    group sex and swinging ideas that you guys were

9    sharing with one another.  Is that your testimony?

10        A    That's correct.

11        Q    Okay.  And you just mentioned that this --

12   some of these things at least were included in actual

13   contract that you worked out?

14        A    Yeah.  Where she was allowed to have sex

15   with members of the same sex.

16        Q    Okay.  And that was something that she

17   signed off on?

18        A    Yeah.

19        Q    Explicitly?

20        A    Yeah.

21        Q    And these conversations -- the -- the

22   other ones involving various, you know, things in

23   your sexual relationship, she was a participant in

24   those conversations, right?

25        A    Yeah.

1          Q      And presuming that any of these acts

2     actually occurred, she would have been an active and

3     willing participant in those?

4          A      Yeah.

5          Q      And you also made some testimony about the

6     Naked Bike Ride.

7          A      Yeah.

8          Q      What year did you guys do that?

9          A      That was in 2012 and 2013.  That'd be June,

10    I think the days varied.

11         Q      Okay.

12         A      It was, like, June 20th, around there.

13         Q      And you also discussed a little bit the one

14    couple that you guys reached out to back -- kind of a

15    ways back in 2011.  Do you remember that?

16         A      December of 2000 -- or sorry.  Yes, in

17    January of 2011.

18         Q      Okay.  So that was fairly early on in the

19    relationship?

20         A      Yeah.

21         Q      Okay.  And you made a lot of statements

22    about -- you -- you frequently used the word, "we,"

23    saying, "We contacted these people," and, "We sought

24    out this experience," and, "We did this," and "We did

25    that."  But to be clear, it was you, for the most

B. Barber - X                           526

 1    part, who was engaged in the conversation with

 2    these -- this other couple, right?

 3         A    She was also what is called carbon copied

 4    into that and she also had direct correspondence with

 5    these couples.

 6         Q    Sure.  She had testified about conversing

 7    with the male half of that couple --

 8         A    Yeah, well, she --

 9         Q    -- to some extent, right?

10         A    -- with both, yes.

11         Q    But your testimony about sending these

12    couples explicit images and things, you were the

13    sender, right?

14         A    Yes.  And she was also carbon copied into

15    the entire thread.

16         Q    Sure.  And you testified that when you

17    exchanged these messages and conversations and

18    photos, but particularly the photos and other images,

19    you said that these were exchanged via a

20    password-protected account; is that right?

21         A    That's correct.

22         Q    Okay.  But you felt comfortable doing these

23    things and just carbon copying her after the fact

24    because it was your understanding that she had agreed

25    to this, right?

1      A    Yeah.  We were both the participant and had

2   seen their -- their pictures, in fact.

3      Q    Okay.

4      A    So if she wanted to take a look, you know,

5   and forward her those pictures.

6      Q    So you had had distinct conversations,

7   explicit agreements about engaging in things like

8   the Naked Bike Ride and joint-couple sex?

9      A    Yeah.  In fact, she had sex with a woman

10  that met during the Naked Bike Ride.

11     Q    So you had explicit agreements and

12  conversations about these things?

13     A    Yeah.

14     Q    So that's pretty different from now, right?

15     A    Yeah.  That's fair that now, we're not --

16  we're -- we're longer in contact and we're not having

17  sex, clearly.

18     Q    And by your own testimony, you didn't have

19  any explicit agreements after the making of these

20  videos regarding whether or not you could post them

21  anywhere?

22     A    So how does that affect my copyrights?

23     Q    I'm asking you a question.

24     A    What was the question?

25     Q    You just testified that with regard to your

1    sexually-progressive relationship --

2         A    Mm-hmm.

3         Q    -- the things you engaged in, you had a

4    explicit conversations and agreements about, right?

5         A    Yeah.

6         Q    But as you testified on your direct, when

7    it came to posting these videos online in 2016, you

8    hadn't had a conversation at all about doing that.

9         A    Why would I have a need to?  They are

10   my copyright.

11        Q    This is a yes-or-no question.  You didn't

12   you converse with her at all before you posted those

13   videos?

14        A    Why would I need to?

15        Q    Did you --

16             THE COURT:  Sir, you need to answer the

17   question, please.

18             THE WITNESS:  No.

19   BY MS. ATWOOD:

20        Q    Okay.  Now, I want to kind of move through

21   the course of your marriage.  You testified that it

22   was difficult to be separated, far away from each

23   other, right?

24        A    Yeah.

25        Q    Did you miss her while she was gone?

1          A     Certainly.

2          Q     Okay.  And you mentioned that things kind

3    of started getting bad early on in the marriage in

4    2013; is that right?

5          A     Yeah.  Because we needed to basically pool

6    resources and I had to help her with her college

7    degree.

8          Q     Okay.  So things went south kind of fast.

9    And I believe she left you in late 2013; is that

10   right?

11         A     To be precise, I actually had her evicted

12   from the home.

13         Q     Was that in late 2013?

14         A     That was in late 2013.

15         Q     Okay.  And you took it upon yourself to

16   evict her?

17         A     Through a restraining order.

18         Q     Okay.  So suffice it to say things were

19   pretty far downhill at that point, right?

20         A     Yep.

21         Q     And when it became clear that you guys were

22   going to break up, you were pretty upset?

23         A     Yeah.

24         Q     Is that fair to say?  And from that point

25   on, throughout the divorce, things continued to stay

1      fairly hostile, right?

2           A     There was at one point where we had gotten

3      back together in February 2015.

4           Q     But as we've heard through your testimony

5      and questions about mutual arguments with each other,

6      it was not a pleasant divorce?

7           A     No, it was not a pleasant divorce.

8           Q     Okay.  It was your testimony during direct

9      that you believed that she was trying to harm you

10     throughout this process, correct?

11          A     Yeah, Coercion.

12          Q     And it was your testimony that you didn't

13     have this same kind of animosity toward her.

14          A     Yeah, that's correct.

15          Q     And it was also your testimony that you

16     didn't post these videos in question out of any

17     sort -- sort of animosity toward her.

18          A     That's correct.

19          Q     So I'd like to show you what I've marked as

20     State's Exhibit 17.  Have you seen this before?

21          A     Yep.

22          Q     Is this a copy of a Craigslist post that

23     you made in late 2013?

24          A     Yeah, this is a casual encounters

25     Craigslist post.

B. Barber - X                    531

1        Q    Is this the post that you made?

2        A    Yes, that's correct.

3        Q    That's how you're familiar with it?

4             MS. ATWOOD:  Your Honor, we'd offer

5    State's 17.

6             MR. TAYLOR:  No objection.

7             THE COURT:  Thank you.  It'll be

8    received.

9             (State's Exhibit No. 17 received.)

10   BY MS. ATWOOD:

11       Q    Now, late 2013, as you've testified, was

12   the time period that things were getting pretty bad

13   between the two of you and fairly hostile.  Is it

14   fair to say that you made during a pretty hostile

15   portion of that time?

16       A    Yes, I had just been assaulted.

17       Q    Okay.  Isn't it true that on that post, you

18   posted an explicit photo of you and the victim having

19   sex followed by a caption stating that you were "done

20   with her," tired of dealing with her problems and

21   soliciting sex from other women?

22       A    That's correct.

23       Q    Okay.  Is it fair to say that she did not

24   give you permission to do this?

25       A    Why would she need to?  It's my copyright.

1      Q    Is it fair to say that she did not give you

2   permission to do this?

3      A    I don't need permission to post my own

4   images.

5      Q    Did you ask her at all for permission to

6   do this?

7      A    I did not ask her for permission nor do I

8   need to.

9      Q    Did she give you permission at all?

10      A    She has no right to give me permission.

11      Q    Is that a no?

12      A    She has no right to give me permission.

13            THE COURT:  Sir, you need to answer

14   the question.

15            THE WITNESS:  No.  Because she does not

16   have any ability to give me permission to post my own

17   images.

18   BY MS. ATWOOD:

19      Q    So it's your belief that regardless of how

20   explicit the image was of her or potentially harmful

21   it was to her that you could do it anyway?

22      A    Yes, under 106 of the Copyright Act.

23      Q    Okay.  Would you also agree that you posted

24   this particular content out of anger for her?

25      A    I posted it 'cause I wanted to have sex

1    with someone else because she had told me that she

2    wanted me to solicit sex with someone else.  And when

3    I had invited the neighbor over, she, instead,

4    assaulted me.

5        Q    But that has nothing to do with the -- the

6    text in that post, does it?  The text of that post,

7    you're saying you're done with her.

8        A    Yeah.

9        Q    You're tired of dealing with her stuff.

10   And you want --

11       A    And I want to have sex with someone else.

12       Q    -- someone else?

13       A    Yeah.

14       Q    Okay.

15       A    So, I mean, how is it not consistent that

16   I'm allowed to solicit sex from other people using my

17   own images?

18       Q    That wasn't my question.  Did you make this

19   post out of anger toward her?

20       A    I made this post 'cause I wanted to have

21   sex with someone else.

22       Q    So you --

23       A    And I was done with her as it says here.

24   "I am done with her.  I want to have sex with

25   somebody else."

1      Q     And you soliciting sex from another person,

2   why did you feel it was necessary to post a picture

3   of Ms. Vance without her permission?

4      A     'Cause I'm actually in the picture and it's

5   my picture.

6      Q     So it's not your testimony then that you

7   did this out of anger?

8      A     It says clearly, "I am done with her and

9   I'm looking for someone else to have sex with."

10      Q     I'm asking for a yes or no.  Where you

11   angry with her at this time?

12      A     I had been assaulted and I was done with

13   her.  I was done with the relationship.

14      Q     Is that a yes?

15      A     No.

16      Q     So you weren't angry with her at this time?

17      A     No, I didn't assault her.  I was just done

18   with her.  Had I been angry when she was trying to

19   attack me, I would have been obviously trying to

20   attack her, but I didn't.  I didn't assault her.  I

21   just told her to leave.

22      Q     I'm not asking about whether you assaulted

23   her.  I'm asking when you made this post, were you

24   angry with her?

25      A     I was done with her, which is what it says.

```
 1        Q    Is that a yes?

 2        A    I was ambivalent.  Is that an appropriate

 3   response?

 4        Q    Sure.  So we've already established that

 5   you didn't ask her for permission to post an explicit

 6   photo of her.

 7        A    Yeah, and --

 8        Q    But this wasn't the only time --

 9        A    Okay.

10        Q    -- that you refused to respect her wishes

11   or her consent, was it?

12        A    Well, the copyright says I'm the exclusive

13   person that can provide consent under 106 of the

14   Copyright Act.

15        Q    So to be clear, this was not the only time

16   you had violated her consent, was it?

17        A    She has no right to issue consent under the

18   Copyright Act.

19        Q    Is that a yes?

20        A    As I said, she has no right to issue

21   consent underneath the Copyright.  Furthermore, the

22   State is prohibited from conveying to anyone else

23   right to consent underneath the Copyright Act.

24        Q    So correct me if I'm wrong, but it sounds

25   like you're saying, yes, this was not the only time.
```

1      A    I am saying that you are wrong on a -- on a

2    fact of law.

3                 MS. ATWOOD:  Your Honor, can you direct

4    the witness to answer the question?

5                 THE COURT:  Sir, your answer is

6    non-responsive.  It will be stricken.  You need

7    to answer the question that's being asked of you by

8    the prosecutor.  You have an attorney who will assist

9    you if you need some assistance in redirect.

10   BY MS. ATWOOD:

11     Q    So I'll return to my question.  This was

12   not the only time that you refused to respect her

13   wishes or her consent, was it?

14     A    She has no ability to give me consent.  I

15   didn't ask her for consent.

16                THE COURT:  Mr. Barber, please answer

17   the question either yes or --

18                THE WITNESS:  This is not the only

19   time --

20                THE COURT:  -- no.

21                THE WITNESS:  -- I posted pictures

22   without seeking a consent that I don't need to

23   consent to.

24   BY MS. ATWOOD:

25     Q    So, yes?  You had done this without her

B. Barber - X                    537

1    consent before?

2        A    I don't need the consent, therefore, I did

3    not ask for a consent.

4        Q    Well, even aside from the issue of

5    violating her consent by distributing sexual images

6    of her --

7        A    So what right gives her the consent --

8        Q    -- you --

9            THE COURT:    Sir, you need to let her

10   finish the question before you respond.

11   BY MS. ATWOOD:

12       Q    There were other times throughout the

13   course of your relationship that we've discussed here

14   in the trial where you refused to follow her wishes

15   and did things without her consent, right?  I can be

16   more specific if you'd like.

17       A    Yes, please be more --

18       Q    Sure.

19       A    -- specific.

20       Q    So when she filed for divorce, it's true

21   that you refused to sign the divorce papers?

22       A    Yes.  I refused to sign a divorce paper

23   that was contrary to my marriage contract.

24       Q    Okay.  And in the months leading up to this

25   investigation, you continued contacting her despite

B. Barber - X                              538

1    numerous requests that you stop?

2         A    Which incidents are you referring to?  Are

3    you referring to in December 2015?

4         Q    I'm referring to several of the State's

5    exhibits.  Do you have those up here?

6         A    Are you talking about late 2015?

7         Q    Hold on.

8              (Pause in proceedings, 2:04 p.m. -

9    2:05 p.m.)

10   BY MS. ATWOOD:

11        Q    So in reference to State's Exhibits 5 and

12   6, isn't it true that you were also contacting her

13   without her consent?

14        A    Yes.  I was contacting her in these times

15   when she asked to not be contacted.

16        Q    Okay.  It's also your testimony -- it was

17   also your testimony on your direct examination that

18   you had no reason to believe that she wouldn't

19   consent to you disseminating sexual images of her

20   online.  Is that an accurate statement?

21        A    Can you rephrase the question?

22        Q    Did you testify on direct --

23        A    Mm-hmm.

24        Q    -- that you had no reason to believe that

25   she wouldn't consent to you disseminating images

1    online?

2         A    She had granted other people the right and

3    I owned the copyright and it clearly says in the

4    copyright that I have the exclusive consent to

5    distribute pictures that I own.

6         Q    So is that a yes?

7         A    Rephrase the question.

8         Q    It's your testimony today --

9         A    Mm-hmm.

10        Q    -- that you had no reason to believe that

11   she wouldn't consent to you disseminating things

12   about her online?

13        A    I would have no reasonable expectation that

14   she would have any right to object to my ability to

15   post pictures that I own of myself anywhere.  She

16   issued a copyright and I addressed the copyright by

17   saying that it is my copyright.

18        Q    You mean after she already found these and

19   contacted law enforcement to try to get them taken

20   off?

21        A    No.

22        Q    Is that the copyright you're talking about?

23        A    I'm talking about the Digital Millennium

24   copyright notice that I was given.

25        Q    In June?

1      A    I think she says it was in June, but I

2 don't recall if it was in June or earlier.

3      Q    So are you referencing Ms. Vance's

4 testimony that she sent a copyright request to a

5 pornography website that you had already posted

6 videos on asking them to be taken down?  Is that what

7 you're --

8      A    Yeah.  And --

9      Q    -- referring to?

10     A    -- they said somebody has issued a

11 copyright notice.  And clearly, according to the

12 Copyright Act in 201(E), it says the State can't give

13 anyone else consent.  And it says in 106, I'm the

14 only one that can give consent I am the, in fact, the

15 person that owns it.

16     Q    So -- I'm -- I'm going to stop you there.

17     A    Okay.

18     Q    I'd rather not get into copyright law right

19 now.  I'm asking you some pretty direct questions.

20     A    Yeah.

21     Q    So you'd acknowledge that you had -- you

22 felt that you had no reason to believe you didn't

23 have a right to do these things?

24     A    There -- I had never had any believe that

25 it was wrong for me to do these things.

1        Q    Okay.  But isn't it true that you received

2   a cease-and-desist notice in 2015?

3        A    It is true.  And in July 2015, she had

4   contacted me and we had sex and got back together

5   again.

6        Q    Sir, I'm going to ask you to be responsive

7   to my questions --

8        A    I did receive --

9        Q    -- and to limit your answers to the

10  questions.

11       A    I -- I did receive this, yes.

12       Q    Okay.  And isn't it true that that cease

13  and desist notice specifically states that Ms. Vance

14  felt that you distributing personal information

15  online against her, was harassing and intimidating?

16       A    And, again, we -- we were discussing this

17  about how I would be able to publish allegations

18  that she had made to other people.  And we had joint

19  custody --

20       Q    I'm sorry, sir.  I'm going to ask you

21  to answer --

22       A    Okay.

23       Q    -- the question.  Isn't it true that the

24  notice you received explicitly told you that she

25  found your actions harassing and intimidating?

