1        IN THE CIRCUIT COURT OF THE STATE OF OREGON

2            FOR THE COUNTY OF WASHINGTON

3    STATE OF OREGON,                    )
                                         )
4            Plaintiff,                  )   Washington County
                                         )   Circuit Court
5            v.                          )   No. 16CR46339
                                         )
6    BENJAMIN JAY BARBER,                )   CA A163786
                                         )
7            Defendant.                  )   *Volume 5 of 5*

8

9            *TRANSCRIPT OF PROCEEDINGS ON APPEAL*

10                BE IT REMEMBERED that the above-entitled

11    Court and cause came on regularly for hearing before

12    the Honorable Beth L. Roberts, on Thursday, the 1st

13    day of December, 2016, at the Washington County

14    Courthouse, Courtroom No. 304C, Hillsboro, Oregon.

15                    APPEARANCES

16            Marie Atwood, Deputy District Attorney,
              Appearing on behalf of the State;
17
              Cameron Taylor, Attorney at Law,
18            Appearing on behalf of Defendant Barber.

19                   ALSO PRESENT

20            Melanie Kebler, Attorney at Law.

21

22            KATIE BRADFORD, CSR 90-0148

23                   Court Reporter
                     (503) 267-5112
24
      Proceedings recorded by digital audio recording;
25    transcript provided by Certified Shorthand Reporter.

1                          <u>GENERAL INDEX</u>

2                            <u>VOLUME 5</u>

3                                                      <u>Page No.</u>

4    December 1, 2016 Proceedings                657

5    Case Called; Parties Introduced            657

6    Sentencing Hearing                         657

7    Colloquy, re:  Defendant's Motion in

8       Arrest of Judgment                      657

9    State's Recommendation                     658

10   Defendant's Recommendation                 676

11   State's Recommendation                     681

12   Defendant's Recommendation                 686

13   Defendant's Statement to the Court         693

14   Attorney Kebler's Statement to the Court   696

15   Sentencing                                 700

16   Reporter's Certificate                     704

17                          *  *  *

18

19

20

21

22

23

24

25

```
1        (Volume 5, Thursday, December 1, 2016, 8:28 a.m.)

2                    P R O C E E D I N G S

3                    (Whereupon, the following proceedings

4        were held in open court:)

5                    THE COURT:  Thank you.  Please be

6        seated.

7                    All right.  We're here this morning on

8        the State of Oregon versus Benjamin Barber,

9        16CR46339.  Mr. Barber is present with his attorney,

10       Mr. Taylor.  And Ms. Atwood is here on behalf of the

11       State.

12                   And this is the time for sentencing on a

13       guilty verdict on five counts of Unlawful

14       Dissemination of an Intimate Image.

15                   And, Mr. Taylor.

16                   MR. TAYLOR:  Judge, good morning.

17       Before we begin, I just wanted to let the Court know

18       about one issue.  My client has prepared a motion in

19       arrest of judgment.  I do not intend to argue this

20       matter.  However, I talked to folks about how to

21       handle this situation.

22                   And the advice that I was given was to

23       inform the Court of this, ask if the Court would be

24       willing to hear Mr. Barber on that matter and

25       basically proceed as Your Honor wishes.
```

1                    THE COURT:  Well, we're going to go

2       ahead and sentence him today and he could certainly

3       file his motion and the -- if that's what he wants to

4       do and we'll deal with it at that time.  But we're

5       not going to hear it today.

6                    MR. TAYLOR:  Understood, Judge.

7                    THE COURT:  Okay.  Thank you.

8                    MR. TAYLOR:  Should we begin by

9       discussing a merger issue?

10                   THE COURT:  Actually, I'll just hear

11      from the State and then you can make your argument.

12      Thank you.

13                   MS. ATWOOD:  Thank you, Judge.

14                   So I had a chance to go through defense

15      counsel's merger motion -- or sentencing memorandum,

16      which does focus on 161.067 and it sounds like the

17      gist of their argument is that the State can't

18      provide any information regarding a sufficient cause

19      or break in the defendant's conduct that would give

20      the Court the authority to sentence him separately

21      for these crimes.

22                   However, obviously, we disagree with

23      that assertion.  The defense, in their motion, rely

24      on Campbell (phonetic), Huffman (phonetic), Reed

25      (phonetic), Howe (phonetic) and primarily, State v.

1    Cale (phonetic).  And then I believe we got another

2    case e-mailed to us yesterday.

3                   I didn't have the opportunity to read

4    that.  I was in Court yesterday.  But when I breezed

5    through it this morning, it seems like it's pretty

6    much in line with what Howe and Cale stand for.

7                   However, in addition to these cases,

8    there are a few that I would like to draw your

9    attention to that also have come out this month, so

10   they're fairly new.  That would be State v. Dolphu

11   (phonetic)and State v. West-Howell (phonetic).

12                  And I -- when I'm done with my

13   arguments, I have a list of citations and I printed

14   out those two for you, so I don't know how available

15   they would be on Westlaw or anything like that.

16                  So to go through those two cases, State

17   v. Dolphu first of all, that was a child pornography

18   case where the defendant downloaded several images to

19   his computer and stored them all in one folder that

20   was publicly available on a peer-to-peer network.

21                  His charges were 15 Counts of

22   Encouraging I and an Encouraging II.  He argued that

23   all the counts should merge because the individual

24   images were found via the same search warrant at the

25   same time and they were possessed by him at the same

1    time.

2            However, the Court denied the merger

3    motion on two grounds, really, the first being that

4    the State had provided evidence during trial that

5    would indicate that they were obtained at different

6    times, the videos -- or the images.

7            And under the circumstances of that

8    case, each download or each image that was at issue

9    could have been proven without getting into the facts

10   of the downloads or possession of the other images.

11   So each count could have been viewed in a vacuum, if

12   necessary.

13           So those were the two important

14   considerations to the judge in that case -- or to

15   the -- the Court of Appeals in that case.  Moving on

16   to State v. West-Howell, this was a situation where

17   the defendant basically engaged in a continuous,

18   lengthy, very brutal attack on his wife that

19   consisted of several criminal acts, one after another

20   after another.

21           But in -- as a whole, it was a

22   continuous episode.  So the acts in that case that he

23   committed against the victim were Forcible Sodomy,

24   followed by Assault, followed by strangulation,

25   followed by Attempted Rape, followed by another

1    Forcible Sodomy.

2              And he was convicted of the two sort of

3    book-end counts of Forcible Sodomy and argued that

4    this was one continuous episode.  His intent to

5    attack this same victim never changed throughout, so

6    the counts should merge.  However, the Court again

7    rejected the merger argument.

