1           IN THE CIRCUIT COURT OF THE STATE OF OREGON

2                FOR THE COUNTY OF WASHINGTON

3

4    STATE OF OREGON,                    )
                                         )
5           Plaintiff,                   )  Washington County
                                         )  Circuit Court
6           v.                           )  No. 16CR46339
                                         )
7    BENJAMIN JAY BARBER,                )  CA A163786
                                         )
8           Defendant.                   )  *Volume 1 of 5*

9

10          *TRANSCRIPT OF PROCEEDINGS ON APPEAL*

11              BE IT REMEMBERED that the above-entitled

12    Court and cause came on regularly for hearing before

13    the Honorable Suzanne M. Upton, on Tuesday, the 9th

14    day of August, 2016, at the Washington County

15    Courthouse, Courtroom No. LEC, Hillsboro, Oregon.

16                       APPEARANCES

17          Marie Atwood, Deputy District Attorney,
            Appearing on behalf of the State;
18
            Cameron Taylor, Attorney at Law,
19          Appearing on behalf of Defendant Barber.

20                      ALSO PRESENT

21          Melanie Kebler, Attorney at Law.

22
                 KATIE BRADFORD, CSR 90-0148
23                     Court Reporter
                      (503) 267-5112
24
      Proceedings recorded by digital audio recording;
25    transcript provided by Certified Shorthand Reporter.

1                         <u>GENERAL INDEX</u>

2                          <u>VOLUME 1</u>

3                                                    <u>Page No.</u>

4    August 9, 2016 Proceedings                     3

5    Case Called; Parties Introduced                3

6    Release Hearing                                3

7    Defendant's Position                           4

8    State's Position                              10

9    Victim's Attorney's Position                  13

10   Defendant's Response                          15

11   Court's Ruling                                17

12   Reporter's Certificate                        20

13                           *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

1          (Volume 1, Tuesday, August 9th, 2016, 1:44 p.m.)

2                     P R O C E E D I N G S

3                     (Whereupon, the following proceedings

4     were held in open court:)

5                     THE CLERK:  We're on the record.

6                     THE COURT:  Go ahead.

7                     MS. ATWOOD:  Okay.  So this is State

8     v. Benjamin Jay Barber, 16CR46339.  We're here for a

9     hearing on defendant's motion for release.

10                    The State filed a response this morning

11    that I also believe the release office forwarded to

12    Your Honor.  If you need another physical copy, I

13    have one here.

14                    THE COURT:  No, I've got it.

15                    And so then, Mr. Taylor, did you get a

16    copy of the release report and the statement from the

17    victim and the State's response?

18                    MR. TAYLOR:  I did, Judge.

19                    THE CLERK:  It's in here, Judge.  I

20    don't think -- Mr. Barber is not (indiscernible).

21    There we go.  Sorry.

22                    (Defendant Barber enters the courtroom.)

23                    THE COURT:  Okay.  So we're calling the

24    State of Oregon versus Benjamin Jay Barber.

25                    Hi, there.  Come on up, Benjamin Barber.

1          DEFENDANT BARBER:  Yes, ma'am.

2          THE COURT:  Okay.  And the case number

3    is 16CR46339.  This gentleman is in custody.  He's

4    with counsel, Cam Taylor, who's just told me that

5    he's received all these documents.

6          And, Ms. Atwood, did you receive the

7    release officer's report?

8          MS. ATWOOD:  I did, Judge.

9          THE COURT:  Okay.  So it's -- it's your

10   motion and I'd be glad to hear from you further if

11   you wish, Mr. Taylor.

12         MR. TAYLOR:  Yes, Judge.  So I provided

13   the Court with a motion and an affidavit which

14   outlines sort of a basic plan.

15         I'd like to talk about a few things,

16   primarily starting with what has changed since my

17   client was released on his own recognizance because,

18   as Your Honor is aware, Mr. Barber was originally

19   arrested, booked and released on his own

20   recognizance.

21         THE COURT:  Right.

22         MR. TAYLOR:  He was given an arraignment

23   date.  The situation appears to be that when he was

24   in custody for a day or so, he was told that his

25   arraignment would be at 8:15 -- or at 3:00 in the

1     afternoon on the standard out-of-custody arraignment

2     docket.