1         A    I understand that she may feel that way.

2    But I have the ability to talk about truths to, say,

3    friends, say, to my website if I had a blog.  I could

4    talk about my life in a blog.  And just because

5    somebody asserts something doesn't make a -- a

6    necessity of fact.

7         Q    But you knew at that time that she believed

8    that you were harassing and intimidating her?

9         A    I understand that that's what she feels.

10    If she would like to have the only ability to talk to

11    our friends about our issues together, then I can

12    understand why she would want -- feel that was

13    harassing.

14         Q    Okay.  So I want to kind of move toward

15    what I believed your testimony was, although now, it

16    seems as though your testifying today that all of

17    your actions were lawful under your understanding of

18    the copyright law?

19         A    Yes.  Which expressly preempts State

20    attempts to override exclusive consent --

21         Q    Okay.

22         A    -- as provided in 106.

23         Q    So I want to go back to what you initially

24    said was the reason you did this in your direct.  You

25    stated that you repeatedly contacted her against her

1    will and -- and disseminated these videos on multiple

2    websites because you were extremely depressed at

3    the time?

4          A    I was extremely -- I was extremely

5    depressed.

6          Q    And you testified that -- but it was a

7    depression, that you were just lonely, but you

8    weren't angry?

9          A    I was extremely lonely and I was literally

10   living outside.  And I'm not sure if you've ever had

11   to live outside, but almost freezing to death gives

12   you a grim outlook on your life and your prospects.

13         Q    But is it your testimony that your -- you

14   weren't angry at the time?

15         A    No.

16         Q    But that's not what you told Ms. Vance,

17   was it --

18         A    I told --

19         Q    -- in the months leading up to this

20   investigation?

21         A    Yeah.  I told Ms. Vance that I had some

22   contempt for her actions.

23         Q    And that's not the only thing you said to

24   her, right?  You told her that she was the one who

25   ruined your life, that she was the one who caused all

B. Barber - X                    544

1   these things to happen to you?

2        A    I'm not sure where that is, but if you can

3   provide me with it --

4        Q    Certainly.

5        A    -- it may have very well have happened.  I

6   am upset that she may have tried to, for instance,

7   create events that did this to me.

8        Q    I'm going to ask you to --

9        A    Okay.

10        Q    -- hold on.  I -- I want to focus on the

11   question I actually asked.  So I'm going to read to

12   you what's been marked as State's Exhibit 7.  After

13   you --

14        A    May I see that exhibit, by the way, after

15   you're done?

16        Q    Sure.  After you stated that you have

17   contempt for Ms. Vance, isn't it true that you told

18   her that a lot of the circumstances you were in now

19   are a result of, "You ruining my relationships with

20   my landlords because of how shortsighted you were.

21             "I'm also upset that I worked to bring you

22   to Portland and keep you in school, yet you cared so

23   little about me that you want me to suffer in

24   homelessness"?  You said that to her?

25        A    Yeah.  And did I also say in that, I think

1    that I actually loved her?

2         Q    But it's fair to say that that was a pretty

3    angry time for you?

4         A    It was a pretty hopeless time.

5         Q    You also told her in 2015 that she was --

6    and pardon me, I realize we're in court.  You told

7    her that she was on your shit list.  Do you remember

8    that conversation?

9         A    I don't recall that conversation.

10        Q    Do you recall that part of the conversation

11   where you told her that retribution was on the

12   table.?

13        A    I don't -- I think that I was trying to

14   issue, like, an appeal of the marriage contract that

15   we had -- sorry, the divorce, rather, because she had

16   wanted me to pay for entire college education.

17        Q    Nevertheless, you told her she was on your

18   shit list and threatened her with retribution,

19   correct?

20        A    I -- I do not remember that.  I don't know

21   where it is, but I may --

22        Q    I can refresh your recollection.

23             (Whispered discussion, off the record,

24   2:12 p.m. - 2:13 p.m.)

25             MS. ATWOOD:  So I would like to -- do

1    you mind if I mark on this?

2    BY MS. ATWOOD:

3        Q    So do you remember the conversation with

4    Ms. Vance that you had back in July of 2015?

5        A    Oh, was this the one --

6        Q    It's the same conversation where you

7    mentioned --

8        A    -- that we got back together, right?

9        Q    -- the doxing.

10       A    Yeah.  And then I think we got back

11   together right after this.

12       Q    So you recall that conversation?

13       A    Yeah.

14       Q    Okay.  So do you remember the bracketed

15   portion of that conversation?

16       A    Let me see the (indiscernible).

17           (Pause in proceedings, 2:13 p.m. -

18   2:14 p.m.)

19           THE WITNESS:  Yeah, I was -- we had an

20   internet conversation that happened before I was

21   going to appeal the divorce decree that had me

22   essentially paying for her college education despite

23   the fact that I was doing her homework for her.

24   BY MS. ATWOOD:

25       Q    So it is true then that you told her,

1    "Quite frankly, you are still on my shit list and

2    have not redeemed yourself.  While knowledge is

3    freely given, retribution is still on the table"?

4         A    Yeah.

5         Q    Okay.  Now, you also heard two witnesses

6    testify so far in this trial that you made

7    another threat in 2015 to create a website called

8    meaganvance.net and post her sexual transgressions;

9    is that accurate?

10        A    That's actually not accurate.

11        Q    You did create that website?

12        A    I did create the website.  It had a shampoo

13   thing on it.  That's all that it had.  In regards to

14   what I was planning on putting on it was essentially

15   the chat logs, all the chat logs that we ever had

16   together.

17             And that was, apparently, from what I've

18   heard from Ms. Vance's testimony, the reason why she

19   had her acquaintances put our pornography on the

20   internet.

21        Q    Well, let's be clear.  Her testimony was

22   that she had told people she was worried you were

23   going to put those things on the internet?

24        A    I thought that, to be clear, she was the

25   one that gave them the URL and that they were trying

1    to protect her by putting our pornography on the

2    Internet.

3         Q    No, that's not what she testified.

4         A    That, I think, is actually what she

5    testified.  I guess we could probably get a copy of

6    that to be more precise.

7         Q    Well, I'd like to focus on your testimony

8    for the time being.

9         A    Okay.

10        Q    So despite the fact that you had repeatedly

11   contacted her without consent, expressed your anger

12   to her, threatened retribution toward her and, in

13   fact, posted, without her permission, in anger,

14   explicit videos online, you're testifying today that

15   when you posted these videos it wasn't out of anger

16   or for revenge?

17        A    No.  I was posting at the same time as I

18   posting this -- quite literally everything else that

19   I have.  And there's also a GitLab which has similar

20   records showing, essentially, uploading 40

21   repositories or so of code that I've created at the

22   same time.

23             There's also (indiscernible) stuff on

24   Facebook where it shows me uploading all the rest of

25   the things I had at the time.  I had no money, so if

1    I have no money, what happens is it all gets deleted,

2    just as the server that I had when I was in jail got

3    completely deleted because I couldn't pay for it.

4         Q    So that's a yes that you weren't posting

5    these videos for revenge?

6         A    I was posting it because if I didn't post

7    it, it was going to get deleted.  And I had no money.

8    I was thinking about killing myself.  I was thinking

9    about walking in front of a bus.

10        Q    But you didn't try to find any other means

11   to preserve these that might not completely ruin

12   someone's life?

13        A    How am I going to preserve them if I'm

14   dead?

15        Q    Well, did you make any attempts to ask

16   Ms. Vance whether or not maybe she wanted them?

17        A    I thought you said that I wasn't supposed

18   to contact her.

19        Q    I haven't told you anything, sir.

20        A    Okay.  I --

21        Q    I'm asking you --

22        A    -- I was underneath the impression that --

23        Q    Did you try --

24        A    -- I was underneath the impression that she

25   didn't want me to contact her.  And I'm not going to

1    make her more angry.  I know what happens when I make

2    her angry.  So I wouldn't have talked to her.  I

3    wouldn't have put -- I wouldn't have sent these

4    to anyone because it would obviously make her

5    extremely angry.

6         Q    But you had talked to her consistently in

7    the months leading up to when you did this and you

8    continued to talk to her after you did this.

9         A    How consistently is once every month or

10   two months?

11        Q    You just stated, sir, that you didn't feel

12   that you were allowed to talk to her about whether or

13   not it was okay to post these videos.

14        A    The few times that I did talk to her, it

15   was times where I was extremely suicidal, feeling

16   upset.  And I'm sorry that I -- I would -- I actually

17   apologized saying, "I'm sorry I'm burdening you

18   because I feel so bad about myself right now."

19             And when I have no one to talk to and I'm

20   feeling in dire straits, that she's the only person

21   that understands who I am and why I'm trying to reach

22   out.  And --

23        Q    So to be clear --

24        A    Yeah.

25        Q    -- you never tried to revisit that topic

1    with her?

2         A    I never tried to revisit that topic.

3         Q    And to be clear --

4         A    I'm not going to try and --

5         Q    -- she never gave you permission to

6    disseminate these?

7         A    She has no reason to give me permission

8    because they are all mine and the Copyright Act that

9    gives me exclusive right to consent to the

10   distribution.  And in Section 201 says the State is

11   prohibited from transferring or expropriating those

12   rights.

13        Q    So that's a no, she never gave you

14   permission?

15        A    Why would she have the ability to give me

16   permission?  Why would it matter?

17        Q    Sir --

18        A    They are my pictures.  I took them.  As far

19   as I'm concerned, they're mine.  I -- that's why I

20   wouldn't go asking people.

21             And I wouldn't go try and rub salt in the

22   wounds and say, "Hey, ha-ha-ha.  I have these

23   pictures of you.  I'm putting them online,' cause, of

24   course, what's going to happen is I'm going to have

25   her army of protectors --

B. Barber - X                    552

1        Q    I'm going to -- going to ask you --

2        A    -- that'll to come after me again.

3        Q    -- to return to my question.

4        A    Okay.

5        Q    Did you ever ask her permission?

6        A    Why would I have needed to?

7             THE COURT:  I think that this has

8   been --

9             MS. ATWOOD:  Thank you, Judge.

10            THE COURT:  -- asked and answered.

11            MS. ATWOOD:  I'll move on.

12  BY MS. ATWOOD:

13       Q    I also want to talk to you a little bit

14  about the issue of the doxing in July 2015.  You

15  testified that you had heard these videos were

16  accessed and it was your understanding, from talking

17  to Ms. Vance, that she didn't care, more or less,

18  because she said that she had also heard about it.

19       A    The response was one line, that she had

20  heard about it.  And she did not express any sort of

21  concern whatsoever.  We have both been completely

22  nude in public, photographed by the newspaper, of all

23  people, being naked.

24            I have no shame about having done that.

25  I have no shame about having sex or having a

1    sexually-adventurous lifestyle.  I don't know why

2    she would have any shame for doing that.  I

3    understand that she now believes that she doesn't

4    want me to do that.

5         Q    I'm going to ask you to --

6         A    Yeah, so what's the question?

7         Q    -- please answer my question.

8         A    Sorry.

9         Q    So it was -- it's your belief that she

10   didn't care because of the nature of the statement

11   that she responded to you, that she had heard

12   about it?

13        A    It is my assumption that if she had cared

14   she would have stated, "I care.  Oh, my God.  I'm

15   going to call the police.  These people put our

16   pornography on the internet.  We should have them

17   arrested and put in jail for two months."

18        Q    So she never told you that she was happy

19   about it?  She never told you that she was okay with

20   it?

21        A    Well, apparently, she was the one that

22   provided it to them.

23        Q    I'm asking you a yes-or-no question.

24        A    She never gave me any description of how

25   she felt about it at all, other than she had heard

B. Barber - X                         554

1    about it.  And, apparently, she had provided it to

2    them.

3        Q    And you've stated that you didn't care if

4    other people accessed these videos at that time

5    because it was not affecting your material

6    circumstances, right?

7        A    Yeah.  It -- everyone knows -- everyone

8    that knows us knows about this sort of stuff.

9        Q    Well, and at the time, to be clear, wasn't

10   this when you were suffering with unemployment,

11   homelessness?

12       A    At this time, I had, I think, left my job

13   about a month prior.

14       Q    Okay.  So there weren't really very many

15   material circumstances to be affected?

16       A    Well, the reason why my material

17   circumstances and been affected were more about the

18   other accusations that had been lodged.

19       Q    I'm just asking you whether or not --

20       A    Well, I could --

21       Q    -- there are very many material

22   circumstances --

23       A    -- I could perhaps find another job, right,

24   if I wanted to and it wouldn't have materially

25   effected those circumstances either.

1          Q    Well --

2          A    -- because it happened.

3          Q    -- let's be clear.

4          A    Yeah.

5          Q    Your material circumstances are pretty

6    affected now, right?  You testified all about your

7    new job at Intel?

8          A    Yeah, and that was affected by

9    incarceration.  If someone had found this online, it

10   would have not have effected my job.  And, in fact,

11   I'm fairly certain that it's actually prohibited from

12   discriminating against people for what's called

13   gender expression in the State of Oregon.

14              So she also would have been protected by

15   law.  Gender expression includes speech and this is a

16   form of speech.

17         Q    So returning to my questions, now your

18   material circumstances are effected by this whole

19   situation, right?

20         A    Yes --

21         Q    It's pretty upsetting?

22         A    -- because of incarceration.

23         Q    So you would agree that's reasonable for a

24   person to experience harm when something like this

25   gets out about them?

1        A    I think it would be -- it would cause

2    material harm to arrest somebody for something that

3    shouldn't be a crime, certainly.

4                  THE COURT:  Mr. Barber.

5                  THE WITNESS:  Yes.

6                  THE COURT:  Please, listen to the

7    question and answer the question.

8    BY MS. ATWOOD:

9        Q    Is it your testimony -- well, let me back

10   up.  Would you agree that it's reasonable for a

11   person to feel harmed by sexually-explicit images

12   being released without their permission?

13       A    Well, if what your question is as to

14   whether or not Meagan would be arrested --

15       Q    No, that is not my question.

16       A    Well, the -- 'cause they were my photos.

17   They were distributed without my permission by

18   Mrs. Vance.  So if your question is if somebody would

19   be harmed by send -- by sending my sexually-explicit

20   photos without my permission and incarcerated, then,

21   yes, it would harm them.

22       Q    That's not my question, sir.  Is it -- do

23   you truly believe that it's impossible to be harmed

24   by someone disseminating explicit photos of you

25   without your consent?

1        A     It is -- it is prohibited to discriminate

2   against someone for gender expression, which includes

3   speech.  And that is in the State of Oregon.

4        Q     So is -- that's your belief.  Your belief

5   is that this all okay because it's your speech?

6        A     I think that not only is it okay, but I

7   think that everyone who knows us personally already

8   knows about this.  And what you do in your home stays

9   in your home.  What you do at work has nothing to do

10  with what you do in your home.

11       Q     Exactly, right?

12       A     If people -- if people -- yeah.  And if

13  somebody at work place had complained, they would be

14  breaking the law.

15       Q     So I -- I'd like to talk about what you

16  just said.  What you do in the home stays in the home

17  and what you do at work should not have to be

18  affected by that, right?

19       A     That's why I don't send --

20       Q     These videos were something you and

21  Ms. Vance made at home privately with each other

22  while you were married or dating, correct?

23       A     While we married, we made these photos,

24  yes.

25       Q     And since then, you've gone through a

 1    hostile divorce, been issued a cease-and-desist

 2    notice, multiple times told her that you have

 3    contempt for her, correct?

 4        A    I have told her that I have contempt for

 5    the things that she has done, which is, I think, what

 6    I was talking about regarding the circumstances that

 7    she had done when I say about ruining my relationship

 8    with my landlord.

 9        Q    And now --

10        A    So you can --

11        Q    -- you're aware --

12        A    -- can you love -- what -- can love

13    somebody and have contempt for their actions?

14        Q    I'll -- I'll be asking the questions

15    here today.

16        A    Okay.

17        Q    So now, you're aware that Ms. Vance has a

18    job a special education teacher, right?

19        A    Yeah.

20        Q    At a middle school?

21        A    Yeah.

22        Q    That she's in a relationship?

23        A    I understand, yeah.

24        Q    That she's moved on from your relationship?

25        A    Yeah.

1     Q     And that she wants nothing to do with you?

2     A     I understand.

3     Q     Okay.  And you don't believe that that

4  changes things as far as her consent would be

5  concerned with you disseminating these?