8              The Court specifically noted that

9    whether it's a continuous episode is really not the

10   operative question.  The operative question is

11   whether the intent or the choice that was made when a

12   person commits each violation or each act changes.

13             And the specific language that the Court

14   used was, "Whether the acts were of a qualitatively

15   different nature," if a person has to make an

16   independent choice before committing the next act

17   after the first act begins.

18             Similarly, in State v. King, that's a

19   2014 case, the defendant was convicted of two

20   different counts of Assault -- and I think it was

21   Assault IV and Assault III -- based on one continuous

22   episode of assaulting the same victim.

23             He initially began by assaulting the

24   victim on his own and then his friend joined in and

25   they assaulted the victim together.

1        In that case, the Court also declined to

2   merge those two counts based on two kind of

3   observations, the first being that the defendant

4   could have stopped when or before his friend joined

5   in, but instead, made a conscious choice to continue

6   engaging in the assault, knowing that the nature of

7   the assault had changed.

8        And -- and the language they used in

9   that case was that something of significance occurred

10  in between or during those two separate acts that

11  changes them qualitatively.  This, again, leads us

12  into State v. Howe, which is cited by the defense.

13        This was the situation where the

14  defendant orchestrated this kind of group-sex

15  encounter involving a minor.  And in that case, the

16  State argued that the counts shouldn't merge because

17  each individual sex act with a different partner

18  constituted a qualitatively different scenario.

19        However, that was distinguishable from

20  these other cases because the Court concluded that

21  the defendant's actions are what the question is, not

22  another person in the room's actions.  And in that

23  case, the defendant's conduct, his intent, his

24  control over orchestrating the situation was the same

25  throughout.

1            So Howe is different, factually and

2    legally, from the other cases that I've just

3    discussed because the defendant's conduct didn't

4    change.  His choices never differed throughout the

5    entirety of that episode.

6            So when you're looking at these four

7    cases and the other cases that were cited by defense

8    counsel, in briefing, what I kind of compiled were a

9    list of scenarios that the Court has found constitute

10   a sufficient break or change in a person's conduct

11   for purposes of this anti-merger statute.

12           And the scenarios that have been found

13   to constitute that necessary break include where one

14   act begins before another act ends, where each act

15   requires an independent choice, where a significant

16   event occurs differentiating the -- the two criminal

17   acts, where one act could be proven without evidence

18   of the other act, where one act was of a

19   qualitatively different nature than the other act and

20   where a person exercised independent control over

21   each act.

22           In this case, it's the State's position

23   that several, if not all, of these factors or

24   different means of constituting a sufficient break

25   are present.  The -- really, the fact that the State

1    charged its counts based on the defendant's actions

2    on individual websites really illustrates this point.

3                By posting to individual websites that

4    are independent of one another, each act that he

5    committed necessarily had to end before the other act

6    began.  The defendant had to navigate independently

7    to different websites, typing in different URLs.

8                When we got to these websites, he had to

9    create accounts on these websites where he provided

10   different user profile information from website to

11   website.  He had to specifically choose which videos

12   he wanted to upload to which sites.  And that differs

13   from website to website, as we saw during trial.

14               These are all independent choices that

15   occurred between each act that he committed.  And

16   each one of these choices would constitute a

17   significant event that changed the nature of his act.

18   This also necessarily means that he had independent

19   control over the individual violations themselves.

20               He and only he chose which sites to go

21   to.  He was the one who chose whether to create a

22   profile or how much information to provide.  He was

23   the one who chose which videos to post and when.

24               And his independent control, again, is

25   reflected by the fact that when you look at the

1   evidence presented at trial, the different sites that

2   he was convicted of by the jury all had different

3   information, different amounts of content, that was

4   uploaded at different times.

5              His act of choosing where, when and what

6   to post, those are qualitatively different entities

7   that vary from count to count.  And, finally, the

8   State could have easily presented a case for each

9   count separately, essentially in a vacuum without

10  getting into the facts of the other counts.

11             So by charging the case and -- and --

12  and posing the case to the jury the way that we did,

13  I think that it avoids this issue all together.

14  There's no question about whether or not he committed

15  a separate, qualitatively-different act every time he

16  navigated to a different website and posted different

17  content.

18             This then brings us to the -- the case

19  that defense counsel relies on most heavily, which is

20  State v. Cale.  And I think that it's notable that

21  defense counsel omitted probably the most important

22  language in -- in -- that's relevant to our case,

23  that the Court noted in that opinion.

24             In an internet context, the Court

25  basically stated that proof of independent downloads

1    or navigation can show sufficient pause.  And I have

2    the exact quote here.  When the Court concluded that

3    merger was appropriate in State v. Cale, they

4    concluded so because, quote, "There is no evidence

5    suggesting that the defendant individually clicked on

6    each image or individually initiated each download."

7              This obviously implicates -- or implies

8    that evidence that someone clicks on a different

9    image or navigates to a different download or

10    initiates a different download would constitute a

11    sufficient pause or break in conduct.

12             That's exactly why the State proceeded

13    the way that it did at trial and that's exactly the

14    reason why the defendant should be punished

15    separately for these separate offenses.  He had to

16    click to a different website.  He had to initiate a

17    different download to commit you to these violations.

18             So that -- for those reasons, I believe

19    that our case is absolutely distinguishable from

20    State v. Cale and from State v. Howe that the defense

21    relies on in their briefing.

22             And I would just note that in actually

23    discussing our case, defense counsel is remarkably

24    minimal in briefing and really only makes two points,

25    the first being that, according to the defense, there

1   is no evidence of the circumstances surrounding the

2   uploads and second, that if the defendant uploaded

3   these images in one sitting, that merger necessarily

4   applies.

5          I'd like to start really, with, the

6   second point that as you've already heard from the

7   case law, that's a complete mischaracterization of

8   what the rules regarding merger are under the

9   statute.  It does not matter whether it's a

10  one-sitting or one-continuous-episode situation.

11         And that's exactly what the Court said

12  in West-Howell and in King.  Those were the, quote,

13  unquote, "One-continuous-episode cases," where the

14  Court still declined to merge.  So that's really not

15  the consideration.  The consideration are all the

16  things we talked about before.