3               He then was released, his arraignment

4     got moved to the out-of-custody morning docket.  He

5     misunderstood that and he appeared on the correct day

6     of his arraignment, but at 3:00 p.m.

7               So I think that's an important fact to

8     know in this case, Judge, because, while, yes, he got

9     the time wrong, it shows that he was clearly not

10    intending to run off or avoid court or anything like

11    that.  For that matter, his bike is apparently still

12    locked up out in front of the jail.  He would very

13    much like to retrieve it.

14              So that is the main thing that has

15    factually changed in this case since he was recogged.

16    What I want to talk about is our release plan, Judge.

17    What we are asking the Court to do is release

18    Mr. Barber back to his own apartment.

19              He resides at an apartment here in

20    Hillsboro.  The address is 176 Northeast Jackson

21    Street.  It's a little two-story apartment complex

22    not far from here.

23              The other part of our release plan is

24    that this morning I -- I spoke to his mother whose

25    name is Jane Cortez.  She lives in Oregon City and I

1    kind of filled her in on what's going on and I

2    provided all of her information to the Court.  She

3    has agreed that if Mr. Barber is released, she will

4    keep in contact with him.

5              She will help make sure that he appears

6    for all his court dates and make sure that there

7    aren't any problems on release.  For what it's worth,

8    she also says she's going to drag him to church every

9    Sunday.

10             So she is going to be involved in his

11   life and make sure that they're aren't any more

12   Failures to Appears, but I don't believe that there

13   will be.

14             I have spent already a great deal of

15   time talking to Mr. Barber about his case.  He is

16   very anxious to be involved with this case.  He's

17   very committed to this case.  I expect he will be in

18   excellent contact with me if he's released.  And he

19   does intend to appear for all dates and to litigate

20   this case.

21             You know, Judge, I want to address some

22   of the things the district attorney mentioned in her

23   motion and sort of talk about the release criteria.

24   First off, Judge, the issue of protection of the

25   victim.  You're aware of what this charge is and

1      basically what it amounts to.

2                     It is a distribution of images on the

3      internet type of charge, so it's not a physically

4      violent charge of any kind.  There are no allegations

5      of any sort of, you know, physical presence or

6      physial threats or anything of that nature.  So the

7      physical safety of the victim, I don't believe, is an

8      issue.

9                     I also don't believe there's any

10     indication that anyone else is in any sort of danger

11     or anything like that in this case.  Again, these are

12     misdemeanor charges.  Yes, there are nine counts.

13     But as it stands, they are nonviolent misdemeanor

14     charges and I think that's important to consider

15     under release criteria.

16                     His criminal history, also important as

17     noted in the release report, he has an old Furnishing

18     charge that was reduced to a violation, a Harassment

19     that was no complainted and a Criminal Trespass that

20     is currently in community court in Multnomah County.

21                     I guess the main thing I'll focus on is

22     the Harassment.  It's a Harassment you will be told

23     does involve the same complainant.  And, Judge, the

24     issue is that my client and the alleged victim in

25     this case were previously married.

1          They apparently had a very messy divorce

2     in 2013, one of those cases where there were

3     definitely restraining orders flying in both

4     directions as well as both parties being arrested for

5     Harassment once.  No charges came out of either of

6     those.

7          That issue has obviously resolved.  They

8     no longer reside together.  They certainly have no

9     desire to be together or get back together or

10    anything like that.  As far as some of the other

11    things the DA mentions, the DA talks about employment

12    and homelessness as being issues for why we should

13    not release my client.

14          What I can tell the Court is this:  My

15    client is currently employed at Intel.  He is a cloud

16    engineer.  I spoke to his employer yesterday.  He is

17    still currently employed as of today.  If he gets

18    released and goes to work tomorrow, he has a good

19    chance of continuing to be employed.

20          So if avoiding unemployment is an issue,

21    then the best thing to do would be to release him so

22    that he can salvage his job.  And, again, as far as

23    homelessness, same argument.  If he is released he

24    can go back to work, he can continue to make money.