6     A     Because that consent is legally protected

7  underneath federal law, which preempts state law.

8     Q     So what's the answer to my question?

9     A     Do I think it would harm her?

10    Q     No.  Do you -- Do you not think that that

11  would change her consent if it was ever given?

12    A     There's no consent needed because she is

13  prohibited from having such consent.

14          MS. ATWOOD:  I have no further

15  questions, Your Honor.

16          THE COURT:  Mr. Taylor.

17               REDIRECT EXAMINATION

18  BY MR. TAYLOR:

19    Q     Mr. Barber, I'm going to move through in

20  kind of a narrative fashion what Ms. Atwood went

21  through with you.  The first couple of topics you

22  guys talked about where your sort of progressive sex

23  life.

24    A     Yeah.

25    Q     How many years -- can you give me a date

B. Barber - ReD                                        560

1    range that you guys were involved in that?

2        A    The progressive sex life?

3        Q    Yes.

4        A    I would say three.

5        Q    All right.  Was that during the same period

6    that you guys participated in the World Naked Bike

7    Ride a couple times?

8        A    Yeah.

9        Q    And was Ms. Vance teaching at that time?

10       A    Yes, she was.

11       Q    All right.  So Ms. Atwood asked you several

12   questions about this discussion that was had

13   supposedly between you, Ms. Vance and Mr. Goldstein

14   was perhaps there as well, this conversation about an

15   internet website.  Do you recall Ms. Atwood asking

16   you those questions?

17       A    Yeah.

18       Q    All right.  So Ms. Atwood linked those to

19   sexual transgressions.  Do you recall her asking you

20   that question?

21       A    I recall her asking that question.

22       Q    Do you recall ever saying anything about

23   a threat to post sexual transgressions or just

24   transgressions?

25       A    Transgressions.  More precisely, all the

1    chat logs that we had accumulated because anyone who

2    sees those chat logs are immediately incensed by the

3    duplicitous nature of her communications.

4         Q    So there was no mention of sexual

5    transgressions?  Do I understand that correctly?

6         A    Yeah, that's correct.

7              MR. TAYLOR:  If I can -- I need to

8    approach and have a look at a couple of those

9    exhibits.

10             (Pause in proceedings, 2:26 p.m. -

11   2:27 p.m.)

12   BY MR. TAYLOR:

13        Q    Ms. Atwood asked you some questions about

14   State's Exhibit 7.

15        A    Yeah.

16        Q    Do you recall that?  That's the e-mail that

17   involves the contempt line.

18        A    Yeah.

19        Q    What is the date on that e-mail?

20        A    That is May 30th, 2016.

21        Q    So do I understand correctly that that

22   would be a -- at least nearly two months after these

23   videos were posted?

24        A    Yeah.

25        Q    So this bit about contempt came after that?

```
 1         A     After the posting the photos?

 2         Q     Right.

 3         A     Yeah.  And it also says that I love her,

 4    which means that you can love somebody and not like

 5    the things that they do.

 6         Q     Understood.  Ms. Atwood also asked you

 7    several questions about this cease and desist that

 8    you received?

 9         A     Correct.

10         Q     Do you recall when you received that?

11         A     That, I think, is dated April of 2015.

12         Q     Was that during the divorce proceedings?

13         A     That was during the divorce proceedings.

14         Q     Subsequent to that, for example, July 2015,

15    did Ms. Vance initiate conversations with you?

16         A     That was the thing where she talked about

17    the shit list.  And after we had discussed that, we

18    had --

19         Q     So is that --

20         A     -- gotten back together.

21         Q     Is that yes or no after this cease and

22    desist?

23         A     Yeah, that's after this.

24         Q     Thank you.  You spent a lot of time talking

25    to Ms. Atwood about copyright, free speech, things
```

1    like that --

2         A    Yeah.

3         Q    -- correct?

4         A    Yeah, that's correct.

5         Q    At the time that you posted these videos,

6    were you thinking any of that stuff?

7         A    No.  I wasn't thinking about that at the

8    time, but it's come to my attention now that it's

9    become a big issue in my life.

10        Q    So all your looking into copyright and

11   First Amendment stuff and all that came after this

12   case started?

13        A    Yeah.  I mean, at the time I knew that they

14   were mine.  I'm in it.  And I have a cursory

15   knowledge of copyright because I deal with computer

16   code.

17        Q    When you were posting these images, were

18   you thinking about that stuff?

19        A    Well, I mean, I know that I'm not supposed

20   to post things I don't own because that's how you get

21   in trouble for copyright infringement.  I can't post

22   someone else's code.  I can't post someone else's

23   pictures.  I can only post my own things that I make.

24             MR. TAYLOR:  All right.  Thank you.

25   Those are all my questions.

1            THE COURT:  Okay.  Mr. Barber, you may

2    step down.  Thank you.

3            MR. TAYLOR:  Judge, I'm just returning

4    the exhibits to the Court.

5            THE COURT:  Thank you, Mr. Taylor.

6            MR. TAYLOR:  And, Judge, that's all we

7    have for the defense.

8            THE COURT:  Okay.  Thank you.

9            MR. TAYLOR:  We rest at this time.

10           THE COURT:  Thank you, very much.

11           Ms. Atwood, did you have any rebuttal?

12           MS. ATWOOD:  I do, Judge.  But can I ask

13    for a brief recess?

14           THE COURT:  Okay.

15           MS. ATWOOD:  Thank you.

16           THE COURT:  All right.  We're going to

17    take a brief recess.

18           And I'm assuming it won't be more than

19    five minutes?

20           MS. ATWOOD:  No, that should be fine.

21           THE COURT:  So you'll have time to walk

22    in the door, close it and come back out.

23           MR. TAYLOR:  A little exercise.

24           (The following proceedings were held in

25    open court, out of the presence of the jury,

1    2:30 p.m.)

2                    MS. ATWOOD:  Thank you, Judge.  I just

3    wanted to make sure that (indiscernible).

4                    THE COURT:  Sure.

5                    (Recess taken, 2:31 p.m. - 2:33 p.m.)

6                    THE COURT:  I guess I only gave them

7    three minutes.

8                    Okay.  Ready?

9                    MS. ATWOOD:  Yes, Judge.

10                   THE COURT:  Okay.  We'll go ahead and

11   bring the jury back in.

12                   (The following proceedings were held in

13   open court, the jury being present, 2:35 p.m.)

14                   THE COURT:  All right.  Ms. Atwood, you

15   may call your next witness.

16                   MS. ATWOOD:  Thank you, Judge.  The

17   State will recall Meagan Vance.

18                   THE COURT:  You're still under oath.

19   Thank you.

20                      ***MEAGAN VANCE***

21   Was thereupon recalled as a rebuttal witness on

22   behalf of the State; and, having been previously

23   sworn, was examined and testified as follows:

24   ////

25   ////

<u>DIRECT EXAMINATION</u>

BY MS. ATWOOD:

    Q   So you just heard quite a bit of testimony
and there's a couple of things I want to ask you
about, starting with a -- an exhibit that was entered
into evidence that I will refer you to if I can find
it.  So this is State's Exhibit 17.  Are you familiar
with what's depicted in that exhibit?

    A   Yeah.

    Q   And that's a sexually-explicit photo of you
and the defendant?

    A   Yes.

    Q   You heard some testimony and some questions
about that exhibit and, specifically, that the
defendant testified that the reason he posted it was
because you assaulted him.  Were you ever charged
with any crime?

    A   No.

    Q   Has the record of that incident been
expunged?

    A   Yes.

    Q   The next thing I want to ask you is just a
couple of questions turning back to this relationship
the two of you had with another couple.  You heard
some testimony from the defendant about you

1    participating mutually in the dissemination of images

2    of yourself to this other couple.  Did you ever send

3    any images to them?

4         A    No.

5         Q    Did you ever instruct the defendant to send

6    any images to them?

7         A    No.

8         Q    Did he ever ask or receive your permission

9    to disseminate the images he did send to them?

10        A    No.  He -- he told me about it after the

11   fact.

12        Q    And is that what we're referring to when we

13   say you were CCed later in the e-mail?

14        A    I don't remember if I was CCed, but I

15   was told.

16        Q    Okay.  The last thing I want to discuss

17   with you is a couple of statements that the defendant

18   made about false allegations that you made in the

19   past, specifically stating that he has a belief that

20   you were out to hurt him.

21             And we've -- you acknowledge that during

22   the course your divorce there were some mutual

23   arguments and threats between the two of you, right?

24        A    Yeah.

25        Q    When you contacted police for purposes of

1    the investigation of this case, what was your

2    motivation?

3         A    I wanted the images gone -- or the videos

4    gone.  I -- I wanted help with getting them gone.

5    And I knew that contacting him wouldn't get them

6    gone, so -- and I was just trying to get rid of them.

7              MS. ATWOOD:  Those are all my questions.

8    Thank you.

9              THE COURT:  Thank you.

10                   CROSS-EXAMINATION

11   BY MR. TAYLOR:

12        Q    Ms. Vance, just one or two things.

13   Ms. Atwood asked you some questions about that

14   assault.  So you were in fact, arrested for Assault

15   against Mr. Barber?

16        A    I was arrested for domestic violence,

17   Harassment.

18        Q    Thank you.  And Ms. Atwood asked you about

19   that being expunged, correct?

20        A    Yeah.

21        Q    And you, in fact, filed for that

22   expungement about a week after Mr. Barber was

23   investigated in this case?

24        A    I filed for the expungement this summer.

25   I -- now that you mention, it -- it is around the

 1    same time.

 2          Q    June 28th sound correct?

 3          A    I think so.

 4                MR. TAYLOR:  Thank you.  Those are all

 5    my questions.

 6                THE COURT:  Okay.  Any redirect?

 7                MS. ATWOOD:  Nothing, Your Honor.

 8                THE COURT:  Okay.  Ms. Vance, you may

 9    step down.

10                THE WITNESS:  Thank you.

11                THE COURT:  Anything else, Ms. Atwood?

12                MS. ATWOOD:  No, Your Honor.

13                THE COURT:  Okay.  So are you ready to

14    proceed into closing?

15                MS. ATWOOD:  Yes.  I just have a little

16    bit of setup to do.

17                THE COURT:  Okay.  So at this time, the

18    State has rested and we're going to hear the

19    attorneys' closing arguments.

20                (Pause in proceedings, 2:39 p.m. - 2:41

21    p.m.)

22                MS. ATWOOD:  May I proceed, Your Honor?

23                THE COURT:  Yes, please.

24                      CLOSING ARGUMENT

25                MS. ATWOOD:  So you've heard a lot of

State's Closing Argument                    570

1    evidence so far in this case and this is a -- as --

2    as you heard already from the judge, a fairly lengthy

3    statute that we're dealing with.

4              So what I've done is prepared a

5    PowerPoint to help us get through closing arguments

6    so that you can reference some of the things that

7    you're going have to be deciding later on in your

8    deliberations while I'm arguing.

9              So I first want to talk about the

10   purpose of closing argument.  There's a number of

11   things that I'm going to do and that you're going to

12   have to do in your role as jurors in this case.  The

13   first thing that I want to go over with you is just

14   to review the law.

15             It's been since the beginning of this

16   trial that we've actually talked about what the

17   statute says, so before I proceed with any discussion

18   of the evidence or the facts, I'm going to go over

19   line by line every single element of the statute,

20   what the definitions are and what everything means so

21   that we're on the same page before we talk about how

22   to apply the facts.

23             So after we review the law, what we're

24   going to do is review the evidence.  There's a lot of

25   it in the form of exhibits, testimony.  There's

1    computer disks, there's videos, there's images.  We

2    have a lot to work with here.

3                But I'm going to try to get through most

4    of it during my closing and you'll have it all of it

5    for your review during your deliberations.  And

6    what's important to know going forward is the

7    difference between the evidence and the facts.

8                So there's two sides to this case, as

9    you can see.  And both sides have put forth evidence

10   of their own and as I'm sure you can see, those sides

11   don't jive.  So you're going to have to decide in

12   your role as jurors what the actual facts are.

13               You take the evidence and decide what

14   parts of it are worthy of your consideration based on

15   what you believe is valuable and credible and that's

16   what you decide the facts from.  So after you review

17   the evidence, we're going to go over some jury

18   instructions.

19               You're going receive a large packet

20   of information from the judge that includes these

21   instructions, but there's a few of them that I want

22   to talk to you about during my closing arguments.

23   And I want us to recall some of our earlier

24   discussion.

25               It's been since yesterday morning since

1    either of us had a chance to talk to you guys, but I

2    think that you'll find during your deliberations that

3    a lot of what we talked about is going to be pretty

4    relevant to how you decide this case.

5                     So starting just from the top, Unlawful

6    Dissemination of an Intimate Image.  This is the

7    charge that is in each and every single count in this

8    case.  So they're all the same.  I'm going to go over

9    the elements one time, but the elements remain

10   consistent throughout your deliberations.

11                    So what the State has to prove to

12   establish the crime of Unlawful Dissemination of an

13   Intimate Image is, first of all, that the crime

14   occurred when we said it did.  And I don't think

15   you're going to hear any real argument as to that

16   point.  It's not exactly in contention when these

17   videos were posted.

18                    But as the State has charged it, the

19   videos were posted sometime between January 1st and

20   June 21st of 2016.  Now, the first element you're

21   going to have to decide on is whether the defendant

22   knowingly caused images to be disclosed through an

23   internet website, whether those images were

24   identifiable images of the victim and -- whose

25   intimate parts were visible or who was engaged in

State's Closing Argument                573

1    sexual conduct.

2              You're going to have to decide whether

3    the defendant knew or reasonable should have known

4    that the victim did not consent to that disclosure.

5    You're going to have to decide whether the

6    intended -- whether the defendant intended to harass,

7    humiliate or injure the victim when he acted.

8              And along side that, you're going to

9    have to decide whether the victim was, in fact,

10   harassed, humiliated or injured by that disclosure

11   and, finally, whether a reasonable person in that

12   position would have felt harassed, humiliated or

13   injured by that disclosure.

14             So I'm going to start with the very

15   first element.  Of course, as anything in the law,

16   there are definitions within definitions.  So the

17   defendant knowingly disclosed -- or caused images to

18   be disclosed through an internet website.

19             There's a few parts that you're going to

20   have to be working with here, the first being the

21   definition of "knowingly," what it means to do

22   something with knowledge under the law in the State

23   of Oregon.

24             "Knowledge" means that a person acts

25   with awareness that their conduct is of a particular

1    nature or that a particular circumstance exists.  So

2    we talked about this in jury selection, how you can

3    tell when someone means to do something versus a

4    mistake, whether they're aware of the circumstances

5    versus unaware.

6                    That's the kind of deliberation you're

7    going to be dealing with when you're determining

8    whether someone acted knowingly.  Knowingly is the --

9    I'll call it the second highest level of culpability.

10                   Intentionally is the highest, when a

11   person acts with a conscious objective.  The second

12   prong down is knowingly, whether they act with an

13   awareness.  So the second piece of this element is

14   the definition of an image.  I don't think that this

15   is really a point of contention.

16                   The images involved in this case were

17   videos and I don't think you'll hear much by the way

18   of contradictory argument on the point, but that's

19   the definition.  And, finally, what it means to

20   disclose.  This includes a lot of things.

21                   You can disclose something by

22   transferring it to another person, by distributing it

23   to several people, by exhibiting it, not necessarily

24   giving to anyone, by advertising someone to try to

25   access it or offering to, you know, disclose it to

State's Closing Argument                575

1    someone.

2              So there's a lot of possibilities there.

3    And you're going to be required to determine whether

4    or not one of those things happened in this case.  So

5    the second element that you'll be working with is

6    whether or not the image was an identifiable image of

7    the victim whose intimate parts were visible or who

8    was engaged in sexual conduct.

9              So "intimate parts" has a definition

10   that is fairly self-explanatory and I'm sure you guys

11   will have no problem determining that.  And -- and I

12   don't think that it'll be a huge point of controversy

13   in the defense's closing argument whether or not

14   intimate parts were visible or sexual conduct

15   occurred in the videos at issue in this case.

16             You'll also be given some further

17   definitions regarding what "sexual intercourse"

18   versus "deviate sexual intercourse" means.  Those

19   mean slightly different things.  "Sexual intercourse"

20   has its normal meaning as you might expect.

21             "Deviant sexual intercourse" can include

22   things like types of oral sex, but I'll think you

23   find that sexual conduct was included in these videos

24   that were diseminated.