17         Second, on -- back to the point of

18  whether or not there were evidence of the

19  circumstances of the uploads in this case, we

20  wholeheartedly disagree with the defense's

21  characterization of the evidence that came out in

22  trial for a few reasons.

23         First being that, to my recollection,

24  the defendant took the stand and admitted that he had

25  uploaded the videos to, I believe, three separate

1   websites, Pornhub, Porn.com and xHamster.  That is an

2   admission to committing separate acts via separate

3   navigation on independent websites on the internet.

4          He admitted it to the jury.  The second

5   point being that defense counsel essentially made all

6   of these same arguments to the jury during closing

7   and basically crossed the State's detective on this

8   exact issue thoroughly during the course of

9   the trial.

10          It was one of their biggest points of

11  contention, that the State could not prove that he

12  committed independent crimes or independent voluntary

13  acts.  This was specifically argued to the jury and

14  they disagreed beyond a reasonable doubt.

15          So that is more than enough information

16  that the Court needs to reject this argument.  Now,

17  finally, we disagree about the nature of the evidence

18  that was presented because there was ample evidence

19  and information presented to the jury and to the

20  Court regarding the time and manner and circumstances

21  of the postings.

22          So what I had done was basically compile

23  the list that I went through with the jury in closing

24  that was based on the exhibits provided to the jury

25  during trial.  And I limited it to the five counts,

1    obviously, that he was convicted of, which were in

2    reference to Pornhub, RedTube, Porn.com, TNA and

3    xHamster.

4                And this is one of the documents I will

5    supply Your Honor.  I've also brought all the

6    evidence back.  I don't believe there's really any

7    need for you to examine it again, just based on the

8    legal basis of our argument.

9                However, if you do want to confirm this

10   information for yourself, I have all the exhibits

11   that were supplied at trial and a -- a list basically

12   detailing what specific information we know about

13   the counts he was convicted of.  And I'll go through

14   that now.

15               Pornhub was Count 1.  In that count,

16   the -- the information that the jury heard was that

17   he had a user name BarberB reflecting that he was a

18   31-year-old male who lives in Portland, Oregon.

19               On that site, the information from

20   screenshots show that he joined two years ago and

21   that he uploaded two videos in April of 2016.  These

22   were the videos that were 16 and 18 minutes long.

23   His last login was in June 2016 and the videos were

24   still active.

25               RedTube, this was the site that was an

1    affiliate of Pornhub.  And it's important that these

2    two are the only two that he was convicted of that

3    were affiliates because the information on RedTube is

4    completely different than the information on Pornhub.

5                    And from the State's closing argument,

6    that was our position, was that the fact that this is

7    different content posted at different times by

8    someone who joined at different times, shows that he

9    committed these acts independently.

10                   So getting to RedTube, again, user name

11   BarberB, except this time, he was reflected as a

12   31-year-old male who lives in Newberg.  He joined

13   that website not two years prior, but in April.  And

14   he uploaded four videos, including two that were

15   totally different from the Pornhub videos, on April

16   6th, 2016.

17                   His last login was in April, most likely

18   when he posted those videos.  So he was still logging

19   in and using Pornhub, even after he was using

20   RedTube.  And the videos were, again, still active by

21   September.

22                   Porn.com, his user name was BarberB.  He

23   joined in March, so that was, again, a different time

24   of joining than Pornhub and RedTube.  He was -- he

25   uploaded four videos that were both seen by the

1    victim and by Deputy Duenas.  However, he removed

2    those videos after police contact.

3              And they were then unavailable to

4    Detective Rookhuyzen by the time he was completing

5    his investigation, again, suggesting that he had

6    independent control over these videos.

7              And this, Porn -- Porn.com, notably was

8    an independent website, not related to any of the

9    other four counts that he was convicted of.  Fourth,

10   TNAFlix, user name BarberB.  On that website, he was

11   noted to be a verified member.

12             He uploaded two videos in March 2016.

13   So, again, different from not only Porn.com, RedTube,

14   but these two videos were different than the two

15   videos uploaded to Pornhub.  And these videos were

16   still active by September 2016.

17             Finally, Count 5, xHamster.  His user

18   name was Benjamin Barber and he was registered at

19   starworks@gmail.com.  And we know that because of the

20   e-mail he sent to the victim, reflecting that he had

21   not only admitted to uploading videos to this website

22   specifically, but that he was the one who exercised

23   control to remove them.

24             And he uploaded, uniquely, three videos

25   to this website as opposed to the two on Pornhub and

1    TNA that were different and the four on RedTube and

2    Pornhub that were different.

3              So this information obviously indicated

4    to the jury and should indicate to you now that not

5    only did he have independent control over his actions

6    on these websites, he joined them at different times.

7    He uploaded different content at different times.  He

8    removed some but not all.

9              All of this points to the fact that

10   these counts are qualitatively different, that there

11   was a sufficient pause between March and April of

12   2016 and that he, in fact, did make a conscious,

13   controlled choice between posting from one website to

14   another to another.

15             He could have stopped after the first

16   one, but he did not.  And he should be held

17   accountable for every action that he took thereafter.

18   So from the State's perspective, there is ample

19   evidence to -- to prove -- and -- and there was

20   enough evidence to prove to the jury beyond a

21   reasonable doubt that these were all independent

22   choices that he made voluntarily and consciously.

23             However, even if the Court were to

24   determine that these violations occurred or could

25   have theoretically occurred as one course of conduct,

1   I would suggest that the Court look at ORS 137.123.

2                   That statute states that the Court has

3   discretion to impose consecutive terms for separate

4   convictions arising out of a continuous course of

5   conduct that the Court finds a couple of things:

6                   First, that these independent violations

7   were not merely incidental to one act and that they

8   were, instead, an indication of the defendant's

9   willingness to commit more than one criminal offense;

10   and second, that the violations themselves, the

11   greater and greater violations, caused or created a

12   risk or causing greater loss, injury or harm to the

13   victim.

14                   Both of these elements are present in

15   this case, basically, due to the nature of the crime

16   itself.  Again, because he posted these to different

17   websites, I think it's obvious that this isn't a

18   merely incidental violation that arose from one act.

19                   There was no information presented at

20   trial that would indicate that, including the

21   defendant's own admission to posting -- sorry --

22   to -- to numerous websites.  Second, obviously,

23   the -- the nature of the violations themselves causes

24   and creates a risk of causing greater loss, injury or

25   harm to the victim.