25    He can keep his house.  He will not become homeless

1     again.

2              Family relationships, I discussed that

3     as well as current residence and third-party issue

4     with his mom.  The other thing I guess want to

5     mention at this point, there's been talk between the

6     release officer and the DA about, if he's released,

7     a -- an issue on internet use, since these are crimes

8     that arise from internet use.

9              The basic argument we would put forward

10    there is that, as far as the condition goes, we would

11    ask that he be allowed -- and that's what the DA is

12    asking for in their motion -- no internet use except

13    for work purposes that I mentioned.  He is a software

14    engineer.

15             So we would be asking that he be allowed

16    to use the internet and internet devices at work

17    solely for employment.  What I can tell the Court

18    there is that Intel obviously monitors their internet

19    usage.  So if he's using a computer at work, it is

20    only going to be for work purposes.

21             We have no objection or any problems

22    with prohibitions on social media or personal

23    internet use.  I think the other thing to consider

24    there is that if he did anything in the future, he

25    would be exposing himself to additional criminal

1    liability.  So that's a consideration in that regard.

2              We also do not object to the -- the

3    district attorney's request for no contact with the

4    complainant's current boyfriend.  We don't object to

5    that at all.  So we'd be fine with those types of

6    release conditions.  So that's what I'll start out

7    with, Judge, and throw it to the DA.

8              THE COURT:  Thank you, Mr. Taylor.

9              Ms. Atwood, go ahead.

10             MS. ATWOOD:  Thank you, Judge.  So I've

11   had a chance to review the Release Office's report.

12   And I've also had a chance to speak with defense

13   counsel today.  And there's a couple of things that

14   have come to light since I filed my memorandum in

15   response to the defense motion.

16             It does appear that although, there have

17   been, I guess, a few different addresses that the

18   defendant has stated that he lives at in the records

19   that we were able to find, the one that we had most

20   recently gotten from him on his initial release

21   agreement -- the reason for the State's concern

22   primarily was that the address as it was listed on

23   that document was not -- when you looked for it on

24   the internet, was not coming up to a physical

25   residence.

```
 1              So that was part of -- of my concern,
 2    was that the defendant wasn't being, I guess, direct
 3    enough about where it was he was residing.
 4              Secondly, the -- I guess the most
 5    important things at this point for the State are the
 6    victim's protection, primarily and just the nature of
 7    the charges in this case and the ability of the State
 8    to pursue additional investigation and preserve as
 9    much evidence as possible.
10              I mean, this is an unusual type of case
11    in that the charges are -- involve the use of the
12    internet and computers and social media and
13    electronic evidence that the defendant, if he were to
14    remain out of custody, could delete.
15              He could go online to his various
16    accounts that he was using to post these photographs
17    and videos and try and hide evidence.  The defendant
18    could, on the other hand, continue disseminating
19    information about the victim and images and videos of
20    the victim unlawfully.
21              So that is a huge primary concern of the
22    State in this case 'cause we do still have ongoing
23    investigation to try and get our hands around what
24    the full scope of defendant's actions were.
25              Secondly, regarding the protection of
```

1      the victim, the Court has the letter, the -- the --

2      the written statement that the victim prepared in

3      anticipation of today's hearing where she details the

4      fact that not only has he continued to purchase

5      domain names online using her name, he's e-mailed to

6      her at work these images of herself, you know,

7      creating a serious risk for her livelihood and her

8      well being during the course of the investigation in

9      this case.

10                  So it's not that as soon as the

11     defendant was aware that he was being investigated or

12     searched for police that he stopped these actions.

13     He continued to contact the victim and continued to

14     disseminate things about her online.

15                  And, additionally, the reason that the

16     State would have asked for the no-contact condition

17     with Micah Goldstein (phonetic), the victim's

18     boyfriend, is because he's also become a target of

19     the defendant's communications and actions in this

20     case.

21                  So I think the victim protection and the

22     nature of the case being a primary -- part of the

23     primary release criteria should, I guess, be at the

24     forefront of the Court's mind when making a release

25     decision today more so than whether or not the

1    defendant is currently employed.