25             So the third element of Unlawful

1    Dissemination is whether or not the defendant knew or

2    reasonably should have known that the victim did not

3    consent to the disclosure of the images.  Again, the

4    same definition applies for "knowingly" or with

5    "knowledge," whether he had an awareness that there

6    was no consent.

7              But in this case, the statute also says,

8    "Reasonably should have known."  So you're working

9    with both whether or not there's evidence of his

10   subjective knowledge or whether or not, objectively,

11   he should have known under those circumstances.  And

12   this is an "or," so either one of those that you find

13   would apply.

14             Next element, whether or not the

15   defendant acted with the intent to harass, humiliate

16   or injure the victim.  Now, "intentionally" and "with

17   intent," as I mentioned before, is a bit of a higher

18   standard as far as culpability is concerned.

19             When someone acts intentionally, the

20   State has to show that the person acted with a

21   conscious objective to cause a certain result or to

22   engage in a particular type of conduct.

23             And in this case we know what the

24   conduct was and the result, obviously, is this

25   harassment, humiliation and injury.  And what's going

State's Closing Argument                577

1    to be important to you when you're working through

2    the evidence and deliberating is thinking about all

3    those things we discussed in jury selection.

4              When I asked you, how can you tell when

5    a person intends to do something versus when it's an

6    honest mistake or when it's not culpable, you think

7    about a person's statements.  You think about the

8    circumstances, the relationship in question.

9              You think about whether or not there's

10   any evidence of motive or bias.  Those are all going

11   to be very relevant to your determination in this

12   case.  So the next element, of course, is whether the

13   victim was, in fact, harassed, humiliated or annoyed

14   by this disclosure.

15             This is a subjective standard and you're

16   going to have to decide whether or not, based on the

17   testimony, of the victim in this case, Meagan Vance,

18   she was harassed, humiliated or injured.  And I -- I

19   don't think that that's going to be a real point of

20   contention either.

21             She testified very clearly how this is

22   affecting her life.  But we'll get back to the pieces

23   of evidence that are relevant to this element later.

24   And, finally, the last element, whether a reasonable

25   person in this situation would be harassed,

State's Closing Argument                578

1    humiliated or injured by the disclosure.

2              So this is the objective standard that

3    is supposed to, you know, counter balance whether or

4    not the victim was subjectively harassed or

5    humiliated or injured by the conduct.

6              And we talked about this in jury

7    selection, too.  What are some scenarios where a

8    person -- where it might not be reasonable for them

9    to be harmed by this content or by this act being

10   committed against them?

11             So when you're thinking about the

12   circumstances of this case and the effects that it's

13   had on the victim, you'll have to ask yourselves

14   whether or not a reasonable person would have felt

15   the same way.  So that takes us through all of our

16   elements.

17             And when you look at the elements as a

18   whole, I think you'll find that you can kind of

19   categorize them a little bit.  The first two

20   elements, whether or not the defendant knowingly

21   caused the images to be disclosed and the nature of

22   the images themselves, really hits at the point of

23   what the defendant did, what actually happened.

24             The next two elements, whether the

25   defendant knew or should have known there was no

1   consent and whether he acted with the intent to

2   harass, humiliate or injure, those two elements

3   really get at what the defendant's state of mind was.

4             And, finally, the last elements

5   regarding whether the victim was harassed, humiliated

6   or annoyed and whether a reasonable person would have

7   felt the same, obviously, get at the result from the

8   defendant's conduct.

9             So the -- in the big scheme of things,

10  the -- the type of things that you're going to

11  deliberating on are, what happened?  What was in the

12  defendant's mind?  And how did it affect the victim?

13            So let's talk about what the defendant

14  did.  The defendant posted sexual videos of the

15  victim to numerous pornography sites throughout the

16  spring of 2016.  Now, how do we know he did that?

17  You've heard testimony to that effect.  You'll see

18  exhibits to that effect.

19            Some of those exhibits were not actually

20  displayed during the course of trial.  And that's

21  something that I should sort of offer as a -- a

22  general disclaimer.  You guys saw me offer several

23  disks that the officers have used to compile their

24  screenshots and video captures of this evidence.

25            And it's important for me to address

1    that.  This case is about images being disclosed to

2    people the victim didn't know without permission.  So

3    those were not displayed to you in court.

4                But you're free to watch them, view

5    them, peruse them as much as you'd like during the

6    course of your deliberations, because there is

7    significant data in there that's going to be

8    important to your deliberations.

9                So let's talk again about what the

10   defendant actually did and how we know he was the

11   person who distributed these videos and how he did it

12   and when.  First and foremost, he was the only person

13   who had the videos.  The victim told you that they

14   record them on his phone.  He was the person who

15   owned that phone.

16               She never received a copy of them.  And

17   by their own agreement, they were not supposed to be

18   distributed to anyone else.  And, of course, we have

19   ample evidence, both by the way of testimony and the

20   exhibits you're going to have your disposal, that the

21   videos were found on these websites linked to the

22   defendant's go-to user name.

23               The victim testified that he has used

24   the same user name, BarberB, throughout the course of

25   the entire time she has known him.  So that's another

1    element -- or fact that points to the -- the fact

2    that the defendant was the one who engaged in this

3    conduct.

4            So along the same lines with what the

5    defendant did, these videos were identifiable.  You

6    can watch the videos if you feel that that's

7    necessary, but the testimony sufficiently established

8    that you can see the victim's face, you can hear her

9    voice, you can see both of their entire bodies.

10           They're occurring in the defendant's

11   home.  Both parties are easily identifiable in the

12   videos.  And not only is she identifiable visually,

13   she's identifiable by her medical condition and the

14   fact that the defendant labeled the videos "Albino

15   Porn."

16           And you heard her own testimony that

17   she's about it as far as that particular fetish is

18   concerned.  And she was identifiable by name.  All

19   she had to do was Google her own name and the -- the

20   comments associated with the videos led to them.

21           So we know that the defendant posted the

22   videos.  We know that she's identifiable in the

23   videos.  And we know, obviously, that sexual and

24   intimate parts and sexual conduct was occurring in

25   the videos.

1          And just to top it all off, besides the

2    circumstantial evidence, the exhibits, the testimony

3    of numerous witnesses, the defendant admitted that he

4    posted these videos.

5          And, of course, the defendant's

6    admission to posting them in a very limited fashion

7    is contradictory to a lot of the evidence that you're

8    going to see.  But we can get to that later.

9          So following up, what was the

10   defendant's state of mind when he did it?  He knew

11   that she did not consent to this disclosure.  He took

12   the stand in front of you, of course, and said that

13   she didn't have the right to consent to the

14   disclosure.

15          But the fact that she had had a concrete

16   conversation with him prior to the making of the

17   videos established that she did not consent to that

18   disclosure.  The fact that they never revisited that

19   conversation after, initially, her saying, "Don't

20   disseminate these," shows that he knew that she did

21   not consent to that disclosure.

22          And to top it all off, the fact they --

23   these videos where made when they were in a committed

24   relationship and the only things to follow that were

25   hostility and divorce, cease-and-desist notices, the

1    defendant clearly knew that she did not consent to

2    him disseminating these videos.

3                    Now, the defendant was aware of the

4    victim's new job and her relationship.  And this is

5    particularly relevant to whether or not he knew about

6    the consent because, as the victim testified to,

7    there conversation about making them in the first

8    place included her main concerns, which were not

9    destroying her job prospects.

10                   And she managed to get the job that she

11   had been working for for so long, so the defendant

12   had no reason to believe that it would have been okay

13   now to disseminate these photos.  Again, the victim

14   repeatedly tried to get the defendant to stop

15   contacting her.

16                   And that is analogous to this whole

17   situation.  He repeatedly disregarded her requests.

18   You've seen the evidence and heard the testimony.  He

19   made it a habit to do things without her consent.

20   Regardless of whether she told him and how many times

21   she told him, it was hurting her.

22                   Once caught, the defendant tried to

23   cover his tracks.  That is what we call a

24   consciousness of guilt.  Once he was confronted with

25   the fact that we knew he had posted these videos, he

State's Closing Argument                    584

 1    went on a removal spree to correlate with his posting

 2    spree.  And he even sent the victim proof that he had

 3    gone around trying to remove them while he was

 4    begging her not to get into trouble.

 5                So the other part of the defendant's

 6    state of mind is whether or not he acted with the

 7    intent to harass, humiliate or injure the victim.

 8    Now, you -- you've heard the background story.  This

 9    was a very rocky relationship that led to a very

10    hostile divorce.

11                But what you're going to find when

12    you're trying to decide what the defendant's intent

13    was is the things that the was confronted with on the

14    stand.  He could to testify to you all day that he

15    wouldn't do this to hurt her.

16                But what you've seen is that when they

17    broke up, he posted naked pictures of her on the

18    internet in anger.  When she came to move her things

19    out the house, he threatened to make a website and

20    post her sexual transgressions out of anger.

21                So when she finally moved on and had

22    told him to never contact her again, he decided to do

23    the same thing.  He was going to get online, post the

24    videos that she had specifically told him she was

25    afraid of getting out in the world because he felt

1    injured by her and he wanted to injure her as well.

2           He blamed her for his unemployment, for

3    his homelessness, for his loneliness.  You'll see

4    that in the text messages.  It's in the e-mails.

5    It's in the testimony.  There's no question about

6    what his mental state was toward the victim.

7           He did testify to you that he felt no

8    animosity, but it just doesn't -- it's not

9    corroborated by the evidence that you're going to be

10   able to look at.  There's more.  So the threats that

11   he made not only to create a website called

12   meaganvance.net and post her sexual information, he,

13   in fact, did that.

14          The witnesses you heard from saw the

15   website.  And he threatened to seek retribution

16   against her in the months leading up to this

17   investigation.  He said he would seek retribution.

18   He said that he had contempt.

19          And he admitted to Deputy Duenas during

20   the initial conversation they had that he posted the

21   videos because she ruined his life.  Defendant's

22   actions, again, after he was caught, show that

23   consciousness of guilt, him trying to cover his

24   tracks.

25          The only reason a person would do that

1    would be if their intent was malicious.  So I want to

2    go through some of the exhibits that you're going to

3    get a chance to look at.  And you'll see the sort of

4    trajectory of escalation that's involved in the

5    defendant's contacts.

6              So as I mentioned before and as you've

7    heard in the trial, things started off not so bad

8    when the defendant was contacting the victim in late

9    2015, that he misses her, that he wants to see her,

10   things like that.

11             That transformed into, "I know I'm a

12   burden to you.  I want to leave this world.  I plan

13   on setting myself on fire."  That transitioned into,

14   "I'm having a really rough time.  I can barely

15   survive.  Can we be friends?" which, of course, is

16   followed by another demand that he stop contacting

17   her.

18             This transition into, "I have no social

19   support.  I have no friendships.  I thought about

20   ending my -- ending my life numerous times," again,

21   the only response being, "I don't want anything to do

22   with you."

23             "I know you don't like hearing from me.

24   I need to get this off my chest.  I don't have anyone

25   to talk to.  I do miss and love you a lot of the time

1   and I have contempt for you.  My circumstances are a

2   result of you.  Everyone else leaves work and has

3   friends and family to come home to and I have

4   nothing."

5             And, finally, after the videos were

6   posted, the videos were found, the defendant was

7   caught, starting from the bottom you can see the

8   defendant's responses, "Stop trying to ruin my life.

9   Please make this stop.  I'm trying to work hard.  Can

10  you just tell me if you're going to move forward

11  destroying my life?"

12            This is followed, "I'll send you my

13  paychecks one by one," followed by, "Tell me what you

14  want from me.  Let's come to an agreement.  Please

15  stop ruining my life."  He knew that what he had done

16  was wrong and he knew that he had gotten caught.

17            Of course, then he e-mails her proof,

18  not only that posted the videos, but that he had the

19  ability to take them down.  And as you heard in his

20  testimony today, he didn't even think that he should

21  have had to do that.

22            So, finally, moving on to the last

23  couple of elements in the charge, the result, the

24  harm to the victim from what the defendant did.

25  The -- the victim in this case was very much

State's Closing Argument                    588

1   reasonably harmed by the defendant's actions.

2                You heard her testify about, again, the

3   conversation they had regarding making the videos,

4   her concerns at that time, the fact that, at this

5   point in her life, she has gotten to where she wants

6   to be.  She has moved away from him.  She is in a

7   functional relationship.  She's got her job.

8                Of course, she's worried about the

9   professional ramifications of these now even more so

10  than before.  Of course, when she testified about her

11  personal reactions to finding this on the internet,

12  she was afraid of what it could do to her life and

13  her reputation.

14                And she was humiliated.  And she just

15  testified to you again on rebuttal that all she

16  wanted was for them to be taken down.  She also

17  testified to you that every time she had to deal with

18  this, every time she found a new one, this whole

19  process has made her relive the hostility of a toxic

20  relationship.

21                And she testified that her current

22  relationship has suffered as a result.  And anybody

23  who is in the victim's position would have felt the

24  same.  So you're going to get a verdict form that's

25  got a lot of separate counts listed on it.  But this

1          is the way that the counts are going to be divided.

2                    The State has charged the defendant with

3          seven counts on the basis of each website that the

4          videos were found on.  So I'm going to go through

5          each count one by one and talk to you guys about the

6          evidence that you've seen and heard that points to

7          the defendant being guilty of that particular count.

8                    And I want to point out that there's

9          some key evidence that you're going to have to look

10         at and look for when you're going through what you've

11         heard, your own notes and what you can see for

12         yourselves on the disks and in the exhibits.

13                   But the way that you can tell that each

14         count involves a separate and distinct crime is going

15         to be determined by the details of the posts.  And

16         what you heard from Detective Rookhuyzen is that

17         there were four distinct videos in this case and he

18         was able to classify which one was which by how long

19         they were.

20                   And -- and you'll see these times, this

21         21 minutes and 25 seconds, 16:01, 18:46.  You'll see

22         those numbers over and over again.  But that's how

23         you can tell which video is which, which were posted

24         to what sites how many times, how many times they'd

25         been viewed.

1          And things like dates are going to also

2     be very relevant to you in determining his guilt for

3     each individual count.  When the defendant joined the

4     website, when his last login was on the website, when

5     the videos where uploaded, when the videos were

6     deleted.

7          All of those are going to be incredibly

8     relevant pieces of information for you.  And,

9     finally, the number views.  You heard from Detective

10    Rookhuyzen that this was significant to him in

11    addition to all these other bits of information in

12    differentiating between a scenario where the

13    defendant actively posted versus when one website

14    mirrored the content from another.

15         And in his testimony to you, he

16    explained that when content is mirrored, generally

17    speaking, the content is going to appear identical.

18    That's how a mirror works.

19         And the number of views, the dates, when

20    they joined, when they were uploaded, which videos

21    were uploaded, that's how you're going to be able to

22    tell that this wasn't an accident, that this was a

23    conscious intentional act on the defendant's part.

24         And, again, the number of views is also

25    going to be relevant to you in determining the

State's Closing Argument                591

1    reasonableness of the harm to the victim.  When

2    you're looking at the exhibits -- and this includes

3    the screenshots from the websites themselves --

4    you're going to see, obviously, not just the sexual

5    content of the victim and the defendant in this case,

6    but there's sexual content all over the place, on the

7    header, on the sidebar.

8            You're going to see some truly

9    disturbing images, some disgusting images.  And that

10   is incredibly relevant to whether or not the harm to

11   the victim is reasonable.  If a person has their

12   personal identity, their information, their own

13   intimate content displayed against their will on site

14   next to, like -- like, rape videos and things like

15   that, underage porn, things like that --

16           MR. TAYLOR:  Objection, Judge.

17           THE COURT:  This is argument.  Go ahead.

18           MS. ATWOOD:  It's entirely relevant to

19   whether or not a person would feel additional harm

20   and humiliation from being associated with sites like

21   that, from sites that they never would have wanted to

22   be on in the first place.  Oh, sorry, I skipped

23   ahead.

24           So beginning with Count 1, Pornhub.com.

25   This was one of the websites where there was a clear

1    registration with the user name BarberB, the

2    defendant's go-to user name.  This website, as you'll

3    see in the screen shots shows that he had joined two

4    years ago, been a -- been a member there for quite

5    some time.

6              You'll see that he uploaded two videos

7    in April 2016.  And these were both titled "Albino

8    Porn," as all the videos are in this case.  And it

9    was the 16:01 and the 18:46 video.  And as Deputy --

10   or Detective Rookhuyzen testified these had a

11   substantial amount of views already, just after a few

12   months of being posted.