1              The reason that this statute exists is

2    to protect people from the extensive amount of harm

3    that can result from these types of images being

4    posted to the internet.

5              Every single time the defendant decided

6    to post to a third, fourth, fifth website, the harm

7    to the victim became exponentially greater and he

8    should be held accountable for that.  There's a few

9    cases on point to this statute as well, the first one

10   being State v. Cone.

11             In that case, the defendant was

12   convicted of Assault and Burglary arising out of one

13   incident against the same victim.  However, the Court

14   noted that the -- the harm of an assault is different

15   and greater than merely the harm of a burglary, so he

16   should be held independently accountable for those.

17             In State v. Grove, this was also a

18   Burglary and Attempted Rape.  The record supported

19   the sentencing Court's finding that the defendant was

20   willing to commit both crimes.  And that basically

21   gets to Subpart A of this statute, that this wasn't

22   incidental.

23             He didn't incidentally rape someone when

24   he decided to break into their home.  He

25   independently made the choice to commit both of those

1      acts and was held independently accountable for them.

2                    Similarly, State v. Anderson, the

3      defendant's convictions for Robbery and Assault of

4      the same victim were punished separately and -- and

5      independently of each other, consecutively, because

6      the harm of striking the victim through the -- the

7      course of the robbery was not only qualitatively

8      different, but more serious and more harmful,

9      personally.

10                   And, finally, in Austin v. McGee, that

11     case involved a conviction for Third Degree Rape and

12     a conviction for First Degree Rape, arising out of a

13     single sexual assault to one victim.

14                   Those counts were served consecutively

15     because of the greater harm of committing the

16     secondary violation, regardless of whether it arose

17     out of the same course of conduct.

18                   So, again, I disagree with the defense

19     on the legal basis for their merger motion.  I

20     disagree with the characterization of the facts and

21     even if the Court were to consider the defense's

22     motion, I think we have a completely independent

23     basis for punishing these counts separately.

24                   Unless you have any other questions for

25     me, I can forward to you the cases that I've printed

1    out, the citations and the sort of go-to list of

2    evidence.  And would -- do you want the actual

3    exhibits themselves?

4                     THE COURT:  No.

5                     MS. ATWOOD:  Okay.

6                     THE COURT:  You may give them to my

7    staff.

8                     MS. ATWOOD:  And I guess with that, I

9    will end and then when we actually get to

10   sentencing --

11                    THE COURT:  Okay.

12                    MS. ATWOOD:  -- I have some more

13   comments.

14                    THE COURT:  Mr. Taylor.

15                    MR. TAYLOR:  Thank you, Judge.

16                    I'm going to keep my remarks relatively

17   brief.  I think the State is mischaracterizing the

18   merger issue and I think the case that makes that

19   most clear is the case I've forwarded to the Court

20   that came out in the Court of Appeals yesterday

21   morning, so I apologize.  I didn't have a chance to

22   summarize and brief it.

23                    But the basic circumstances of that case

24   are a guy gets convicted of three counts of Sex Abuse

25   I.  The factual scenario is that he --

1          THE COURT:  I read the case.

2          MR. TAYLOR:  Oh, thank you, Judge.  All

3     right.  So when the State argued about merger, they

4     seemed to place a great deal of weight on this idea

5     of independent choices and independent personal

6     control of the actions, saying that, no matter what,

7     if Ben Barber was sitting there in front of a

8     computer clicking, each time he clicked, it was an

9     independent choice.

10          And that clearly isn't what the cases

11     tell us because, as Nelson showed, the guy was

12     convicted of three different Sex Abuse counts for

13     touching the same person in different areas.  Those

14     would obviously be independent choices each time he

15     touches a different part of this person.

16          And he has total control over and as the

17     State put, could stop any time he wanted.  So that

18     can't be the legal issue here.  The real question it

19     seems, Judge, is was there an intervening act?

20          And the State got at a lot of that in

21     their case as they talked about because they

22     discussed, you know, the one case where the guy

23     commits this whole string of Sodomy, Assault,

24     strangulation leading to sodomy, gets convicted of

25     the two Sodomies.

1                    And then the Court looks and says, "Ah,

2      obviously, there was intervening circumstances where

3      things changed."  This ended being a sexual assault,

4      became a more physical -- or straightforward physical

5      assault and then became a sexual assault.  So you've

6      got different crimes occurring.  And it's clearly

7      different here where --

8                    THE COURT:  Go ahead.

9                    MR. TAYLOR:  -- the State has to prove

10     that Ben Barber did something different.  And I guess

11     what I'm getting at -- and I had a little bit of

12     discussion with Ms. Atwood.

13                   I've reviewed what I recall of the

14     evidence and using the State's own sort of cheat

15     sheet, it's -- I -- I agree that they have evidence

16     and did present evidence at trial that there were

17     some videos uploaded in April, some videos uploaded

18     in March.

19                   So you've got Pornhub and RedTube, which

20     both appear to be April.  There's a specific date on

21     RedTube; that's April 6th.  There's no specific date

22     on Pornhub.  And as the State noted themselves, those

23     sites are affiliated.  With Porn.com and TNAFlix, all

24     we know is that they both came up in March 2016.

25                   And then with regard to Count 5,

1 xHamster, we don't appear to have a date.  The State

2 didn't mention any sort of dates and I don't recall a

3 date being presented at trial.

4      I will admit that I have been -- you

5 know, this case hasn't been as easy for me to pore

6 over the evidence since the State has kept it sealed

7 the entire time and I was only able to view it.

8      But I believe that at trial, the only

9 evidence presented is that there were -- Counts 1

10 and 2 occurred in April, 3 and 4 in March and then

11 unknown in -- a -- a Count 5 is unknown.  And so the

12 burden, again, is on the State.

13      And the case law is very clear they must

14 produce non-speculative evidence that there was

15 separate -- that -- that there were distinct

16 transactions.  And I think the State has not been

17 able to prove whether the two counts in April were

18 the same day, sitting at the computer at the same

19 time and same with the counts in March.

20      So I think, at most, Counts 1 and 2

21 should merge and Counts 3 and 4 should merge and

22 Count 5 should merge with one of those two counts.

23 So I think we're looking at a total of two

24 convictions.