2            It's a good thing that the defendant's

3    currently employed, but the fact that his employment

4    is so intertwined with internet usage and computer

5    usage, I think, creates an unnecessary risk that the

6    victim shouldn't have to be dealing with at this

7    point.

8            So unless you have any other questions

9    for me, the victim's attorney is here today and would

10   like to be heard on the record regarding the motion.

11   The victim is not able to be here today herself.

12           THE COURT:  Thank you very much.

13           Counsel, I'd be glad to hear from you.

14           MS. KEBLER:  Absolutely.

15   Melanie Kebler, Your Honor, for the victim, 083798.

16   And we agree with the position of the State.  My

17   client, as she detailed a little bit in her letter,

18   has experienced a lot of emotional and some physical

19   abuse from this defendant in the past.

20           And what I think worries her the most

21   are the statements that he has made and then followed

22   through on about ruining her life.  I can tell you

23   the divorce was messy because he wanted it to be

24   messy.  He dragged it out as long as he could.

25           And he is simply not accepting and

1    not -- and not happy that she has ended the

2    relationship.  And that's been a pattern of the

3    communications even over the past six months.  I will

4    let you know that she has tried to say, "Stop

5    contacting me.  Don't send me e-mails."  You know,

6    "Let it go."

7              And that's been going on for months

8    before this report was even made.  So there are some

9    serious concerns about whether or not he'd be able to

10   follow a no-contact order.  My client has mental

11   health concerns for defendant.  And I don't know if

12   defense attorney can speak to that.

13             THE COURT:  Your client has concerns

14   about his mental health --

15             MS. KEBLER:  Yes.

16             THE COURT:  -- right?  Right.

17             MS. KEBLER:  Yes.

18             THE COURT:  That's what I thought.

19             MS. KEBLER:  So -- so, Your Honor, we do

20   oppose release on the same, you know, basis the State

21   outlined.  And if you are considering release, I

22   think my client would be much more comfortable if he

23   is released to a third party, so not living on his

24   own, but living with a family member, mom.

25             Oregon City is far away from here.  The

1    victim lives in this area as well.  And that would be

2    someone that could actually say, "Yeah.  He's not

3    using internet or social media while he's at home,"

4    if that's a condition that Your Honor imposes.

5              So I would encourage, if there is a

6    release today, that there be very, very strict

7    release conditions, just given his behavior in the

8    past and his inability to leave my client alone.

9              THE COURT:  Thank you very much.

10             MS. ATWOOD:  Yes.

11             THE COURT:  Back to you, Mr. Taylor.

12             MR. TAYLOR:  Thank you, Judge.  Brief

13   response that I guess will let him address most of

14   the concerns raised by the DA and counsel.

15             I have had what Judge Sims would refer

16   to as the woodshed talk with my client and explained

17   to him that, should the Court allow his release,

18   there's going to be conditions of no contact with

19   anyone involved and absolutely nothing on the

20   internet that could be construed anything of the type

21   or messing with evidence or anything of that nature.

22             And I've explained that there is, for

23   lack of a better word, a circle of things that that

24   encompasses, right?  A circle of prohibitions.  And

25   then much wider than that is there a circle of things

1      that might be construed in that light and that he

2      will do absolutely nothing to get even close to that

3      outer circle of things that could possibly ever raise

4      any concerns.

5                So what I guess I'm getting at is that

6      I've had a very serious talk with my client about

7      how, if released, there will be no contact of any

8      kind.  There will be no messing around on the

9      internet, nothing like that.  And he has indicated

10     that he understands that.  He accepts it.

11               All he wants to do is sleep in his own

12     bed and go to work.  That's what we have for you,

13     Judge.

14               THE COURT:   Thank you.

15               Mr. Barber, I'm not going to do what

16     your attorney's asked.  You've got a good lawyer and

17     I hope you will continue to follow his advice.  I

18     don't want you to misunderstand that this is some

19     flukey thing that, quote, "Just because you failed to

20     appear, now all of this is falling on your head."

21               Because let's back up and just say,

22     "Okay.  If you hadn't failed to appear and just on

23     your own came back to court on the next court date,

24     you would have then been charged the remaining" -- I

25     think it's seven more counts; is that right, or eight

1     more counts?