13             You'll see that his last login was in

14   June of 2016 and you'll see that based on the

15   information provided and the testimony and what was

16   still active in the exhibits, that those videos were

17   still active and alive in September 2016.

18             So this is all the evidence that you

19   have and all the evidence you need to find that these

20   videos were posted by him on the dates that they were

21   alleged to be posted and that they are the videos in

22   question of the victim in this case.

23             Moving on to Count 2, RedTube.com.  This

24   was, again, another account located with user name

25   BarberB and a -- a totally independent registration.

1      And the reason that we know that is that the videos

2      that were posted, there were four of them.

3              So you heard some cross-examination of

4      the detective about the fact that RedTube is an

5      affiliate of Pornhub.  But what he explained to you

6      is that if RedTube were merely mirroring their

7      content from Pornhub.com, it would appear the same.

8              And as you can see, RedTube had

9      significantly more content than Pornhub.com.  You

10     can't possibly mirror something that isn't there for

11     you to mirror.  So in addition to the two videos that

12     had already been posted to Pornhub, two more were

13     posted to RedTube.

14             And these videos are all -- all four

15     independent unique videos, as you can see by the time

16     stamp.  And they all had different numbers of views

17     that were not consistent with any other website.

18             You'll see that the defendant, again,

19     joined in April, also different than Pornhub.com,

20     where he joined two years ago, and that his last

21     login was also in April.  All four videos were still

22     active by the time Detective Rookhuyzen performed his

23     investigation.

24             Count 3, Porn.com.  Again, this was a

25     separate, independent website, not an affiliate of

1    RedTube or Pornhub, but, again, had a registered user

2    named BarberB.  The evidence you've heard during the

3    course of the trial and that you'll see in the

4    exhibits shows that he joined in March 2016, an

5    independent joining date, that he uploaded four

6    videos.

7              And these were four of the videos that

8    the victim initially found.  She preserved the links

9    in a list that's been provided to you.  And these

10   were the links that Detective Rookhuyzen later used

11   to try to find more information online.

12             And you'll also find that the

13   screenshots of the videos themselves were preserved

14   by Deputy Duenas in one of the disks that's available

15   to you.  All four videos were removed after police

16   contact.

17             So we know that this website must of had

18   an independent act, an independent registered user,

19   an independent crime committed because, again, the

20   content is different.  The joining date is different.

21   It has all four videos as opposed to just two.

22             And in this case, they were all removed,

23   whereas the videos on the other websites stayed.  So

24   someone went in and removed those.  And I think

25   you'll find that that person was the defendant.

1          Count 4, TNAFlix.  As you heard from

2     Detective Rookhuyzen, this also appeared to be a

3     totally independent website and not an affiliate of

4     the others.  Again, had a registered user named

5     BarberB.  And you'll see in the screenshots that he's

6     labeled as a verified member.

7          He uploaded two videos to that website

8     in March 2016.  Those were the 16:01 video and the

9     21:25 video.  Both of those were documented in the

10    evidence that's available to you.  These videos were

11    still available by September 2016.

12         Count 5, xHamster.com.  We learned a lot

13    of information about this.  Not only was the user

14    info Benjamin Barber, but we also got his e-mail.

15    And the reason we got this is because xHamster.com

16    was the website that he forwarded an e-mail from to

17    the victim, showing that he had tried to cover his

18    tracks.

19         The user info clearly depicted both his

20    first and last name and, of course, the

21    starworks5@gmail.com that's been associated with him

22    throughout the course of his relationship with her.

23         He uploaded three videos to this

24    website.  From the evidence that we received, they

25    were all labeled "Albino Porn" in the links and,

1     again, they were observed by the victim and then

2     later e-mailed from the defendant to the victim.  He

3     requested that removal after he realized that he was

4     in trouble.

5              Count 8, PornTV.  Sorry, I skipped ahead

6     in my numbers.  I believe that should be Count 6; is

7     that right?  So the next count, PornTV, the user name

8     on that website, again, BarberB.  Four videos

9     uploaded this time.

10             This was also an independent website

11    that did not appear to be an affiliate of the Pornhub

12    network.  These were all labeled "Albino Porn."  And

13    they were preserved in screen shots by Deputy Duenas.

14    And those are going to be found for you to review on

15    State's Exhibit 15.

16             And, finally, our last count is

17    PornTube.  This website refers to three videos that

18    were uploaded.  Again, a unique amount of content in

19    reference to the other websites were postings were

20    located.  The videos for the ones that Deputy Duenas

21    was able to actually pull himself.

22             And you can see State's Exhibit 14 for

23    more information about these.  So we've gone over the

24    elements of the crime one by one and a little bit in

25    groups to discuss how we know what the defendant did,

1    how we know why he did it and how we know the type of

2    harm that it caused.

3              So when you're going back to deliberate,

4    you have a pretty important job.  It's an essential

5    part of this process.  But your job in today's case

6    can be described as follows:  You have to decide what

7    the facts are.

8              Again, these two tables don't agree on

9    what the facts are and you are the people who have to

10   decide what actually happened.  And the way that

11   you're going to have to do that is by reviewing the

12   evidence and deciding what evidence you're going to

13   accept.

14             Once you decide what the facts are from

15   that, you apply the law to the facts to see if the

16   facts fulfill the elements of the crimes we've just

17   discussed.  You're going to have to review and follow

18   the specific instructions given to you by the judge

19   and I think they're going to be very helpful to you

20   in your deliberations.

21             And I'm going to go over a few of them

22   with you.  And, finally, all you're here to do today

23   is to use your common sense.  That's explicit in the

24   jury instructions, is that any determination that you

25   make of whether a crime was committed beyond a

1    reasonable doubt has to be made based on your common

2    sense.

3                So let's talk about reviewing the

4    evidence.  And some of the instructions you're going

5    to receive.  One of the instructions you receive has

6    to do specifically with what type of evidence you're

7    going to look at.

8                So there's two types of evidence,

9    generally speaking:  Direct and circumstantial.

10   Direct evidence refers to eyewitness accounts.  You

11   have a number of direct pieces of evidence in this

12   case, photos themselves.  You can see the evidence of

13   the videos themselves.

14               The other type of evidence is

15   circumstantial.  Circumstantial evidence is evidence

16   that, taken as a whole, can lead you to make an

17   inference about what a certain fact is.

18               A good example is, you know, you go

19   to -- you -- you bake a batch of cookies.  You leave

20   your child in the room.  When you come back into room

21   the cookies are gone and your child is covered with

22   chocolate.  Circumstantially, you know who ate those

23   cookies.

24               So your decision in a trial when you're

25   deliberating as jurors is to take a look at both

1   types of evidence, decide what evidence you find

2   valuable and you can base your verdict on both one or

3   the other.  Here, I would submit to you that we have

4   both.

5              Again, you've got the videos, you've got

6   the screenshots.  There's no question what was found

7   and where it was found.  You have the data, as we've

8   discussed when I went through single count with you,

9   of who posted it, how many times, how many views,

10  what dates, when they joined.

11             But you also have a series of very

12  important circumstantial facts that are going to help

13  you determine what the defendant's intent was, what

14  his knowledge was in this case and the circumstances

15  of his relationship with the victim, the

16  circumstances of his life at the time, the

17  circumstances of his testimony to you.

18             When you look at all that in light of

19  the actual evidence that's in front of you, you're

20  going to be led to no other conclusion than that the

21  defendant acted intentionally and knowingly in this

22  case.

23             So, again, your job today is potentially

24  to draw inferences.  You're encouraged to draw

25  inferences.  Your inferences have to be based on

State's Closing Argument                    600

1    common sense and reason.  And you have to decide what

2    you believe.  And a big part of that is deciding what

3    your thoughts are on all the testimony you've heard.

4              And there's specific instructions that

5    kind of guide you through how to analyze each

6    witness' testimony.  So evaluating witness testimony.

7    In evaluating a witness and deciding whether you

8    believe what they say, there's a number of factors

9    that you should consider, first, being the manner in

10   which the witness testifies.

11             And I think that's going to be

12   particularly significant in this case, considering

13   you all got to observe the manner in which the

14   defendant testified when he was asked the tough

15   questions, when he was confronted with things that he

16   had said.

17             Again, the nature and quality of the

18   witness' testimony.  Was it thorough?  Was it

19   logical?  Was it sensible?  Was the person being

20   defensive?  Was the person being evasive?  Those are

21   all important considerations.

22             I anticipate that the defense might try

23   to argue that a lot of this case boils down to he

24   said/she said.  The State would submit to you that

25   that's not the case.  You have tons of evidence at

1    your disposal.

2              But if you do have a question -- and

3    what you're trying to decide is whether you believe

4    one witness over another -- this is the sort of thing

5    you're going to have to keep in mind.  You have to

6    decide who is telling the truth and who is not.

7              And when you're talking about who's

8    telling the truth and who is not, the evaluating

9    witness testimony instruction is what you're supposed

10   to follow.  Again, think about evidence that

11   contradicts the testimony of the witnesses.

12             The defendant took the stand and denied

13   ever having done or said things that are specifically

14   documented in exhibits that you're going to be able

15   to see.  That's the kind of thing that you're going

16   to have to remember when deciding who to believe.

17             And, finally, evidence concerning the

18   bias, motives or interests of the witness.  I mean,

19   it's clear here today what everybody's biases might

20   be.  You've heard tons of testimony and seen the

21   exhibits yourself now, that the defendant had

22   contempt for victim when he committed these acts,

23   that he sought retribution against her when he

24   committed these acts, that he's acted with the same

25   intent before.

1              That's all the information you need to

2     that effect.  And you heard him testify and admit

3     on -- on cross-examination that he didn't care at

4     time because it didn't affect his life.  But now he

5     understands what it means to have a job and have

6     security and have a successful life.

7              And he still doesn't care about how it

8     affected the victim.  So I'm going to have another

9     chance to talk to you after the defense does their

10    closing argument.

11             But I just really want you to keep in

12    mind, what is in front of you, how you're going to

13    decide who you believe and using our common sense in

14    this case.  So with that, I will stop for now and I

15    will pick back up for rebuttal.

16             THE COURT:  Thank you, Ms. Atwood.

17             We'll get the lights for you.

18             MR. TAYLOR:  Thank you.

19             (Pause in proceedings, 3:19 p.m. -

20    3:20 p.m.)

21                    CLOSING ARGUMENT

22             MR. TAYLOR:  It kind of turns out that

23    my closing argument is probably going to go in the

24    exact reverse order of the State's argument just by

25    happenstance.  First thing I want to talk to you

1    about is what your job is here.  We talked about this

2    some in voir dire.

3              The judge is giving you instructions.

4    You are here for proof beyond a reasonable doubt of

5    the elements of this crime, which then begs the

6    question, what are you not here for?  You are not

7    here for speculation, conjecture, guesswork.

8              You are not here to make judgments on

9    whether you prefer Mr. Barber or Ms. Vance, whether

10   you think they're good or nice people, whether you

11   think they are strange people because I'll start by

12   submitting to you, Benjamin Barber is a strange

13   person.

14             He reminds me of one of those toy

15   robots, the little tin old ones with the big screw on

16   the back.  And you wind them up and the go round and

17   round and round on the floor and keep doing the same

18   thing over and over again.  You saw Ben Barber

19   testify.  He gets an idea in his head and he clings

20   to it so tightly.

21             He talked endlessly about copyright and

22   things like that, things that he looked into after

23   this case started.  He gets an idea and he just hangs

24   onto it.  That's what he was doing in this case

25   around the time of these postings.

 1                   But his idea then was that he wanted to

 2      end his life.  Now, I want to talk to you all about

 3      the evidence and what you're really going to see

 4      'cause it's important in this case -- and I saw many

 5      of y'all were taking very good notes -- to pay very

 6      close attention to exactly what the evidence was,

 7      exactly what the testimony was because the judge is

 8      going to give you another instruction, he gave one at

 9      the beginning, that the lawyers arguments are not

10      evidence.

11                   If your notes conflict with the

12      evidence, you rely on your notes -- conflict with our

13      representation of the evidence because there has been

14      a great deal of hyperbole, exaggeration and slipping

15      additional facts into representations of the evidence

16      that were not reflected by the testimony.

17                   Example being, Ms. Vance and

18      Mr. Goldstein testified to this statement Mr. Barber

19      made back in early 2015 sometime about this website.

20      Both of them very clearly testified that he said he

21      was going to make this website about the

22      transgressions.  Transgressions.

23                   And they were asked, was there mention

24      of the videos or sexual content?  And the both said,

25      "No."  And the State stands up here and injects

Defendant's Closing Argument                605

1    sexual transgressions into that representation of the

2    testimony.

3            To pitch this as some prior threat,

4    you've got to know he said, "Sexual transgressions,"

5    last time.  Now, he's doing this.  They must be

6    linked.  Look to your notes because your job is to

7    be -- be very careful finders of fact in this case.

8            And as to that particular point, your

9    notes will reveal that it was transgressions,

10   absolutely no mention of pornography.  But speaking

11   of the pornography, let's talk about that.  You

12   didn't end up having to view it in this trial.

13           And there is not a dispute in fact as to

14   whether those videos were pornographic in nature,

15   whether they contained sexual and intimate acts.

16   They did.  So what do we know about them otherwise?

17   There are four videos, all about the same, taken

18   about the same time, both videos equally featuring

19   Ms. Vance and Mr. Barber, which then raises

20   questions.

21           And many of these questions, we talked

22   about in voir dire.  And I'm going to expand on a

23   couple of other facts and then talk about the

24   questions it raises.  So you've got both of them in

25   the videos, totally consensually made, both having a

Defendant's Closing Argument                 606

1    good time, both voluntarily there.

2              What were they made on?  They were made

3    using Mr. Barber's camera phone.  His property, his

4    person.  Where did they go?  His computer, what his

5    phone hooks up to.

6              And why is this important?  Because in

7    our voir dire and you likely know this from your

8    common sense, there was a great deal of discussion

9    about technology, photos like this, videos like this

10   because it's a huge thing these days.

11             You see it on the news.  You hear about

12   friends and family members doing it.  You hear about

13   stories gone wrong with it.  And the question then

14   becomes:  What are the different types of these

15   photographs?

16             Because you have very different

17   scenarios.  For example, somebody takes their own

18   nude photograph of themselves; photo of just

19   themselves.  Sends it to somebody else.  These are

20   the topics we got into in voir dire.

21             So your question then becomes:  Where is

22   the consent line?  What rights do you have to keep

23   ultimate consent over a photo?  Is there likely more

24   consent?  Do you have greater control over what

25   happens to that photo if it's just a photo of you

Defendant's Closing Argument                607

1    versus a photo of two people?

2            When there's a photo of two people, a

3    video of two people, who has the right to do things

4    with that?  And I'm not talking about copyright, I'm

5    just talking about your common sense, your reason and

6    the questions you need to ask yourself about this

7    case and this type of behavior.

8            Because where is the line drawn?  You

9    have a photo now of three people.  Do we need

10   everyone's consent to do anything with it?  Does the

11   keeper of the photo, the video, have more of a right

12   to it?  What about the creator, the person who made

13   the video themselves?

14           These are the questions you need to ask

15   yourselves when it comes down to the contents of

16   those videos, who had the rights to them to do what

17   they wanted?  Now, the next question you get to is:

18   Reasonable persons.  Reasonable beliefs.

19           And what we're getting at here are the

20   topics we broached in voir dire about what do people

21   expect is going to happen?  And we went through this.

22   The whole group talked for a long time and, again,

23   these are things you know.

24           People have come to realize there's a

25   significant danger in making these types of photos

Defendant's Closing Argument                    608

1    and videos because everyone knows they get out.

2    Would a reasonable person make these kinds of videos?

3    Can a reasonable person then complain if they make a

4    video with somebody else, then it got distributed?

5                  Again, getting back to who has the right

6    in a shared situation like this?  But you're not just

7    dealing with the average person here.  Because what

8    do we know about Mr. Barber and Ms. Vance?  They are

9    not, apparently, average people when it comes to

10   their escapades.

11                 And I'm not going to beat this point to

12   death, but you have heard a great deal of testimony

13   that they were involved in a variety of activities at

14   this time.  They wanted to get out there and live it

15   up and experience all the things there are in life.