25      Now, turning my remarks to the

1   concurrence issue, the State's kind of bringing this

2   up right now.  I'm reading over the statute,

3   specifically, 137.123(5) where it's talking about the

4   Court's discretion to impose consecutive counts.

5               I don't believe that, you know, those

6   two qualifications are met.  Subsection A, I don't

7   believe, is met because it requires just discussion

8   about willingness to commit a more serious crime and

9   that the other crime was sort of incidental to that

10  commission.

11              That's clearly not met in this case

12  because we have five counts that are all exactly the

13  same crime.  There is no more or less serious crime

14  here.  And the second one, Subsection B, is talking

15  about different victims.  And there's clearly not

16  different victims in this case.  It is one victim,

17  Ms. Vance.

18              So, Judge, I don't believe either of

19  those exceptions are met.  I think no matter how many

20  separate convictions the Court enters, I do think any

21  sentences would have to be concurrent.  But, again, I

22  do believe that it should merge down into two counts.

23              THE COURT:  Okay.  So as far as the

24  merger issue, I do find -- I reviewed the evidence

25  myself.  I had kept the notes and I do find that each

1   act was a separate act and transaction, independently

2   exercised to make a conscious choice to commit that

3   crime at that time.  So I do find that all five

4   counts are separate acts and transactions and he'll

5   be sentenced accordingly.

6               So what would you like me to know,

7   Ms. Atwood, regarding sentencing?

8               MS. ATWOOD:  Thank you, Judge.  So I'm

9   not going to really review, like, what came out at

10  trial.  I'm sure this case is unique enough to

11  everybody that we recall the gist of the -- the

12  factual situation.

13              But I kind of just want to touch on the

14  overall harm that this has caused to the victim and

15  what we had heard and saw from the defendant during

16  the course of the trial.

17              This was a person who not only was

18  emotionally harmful and manipulative to the victim

19  during the course of their relationship, but bad

20  behavior has not only continued, it has escalated

21  since she has tried to leave him.

22              She has -- she has spent the past three

23  years of her life trying to extricate herself from

24  this individual and he has responded by doing

25  everything he can to prevent that, including

1    stalking-type behavior, relentless contacts despite

2    cease-and-desist notices, harassing her and her new

3    boyfriend and, finally, the -- the incidents that led

4    to the charges filed in this case.

5              I -- I just want to discuss the facts

6    that the defendant took the stand, he took an oath

7    and he, on direct, testified that he only did what he

8    did because he was very depressed and that he also

9    thought that the victim had given him permission.

10             But as we saw on cross, his testimony on

11   cross-examination revealed that this, essentially,

12   was a complete fabrication.  He only responded to the

13   State's inquiries on cross by stating that the -- the

14   victim has no rights, that he does not respect her

15   rights to privacy over these images, that he doesn't

16   even -- even respect the law.

17             The fact that what he did was illegal,

18   he didn't care.  He -- he believed himself to be

19   above it because he didn't like it.  And clearly,

20   from what we heard on cross, he does not have even

21   the slightest amount of -- of remorse for what he has

22   done to her.

23             He, in fact, testified that he would

24   like to see her arrested for what she's done to him.

25   This sort of backwards, I guess, respect for the

1        situation at hand gives us no indication that he's

2        going to change his mindset, let alone his behaviors.

3                     And I just want to emphasize that I know

4        that defense counsel is going to rely heavily,

5        probably, on the fact that these are the defendant's

6        first criminal convictions.  He does have the arrest

7        for Harassment against this victim.

8                     I believe he has also got a case for

9        Trespassing at, I think, a women's rights -- or

10       feminist conference where he was harassing women

11       there.

12                    But despite the fact that his criminal

13       history is not extensive, I really just want to

14       emphasize for the Court that the victim will

15       literally never be able to walk away from what he did

16       to her.

17                    She tried to have the videos removed.

18       Even he tried to remove some of them.  And you know

19       how the internet works.  It's game over for her,

20       essentially.

21                    She's told me that it's, basically, just

22       a ticking clock until she realizes that someone who

23       she is a teacher to or a parent who she works with is

24       going to see these things about her online.

25                    She thinks that it will forever leave

1    her job and her livelihood and her personal

2    self-worth in jeopardy because of his actions that he

3    does not have any regard for.

4              Having said that, I think that this is a

5    serious case, these are serious charges and they

6    should have serious penalties.  The State's offer

7    initially to the defendant as far as custody time was

8    concerned was 90 to 180 days jail per Court.

9              I think that not only the facts of the

10    case, but the defendant's attitudes to -- toward the

11    Court, toward the State, toward the victim during

12    trial, have kind of heightened the stakes for him.

13              I think that he should be subjected to

14    at least 180 days to a year jail per Court.  I think

15    that on another count, obviously, he should be placed

16    on five years of formal probation and as part of that

17    formal probation, he should be required to do a

18    number of things.

19              I think he should be subjected to sex

20    offender evaluation and treatment, including the

21    conditions involving restrictions on internet and

22    computer use.

23              He should engage in domestic violence

24    evaluation and treatment as per his PO and, finally,

25    a mental health evaluation and treatment per PO

1    because, from the victim's perspective, there's

2    something underlying this behavior that -- that leads

3    him to lash out against her, specifically, that needs

4    to be addressed.

5              And from the State's point of view, when

6    we see this sort of thing, I think mental health

7    could be at issue.  I'm torn, I guess, regarding the

8    computer conditions and whether or not to ask the

9    Court to require as a part of probation that the

10   defendant actively try to remove and delete any and

11   all copies of these videos or images that he has of

12   the victim.

13             The reason I'm torn is -- I mean,

14   we've -- we've done this on other cases before as

15   part of probation.  And I do want for the victim's

16   sake, for these to be removed as fastly and -- and as

17   quickly and as effectively as possible.

18             However, I don't necessarily trust, A,

19   that the defendant will do this to his own best

20   ability and, B, that he won't try to, again, save

21   some of these images for other potentially criminal

22   uses or try to manipulate the situation in some

23   other way.

24             So I will leave that as kind of an idea

25   open to the Court, either in addition to or maybe

1    before the computer conditions set in.  We would

2    obviously ask for no contact with the victim or with

3    her boyfriend, Micah Goldstein, who also has been

4    concerned for the defendant's behavior toward him

5    throughout this whole situation.  I don't believe --

6                 THE COURT:  Is there any restitution

7    (indiscernible)?

8                 MS. ATWOOD:  I don't believe there's any

9    restitution at issue, Your Honor.  And with regards

10   to the jail time, we would leave programming per

11   Court.

12                Unless you have any other questions for

13   me, I think that that's all I have.