2               MS. ATWOOD:  Eight.

3               THE COURT:  And so then you would have

4     had to been booked on it.  And then I would probably

5     have heard this same information from the victim.

6     And then I would I say what I'm going to say today,

7     is I'm going to raise the security.

8               I'm really concerned about you.  This is

9     dangerous.  It is weird.  It is creepy.  Here's the

10    thing is congratulations that you haven't physically

11    harmed her terribly, but the kind of harm you can do

12    to somebody by doing the stuff that you have done can

13    be lifelong lasting, putting these kind of images.

14               And we all know that you can't

15    necessarily take stuff down, take stuff off even if

16    you appear to.  It can be there somewhere and that

17    this isn't just that you know, you had a blowup or

18    you had an argument or you decided to get divorced

19    and you did something; and, gosh, you feel bad

20    about it.

21               You've been doing this and doing this

22    and doing this.  And you've been saying that this is

23    the purpose that you had for it, that you were going

24    to ruin her life.

25               And the fact that you would do something

1     in addition to pictures, which is horrible, but that

2     you would also buy domain names in the name of your

3     former wife, sounds like to me a person that's

4     planning to do some stuff in the future.

5              So I can't prohibit you from posting

6     bail, but I -- I would be very concerned about a

7     situation where -- and here's the thing, is even if

8     you're not physically near her, it -- you're

9     obviously really good at computers.  That's the kind

10    of work that you do.

11             You could probably do stuff right under

12    your mom's nose and she wouldn't even realize, grab a

13    phone or something.  So I'm going to raise it 250,000

14    and you can post ten percent of that.

15             If you do post ten percent of that, even

16    then I would want you to be under a strict release

17    agreement and I would adopt if that happened all of

18    the conditions recommended by our Release Office.

19    And I believe that they're addressed also in the

20    State's motion.

21             And I know you've conceded those issues

22    if we get to that point in terms of you know, no --

23    no contact, computers, et cetera.  But I have no

24    doubt that your attorney, because I know him to be

25    very thorough, has had a gone-to-the-woodshed type of

1    talk with you about this.

2              But I just want you to hear it from me,

3    too.  Whatever's going to happen with this case, if

4    you decide to have a trial, then you're presumed to

5    be innocent and that's just fine with me, but I've

6    got to make the decisions on what's in front of me

7    now and this is extremely concerning, okay?

8              So my rulings will so reflect and let me

9    sign this and then you can fill that out.

10              And, Ms. Larson, is there anything else

11    that I need to address between what you have

12    recommended and what the State's criteria is?

13              MS. LARSON:  No.

14              THE COURT:  Thank you very much.  So

15    then that's all we're going to do.

16              Thank you, Mr. Taylor.

17              MR. TAYLOR:  Thank you, Judge.

18              THE COURT:  And Ms. Atwood.

19              MS. ATWOOD:  Thank you, Judge.

20                        * * *

21     (Court adjourned, Volume 1, 8-9-16 at 2:00 p.m.)

22

23

24

25

1                  REPORTER'S CERTIFICATE

2                  I, Katie Bradford, Court Reporter of the

3      Circuit Court of the State of Oregon, Twentieth

4      Judicial District, certify that I transcribed in

5      stenotype from a digital audio recording the oral

6      proceedings had upon the hearing of the

7      above-entitled cause before the HONORABLE

8      SUZANNE M. UPTON, on *August 9, 2016*;

9                  That I have subsequently caused my

10     stenotype notes, so taken, to be reduced to

11     computer-aided transcription under my direction; and

12     that the foregoing transcript, *Volume 1 of 5, Pages 1*

13     *through 19*, both inclusive, constitutes a full, true

14     and accurate record of said proceedings  taken from a

15     digital audio recording and so reported by me in

16     stenotype as aforesaid.

17                  Witness my hand and CSR Seal at

18     Portland, Oregon, this 11th day of January, 2017.

19

20

21                          _____
                             Katie Bradford, CSR 90-0148
22                           Court Reporter
                             CSR Expires:  9-30-17
23                           (503) 267-5112

24

25