16                 But everyone knows that there are

17   dangers and there are risks to engaging in that kind

18   of behavior.  And some of them were very clearly not

19   a problem at all here.  For example, you do the world

20   Naked Bike Ride.  You get naked.  You get on your

21   bicycle.  You ride around Portland.  People take

22   photographs of you.

23                 You are out there in the nude for the

24   whole world to see, for the newspapers to photograph.

25   It's a huge thing every year.  So how can you then

Defendant's Closing Argument                 609

1     turn around and say, "That was fine.  I engaged in

2     those activities.  But this?  No."

3                     And this plays into the doxing thing.

4     The reason being, what did Ben Barber know about

5     concern about these videos?  Because the testimony is

6     that Ben Barber did not -- was not aware of any

7     agreement to keep these under lock and key.

8                     In fact, to his knowledge, they were

9     part of their lifestyle.  They were for sharing with

10    all these other folks that they were trying to talk

11    to and meet and things like that.  And the

12    circumstances seem to corroborate that.  The Naked

13    Bike Ride.

14                    So then the question becomes:  How can

15    you really say that there must have been an

16    expectation of privacy?  And the doxing thing brings

17    that to light.  I was thinking about Ben Barber's

18    side of that.  Ms. Vance testified to her -- her

19    side, her knowledge of what was going on there.

20    Sure.

21                    Was any of that communicated to Mr.

22    Barber?  July of 2015, "Have you heard, people are

23    trying to dox our pornography?  To share it on the

24    Internet?"

25                    "Yeah, I heard about that."  And Ms.

Defendant's Closing Argument          610

1       Vance's explanation, no matter what you make of it,

2       if you think of what effect that had on Mr. Barber.

3       And the only possible effect, the only possible

4       answer that could give him is that she doesn't care.

5       He's had the videos the whole time.  Whatever.

6               What else do you know about the videos?

7       Again, Ms. Vance testified to her side -- her opinion

8       on those videos.  I'm talking about the divorce.  She

9       tells us, "Oh, I was very concerned about them during

10      the divorce.  I spoke to my lawyer."  But at

11      absolutely no point, were they brought up in those

12      proceedings.

13              Answer this question:  Did anybody

14      mention them in all the filings and paperwork?  No.

15      Did you ever discuss it with Mr. Barber?  When you

16      were splitting up, did you say, "Hey, remember those

17      videos" that she was, evidently, quite concerned

18      about?

19              "Hey, now that we are splitting up,

20      those need to be destroyed, deleted, kept under lock

21      and key," was there any discussion?  No.  Because,

22      folks, the reason I'm covering all these things about

23      what was said to Mr. Barber, what did people let him

24      know, is because his mental state is an important

25      part of this crime.

Defendant's Closing Argument                611

1                    If you commit a crime unwittingly or not

2       knowing what the circumstances are, then you aren't

3       guilty of a crime.  That's these mental states that

4       Ms. Atwood had up there with the long convoluted

5       definitions.

6                    But the question comes down to:  What

7       was that person feeling in their head?  What were

8       they feeling in their heart?  What were their

9       intentions?  What did they know about the

10      circumstances?

11                   And all of the evidence and testimony

12      leads to the belief that Mr. Barber was under the

13      impression, for a substantial period of time, not

14      just when these videos were posted, but reaching much

15      farther back, that she didn't care about these

16      videos.

17                   She wasn't worried.  She never has been.

18      So how can you find proof beyond a reasonable doubt

19      that he must have known or reasonably should have

20      known that she would be upset by this disclosure?

21      Because all the evidence and testimony points in the

22      opposite direction.

23                   And you might say, and the State may

24      argue, of course somebody would be harmed by this.

25      What other -- what other possibility is there?  But,

Defendant's Closing Argument            612

1    folks, as I've talked about, we're not dealing with

2    everyday conservative normal people.

3                    We're not dealing with people who would

4    never have a photo like this in the first place.

5    We're dealing with a couple that was living this life

6    for quite a long time.  That was out there in public

7    view doing a whole lot of things that reasonable

8    people would not engage in in the first place.

9                    I want to get back to talking about some

10   things you're not here to do.  And I want to talk

11   about the divorce.  Again, I don't mean to beat to

12   death every single fact.  It is clear from everyone's

13   testimony, this was an ugly divorce.

14                   The marriage didn't last very long,

15   right?  They get married the end of 2012, and by the

16   end of 2013, she's moving out.  They're splitting up.

17   They come to loggerheads.  I talked to you some in my

18   opening statement about folks who make a mountain out

19   of a mole hill, that old saying.

20                   This case represents yet another

21   mountain out of mole hill.  And we know that that is

22   their practice.  What facts do we have showing that?

23   All sorts of discussion about their previous

24   relations -- or the sexual adventures that were

25   going on.

Defendant's Closing Argument                    613

1                    They cannot get those straight.  Things

2    get blown wildly out of proportion in both different

3    directions.  But more importantly, their actions

4    during the divorce.  As we just learned, Ms. Vance

5    gets arrested.  There's a whole kerfuffle there.

6    That leads to Mr. Barber turning around and going

7    cruising on Craig's List for other folks to meet.

8    What about during the divorce?

9                    It's very clear that they just bickered,

10   fought throughout the whole thing.  All their

11   communications that we've seen and talked about are,

12   "I'm going to get you arrested for this.  I'm going

13   to get my lawyer and go after you for fraud.  I'm

14   going to get you arrested for blackmail."  They go on

15   and on, back and forth.

16                   These people are toxic for each other.

17   But I said, what are you not here to decide?  You're

18   not here to decide whether you condone any of their

19   activities or their behavior, the way that they

20   relate to each other.  These aren't your concerns.

21                   You're not here to pick a side or pick a

22   winner.  You're here for proof beyond a reasonable

23   doubt, whether or not the State's proven to you that

24   Mr. Barber committed these crimes.  Speaking of

25   which, I need to take a moment to talk about the

1    intricacies, the individual counts.

2              Now, by and large, the things I am

3    telling you apply to all the counts, but I would be

4    remiss if I did not have a discussion with you about

5    Detective Rookhuyzen, Deputy Duenas -- Duenas, and

6    the things that they uncovered.  And Ms. Vance as

7    well.

8              You have seven counts in front of you.

9    Which ones -- which websites did Mr. Barber actually

10   upload these documents to?  Which websites do we not

11   know whether or not he did?  He admits to the police

12   that he put them on two or three websites.

13             And here the State is stuck in the

14   lurch, because the State is having to say to you,

15   with reference to statements he made to police,

16   "Believe some of them, but not the others.

17             "Buy into the statements related by

18   Deputy Duenas as to why he did it, believe those

19   wholeheartedly.  That's our case.  But this bit about

20   two or three websites, don't believe that.  It was

21   way more."  Then why is there a question?

22             There's a question because, as Detective

23   Rookhuyzen and Deputy Duenas talked about, these

24   pornographic websites, a number of them are

25   affiliates and subsidiaries of others.  So you have a

Defendant's Closing Argument                    615

1    situation where, for example, Benjamin Barber puts a

2    video on Porntube.com.

3              It so happens that Redtube.com is an

4    affiliate of that website.  And there was a great

5    deal of discussion that it is very common amongst

6    these websites, particularly the ones that are

7    mirrors and affiliates, to mirror content.

8              Somebody puts a video on Porn Tube

9    somebody creates an account on RedTube, things get

10   automatically uploaded -- mirrored to the other site.

11   And the State is relying heavily in making their

12   distinctions on the view counts.

13             But I submit to you that there is no

14   evidence with any certainty that these view counts

15   necessarily have to be distinct.  If a video gets put

16   on Porn Tube and then the next day RedTube

17   automatically, you know, whatever software it has

18   that automatically copies it, puts it then on

19   RedTube, you do have two, distinct videos on two

20   distinct sites.

21             Obviously, they would, therefore, have

22   different view counts.  But where is the proof of an

23   independent act?  Because the State is telling you

24   that each one of these, beyond a reasonable doubt,

25   was an independent act.  That Mr. Barber went down

Defendant's Closing Argument                616

1    the line and said, Porn Tube, upload.  RedTube,

2    upload.

3                 And it's clear, as he admitted to the

4    police, that he did upload to XHamster, Pornhub and

5    Porn.com.  Deputy Duenas told you that and Mr. Barber

6    told you that on the stand.  There's no dispute of

7    fact there.  The question becomes the other four

8    sites.

9                 Which has the State proven to you beyond

10   a reasonable doubt, was a separate action and which

11   are you simply unsure about?  Because if you are

12   unsure, then your verdict is not guilty.  That's what

13   the law requires of you.

14                If you don't know whether he uploaded

15   that site or not or whether it's a mirror or was

16   automatically pulled from another site, your verdict

17   on those counts is decidedly not guilty, without a

18   question towards any other elements of the crime.

19                I want to turn and talk a little bit

20   about the things the State is relying on, and this is

21   turning back to the big picture.  Things that apply

22   to all counts.  The State talked to you repeatedly

23   about this idea of consciousness of guilt.  That Mr.

24   Barber's actions, after being alerted that the police

25   were involved, displayed he's consciously guilty.

Defendant's Closing Argument                617

1              He knows he did something wrong.  And

2     the State's extrapolation of that point, is that he

3     must then carry this supposed consciousness of guilt

4     and apply it to the intent related to the crime.  And

5     here's an important distinction, too.

6              The main that we are attacking is the

7     intent, which is what I'm going to finish my talk

8     about.  The intent element of this crime.  Because of

9     those seven elements, one of them is intent to

10    humiliate, to injure, to harm.  So the person who

11    uploads a video, only commits a crime if their

12    conscious objective, at the time they upload that

13    video, is to cause harm.

14             If their actions are malicious.  So

15    going back to the State's consciousness of guilt

16    argument, the State relies on two basic things there:

17    Number 1, the fact that he pulled the videos down.

18    That he tried to clean them up.

19             Folks, that was exactly what Ms. Vance

20    wanted him to do.  In her text messages to him, she

21    says, "We need to talk right now.  It's about the

22    videos."  The light goes on in Mr. Barber's head.

23    Those videos I put up a couple months ago.  So what

24    does he do?  Of course, as soon as he gets home from

25    work, he starts trying to pull them down.

Defendant's Closing Argument                    618

1               Ms. Vance has let him know, at this

2    point, that she isn't happy about that.

3    Consciousness of guilt?  No.  He's trying to be

4    decent to the woman that he still has feelings for.

5    And that's one of the problems with these folks is

6    that six years in, Mr. Barber is still totally hung

7    up on her.  He's in love with her.

8               He is the wind-up robot and just keeps

9    plugging along for Ms. Vance.  So what consciousness

10   of guilt is there?  Oh, it's being a decent human

11   being.  It's saying the person I care about has let

12   me know they are not happy about this.  I am rushing

13   home to try and get these videos off the Internet to

14   make her happy.

15              And then things got worse.  Obviously,

16   Deputy Duenas starts calling him.  He realizes, oh,

17   my God, the police are involved.  None of these are

18   things that he knew when he posted those videos.  And

19   that's your question here.  So when he sends Ms.

20   Vance these follow-up e-mails, "I'll give you my

21   paycheck.  Please don't ruin my life."  Yeah, he

22   feels bad.

23              But he wants the situation to be over.

24   You cannot transfer this supposed consciousness of

25   guilt to his actions two and a half months earlier.

Defendant's Closing Argument                619

1   There's simply no link.  All he knew was that she's

2   unhappy.  She's called the police.  And he wants to

3   get out of this situation.  Of course he does.

4           That doesn't equate to criminal intent

5   two and a half months earlier.  Let's talk about the

6   things he says to Deputy Duenas.  Going back to my

7   wind-up robot analogy.  Deputy Duenas contacts

8   Mr. Barber.

9           When they finally talk on the phone,

10  Duenas says, "What's up with these videos?  What's

11  the deal?"  He's, obviously, a police officer, so

12  this is not a good phone call to receive.  How does

13  Mr. Barber react?

14          He gets wound up.  All this pressure

15  winds the spring up, and he just starts spewing the

16  entire back story of their relationship.  That's what

17  he did on the stand.  He's going a hundred miles a

18  minute talking about threats and blackmail and their

19  friends and doxing.

20          And the list just goes on.  And all of

21  this, including his current relationship, gets thrown

22  at Deputy Duenas who, to his credit, admitted, "Yes,

23  my report, which is my testimony, represents what I

24  got out of that conversation.  Yes, there was a lot

25  to that conversation.  He told me many things.  This

Defendant's Closing Argument                620

 1    is what I got out of it."

 2              So he's cherry picked, and that's fine.

 3    He's trying to hit the important parts.  He's a

 4    police officer with a lot of cases.  He can't

 5    possibly sit down there and write out verbatim what

 6    every single interview is.  You're going to get a

 7    jury instruction on this point.

 8              The jury instruction's entitled,

 9    Defendant's Statements.  And it goes through a list

10    of questions you ask yourself on the law.  When

11    somebody comes into court and takes the witness stand

12    and starts talking about things that a defendant

13    said, the law tells you to look at those skeptically

14    and ask yourself a number of questions.

15              Did the person who's testifying about

16    those statements accurately hear what the defendant

17    was trying to say?  Did they understand what he was

18    trying to say?  If they recorded it, did they record

19    it properly?  You've got to ask yourself all these

20    questions, particularly what you know about Benjamin

21    Barber right now.

22              Because it's so easy to understand and

23    imagine how that conversation with Deputy Duenas

24    went.  "Did you post these videos?"  Blah, blah,

25    blah, blah, blah, blah, blah, blah.  He went on and

Defendant's Closing Argument                    621

1    on with the whole story, and Duenas was trying to

2    keep up.  So for the State to hang -- their hat on

3    these statements, it doesn't get you there.

4                   The law tells you:  Be skeptical.  And

5    you now know, based on everything you've heard about

6    those statements, you're not getting the full story.

7    The full, tortured story that he certainly relayed to

8    Deputy Duenas.  So the question becomes -- the

9    big-picture question -- intent.

10                  What was going through Benjamin Barber's

11   head in April when he posted those videos?  And to go

12   back through the facts, what do we know?  We

13   basically -- we basically pick up in November.  And

14   I'm talking about the text messages, the e-mails,

15   things like that.

16                  Because some of these statements written

17   and recorded just like that, are an amazing window

18   into what they were thinking.  What their mental

19   state was at.  Because it's easy for witnesses to

20   walk into court and talk about things that have

21   happened.  As I'm sure many of you can imagine form

22   your common sense, when you look back on things that

23   have happened in your life, it's easy to look at them

24   with rose-colored glasses.

25                  There's a reason that expression exists.

Defendant's Closing Argument                622

1    As human beings, when we think about our past, think

2    about our actions, the things we've said to other

3    people, the things we've done to other people, we

4    look at them in a way that makes us feel good about

5    ourselves.  You forget the rough edges of things.

6    You forget the nastiest parts of things you've said.

7                    So when a witness comes in and tells

8    you, "This is how it all happened."  Tells you the

9    giant story of their relationship, you know from your

10   common sense they will be inherently biased, whether

11   they want to or not.  The facts, evidence, written,

12   e-mails, texts, those can't be changed by somebody's

13   rose-colored glasses.  They're uncontrovertible.

14                   So what do we know about Ben Barber's

15   communications to Ms. Vance?  Because, obviously,

16   someone's communications towards somebody are likely

17   to reflect their feelings towards somebody.

18                   So November, December, the texts Ms.

19   Atwood showed you.  "I miss you.  I'm lonely.  I wish

20   we were spending Thanksgiving together.  I wish we

21   were spending Christmas together.  I miss you, ben."

22   Is there an ounce of this malice in there?

23                   Is there a threat?  No, there's not.

24   There's sad.  They quickly turn hopeless.  So what do

25   you know about what's going on with Ben Barber at

 1    that time?  From what he told us and nobody seems to

 2    dispute, he is so incredibly down on his luck.  No

 3    job.  No house.  He's sleeping on the roof of an

 4    industrial warehouse.

 5                    So of course he is hopeless.  Of course

 6    he is in despair.  The next few months.  From his

 7    testimony we know, he checks himself into OHSU.

 8    There's suicidal thoughts.  He's wavering between

 9    jumping in front of a bus and lighting himself on

10    fire.  It is nearly impossible to imagine how that

11    would feel.

12                    And the only person in his life he

13    believes may care about him, he believes may even

14    notice if he does one of these two things, is Ms.

15    Vance.  And sure, Ms. Vance doesn't want to hear from

16    him.  Again, that's not a fact you're here to decide.