14                THE COURT:  Okay.  Thank you.

15                Mr. Taylor.

16                MR. TAYLOR:  Judge, I'm not going to

17   rehash a lot of the facts about what happened at

18   trial because, as Ms. Atwood said, we all remember.

19   This has clearly been a very complicated relationship

20   in which, yes, the facts do indicate that Mr. Barber

21   was not the party in the right most of the time.

22                I think that it is now very clearly over

23   and I think that's the most important thing towards

24   making sure that nothing like this ever happens

25   again.

1          When I look at this case as an objective

2     observer, Judge, I think that the appropriate thing

3     in this case is to ensure that Mr. Barber never has

4     any contact with Ms. Vance again and to get at what

5     might be the root causes of what brought us here

6     today.

7          And when I look to those, the things

8     that come to me are the DV package and the mental

9     health package.  Regarding the mental health, Judge,

10    when we were investigating this case, I came across a

11    lot of records that were not relevant at trial, so

12    I've never brought them before the Court.

13         What they indicated is that Mr. Barber

14    does have a form of mild autism and I think that

15    plays into some of the behavior here because in my

16    researching that issue, people with autism have

17    difficulty understanding the consequences of the

18    things they say or the things they do on other

19    people.

20         And I spoke to a doctor about this for a

21    while because, quite frankly, I found it interesting.

22    And I think there's a good part of that in play in

23    this case.

24         I think there may be some other mental

25    health issues.  There was obviously testimony and

1    discussion at trial about depression and suicidality

2    that played a big part in his actions earlier this

3    year.

4              So I think that the mental health

5    package is absolutely appropriate.  I also am not --

6    not going to oppose at all the domestic violence

7    package.

8              I think that we all know that package

9    gets to issues of relationship dynamics, control and

10   things like that, that were clearly at play in this

11   trial.

12             What I would ask the Court not to impose

13   is the sex offender package.  I don't think that

14   there was really any testimony in this trial or any

15   evidence that this -- I mean, yes, there are

16   obviously pictures of sex and videos of sex.

17             But what there wasn't was any indicia of

18   sort of deviate sexual intercourse, illegal sexual

19   intercourse or actions or things of that nature.  In

20   my understanding -- and Your Honor knows I -- I don't

21   do a ton of sex cases.  I am a newer attorney.

22             But my understanding of the sex offender

23   package is that it primarily focuses on that type of

24   action.  And I don't think that those classes or

25   those courses, from what I know about them, are going

1    to do anything for Mr. Barber or correct any

2    inappropriate behavior that he's currently

3    engaged in.

4                So I think that is a -- is a misstep.

5    And I also know that package is incredibly expensive,

6    incredibly time consuming, difficult.  And requiring

7    those classes and things like that, I don't think, is

8    going to add anything and I think it's going to make

9    it much more difficult for Mr. Barber to be

10   successful on probation.

11               Now, I think a great deal of

12   Mr. Barber's anger and resentment towards Ms. Vance

13   came from his perception of what she had done.  And

14   we heard that over and over again.  Between the

15   divorce, garnishments, his housing, he blamed a great

16   deal of it on her.  Those feelings, I think, will be

17   addressed by the DV package.

18               What I think is important to having

19   Mr. Barber live a successful life and not come before

20   this Court again or any other Court is for him to be

21   on his own, having learned lessons, but to be able to

22   be employed and successful.

23               And I think that, you know, getting back

24   to what I said a moment ago, is that a great deal of

25   his anger was that he felt like he couldn't get a

1    job, he couldn't get a house, things like that.

2              And so I think the best course of action

3    is to send him into a situation where, yes, he has

4    requirements and he needs to take probation seriously

5    and not mess around.  And I think formal probation

6    with someone supervising him would be a good idea for

7    the Court.

8              But loading him up with so many packages

9    of -- of dubious influence, I -- I -- I would not ask

10   for.  With regard to custody time, Judge, Ms. Atwood

11   is correct.  This is his first -- these are his first

12   real convictions.

13             Both of them, he and Ms. Vance, have a

14   Harassment arrest against each other when they lived

15   in Multnomah County years ago.  Mr. Barber does have

16   a Criminal Trespass II from when he was apparently

17   causing a ruckus and getting loud at some conference

18   that he politically disagreed with.

19             But this will be his first conviction.

20   He already did 62 days of pretrial, no-program time.

21   I know that was an incredibly difficult time for him.

22   I know, above anything, I think that really sort of

23   turned his head as far as what's going on.

24             And I guess I'll wrap up by talking

25   about the State's argument that he lied on the stand.

1    He's -- the State trots this out with great frequency

2    and just wants to read a lie into everything.  And

3    this is the situation as I understand it, Judge.

4                I absolutely believe that Ben Barber did

5    intend to kill himself and that posting these videos,

6    in part, was related to that.  I'm not going to stand

7    here and say the jury's totally wrong.  But I think

8    that there was a great deal to what Mr. Barber had to

9    say on direct.

10                This was the same thing he told me from

11   Day 1 of this case in tears when I said, "Why did you

12   post these videos?"  This was not a story he cooked

13   up the week or two before trial.  The fact that, yes,

14   on cross, he spent most of his time arguing with

15   Ms. Atwood about copyright.

16                Mr. Barber, like I talked about in my

17   closing argument, is a guy who gets an idea under his

18   skin and really sticks with it.  And he was really

19   interested in doing legal research on his case.  He

20   is a smart guy and he spent a lot of time at the

21   library -- law library.

22                And, yes, he got hung up on this

23   copyright issue and I think he probably tends to

24   pursue some of that at the appellate level or

25   something like that.  But that doesn't mean that he

1    was lying.

2              He has opinions that he has developed

3    during the pendency of this case about the law and

4    how it works and how it interacts with the statute.

5    But that doesn't mean he was lying.

6              He may have been disagreeable and we all

7    watched that cross-examination and saw that.  But

8    this idea that he's just this remorseless lier, I

9    don't think, is supported by what actually happened.

10             We obviously don't object to any of the

11   no contact or anything like that.  That's a great

12   idea.

13             THE COURT:  Is your client working

14   today?

15             MR. TAYLOR:  My -- the last we talked

16   about that a couple of weeks ago, he was doing day

17   labor at Labor Ready and places like that.  I would

18   remind the Court that he is, by trade, a -- a

19   computer engineer.