17                    He reaches out to her and starts telling

18    her about these plans.  No doubt that was unfortunate

19    to hear.  No doubt that was traumatizing to have

20    somebody try and put that burden on you.  But that's

21    what the wind-up robot does.

22                    Where do the e-mails go after that?

23    March, darker and darker.  It is nothing but despair.

24    Which leads us, in the timeline, directly to the time

25    when these videos are posted.

Defendant's Closing Argument                    624

1            Late March, early April, the videos go

2    up.  And what are they part of?  They're part of his

3    purge.  His attempt to make some kind of mark on this

4    world.  Because both he and Ms. Vance testified to

5    their whole lives, they have wanted to make a mark.

6            Since the beginning of their

7    relationship, they would talk about things that they

8    would do.  How they were going to change the world.

9    They were going to do great things for coding to help

10   people with vision problems, to do cancer research.

11   They're both people who want to help the world.

12           And when Mr. Barber looked at the,

13   apparently, quite serious possibility that he would

14   remove himself from the world, he said, what mark am

15   I going to leave?  That's exactly the type of

16   question somebody with those kinds of interests asks

17   themselves.

18           And so what did he do?  Goes on

19   Facebook.  Puts all his personal photos.  Him as a

20   kid.  Him traveling.  All those kind of things.  He

21   goes on these websites he mentioned, Git Hub, Git

22   Lab, these coding websites, and he dumps all of his

23   code he's ever written.

24           He says, "World, have at it.  I'm

25   probably going to be out of here soon."  And the

Defendant's Closing Argument                625

1    pornography.  He gets on it and says, "Well, that

2    goes up there, too.  Maybe somebody will enjoy it.

3    Maybe somebody will remember me."

4              These are the thoughts of that wind-up

5    robot again.  He's now chugging towards, apparently,

6    his own demise.  And this is how he's going to leave

7    his mark on the world.  It's an incredibly sad thing

8    to think about, but every bit of the evidence as to

9    what was going on with him at that time, leads to

10   that same conclusion.

11             The State hangs -- again, hangs their

12   hat on a couple of facts that are misapplied and

13   misrepresented.  Number 1, the State's really into

14   that May 30th e-mail where he mentioned some

15   contempt.  May 30th happens two months -- month and a

16   half, two months -- after these videos were

17   supposedly put up.

18             And by that time, his fortune's have

19   turned, right?  We know he's gotten this great job at

20   Intel.  He's real happy about things.  He's on the up

21   and up.  He is housed.  So he's back doing his normal

22   things.  Write Ms. Vance, try and impress her with

23   all the great things he's doing for the world.

24             Sends her that long e-mail about doing

25   coding on the human cancer genomes.  I don't

Defendant's Closing Argument                    626

1    understand that stuff, but he's impressed.  And it's

2    his plan he's going to win Ms. Vance back by showing

3    her he's coming  through in the world and doing all

4    this great stuff.

5                    And he revets to his old, "I still have

6    contempt for you."  But that e-mail has nothing to do

7    with what happened two months later, because we know

8    that the fortunes of his life and his attitude on

9    everything has changed by that point due to the

10   improvement of the situation.

11                   And the second thing the State tries to

12   hang their hat on with regard to intent at the time

13   these videos were posted.  Is the supposition that

14   these videos, but only one video, XHamster, was

15   tagged with her name.  So I'll ask you:  What

16   evidence have you seen of this fact?

17                   Because that is an incredibly important

18   fact.  Were that to be true, that would have a lot to

19   do with this case.  Now, Ms. Vance has talked about

20   it.  Have we seen any proof?  Any physical evidence?

21                   Because in this case, we have seen a lot

22   of evidence.  A lot of screen shots.  A lot of

23   downloads.  A lot of search warrants.  Requests for

24   information.

25                   But there is no evidence of that one,

Defendant's Closing Argument                627

1    crucially important fact and you should ask

2    yourselves:  What do you make of that?  Everyone

3    knows how to take a screen shot.

4                   Why was that in the screen shot?  So,

5    folks, I'm going to wrap up.  I'm asking you to look

6    at the evidence.  As I said earlier, people can walk

7    into court and say all kinds of things.

8                   Evidence doesn't change.  Text messages

9    and e-mails don't change.  When you look at the

10   elements of this crime, and ask yourself what was Ben

11   Barber's intent?  The evidence on that point is

12   clear.  He was going to leave this world.  This was

13   the mark he was going to make.  He was not angry with

14   Ms. Vance.  He was not trying to hurt her.

15                  Quite frankly, he probably wasn't even

16   thinking about her.  I'd ask you to find him not

17   guilty.  Thank you.

18                  THE COURT:  Thank you, Mr. Taylor.

19                  Ms. Atwood?

20                  MS. ATWOOD:  Thank you, Judge.

21                  <u>REBUTTAL ARGUMENT</u>

22                  MS. ATWOOD:  So there are a few things

23   that I want to address based on what defense counsel

24   talked to you guys about.  And I want to start off by

25   addressing the array of interesting excuses that the

State's Rebuttal Argument                      628

1    defendant has tried to pose to you during our trial.

2                And I've kind of found three large

3    themes.  And I guess first, I should just note for

4    you -- and I'm sure you've already kind of realized

5    this yourself, but it appears that the defendant

6    can't decide what his defense is in this case.  One

7    minute he's saying he was suicidal and was making his

8    mark on the world.

9                The next minute he was saying she

10   explicitly gave him permission to do this.  And then

11   he's saying well, maybe not explicitly, but over the

12   course of something that happened six years ago, I

13   got this implication that she would consent to it.

14               And, finally, we have this bizarre idea

15   of some kind of copyright defense, where he felt that

16   he was the owner entitled to do what he did to her.

17   Folks, that should be your first red flag.  And none

18   of these defenses are supported by the evidence.

19               That when you take his testimony for

20   what its worth, when you look at the rules for

21   evaluating witness testimony, you're not going to

22   find it worthy of your belief.  I mean, think about

23   this idea of a copyright defense.

24               It doesn't exist.  It does not matter if

25   one person or two person or ten people were involved

State's Rebuttal Argument          629

1    or depicted in this video.  What matters is that the

2    victim was depicted in these videos.  Intimate images

3    of her.  It also doesn't matter who personally

4    recorded them.

5                    Or who stored them on what type of

6    device.  It does not matter.  What matters is that he

7    disseminated them to other people without her

8    permission, because he wanted to cause harm to her.

9    And it is misleading, I would submit to you, as to

10   what the law is to indicate that any of those things

11   matter.

12                   The law is the law, and we went over the

13   elements.  You're required, as jurors, to follow the

14   law.  And the only things that you're here to decide

15   is whether he had that intent.  Whether he engaged in

16   the act of the disclosure and whether it harmed her.

17                   You're required to decide those

18   elements.  Unlawful Dissemination is a crime, whether

19   or not the defendant wants it to be.  And knowledge

20   of the law, knowledge of what the -- the legal

21   ramifications mean is not a defense to a crime.

22   Ignorance of the law is no defense.  What he did was

23   illegal.

24                   Now, moving on to his other interesting

25   defenses, this idea that somehow she implied her

1    consent to him.  That by, you know, five, six years

2    ago, engaging in consensual sex and even making these

3    videos, despite her reservation, that she somehow

4    lost the right to complain about them.

5              There's a term for that in the criminal

6    justice world.  And you refer to it as

7    victim-blaming.  It's illogical.  It's offensive.

8    And in this case, it is totally unsupported by the

9    evidence.  There is a difference, and I know you guys

10    will see this -- I'll give you more credit where

11    credit is due.

12              I know you see the difference between a

13    person actively engaging in sexual conduct with their

14    partner that they're married to versus consenting to

15    that person disseminating it across the world after

16    you've had a horrible divorce.  You see the

17    difference there.  We talked about marriage in jury

18    selection.  There's an expectation of trust.

19              There's an expectation that you can

20    disclose and be intimate with your partner and not

21    have to worry that that person's going to try to harm

22    you.  And we also talked about divorce and the

23    ramifications of a divorce and the fact that divorces

24    often lead people to seek revenge against one

25    another.

1          That's the type of dynamic we're dealing

2     with in this case.  The defendant trusted -- or the

3     victim trusted the defendant when they made these

4     videos.

5          She gave him a very, very limited

6     consent for their creation.  And somehow he's

7     convoluting that point and perverting that whole idea

8     to say that she lost the right to be hurt right now.

9          Defense also poses this argument to you

10     that this is yet another example of a mountain out of

11     mole hill.  Folks, this is not a mole hill.  We

12     discussed this in jury selection.

13          When someone does this to another

14     person, they know -- everybody knows, that it can

15     cause huge ramifications and difficulties in their

16     life.

17          The consequences can be immense.  And

18     you heard from Detective Rookhuyzen that by the time

19     he was able to see these videos, just a couple months

20     after they were posted, more than 11,000 people had

21     seen this.  That's a mountain of people.

22          That's a mountain of violations of the

23     victim's rights, of her privacy, of her sense of

24     security.  This is not a mole hill.  Now, finally,

25     this idea of the suicide defense.  I believe when you

1    go back to deliberate, you'll find that this also

2    doesn't really make sense in light of the evidence,

3    the actual evidence that you're going to have in

4    front of you.

5                    And in light of your own common sense

6    and reason, the things you're required to use as

7    jurors.  When a person, who admittedly and in

8    reported conversations, has threatened another with

9    retribution, who's said that this individual ruined

10   his life, who has been the recipient of a cease and

11   desist notice, notifying him that displaying personal

12   content of the victim online is considered harassment

13   and intimidation, when that person later goes on to

14   do just that, it has nothing to do with his

15   depression.

16                    Sure he was depressed.  The State's not

17   denying that.  He was homeless.  He was jobless.  He

18   had lost the person that he loved.  But don't

19   convolute that into thinking that that's an excuse

20   for his actions.  He wanted to leave this world and

21   make his mark on it before he did so.

22                    If he wanted to make his mark, he

23   would've posted videos of himself.  Maybe limit it to

24   a message.  Maybe blog about it.  Maybe talk more or

25   post things involving his, you know, grandiose ideas.

1    Trying to disseminate ideas about how he wants to end

2    climate change, cure cancer.  The good things about

3    his life.

4              When you think about the manner in which

5    he testified.  When you think about the actual

6    information that you have, is this a person who was

7    writing his last love letter to the earth?  Or is

8    this a person who, in fact, was depressed, was very

9    angry and was using this as a last opportunity to

10   lash out at the person who he thought caused that.

11             That's what was happening in this case,

12   even if he was suicidal.  Now, the next couple of

13   things I want to talk about is this idea that the

14   testimony of the victim in this case doesn't count as

15   proof.

16             Defense counsel kept telling you, "You

17   heard Ms. Vance say this, but there's no proof.  You

18   heard Ms. Vance say that, but there's no proof."  As

19   you'll read in your jury instructions, there's an

20   explicit instruction telling you that the testimony

21   of any witness that you believe is sufficient to

22   prove any fact in question.  The testimony of

23   witnesses is proof, if you believe it.

24             And in this case, I would submit to you

25   that you're going to go back to your deliberations

1    and find that you believe Ms. Vance.  And the reason

2    for that is, because she's the person who testified

3    to you the facts that are supported by the exhibits.

4            The facts that are supported by the

5    defendant's own statement.  As a matter of fact,

6    there's only one person who testified in this case,

7    whose testimony isn't supported by the evidence

8    that's available to you, and whose testimony is

9    contradicted by every other witness who testified And

10   that's the defendant.

11           He's the person in this case who had the

12   motive to commit the act and the motive to testify in

13   an untruthful way to you.  When he took the stand for

14   his direct examination, he answered questions very

15   thoroughly.  He seemed very calm.  He got emotional.

16   But you saw him on cross-examination.

17           As soon as he was faced with things that

18   he had said, he tried to deny they had happened.  He

19   tried to twist his own words to fit a different

20   scenario.  He tried to totally ignore the questions

21   being asked of him.

22           That's the person whose testimony you

23   have to consider.  Is that a person who sounds

24   neutral to you?  Is that a person who sounds like

25   they're not biased?  Now, I guess I -- I would

State's Rebuttal Argument                    635

1    finally close with just saying that in order to

2    believe his testimony, you're going to have to ignore

3    the testimony of the other witnesses.

4                You're going to have to ignore the

5    evidence that's in the exhibits that's in the

6    exhibits provided to you.  You're going to have to

7    ignore your own common sense and what you know about

8    relationships.  What you know about the Internet.

9    What you know about revenge and what you know about

10   divorce.

11               That's what you would have to do to

12   believe the testimony that he offered to you.  Now,

13   defense counsel also poses the idea that it was easy

14   for a witness to just come in here and talk about

15   what happened.  I don't think that you'll find that

16   it was easy for Ms. Vance to come in here and talk

17   about what happened.

18               There was a lot of argument thrown at

19   you about her having -- wanting to seek vengeance

20   against him.  There were a lot of questions on

21   cross-examination of her about whether or not she was

22   the one trying to get him in trouble.  You can say it

23   had similar arguments during their divorce.

24               I don't think you're going to find,

25   during your deliberations, that she came here trying

State's Rebuttal Argument                636

1     to cause trouble in his life.  She came here because

2     something horrible had been done to her by him on

3     purpose.  And she testified to you that all she

4     wanted was for the videos to be taken down.

5           She's not here out of malice for him.

6     She didn't testify out of malice for him.  And it

7     wasn't easy for her to take that stand.  Now, again,

8     to believe that the defendant's only guilty of the

9     counts involving XHamster and Porn.com and Pornhub,

10    you'd have to believe his testimony.

11          And as you've already heard, his

12    explanation to Deputy Duenas that those were the only

13    sites he posted on, doesn't make any sense, because

14    he also, later, told Deputy Duenas he'd had all the

15    videos removed and that he'd sent that proof to the

16    victim.

17          But as we've seen in the exhibits, he

18    only sent the victim proof of removal from one

19    website and that was XHamster.  Inconsistency.

20    That's what matters when you're determining who to

21    believe in this case.

22          So, ladies and gentlemen, I'm going to

23    close now and let you go into your deliberations, but

24    I do want to emphasize again that this is a serious

25    crime.  It is a crime, whether or not the defendant

1    wants it to be.  And everything that you've seen and

2    heard throughout the course of this case can only

3    lead you to one conclusion.

4              And it's that he maliciously,

5    intentionally and knowingly committed Unlawful

6    Dissemination of Intimate Image against Meagan Vance.

7    And for those reasons, I'm going to ask you to find

8    him guilty on every single count.  Thank you.

9              THE COURT:  Thank you, Ms. Atwood.

10                   COURT'S INSTRUCTIONS

11             THE COURT:  All right.  I'm going to go

12   ahead and give you the instructions that you're to

13   use when you begin your deliberations.  It Is your

14   sole responsibility to make all the decisions about

15   the facts in this case.  And you're going to have

16   copies of these instructions to take back with you.

17             You must evaluate the evidence to

18   determine how reliable or how believable that

19   evidence is.  When you make your decision about the

20   facts, you must then apply the legal rules to those

21   facts and reach your verdict.  Remember, however,

22   that your power to reach a verdict is not arbitrary.

23             When I tell you what the law is on a

24   particular subject or tell you how to evaluate

25   certain evidence, you must follow these instructions.

1    Do not allow anything I've said or done during the

2    course of this trial to suggest that I have formed

3    any opinion about this case.  Keep in mind that a

4    judge is required by law to give certain instructions

5    in every criminal case.

6                    When I have sustained objections to

7    evidence or ordered that evidence be stricken or

8    excluded from your consideration, you must follow

9    these rulings.  Do not consider such matters during

10   your deliberations.  Base your verdict on the

11   evidence and these instructions.

12                   The lawyers' statements and arguments

13   are not evidence.  If your recollection of the

14   evidence is different from the lawyers' recollection,

15   you must rely on your own memory.  In deciding this

16   case, you are to consider all the evidence you find

17   worthy of belief.

18                   It is your duty to weigh the evidence

19   calmly and dispassionately and to decide this case on

20   it's merits.  Do not allow bias, sympathy or

21   prejudice any place in your deliberations.

22                   Do not decide this case on guesswork,

23   conjecture or speculation.  Do not consider what

24   sentence might be imposed by the Court if the

25   defendant is found guilty.

1          Generally, the testimony of any witness

2     whom you believe, is sufficient to prove any fact in

3     dispute.  You are not simply to count the witnesses,

4     but you are to weigh the evidence.