20             So if you're going to impose computer

21   conditions, we would ask that at least perhaps the

22   probation officer have discretion about whether he

23   could use them for work purposes.

24             THE COURT:  Okay.  Mr. Barber.

25             DEFENDANT BARBER:  Well --

```
 1                    THE COURT:  You need to stand up, sir.
 2                    DEFENDANT BARBER:  Sorry.  So, like, I
 3    did, actually, you know, like I said, upload those
 4    and I did testify that was the case.
 5                    And the reason that I was disagreeing
 6    with Ms. Atwood was that Ms. Vance said that she did
 7    give the videos to other people and those other
 8    people did upload them for the purposes of
 9    intimidating me.
10                    And so I'm -- I'm not sure why she would
11    claim that they were to be held private and I think
12    that was a matter of discontent between me and her
13    about what rights are granted, including copyrights
14    to another person.
15                    And in the circumstance about putting
16    those videos, I was uploading everything that I had.
17    I have, like, some screenshot of essentially all the
18    code I had uploaded at the same time as I was
19    uploading all this --
20                    THE COURT:  What would you like me to
21    know about your sentencing, sir?
22                    DEFENDANT BARBER:  Oh, okay.  Sorry.
23    What do you want me to tell you about the sentencing?
24    So I am trying to be employed as a computer engineer.
25    And so I'm hoping that I'm able to keep a sort of job
```

1    where I can do that.

2              I think Ms. Atwood said something to the

3    effect that she didn't want me to use the computer

4    for five years, which was their main reason why I

5    didn't take any plea agreement, was because I thought

6    that would, essentially, do me to not ever having a

7    job and not being able to take care of myself because

8    I have, like, physical ailments that sort of make it

9    hard to do physical labor, like Crohn's disease.

10             And then in terms of a -- a jail

11   sentence, I have been in jail for a significant

12   amount of time, obviously.  I'm not trying to be in

13   jail for a long period of time.  And I'll

14   basically -- I think that even having convictions are

15   going to make it more difficult for me, but I --

16                   THE COURT:  Do you understand, sir --

17                   DEFENDANT BARBER:  Yeah.

18                   THE COURT:  -- the harm that you did to

19   the victim?

20                   DEFENDANT BARBER:  I -- I understand the

21   harm.  And I wasn't intending on harming the victim.

22   There are ways that I could have tried to have her

23   arrested for things that she had done in the past.

24                   THE COURT:  Sir.

25                   DEFENDANT BARBER:  Yes, ma'am.

1          THE COURT:  Do you understand what your

2   actions did to her and her livelihood and her

3   reputation and the rest of her life?

4          DEFENDANT BARBER:  Yeah, I -- I

5   understand.  We -- having had a --

6          THE COURT:  And how do you feel about

7   that, sir?

8          DEFENDANT BARBER:  I feel that she has

9   done the same exact back to me --

10          THE COURT:  So you're not feeling the

11   least bit remorseful about it, do you?  You feel you

12   had a right to do it, didn't you?

13          DEFENDANT BARBER:  Well, I mean, I think

14   that when a person has unclean hands, that it -- I

15   mean, we've done terrible things to each other.

16          THE COURT:  So two -- two wrongs make a

17   right, sir?  Is that what you're saying?

18          DEFENDANT BARBER:  No.  Actually, I said

19   to Duenas that two wrongs don't make a right.

20          THE COURT:  But that's what you're

21   saying.  You're saying because she was guilty, that

22   you can do whatever you want to do.

23          DEFENDANT BARBER:  Well, I don't think

24   that I can do whatever I want to do.  But like I

25   said, I -- I was feeling very terrible about myself

1    and I don't think this was the right way.

2             Had she come to me and said, "This is

3    causing me a problem at my job," I would have just

4    taken them down.  I would have not, like, had a big

5    fight with her over it.  I --

6             THE COURT:  And I don't believe you,

7    sir.

8             DEFENDANT BARBER:  Okay.

9             THE COURT:  All right.  Thank you.

10            MS. ATWOOD:  Judge, I forgot to add, we

11   have a victim impact statement that the victim's

12   attorney would like to read.

13            THE COURT:  Okay.

14            MS. KEBLER:  Thank you, Your Honor.  And

15   for the record, Melanie Kebler.  I represent

16   Ms. Vance.  Bar No. 083798.  She could not take more

17   time off work to be here today, so she asked me to

18   read this statement on her behalf.  So the following

19   is her statement.

20            "This crime has affected my life in many

21   ways.  The biggest way it has affected me is

22   emotionally.  Since I left our marriage in 2013, I've

23   been in therapy for PTSD-like symptoms due to Ben's

24   harassment during and after the relationship.

25            "Since I found the videos on pornography

 1    sites, many of my PTSD symptoms have returned,

 2    including fear of people, difficulties with

 3    short-term memory, nausea and vomiting, depression

 4    and increased social anxiety, such as lack of trust

 5    of family and close friends and fear of being harmed

 6    by others.

 7              "I ended my relationship with my

 8    boyfriend, Micah, because my anxiety and panic around

 9    men has overwhelmed me so much that I cannot be

10    around him and still function at my job or in life.

11    For example, I go to the grocery store and forget

12    what I need to shop for repeatedly because of the

13    anxiety and trauma.

14              "Financially, I've taken several days

15    off of work to attend trial, as well as attend

16    meetings with the DA to prepare for the trial.  I've

17    also needed to take two sick days due to the nausea

18    and vomiting from anxiety I've experienced since

19    trial, though I have felt physically ill every day

20    since the trial.

21              "Ben and I have a long history of him

22    threatening me with legal action if I leave, finding

23    my address and posting it online against my wishes,

24    repeatedly contacting me after I ask him to stop,

25    contacting Micah to tell him my transgressions and

1    generally trying to shame me if I leave, while trying

2    to manipulate me to be with him.

3            "I could move on with my life and mental

4    health if Ben stops contacting me and harassing me.

5    He has told me he would make my life as miserable as

6    possible if I left him without going through the

7    amount of marriage counseling that he wanted and I

8    believe he won't stop.

9            "I want this harassment and threats to

10   stop so I can move on with my life and mental health.

11   I'm thankful that after several years, Ben finally

12   clearly broke the law so I could pursue victim's

13   rights.