5          Keep in mind that each party is entitled

6     to the considered decision of each juror.  Therefore,

7     you should not give undue weight to another juror's

8     notes or memory if they conflict with your

9     recollection of the evidence.  The Court, as I said,

10    will provide you with written jury instructions for

11    your use.

12          When you use these instructions, do not

13    place undue emphasis on any particular instruction,

14    but rather view the instructions as a whole.  The

15    defendant is innocent unless and until a defendant is

16    proven guilty beyond a reasonable doubt.  The burden

17    is on the State to prove the guilt of the defendant

18    beyond a reasonable doubt.

19          Reasonable doubt is doubt based on

20    common sense and reason.  Reasonable doubt means an

21    honest uncertainty as to the guilt of the defendant.

22    Reasonable doubt exists when, after careful and

23    impartial consideration of all the evidence in the

24    case, you are not convinced beyond a reasonable doubt

25    that the defendant is guilty.

1           When a witness testifies about

2    statements made by the defendant, you should consider

3    such testimony with caution.  In reviewing such

4    testimony, you should consider, among other things,

5    the following:  Did the defendant make the statement,

6    and if so, did the defendant clearly express what he

7    intended to say?

8           Did the witness correctly hear and

9    understand what the defendant said?  Did the witness

10   correctly remember and relate what the defendant

11   said?  Did the witness intentionally or mistakenly

12   alter some of the words used by the defendant,

13   thereby changing the meaning of what was actually

14   said?

15          If, after weighing such factors, you

16   conclude the defendant said what he intended to say

17   and that the witness to the statements correctly

18   understood, remembered and related to you what the

19   defendant said, then you are authorized to consider

20   such statements for what you deem them to be worth.

21          The term "witness" includes every person

22   who's testified under oath in this case.  Every

23   witness has taken an oath to tell the truth.  In

24   evaluating each witness's testimony, however, you may

25   consider such things as the manner in which the

1    witness testifies.  The nature and quality of the

2    witness's testimony.  Evidence that contradicts the

3    testimony of the witness.  Evidence concerning the

4    bias, motives or interests of the witness.

5              In deciding this case, you may draw

6    inferences and reach conclusions from the evidence,

7    provided that your inferences and conclusions are

8    reasonable and are based on your common sense and

9    experience.

10             There are two types of evidence:  One is

11   direct evidence, such as the testimony of an

12   eyewitness.  The other is circumstantial evidence,

13   the proof of a chain of circumstances pointing to the

14   existence or non-existence of a certain fact.

15             You may base your verdict on direct

16   evidence, or on circumstantial evidence or on both.

17   In this case, the defendant is charged with seven

18   separate counts of the crime of Unlawful

19   Dissemination of an Intimate Image.  Defendant has

20   entered a plea of not guilty to these charges.

21             A plea of not guilty is a denial of

22   every fact alleged.  A person commits the crime of

23   Unlawful Dissemination of an Intimate Image, if the

24   person, with the intent to harass, humiliate or

25   injure another person, knowingly causes to be

Court's Instructions                    642

1    disclosed through an Internet website, an

2    identifiable image of the other person, whose

3    intimate parts are visible or who is engaged in

4    sexual conduct.

5              The person knows or reasonably should

6    have known that the other person does not consent to

7    a disclosure.  The other person is harassed,

8    humiliated or injured by the disclosure.  And a

9    reasonable person would have been harassed,

10   humiliated or injured by the disclosure.

11             In this case, to establish the crime of

12   Unlawful Dissemination of an Intimate Image, the

13   State must prove beyond a reasonable doubt the

14   following elements:  The act occurred on or between

15   -- January 1st, 2016 and June 21st, 2016.

16             Benjamin J. Barber knowingly caused

17   images to be disclosed through an Internet website.

18   The images were identifiable images of Meagan Vance,

19   whose intimate parts were visible and/or who was

20   engaged in sexual conduct.

21             Benjamin J. Barber knew or reasonably

22   should have known that Meagan Vance did not consent

23   to the disclosures.  Benjamin J. Barber intended to

24   harass, humiliate or injure Meagan Vance.  Meagan

25   Vance was harassed, humiliated or injured by the

1    disclosure.

2                   And a reasonable person would have been

3    harassed, humiliated or injured by the disclosure.

4    Although a witness may be allowed to state his or her

5    opinion, you are not required to accept that opinion.

6    To determine what value, if any, you give to a

7    witnesses opinion, you should consider such things as

8    the witness's opportunity and ability to form the

9    opinion, the witness's believability and how the

10   witness reached the opinion.

11                  A person acts "intentionally" and "with

12   intent" when a person acts with a conscious objective

13   to engage in a particular result or engage in a

14   particular conduct.  A person acts "knowingly" and

15   "with knowledge" if the person acts with an awareness

16   that his or her conduct is of a particular nature or

17   that a particular circumstance exists.

18                  Knowledge is also established if the

19   person acts intentionally.  These are the definitions

20   for you to use.  Disclose includes, but is not

21   limited to, transfer, publish, distribute, advertise

22   and offer.

23                  Image includes, but is not limited to, a

24   photograph, film, videotape recording, digital

25   picture or other visual reproductions regardless of

Court's Instructions                     644

1      the manner in which the image is stored.

2               Intimate parts means uncovered human

3      genital, pubic areas and female nipples.  Sexual

4      conduct means sexual intercourse or deviant sexual

5      intercourse or masturbation.

6               Sexual intercourse has its ordinary

7      meaning and occurs on any penetration, however

8      slight.  Emission is not required.  Deviant sexual

9      intercourse means sexual intercourse where a person's

10     consisted -- between persons consisting of contact

11     between the sexual organs of one person and the mouth

12     or anus of another.

13              This is the verdict form that you'll

14     have to go back with you.  It's got the seven counts.

15     Each one says Unlawful Dissemination of an Intimate

16     Image, but it specifically lists the different

17     websites that are alleged in this.

18              So that you'll have a website for each

19     of the seven counts.  You need to evaluate each of

20     these independently and make your vote.  When you

21     return to the jury room, select one of your members

22     to act as your presiding juror.

23              The presiding juror has no greater

24     voting weight but is to preside over your

25     deliberations and be the spokesperson for the jury.

1    You should then deliberate and find your verdict.  If

2    it becomes necessary during your deliberations, to

3    consult with me, you need to do so in writing.  And I

4    will consult with the parties before responding.

5              No one except for you, the jurors, is to

6    be involved in your deliberations.  Therefore, do not

7    tell anyone, including myself or my staff, how many

8    of you are voting guilty or not guilty until you've

9    reached a lawful verdict or been discharged.

10             This being a criminal case, each and

11   every jury must-- juror -- must agree on your

12   verdict.  When you have arrived at a verdict, the

13   presiding juror will sign on the appropriate form.

14   And, again, the presiding juror's signature is on the

15   second page with ability to date this.

16             And after you have reached a verdict,

17   you'll signal the bailiff and the Court will then

18   reconvene to receive your verdicts.  So at this time,

19   I'm going to go ahead and swear the bailiff in.

20             (Bailiff sworn.)

21             THE COURT:  Thank you.

22             So you're going to go ahead and return

23   to your jury room.  Take your notebooks with you.  As

24   soon as you get there, you're going to go ahead and

25   Tiffany's going to bring in the exhibits and the

1    instructions and the verdict form.

2                    And at that point, when you have all of

3    that information, you can begin your deliberations,

4    but don't do so until you've been told by -- by

5    Tiffany, okay?  All right.  Thank you.

6                    (Jury retires to deliberate, 4:16 p.m.)

7                    THE COURT:  Okay.  Exceptions from the

8    State?

9                    MS. ATWOOD:  No, Your Honor.

10                    THE COURT:  Mr. Taylor.

11                    MR. TAYLOR:  Only what was previously

12    mentioned on the voluntary acts, Judge.

13                    THE COURT:  Thank you, sir.

14                    MR. TAYLOR:  Thank you.

15                    THE COURT:  All right.  And you're

16    giving us telephone numbers?

17                    MS. ATWOOD:  Yes.

18                    THE COURT:  Obviously, this has to get

19    done today.

20                    MS. ATWOOD:  Yeah.

21                    THE COURT:  So we'll be here.  Hopefully

22    we'll be able to get it done today.

23                    MS. ATWOOD:  There is an exhibit still

24    on the stand.

25                    MR. TAYLOR:  And do I recall, they lock

1    the courthouse at 5:00, so we got to be inside here?

2                    THE COURT:  Yes.  I think it -- it's

3    Friday night, so I think it is pretty much right at

4    5:00, but you can certainly check with the people

5    that guard and protect us.

6                    MR. TAYLOR:  I shan't risk it.

7                    THE COURT:  Okay.  All right.  Thank

8    you.

9                    MS. ATWOOD:  So if they're not done in

10   time?

11                   THE COURT:  Well, we'll stay if they're

12   not done by 5:00.

13                   MS. ATWOOD:  Okay.

14                   THE COURT:  We'll stay.

15                   MS. ATWOOD:  Okay.  I just didn't know

16   'cause you said you were leaving for vacation, but

17   there's no issue with tonight?

18                   THE COURT:  No.

19                   MS. ATWOOD:  Okay.

20                   (Recess taken, 4:17 p.m. - 7:25 p.m.)

21                   THE COURT:  All right.  So we're back on

22   the record on State of Oregon versus Benjamin Barber.

23   And we have a verdict, so go ahead and get our

24   jurors.

25                   (The following proceedings were held in

1    open court, the jury being present, 7:26 p.m.)

2                    THE COURT:  Okay.  So I understand that

3    there's a verdict now.

4                    And it looks like, Mr. Gordon, you're

5    the foreperson.

6                    PRESIDING JUROR:  Yes.

7                    THE COURT:  Okay.  If you'll hand the

8    verdict to Ms. Morton.  Thank you.

9                    All right.  And so at this time, having

10   not read the caption, "We, the jury, being first duly

11   empaneled and sworn in the above-entitled court and

12   cause, do find the defendant as follows:

13                   On the charge of Unlawful Dissemination,

14   Pornhub, guilty; Unlawful Dissemination, RedTube

15   web -- website, guilty; Unlawful Dissemination,

16   Porn.com website, guilty; Unlawful Dissemination,

17   TNFFlix [sic] website, guilty; Unlawful

18   Dissemination, xHamster -- xHamster website, guilty;

19   Unlawful Dissemination, PornTV website, not guilty;

20   and Unlawful Dissemination, PornTube web -- website,

21   not guilty."

22                   Was this, sir, a unanimous verdict?

23                   PRESIDING JUROR:  It was, ma'am.

24                   THE COURT:  All six of you?

25                   PRESIDING JUROR:  Yes.

```
 1                    THE COURT:  Okay.  Thank you very much.
 2       I appreciate your assistance and at this time you are
 3       all free to go.  If you'll like to wait in the jury
 4       room, I'll be happy to come in and speak with you.
 5       But if you're ready to get out of here, just go ahead
 6       and go.
 7                    A JUROR:  Okay.
 8                    THE COURT:  Okay?
 9                    PRESIDING JUROR:  Thank you.
10                    THE COURT:  Thank you very much.
11                    A JUROR:  Thank you.
12                    (Jury dismissed, 7:28 p.m.)
13                    THE COURT:  Okay.  So, Mr. Taylor, did
14       you want to have brief conversation with your client
15       regarding whether or not he wants to proceed to
16       sentencing?
17                    MR. TAYLOR:  Judge, we actually already
18       discussed that.  We would like to set over
19       sentencing.  There's some merger issues that I'd like
20       to look into and be able to fully and accurately
21       argue to the Court.
22                    THE COURT:  Okay.  Thank you.  And when
23       are you thinking about doing that?
24                    MR. TAYLOR:  I believe we're sort of
25       open to Your Honor's schedule.
```

```
1                    THE COURT:  Okay.

2                    MR. TAYLOR:  I know you have things

3   going on.  Should we discuss with the parties --

4                    THE COURT:  All right.  Why don't you

5   talk about that --

6                    MR. TAYLOR:  -- and staff?

7                    THE COURT:  -- and then meet with your

8   victim?  I'll be right back.

9                    MS. ATWOOD:  Sure.

10                   (Recess taken, 7:28 p.m. - 7:30 p.m.)

11                   THE COURT:  December 1st?

12                   MR. TAYLOR:  I was chatting with

13  (indiscernible) I haven't chatted with Ms. Atwood

14  yet.

15                   MS. ATWOOD:  Sorry, Judge.  We were

16  looking at December 1st.

17                   MR. TAYLOR:  So the judge is gone for

18  two weeks, so we're looking --

19                   MS. ATWOOD:  Yes.  Well, I'm gone the

20  week of Thanksgiving as well, so --

21                   MR. TAYLOR:  All right.  So we're

22  looking --

23                   THE COURT:  I'm not back 'til the 28th.

24                   MS. ATWOOD:  Okay.

25                   MR. TAYLOR:  So we're looking in this
```

1    week right here.  I've got a trial those two days

2    (indiscernible).

3                    MS. ATWOOD:  Okay.

4                    MR. TAYLOR:  So I was hoping

5    December 1st, if that's -- if that works for other

6    people.

7                    MS. ATWOOD:  December 1st.

8                    THE CLERK:  What -- what time are we

9    thinking?

10                   MR. TAYLOR:  I think it's 8:30 or 1:15,

11   correct?

12                   THE COURT:  Probably 8:30 would be the

13   better time.  Does 8:30 work for the victim?  Okay.

14   All right.  So we'll set over sentencing.  And at

15   this time, I'm assuming that there's no request that

16   he be remanded?

17                   MS. ATWOOD:  Your Honor, I would request

18   that he be remanded, but I didn't know if it was

19   logistically possible in this --

20                   THE COURT:  Oh, and what is your request

21   for -- why -- why are you requesting remand?

22                   MS. ATWOOD:  Just because of the nature

23   of the charge and the victim's particular concerns

24   about his being out in public during the meantime.

25                   THE COURT:  Okay.  He's been out of

1    custody since September?

2                    MR. TAYLOR:  That is correct, Judge.

3                    THE COURT:  Okay.

4                    MR. TAYLOR:  And no problems that I'm

5    aware of.

6                    THE COURT:  Okay.  All right.  At this

7    time, I'm not going to remand him into custody.

8                    Mr. Barber, you understand that you are

9    still subject to your release agreement.

10                    DEFENDANT BARBER:  Understood.

11                    THE COURT:  It's still is in -- in

12   compliance, so anything that you were to do to

13   violate that between now and your sentencing would

14   have some very serious ramifications.

15                    DEFENDANT BARBER:  Understood.

16                    THE COURT:  You'd be remanded into

17   custody and there'd be other possible additional

18   charges, okay?

19                    DEFENDANT BARBER:  I understand.

20                    THE COURT:  Okay.  All right.  So we'll

21   set this over to the 1st of December at 8:30 for

22   sentencing.  And are you intending of filing a

23   memorandum of law?

24                    MR. TAYLOR:  Judge, I'm going to be

25   honest with you.  This is the first time I've really

1    needed to look into merger on a case.

2                    THE COURT:  Okay.

3                    MR. TAYLOR:  I -- I imagine I can just

4    orally make it, but if there is issues I file a very

5    brief memorandum with -- with well-advance notice --

6                    THE COURT:  Okay.

7                    MR. TAYLOR:  -- to all parties.

8                    THE COURT:  Okay.  Thank you.

9                           * * *

10    (Court adjourned, Volume 4, 11-10-16 at 7:32 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>REPORTER'S CERTIFICATE</u>

2                    I, Katie Bradford, Court Reporter of the

3    Circuit Court of the State of Oregon, Twentieth

4    Judicial District, certify that I transcribed in

5    stenotype from a digital audio recording the oral

6    proceedings had upon the hearing of the

7    above-entitled cause before the HONORABLE

8    BETH L. ROBERTS, on **November 10, 2016**;

9                    That I have subsequently caused my

10   stenotype notes, so taken, to be reduced to

11   computer-aided transcription under my direction; and

12   that the foregoing transcript, **Volume 4 of 5,**

13   **Pages 359 through 652**, both inclusive, constitutes a

14   full, true and accurate record of said proceedings

15   taken from a digital audio recording and so reported

16   by me in stenotype as aforesaid.

17                    Witness my hand and CSR Seal at

18   Portland, Oregon, this <u>12th</u> day of <u>January, 2017</u>.

19

20

21                    _____
                      Katie Bradford, CSR 90-0148
22                    Court Reporter
                      CSR Expires:  9-30-17
23                    (503) 267-5112

24

25