14           "I was not able to get a protection

15   order from him until this case because I had

16   successfully hidden from him for years while he would

17   repeatedly contact me and purchased the website

18   meaganvance.net.

19           "I know Ben won't stop and I want to

20   finally be safe from him.  I'm hoping that Ben will

21   receive as much probation as possible so I can

22   legal -- be legally protected from his actions that

23   threaten my safety, but may not quite break the law.

24           "Ben needs mental health counseling of

25   some sort because he cannot move on from me or let me

1    go and he actually thinks he's done nothing wrong.

2    He needs mental health treatment as well as domestic

3    violence or domestic harassment counseling because

4    I'm not the first woman he has harassed, threatened

5    and tried to trap into being with him.

6            "I am hopeful that Ben will receive more

7    jail time so that I'm safe from him, especially since

8    I know that he has purchased a website with my name

9    and has every reason to try to continue to harass and

10   harm me.

11           "And I know he won't stop now,

12   especially since I have, quote, 'Ruined his life,'

13   which are his words and messages to me, by defending

14   myself against revenge porn."

15           And, Your Honor, I just wanted to note

16   in the statement that she says she has ended her

17   relationship with her boyfriend who was here with her

18   in trial.  I would still ask that he be part of the

19   no-contact order.  And we agree otherwise with the

20   State's recommendation.

21           THE COURT:  Thank you.

22           All right.  So I will sentence you now,

23   sir.  So you need to stand up again.

24           My greatest concern, again, with you,

25   Mr. Barber, is that you really don't understand your

1    actions and you are playing the victim.

2              And I -- I think that's very unfortunate

3    because you're not going to be able to move on and --

4    and be a productive person until and unless you get

5    rid of that victim's stance that you have.

6              So on Count 1, I am going to sentence

7    you to a straight jail sentence of six months in a

8    Washington County Jail.  You will get credit for time

9    served and all programs.  And I will allow you to

10   turn yourself in tomorrow by 7 o'clock.

11             DEFENDANT BARBER:  Okay.

12             THE COURT:  And so your attorney will

13   tell you how to do that, that you can turn yourself

14   in to the jail Friday by 7:00 p.m.  And then you'll

15   get six month -- six months in custody.

16             And there's jail MAPS, so it's not going

17   to be a complete six months, but that's going to be

18   the sentence on Count 1.  There is a $387 attorney

19   fee on that and a $100 conviction fee.

20             On Counts 2 through 4, I'm sorry, 2

21   through -- I don't think they're 2 through 5.

22             What -- what are the count numbers

23   again?

24             THE CLERK:  2 through 5.

25             THE COURT:  They are 2 through 5?

1          On Counts 2 through 5, I will place you

2    on a five-year formal probation.  As a condition of

3    that probation, you are going to be subjected to a

4    sexual offender evaluation.  And if they determine

5    that you do, in fact, have some issues, they will do

6    whatever treatment they deem to be appropriate.

7          If they decide that that's not

8    appropriate, then you won't have to complete

9    anything.  But you do have to do the evaluation.  You

10   also will not -- you will remove all the sexual

11   images of the victim from your computer and you'll do

12   that with the assistance of your probation officer.

13         So you'll bring the computer into the

14   probation officer and work with the probation officer

15   in order to do that.

16         You will remove all sexual images of the

17   victim from the internet, additionally.  And you are

18   not to use your computer or electronic devices for

19   any sexual activity and that will be worked with

20   through your probation officer.

21         So I'm not prohibiting your ability to

22   get a job in the computer industry.  I realize that

23   that's something that you know how to do and that you

24   will be successful in doing that as long as you have

25   access to a computer.

1                    I will -- also will impose the domestic

2        violence package and any treatment that is ordered in

3        that, you will complete and also a mental health

4        evaluation and any treatment for that.

5                    You are to have no contact with

6        Meagan Vance, her friends or family through the

7        period of your probation unless you get written

8        permission from your probation officer.

9                    And there is a $100 conviction fee on

10       each of those four counts.  And I'll start payments

11       on those in six months at $25 per month, but it has

12       to be paid off within 60 days of expiration of your

13       probation.

14                    Anything I've forgotten, Ms. Atwood?

15                    MS. ATWOOD:  I don't believe so,

16       Your Honor.

17                    THE COURT:  Mr. Taylor, anything?

18                    MR. TAYLOR:  No, Judge.  Thank you.

19                    THE COURT:  And, sir, what time will you

20       be turning yourself in to the jail?

21                    DEFENDANT BARBER:  You said it was

22       7:00 a.m.?

23                    THE COURT:  7:00 p.m.

24                    DEFENDANT BARBER:  7:00 p.m.

25                    THE COURT:  What day?

1                    DEFENDANT BARBER:  Tomorrow.

2                    THE COURT:  Okay.  And what happens, do

3        you think, if you don't do that?

4                    DEFENDANT BARBER:  There will be a

5        warrant issued for the arrest.

6                    THE COURT:  Okay.  All right.  So that's

7        all for today then.  Thank you.

8                    MR. TAYLOR:  Thank you, Judge.

9                    DEFENDANT BARBER:  Oh, am I suppose to

10       file this motion?

11                   MR. TAYLOR:  I'll talk to you about

12       that.

13                   DEFENDANT BARBER:  Okay.

14                            * * *

15               (Conclusion of proceedings,

16                Volume 5, 12-1-16 at 9:18 a.m.)

17

18

19

20

21

22

23

24

25

1              REPORTER'S CERTIFICATE

2              I, Katie Bradford, Court Reporter of the

3    Circuit Court of the State of Oregon, Twentieth

4    Judicial District, certify that I transcribed in

5    stenotype from a digital audio recording the oral

6    proceedings had upon the hearing of the

7    above-entitled cause before the HONORABLE

8    BETH L. ROBERTS, on *December 1, 2016*;

9              That I have subsequently caused my

10   stenotype notes, so taken, to be reduced to

11   computer-aided transcription under my direction; and

12   that the foregoing transcript, *Volume 5 of 5,*

13   *Pages 655 through 703*, both inclusive, constitutes a

14   full, true and accurate record of said proceedings

15   taken from a digital audio recording and so reported

16   by me in stenotype as aforesaid.

17             Witness my hand and CSR Seal at

18   Portland, Oregon, this 12th day of January, 2017.

19

20

21             _____
                Katie Bradford, CSR 90-0148
22              Court Reporter
                CSR Expires:  9-30-17
23              (503) 267-5112

24

25